**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| CONTINENTAL WESTERN INSURANCE COMPANY, | |
| Plaintiff, | |
| vs. | No. _____ |
| THE FEDERAL HOUSING FINANCE AGENCY, in its capacity as Conservator of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, MELVIN L. WATT, in his official capacity as Director of the Federal Housing Finance Agency, and THE DEPARTMENT OF THE TREASURY, | **PLAINTIFF'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** |
| Defendants. | |

Continental Western Insurance Company ("Continental Western" or "Plaintiff"), by and through the undersigned attorneys, files this Complaint against Defendants Federal Housing Finance Agency ("FHFA"), in its capacity as conservator of the Federal National Mortgage Association ("Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie") (collectively, the "Companies"); Melvin L. Watt, in his official capacity as the Director of FHFA; and the Department of the Treasury ("Treasury").  Plaintiff seeks declaratory and injunctive relief (1) to prevent Defendants from giving effect to the so-called "Net Worth Sweep" purportedly agreed to between FHFA, as conservator, and Treasury in August 2012, which effectively nationalized the Companies in violation of the governing statute, the Companies' contractual obligations, and FHFA's fiduciary duties to the Companies' private shareholders, (2) to prevent Defendants from giving effect to purchases of the Companies' securities made by Treasury after December 31, 2009, when Treasury's "emergency" powers to

1

invest taxpayer funds in the Companies expired, and (3) to cause FHFA, as conservator of Fannie and Freddie, to cease acting at the direction and for the benefit of Treasury or any other agency of the United States, rather than Fannie and Freddie, in open violation of the Housing and Economic Recovery Act of 2008 ("HERA"). Plaintiff also seeks an award of damages against FHFA for breach of contract, breach of the implied covenant of good faith and fair dealing, and the improper payment of de facto common stock dividends to Treasury at a time when contractually senior preferred stock dividends to Plaintiff continue to be unpaid.

Plaintiff hereby alleges as follows:

## I.
## INTRODUCTION

1. In 2008, Fannie and Freddie were two of the largest privately owned financial institutions in the world. The Companies owned and guaranteed trillions of dollars of assets, mostly mortgages or mortgage-backed securities. The Companies operated for profit. Their debt and equity securities were privately owned and publicly traded.

2. In addition to debt and common stock, the Companies issued non-cumulative preferred stock ("Preferred Stock"). The Preferred Stock was purchased for value by private investors, including community banks, mutual funds, insurance companies like Plaintiff, pension funds, and countless individuals. The Preferred Stock was perceived to be a conservative investment paying a modest but reliable rate of return and carrying a very high credit rating. The Preferred Stock was senior in right of payment to the common stock of the Companies. Holders of Preferred Stock were entitled to a preference over common stock upon liquidation. In addition, each Company was prohibited from paying a dividend or other distribution to common stockholders in any quarter where it did not pay dividends, in full, on its Preferred Stock. This contractual obligation is referred to as the "Common Stock Dividend Stopper."

3.     Fannie and Freddie had been consistently profitable for decades prior to 2008. However, like many large financial institutions exposed to the U.S. residential mortgage market in 2008, the Companies faced write-downs in the book value of their assets and a loss of investor confidence in the mortgage market broadly.  In reaction to growing concerns about Fannie and Freddie, Congress enacted HERA.  HERA created new powers relating to Fannie and Freddie. Then, only weeks later and pursuant to HERA, a newly created FHFA placed the Companies into conservatorship at the direction of Treasury.  Fannie and Freddie consented to their conservatorships.  There was no determination in 2008 that either Company was insolvent or that FHFA could satisfy any other statutory predicate for mandatory conservatorship or receivership under HERA.  Nor has there ever been since.   In addition, the decision of the Boards of Directors of Fannie and Freddie to consent to conservatorship was not subject to normal fiduciary considerations.  HERA specifically provided that the members of the Boards of Directors shall not be liable "for acquiescing in or consenting in good faith to the appointment of [FHFA] as conservator or receiver . . . ."  12 U.S.C. § 4617(a)(6).  As such, the decision to put Fannie and Freddie under Federal conservatorship was initiated at the direction of Treasury without either a finding of its necessity under HERA or even the relatively low level of fiduciary scrutiny required by the business judgment rule.

4.     At the time, FHFA vowed the conservatorship was temporary:  it was to be terminated as soon as the Companies were stabilized and could be returned to normal business operations.  Investors were entitled to rely on these official statements of the purposes of the conservatorship, and public trading in Fannie's and Freddie's stock was permitted to, and did, continue.  Fannie and Freddie have continued to file reports under the Securities and Exchange

Act of 1934, as amended, with respect to their outstanding Preferred Stock and common stock at all times since 2008.

5.      When they agreed to conservatorship, the Boards of Directors of Fannie and Freddie ceded control of the assets and powers of the Companies to FHFA as conservator under HERA.  No person other than FHFA purports to have fiduciary duties to Fannie and Freddie stakeholders.  FHFA informed the Board of Directors of each Company that they serve at the pleasure and for the benefit of FHFA.  The conservator has ultimate responsibility for, and sole control of, the affairs of Fannie and Freddie so long as the conservatorship continues.

6.      Immediately after the Companies were placed in conservatorship, Treasury used its temporary authority under HERA to enter into agreements with FHFA to purchase securities of Fannie and Freddie ("Preferred Stock Purchase Agreements" or "PSPAs").  Under these PSPAs, Treasury committed to purchase a newly created class of securities in the Companies, known as Senior Preferred Stock ("Government Stock"), at the request of the Companies as and when necessary for the Companies to maintain a positive net worth.  In return for its commitment to purchase Government Stock, Treasury received $1 billion of Government Stock in each Company as a commitment fee and warrants to acquire 79.9% of the common stock of the Companies at a nominal price.  The public markets continued to hold approximately $33 billion of Preferred Stock (junior to any Government Stock, but senior to the common stock), as well as 20.1% of the common stock of the Companies on a fully-diluted basis.

7.      The Government Stock had conventional terms for preferred equity securities.  It ranked junior to all liabilities of the Companies upon liquidation, receiving nothing until all creditors were paid in full.  It was entitled to receive cash dividends from the Companies only to the extent declared by the Board of Directors "in its sole discretion, from funds legally available

therefor". If the Companies did not wish to—or legally could not—pay a cash dividend, the unpaid dividends on the Government Stock could be capitalized (or paid "in kind") by increasing the liquidation preference of the outstanding Government Stock. Therefore, the Companies were never required to pay cash dividends on Government Stock.

8.      The economic substance of this transaction was that Treasury obtained $1 billion of Government Stock and a 79.9% economic ownership of the Companies through warrants, as a commitment fee for providing capital to the Companies in the form of additional Government Stock. In return for this fee, the Companies received a stand-by liquidity facility that permitted them to raise capital by selling Government Stock to Treasury when necessary to preserve a positive net worth, reassuring the financial markets of their solvency. The Companies were not compelled to pay cash dividends on the Government Stock, but could elect to do so in any quarter when it was prudent. If the Companies did not pay cash dividends on the Government Stock, the unpaid dividends accumulated as additional liquidation preference. The Companies continued to be valuable, have thousands of private stakeholders, and be publicly traded.

9.      FHFA and Treasury agreed that the Government Stock would rank senior to the Preferred Stock. The liquidation preference of the Government Stock was senior to the liquidation preference of the Preferred Stock. The Government Stock also accrued a priority right to cumulative dividends at an annual rate of either 10% or 12%, depending on whether the Companies elected to pay dividends in cash or in kind. Finally, the warrants gave Treasury almost 80% of the "upside" in the common equity of the Companies once they were stabilized and exited the conservatorship. Under FHFA's supervision, the Companies significantly wrote down assets as an accounting matter and sold additional Government Stock to Treasury to remedy the resulting non-cash accounting losses. By June 2012, Treasury had purchased

approximately $187 billion in Government Stock of the Companies.  $161 billion of this amount was primarily attributable to non-cash accounting losses (*e.g.*, intangibles, excess provisioning for estimated losses, fair value losses on their derivative securities, and other than temporary impairments on their investments).  The remaining $26 billion was used to pay Treasury cash dividends on the outstanding amount of Government Stock.  Under FHFA's conservatorship, the Companies voluntarily declared and paid to Treasury the maximum amount of cash dividends for each quarter from the fourth quarter of 2008 through implementation of the Net Worth Sweep despite having no obligation to do so.  As explained above, $26 billion of these dividends were funded by Treasury draws and had the net effect of unnecessarily decreasing Treasury's funding commitment.

10.     Treasury made its purchases of Government Stock pursuant to temporary authority established under HERA.  This authority expired on December 31, 2009.  Treasury had made two substantive amendments to the PSPAs prior to the expiration of its authority.  Treasury nevertheless exceeded its authority by continuing to purchase Government Stock after December 31, 2009—indeed, $76.9 billion of the $187 billion of Government Stock was purchased after that date.

11.     By the second quarter of 2012, the housing market was already recovering and both Fannie and Freddie had returned to profitability.  By that time, the Companies were demonstrably solvent and paying 10% cash dividends on the Government Stock without drawing additional capital from Treasury.  These cash dividends were still voluntary—the Companies had no obligation to pay them and, indeed, should not have paid them if faced with any serious concern about the Companies' capital or financial condition or the need to preserve Treasury's commitment.  Of course, it is illegal for an insolvent company to pay dividends.

12.     Treasury was not content with the business deal it negotiated in 2008; it wanted to nationalize the Companies.  In addition to the 10% cash dividends it was regularly receiving, Treasury was entitled to 79.9% of any common dividends (assuming exercise of Treasury's warrants).  However, to pay common dividends, the Companies first had to pay dividends on the Preferred Stock held by Plaintiff and other private investors.  And, when common dividends were paid, Treasury would have to share 20.1% of these with common stock investors.  Instead, Treasury directed FHFA, contrary to its authority under HERA, to simply cut out the preferred and common shareholders entirely and give Treasury *all* of the profits.  Accordingly, just ten days after the Companies announced earnings for the second quarter of 2012, Treasury and FHFA announced the Net Worth Sweep, implemented by a "Third Amendment" to the PSPAs. FHFA's Acting Director subsequently used the phrase "net worth sweep" in describing the Third Amendment.  The Net Worth Sweep was simple in purpose and effect.  It changed the 10% cash / 12% in-kind dividend on Treasury's Government Stock to a dividend of **100% of all current and future profits of the Companies, forever**.

13.     The result of the Net Worth Sweep was to expropriate for the Government the value of the Preferred Stock and common stock held by private investors in violation of the rules of priority, the Companies' contractual obligations, and the need to maintain the Companies' status as private shareholder-owned Companies.  Treasury itself said that the Net Worth Sweep was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers."  Press Release, U.S. Department of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012).  The Companies received no investment by Treasury or other consideration in return for the Net Worth Sweep.

14.     In short, Treasury and FHFA acted together to effectively nationalize two of the nation's largest financial institutions, while they were under the protection of FHFA as *conservator*.

15.     The profits paid to Treasury under the Net Worth Sweep are enormous.  For example, on or about June 30, 2013, Fannie and Freddie collectively paid Treasury the largest dividend in history: $66.3 billion.  By contrast, without the Net Worth Sweep, Treasury would be entitled, if the Companies so elected, to receive $4.7 billion, reflecting the original 10% coupon rate on its Government Stock.  Treasury and FHFA knew or should have known it was going to reap this windfall profit at the time they entered the Net Worth Sweep.  Treasury and FHFA each contend that the extra $61.6 billion is a windfall "dividend" on Treasury's Government Stock, rather than a pay down of Treasury's liquidation preference and redemption of its outstanding Government Stock.  Accordingly, the liquidation preference of the Government Stock is not reduced and remains at $189 billion (the sum of the commitment fees plus the total amount of capital provided by the Treasury).  As a result of the Net Worth Sweep, Treasury's annualized rate of return on its Government Stock for the second quarter of 2013 was not 10%, but 140%.  Furthermore, based on their performance in the third quarter of 2013, the Net Worth Sweep required the Companies to pay Treasury another large dividend of $39.0 billion at the end of last year.  Treasury has now recouped 99% of its actual net cash investment of $161 billion in the Companies.  Yet, the Government insists that Fannie and Freddie must keep turning over their profits to Treasury on a quarterly basis, and the unlawful wind down of the Companies under the Net Worth Sweep continues.

16.     By purporting to enter into the Net Worth Sweep, both Treasury and FHFA have violated their governing statutes.  Indeed, by yielding to Treasury's direction to expropriate the

entire net worth of the Companies for the benefit of the Federal Government, FHFA acted in direct contravention of its charge as conservator to take those actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to carry on the business of the [Companies] and preserve and conserve [their] assets and property," 12 U.S.C. § 4617(b)(2)(D), as well as its obligation not to act pursuant to the "direction of any other Agency [ ]." 12 U.S.C. § 4617(a)(7). And Treasury, for its part, acted without authority by effectively acquiring new securities in Fannie and Freddie through the Net Worth Sweep more than two years after the expiration of its temporary authorization to purchase the Companies' securities. This suit is brought to require Defendants to abide by the law and to enjoin their adherence to all applicable statutory requirements.

17.     By changing the dividend on its Government Stock in this manner, FHFA actually created, and Treasury purchased, an entirely new security. The Net Worth Sweep effectively transformed Treasury's Government Stock from senior preferred stock into common stock. Treasury had no authority to purchase this new security in 2012.

18.     Dividends paid to the controlling shareholder of the Companies in an amount equal to the entire net worth of the Companies are de facto common dividends and violated the Common Stock Dividend Stopper in the Preferred Stock held by Plaintiff. The purpose and effect of the Net Worth Sweep is for Treasury to take all the profits of the Companies for itself by leap-frogging this essential rule of priority, violating the terms of the Preferred Stock instruments and the implied covenant of good faith and fair dealing. Accordingly, Plaintiff is due dividends for each quarter in which dividends based on the Net Worth Sweep have been paid to Treasury, beginning with the third quarter of 2012 and continuing to the present.

19.     The once-voluntary conservatorship of Fannie and Freddie continues with FHFA expressly disavowing any fiduciary duty or standard of care other than as an agent of Treasury. The 2012 FHFA Strategic Plan explicitly rejects any duty of care to anyone other than the "taxpayers." Every day that passes with FHFA in custody of the assets of Fannie and Freddie under this standard of care results in potential diminution of the value of the Companies and harm to the private owners of their residual interests.

20.     The conservatorship and the original PSPAs provided capital to Fannie and Freddie in a transaction that reassured markets and honored, to an extent, the property rights and priorities of the Preferred Stock. In August 2012, however, the terms of the PSPAs were fundamentally altered. Neither FHFA nor Treasury had authority to enter into the Net Worth Sweep. Furthermore, by entering into the Net Worth Sweep, FHFA nullified Plaintiff's contractual rights and breached its fiduciary duty to Plaintiff as well as other Fannie and Freddie preferred shareholders. The Net Worth Sweep must be set aside, FHFA must act as an independent conservator as required by HERA, and dividends must be paid on the Preferred Stock to the extent de facto common dividends are paid to Treasury.

## II.
## JURISDICTION AND VENUE

21.     Counts I-IV of this action arise under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551-706, and/or the Housing and Economic Recovery Act of 2008 ("HERA"), PUB. L. NO. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. §§ 1455, 1719, 4617). The Court has subject-matter jurisdiction over these claims under 28 U.S.C. § 1331. The Court is authorized to issue the non-monetary relief sought with respect to these claims pursuant to 5 U.S.C. §§ 702, 705, and 706. The Court has subject matter jurisdiction over Counts V-VII under 28 U.S.C. §1367.

22.     The Court also has subject matter jurisdiction over Counts V-VII under 12 U.S.C. §§ 1452(c), 1723a(a), and 4617(b)(2)(A).

23.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because this is an action against officers and agencies of the United States, Plaintiff resides in this judicial district, and no real property is involved in the action.

# III.
## PARTIES

24.     Plaintiff Continental Western Insurance Company is an Iowa corporation with its headquarters and principal place of business in Urbandale, Iowa.  Its address is 11201 Douglas Avenue, Urbandale, Iowa 50322.

25.     Defendant FHFA is, and was at all relevant times, an independent agency of the United States Government subject to the APA.  *See* 5 U.S.C. § 551(1).  FHFA was created on July 30, 2008, pursuant to HERA.  FHFA is located at Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024.

26.     Defendant Melvin L. Watt is the Director of FHFA.  His official address is Constitution Center, 400 7th Street, S.W., Washington, D.C.  20024.  He is being sued in his official capacity.  In that capacity, Director Watt has overall responsibility for the operation and management of FHFA.  Director Watt, in his official capacity, is therefore responsible for the conduct of FHFA that is the subject of this Complaint and for the related acts and omissions alleged herein.

27.     Defendant Department of the Treasury is, and was at all times relevant hereto, an executive agency of the United States Government subject to the APA.  *See* 5 U.S.C. § 551(1).  Treasury is located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

# IV.
# FACTUAL ALLEGATIONS

## Fannie and Freddie

28.     Fannie is a for-profit, stockholder-owned corporation organized and existing under the Federal National Mortgage Act.  Freddie is a for-profit, stockholder-owned corporation organized and existing under the Federal Home Loan Corporation Act.  The Companies' business is, among other things, purchasing and guaranteeing mortgages originated by private banks and bundling the mortgages into mortgage-related securities that can be sold to investors.

29.     Fannie and Freddie are owned by private shareholders and their securities are publicly traded.  Fannie was chartered by Congress in 1938 and originally operated as an agency of the Federal Government.  In 1968, Congress reorganized Fannie into a for-profit corporation owned by private shareholders.  Freddie was established by Congress in 1970 as a wholly-owned subsidiary of the Federal Home Loan Bank System.  In 1989, Congress reorganized Freddie into a for-profit corporation owned by private shareholders. Like other private corporations, Fannie and Freddie are, among other things, subject to applicable contract law and applicable law governing duties owed to shareholders.

30.     Before being placed into conservatorship, both Fannie and Freddie had issued several series of Preferred Stock.  Holders of Preferred Stock are contractually entitled to non-cumulative dividends when declared by the Companies and are also contractually entitled to a liquidation preference should the Companies liquidate.  The several series of Preferred Stock of the Companies are in parity with each other with respect to dividend payments and liquidation preference, but they have priority over the Companies' common stock for these purposes.  The Companies are also contractually subject to the Dividend Stopper, which prohibits the Companies from making any dividend or other distribution on account of its common stock in

any quarter where it does not pay dividends, in full, on its Preferred Stock.  Fannie and Freddie

are also contractually prohibited from unilaterally changing the terms of the Companies'

Preferred Stock to materially and adversely affect the rights of preferred shareholders.  As of

September 30, 2013, the Companies had outstanding Preferred Stock with an aggregate

liquidation preference of $33 billion.

31.     Continental Western owns shares in the S series of Freddie Preferred Stock and

shares in the O series of Fannie Preferred Stock.

32.     Prior to 2007, Fannie and Freddie were consistently profitable.  In fact, Fannie

had not reported a full-year loss since 1985 and Freddie had never reported a full-year loss since

becoming owned by private shareholders.  In addition, both Companies regularly declared and

paid dividends on each series of their respective Preferred Stock.

33.     Beginning in late 2006, and accelerating in 2008, the nation's housing market and

mortgage banking industry suffered significant book losses and a substantial decline in value.

The housing crisis had a significant negative effect on the Companies' balance sheets, and from

2007 through 2011 both Fannie and Freddie experienced net losses.  Given their expectation of

maintaining liquidity in the mortgage markets and incurring significant losses in the coming

years along with diminished prospects of profitability, the Companies began in 2008 booking

substantial reserves—recorded losses before actually incurring losses—and eliminated the value

of certain non-cash assets, known as deferred tax assets, from their balance sheets.  These

accounting adjustments were made pursuant to Generally Accepted Accounting Principles

("GAAP").  Fannie's reported annual losses peaked in 2009 at $72 billion and Freddie's annual

losses peaked in 2008 at $50 billion.  The majority of these losses represented non-cash

accounting losses that would later be reversed in large measure upon an inevitable return to profitability.

34.     As the housing and financial crisis deepened, Congress responded in part by enacting HERA.  As relevant here, HERA created FHFA (which succeeded to the regulatory authority over Fannie and Freddie previously held by the Office of Federal Housing Enterprise Oversight) and authorized FHFA, under certain statutorily prescribed and circumscribed conditions, to place those Companies into either conservatorship or receivership.

### Fannie and Freddie Are Placed into Conservatorship

35.     On September 6, 2008, FHFA—under significant pressure from Treasury—placed Fannie and Freddie into conservatorship pursuant to the authority and requirements of HERA. As then-FHFA Director Lockhart explained, conservatorship "is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations."  Statement of James B. Lockhart, Director, FHFA, at 5-6 (Sept. 7, 2008).

36.     According to HERA, "[t]he Agency may, as conservator, take such action as may be—(i) necessary to put the regulated entity in a sound and solvent condition, and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."  12 U.S.C. § 4617(b)(2)(D).  Thus, "[a]s conservator, FHFA is responsible for taking actions necessary to put the Enterprises in a sound and solvent condition, and preserving and conserving the assets of the Enterprises."  Remarks of Edward J. DeMarco, Acting Director, FHFA, Getting Our House in Order at 5 (Wash., D.C., Oct. 24, 2013).

37.     Conservatorship is a status distinct from receivership, with very different purposes, responsibilities, and restrictions.  When acting as a receiver, but not when acting as a conservator, FHFA is authorized and obliged to "place the regulated entity in liquidation and

proceed to realize upon the assets of the regulated entity." *Id*. § 4617(b)(2)(E). The only "post-conservatorship outcome[] . . . that FHFA may implement today under existing law," by contrast, "is to reconstitute [Fannie and Freddie] under their current charters." Letter from Edward J. DeMarco, Acting Director, FHFA, to Chairmen and Ranking Members of the Senate Committee on Banking, Housing, and Urban Affairs and to the House Committee on Financial Services 7 (Feb. 2, 2010). In other words, receivership is aimed at winding down an entity's affairs and liquidating its assets, while conservatorship aims to return it to normal operation.

38.     In promulgating regulations governing its operations as conservator or receiver of the Companies, FHFA specifically acknowledged the distinctions in its statutory responsibilities as conservator and as receiver: "A conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition." Conservatorship and Receivership, 76 Fed. Reg. 35,724, 35,730 (June 20, 2011). In contrast, when FHFA acts as a receiver, the regulation specifically provides that "[t]he Agency, as receiver, *shall* place the regulated entity in liquidation . . . ." 12 C.F.R. § 1237.3(b) (emphasis added). The regulation also provides that in liquidating a company's assets, "priority as between holders of . . . different classes [of stock] should be determined by the capital plans or other underlying corporate instruments," such that preferred stock will have a liquidation preference over common stock. 76 Fed. Reg. at 35,730; *see* 12 C.F.R. § 1237.9(a)(4).

39.     In announcing the conservatorship, Director Lockhart stated that "FHFA will act as the conservator to operate [Fannie and Freddie] until they are stabilized." Statement of Lockhart at 6. Director Lockhart and the FHFA also announced that under the conservatorship "the common and all preferred stocks [of the Companies] will continue to remain outstanding," *id*. at 8, and "continue to trade," *FHFA Fact Sheet, Questions and Answers on Conservatorship*

3, and that Fannie's and Freddie's stockholders "will continue to retain all rights in the stock's financial worth," *id.* Director Lockhart further testified before Congress that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest. Sept. 25, 2008, Hearing, U.S. House of Representatives, Committee on Financial Servs, H.R. Hrg. 110-142 at 29-30, 34.

40.     FHFA also emphasized that the conservatorship was temporary:  "Upon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship." *Id.* Investors were entitled to rely on these official statements of the purposes of the conservatorship, and public trading in Fannie's and Freddie's stock was permitted to, and did, continue.

## FHFA and Treasury Enter into the Purchase Agreements

41.     On September 7, 2008, Treasury and FHFA, acting in its capacity as conservator of Fannie and Freddie, entered into the Preferred Stock Purchase Agreements.

42.     In entering into the Purchase Agreements, Treasury exercised its temporary authority under HERA to purchase securities issued by the Companies. *See* 12 U.S.C. §§ 1455(*l*), 1719(g).  In order to exercise that authority, the Secretary was required to determine that purchasing the Companies' securities was "necessary . . . to provide stability to the financial markets; . . . prevent disruptions in the availability of mortgage finance; and . . . protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B).  In making those determinations, the Secretary was required to consider six factors:

(i) The need for preferences or priorities regarding payments to the Government.

(ii) Limits on maturity or disposition of obligations or securities to be purchased.

(iii) *The [Companies'] plan[s] for the orderly resumption of private market funding or capital market access.*

(iv) The probability of the [Companies] fulfilling the terms of any such obligation or other security, including repayment.

(v) *The need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies].*

(vi) Restrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

*Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C) (emphasis added).

43.     Treasury's authority under HERA to purchase the Companies' securities expired on December 31, 2009.  *See id.* §§ 1455(*l*)(4), 1719(g)(4).

44.     Treasury's PSPAs with Fannie and Freddie are materially identical.  Under the original unamended agreements, Treasury committed to provide up to $100 billion to each Company to ensure that it maintained a positive net worth.  In particular, for quarters in which either Company's liabilities exceed its assets under GAAP, the PSPAs authorize Fannie and Freddie to draw upon Treasury's commitment in an amount equal to the difference between its liabilities and assets.  The PSPAs make clear that FHFA, on behalf of Fannie and Freddie, is not required to request draws.  They provide that FHFA "may" request quarterly draws "not in excess of" the "Deficiency Amount" (so long as Treasury's commitment is not exhausted).  PSPA § 2.2.  Furthermore, by default the "Deficiency Amount" expressly excludes "any obligation in respect of any capital stock of Seller, including the [Government] Stock," although Treasury and FHFA (acting on behalf of the Companies) are permitted to increase the Deficiency Amount by mutual written agreement.  PSPA § 1.

45.     In return for its funding commitment, Treasury received 1 million shares of Government Stock in each Company and warrants to purchase 79.9% of the common stock of

17

each Company at a nominal price. Exercising these warrants would entitle Treasury to up to 79.9% of all future profits of the Companies, subject only to the Companies' obligation to satisfy their dividend obligations with respect to the Preferred Stock. As Treasury noted in entering the PSPAs, the warrants "will provide potential future upside to the taxpayers." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

46.     Treasury's Government Stock in each Company had an initial liquidation preference of $1 billion. This liquidation preference increases by one dollar for each dollar the Companies receive from Treasury pursuant to the PSPAs. In the event the Companies liquidate, Treasury is entitled to recover the full liquidation value of its shares before any other shareholder may recover anything.

47.     In addition to the liquidation preference, the original unamended PSPAs provided for Treasury to receive a cumulative dividend equal to 10% of the value of the outstanding liquidation preference. If the Companies did not pay the dividend in cash, the value of the dividend would be added to the liquidation preference—effectively amounting to an in-kind dividend payment of additional Government Stock. Under the PSPAs, the Companies may redeem such Government Stock and pay down the liquidation preference attributable to such in-kind dividend payments. After an in-kind dividend payment, the dividend rate would increase to 12% until such time as full cumulative dividends were paid in cash, at which time the rate would return to 10%. An in-kind dividend payment would not decrease Treasury's funding commitment because only when the Companies receive "funding under the Commitment" does its size decrease. PSPA § 1.

48.     Finally, the PSPAs provided for the Companies to pay Treasury a quarterly periodic commitment fee "intended to fully compensate [Treasury] for the support provided by

the ongoing Commitment." PSPA § 3.2(a). The periodic commitment fee was to be set for five-year periods by agreement of the Companies and Treasury, but Treasury had the option to waive it for up to a year at a time. Treasury has exercised this option and has never received a periodic commitment fee under the PSPAs.

49.     The PSPAs and the Government Stock Certificates explicitly contemplate that the Companies could pay down the liquidation preference and that when it is paid down "in full, such [Government Stock] shares shall be deemed to have been redeemed." Certificate §§ 3(c), 4(c). Indeed, the PSPAs were "structure[d]" to "enhance the probability of both Fannie Mae and Freddie Mac ultimately repaying amounts owed." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

50.     The PSPAs prohibit Fannie and Freddie from declaring and paying dividends on any securities junior to Treasury's Government Stock unless full cumulative dividends have been paid to Treasury on its Government Stock for the then-current and all past dividend periods.

51.     In approving the exercise of Treasury's temporary authority under HERA to purchase securities of the Companies, Treasury Secretary Paulson determined (1) "[u]nder conservatorship, Fannie Mae and Freddie Mac will continue to operate as going concerns"; (2) "Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent operations"; and (3) "[c]onservatorship preserves the status and claims of the preferred and common shareholders." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

### Treasury and FHFA Amend the Purchase Agreements
### To Increase Treasury's Funding Commitment

52.     On May 6, 2009, Treasury and FHFA amended the terms of the Purchase Agreements to increase Treasury's funding commitment to both Fannie and Freddie. In

particular, under the amendment Treasury's total commitment to each Company increased from $100 billion to $200 billion.

53.     On December 24, 2009—one week before Treasury's temporary authority under HERA expired—FHFA and Treasury again amended the terms of Treasury's funding commitment.  Instead of setting that commitment at a specific dollar amount, the second amendment established a formula to allow Treasury's total commitment to each Company to exceed (but not fall below) $200 billion depending upon any deficiencies experienced in 2010, 2011, and 2012, and any surplus existing as of December 31, 2012.

54.     Treasury's authority under HERA then expired on December 31, 2009.  As Treasury acknowledged, expiration of this authority meant that its "ability to make further changes to the PSPAs . . . [was] constrained."  Action Memorandum for Secretary Geithner at 3 (Dec. 22, 2009).

### The Companies Return to Profitability and Stability

55.     Beginning in the third quarter of 2008, the balance sheets of Fannie and Freddie reflected large non-cash losses, including write-downs of the value of goodwill, intangibles, and significant tax assets and the establishment of large loan loss reserves, based on exceedingly pessimistic views of the Companies' future financial prospects.  These non-cash losses temporarily decreased the Companies' operating capital and their net worth by hundreds of billions of dollars.  For example, in the first year and a half after imposition of the conservatorship Fannie reported $127 billion in losses, but only $16 billion of that amount reflected actual credit-related losses.  To date, the Companies have drawn a total of $187 billion from Treasury, in large part to fill the holes in the Companies' balance sheets created by these non-cash losses.  Including Treasury's initial $1 billion liquidation preference in each Company,

Treasury's liquidation preference for its Government Stock amounts to approximately $117 billion for Fannie and approximately $72 billion for Freddie.  Approximately $26 billion of these combined amounts were drawn simply to pay the 10% dividend payments owed to Treasury.  (In other words, FHFA requested draws to pay Treasury this $26 billion in cash rather than electing to pay the dividends in kind.  Had the dividends been paid in kind, FHFA would not have had to draw from (and, consequently, reduce the remaining size of) Treasury's commitment to pay them.)  Thus, Treasury actually "invested" approximately $161 billion in the Companies, primarily reflecting changes in the valuation estimates of assets and liabilities.

56.     Secretary Paulson has admitted that when Treasury provides money to Fannie and Freddie under the PSPAs, it is "purchasing preferred shares."  HENRY M. PAULSON, ON THE BRINK 168 (2010).  *See also* Action Memorandum for Secretary Paulson (Sept. 7, 2008) ("Treasury's [PSPA] provides for the purchase of up to $100 billion of [Government Stock] from each [Company] to help ensure that they each maintain a positive net worth.").  Of the $187 billion in Government Stock that Treasury has purchased through Fannie's and Freddie's draws on its commitment, $76.9 billion has been purchased after the December 31, 2009, expiration of Treasury's temporary authority to invest in the Companies.  Treasury was without authority to make these purchases.  Indeed, Secretary Paulson has admitted that the PSPAs had "turned [Treasury's] temporary authority to invest in Fannie and Freddie, which would expire at year-end 2009, into what effectively was a permanent guarantee on all their debt."  PAULSON, ON THE BRINK 11.

57.     HERA's legislative history confirms that Treasury's post-2009 purchases of Government Stock exceeded its temporary authority under HERA.  Secretary Paulson testified to Congress that HERA would give "Treasury an 18-month *temporary* authority to purchase—only

21

if necessary—equity in either of these two [Companies]." *Recent Developments in U.S.*

*Financial Markets and Regulatory Responses to Them: Hearing before the Comm. on Banking,*

*Housing and Urban Dev.*, 100th Cong. (2008) (statement of Henry M. Paulson, Sec'y, Dep't

of the Treasury) at 5 (emphasis added).   In response to questioning from Senator Shelby,

Secretary Paulson reiterated that Treasury's authority to purchase Fannie and Freddie stock was

intended to be a "short-term" solution that would expire at "the end of 2009." *Id.* at 11-12.   In

analyzing HERA, the Congressional Budget Office accordingly emphasized that only "before the

temporary authority expired" could Treasury "provide funds to the [Companies]."   CBO's

Estimate of the Cost of the Administration's Proposal to Authorize Federal Financial Assistance

for the Government-Sponsored Enterprises for Housing at 3 (July 22, 2008).   "Consequently, if

the Treasury purchased equity in Fannie Mae or Freddie Mac, that purchase cost would also be

recorded on the budget as budget authority and outlays in 2009 or during the first few months of

fiscal year 2010, before the temporary financial assistance authority expired." *Id.* at 7.

   58.    By 2012, the housing market was already recovering and both Fannie and Freddie

had returned to profitability.   In August 2012, the Companies and FHFA knew or should have

known that previously anticipated losses far exceeded their actual losses.   The Companies had

provisioned more than $225 billion over the previous four years to absorb anticipated losses.

Only half of those reserves may now be needed.   These excess loss reserves artificially depressed

the Companies' net worth.   Upon reversal of these loss reserves, Fannie's and Freddie's net

worth increases accordingly.   Fannie has not drawn on Treasury's commitment since the fourth

quarter of 2011, and Freddie has not drawn on Treasury's commitment since the first quarter of

2012.   In fact, in the first two quarters of 2012, the Companies posted sizable profits totaling

more than $11 billion.

59.     As Fannie explained in August 2012:

> [w]e experienced a significant improvement in our financial results
> for the second quarter and first half of 2012 compared with the
> second quarter and first half of 2011. . . . [W]e saw improvement
> in the housing market in the first half of 2012.  In addition, we
> have seen further improvement in the performance of our book of
> business, including lower delinquency rates and higher re-
> performance rates for our modified loans.

Fannie Mae, Second Quarter Report (Form 10-Q) at 2 (Aug. 8, 2012).  FHFA's Office of

Inspector General similarly recognized that by early August 2012 "Fannie and Freddie were

experiencing a turnaround in their profitability.  Due to rising house prices and reductions in

credit losses, in early August 2012 the Companies reported significant income for the second

quarter 2012 . . . and neither required a draw from Treasury under the [Purchase Agreements]."

FHFA, Office of Inspector General, Analysis of the 2012 Amendments to the Government Stock

Purchase Agreements at 11 (Mar. 20, 2013) ("FHFA Inspector General Report").

60.     Together, the Companies' return to profitability and the stable recovery of the

housing market showed in early 2012 that the Companies could in time redeem Treasury's

Government Stock and provide a return on investment to owners of their Preferred Stock.

61.     Fannie and Freddie are now immensely profitable.  Fannie's reported net income

of $17.2 billion in 2012 was by far the largest in the Company's history.  And it far exceeded

that figure in the first three quarters of 2013, with net income of $77.5 billion.  Fannie has

reported that "we expect our annual earnings to remain strong over the next few years" and that

"[w]e expect to remain profitable for the foreseeable future."  Fannie Mae, Third Quarter Report

(Form 10-Q) at 11 (Nov. 7, 2013).

62.     Fannie's 2013 net income includes the release of $50.6 billion of the company's

deferred tax assets valuation allowance.  The release of this valuation allowance underscores

Fannie's financial strength, as it demonstrates Fannie's expectation that it will generate sizable

taxable income moving forward.  A deferred tax asset is an asset that may be used to offset

future tax liability.  If a company determines that it is unlikely that some or all of a deferred tax

asset will be used, the company must establish a "valuation allowance" in the amount that is

unlikely to be used.  In other words, a company cannot record a deferred tax asset as an asset if it

is unlikely to be used to offset future taxable profits.  Fannie relied on the following evidence of

future profitability in support of its release of the $50.6 billion valuation allowance:

- our profitability in 2012 and the first quarter of 2013 and our expectations regarding the sustainability of these profits;
- our three-year cumulative income position as of March 31, 2013;
- the strong credit profile of the loans we have acquired since 2009;
- the significant size of our guaranty book of business and our contractual rights for future revenue from this book of business;
- our taxable income for 2012 and our expectations regarding the likelihood of future taxable income; and
- that our net operating loss carryforwards will not expire until 2030 through 2031 and we expect to utilize all of these carryforwards within the next few years.

Fannie Mae, First Quarter Report (Form 10-Q) at 15 (May 9, 2013).

63.     Like Fannie, Freddie has also returned to stable profitability.  Freddie reported net

income of $11 billion in 2012.  And in the first three quarters of 2013, it reported net income of

$40 billion—reflecting, among other things, Freddie's decision to release a sizeable ($23.9

billion) deferred tax assets valuation allowance.

64.     Freddie relied on the following evidence in support of its release of the $23.9

billion valuation allowance:

- Our three-year cumulative income position as of September 30, 2013;
- The strong positive trend in our financial performance over the last six quarters, including the quarter ended September 30, 2013;

- The 2012 taxable income reported in our federal tax return which was filed in the quarter ended September 30, 2013;
- Our forecasted 2013 and future period taxable income;
- Our net operating loss carryforwards do not begin to expire until 2030; and
- The continuing positive trend in the housing market.

Freddie Mac, Third Quarter Report (Form 10-Q) at 51 (Nov. 7, 2013).

65.     In addition to the release of deferred tax assets valuation allowances, Fannie's and Freddie's earnings reflect billions of dollars of additional gains attributable to sources of profit other than their day-to-day business operations, such as the reversal of loss reserves and the settlement of legal actions.  For example, in 2013 the Companies recovered nearly $8 billion from settlements of suits brought by FHFA as conservator against financial institutions that sold private-label securities to Fannie and Freddie between 2005 and 2007.  FHFA brought 18 such suits in 2011; 12 remained pending as of January 2, 2014.

66.     The Companies, FHFA, and Treasury knew or should have known in August 2012 that the Companies would reverse substantial loss and deferred tax reserves and reap substantial profits from lawsuits and sources other than their day-to-day business operations.

67.     In sum, "[m]uch has changed since 2008.  The housing market is improving, house prices are rising, and guarantee fees have been increased, all resulting in greater profitability at Fannie Mae and Freddie Mac."  FHFA Inspector General Report at 16; *see also* FHFA, REP. TO CONGRESS iii (2012) ("the overall improvement in the housing market, improved quality of new loans guaranteed, and increased guarantee fee pricing, along with income from the retained portfolio have resulted in improved financial results").  And as FHFA and its then-Acting Director have recognized, "[t]he conservatorships of Fannie Mae and Freddie Mac, . . . combined with U.S. Treasury financial support and management actions, have stabilized" the Companies, FHFA, 2012 REP. at ii, and "it is clear they are each beginning to show regular,

strong profitability," Edward J. DeMarco, Acting Director, FHFA, Remarks as Prepared for

Delivery at Fed. Reserve Bank of Chicago's 49th Annual Conference on Bank Structure and

Competition 2 (May 9, 2013).

### FHFA and Treasury Amend the PSPAs
### To Expropriate the Companies' Net Worth

68.     On August 17, 2012, within days after the Companies had announced their return

to profitability and just as it was becoming clear that they had regained the earnings power to

redeem Treasury's Government Stock and exit conservatorship, FHFA and Treasury amended

the PSPAs for a third time.  Again, at the time that this third amendment was "under

consideration, Fannie Mae and Freddie Mac were experiencing a turnaround in their profitability.

Due to rising house prices and reductions in credit losses, in early August 2012 the [Companies]

reported significant income for the second quarter 2012 . . . and neither required a draw from

Treasury under the PSPAs."   FHFA Inspector General Report at 11.  But rather than fulfilling its

statutory responsibility as conservator to return the Companies to sound and solvent business

operations and, ultimately, to private control, FHFA entered into the Net Worth Sweep with

Treasury, which expropriates all of the Companies' profits and unlawfully begins the process of

winding down the Companies.

69.     As Treasury stated when the Net Worth Sweep was announced, the dividend

sweep of all of the Companies' net worth requires that "every dollar of earnings that Fannie Mae

and Freddie Mac generate will be used to benefit taxpayers." Press Release, U.S. Dep't of the

Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie

Mae and Freddie Mac (Aug. 17, 2012).  The Net Worth Sweep, in short, effectively nationalized

the Companies and confiscated the existing and potential value of all privately held equity

interests, including the Preferred Stock held by Plaintiff.

70.     In particular, the Net Worth Sweep altered the dividend payment on Treasury's Government Stock:  instead of quarterly payments at an annual rate of 10% (if paid in cash) or 12% (if paid in kind) of the total amount of Treasury's liquidation preference, the Net Worth Sweep entitles Treasury to quarterly payments of *all—100%*—of the Companies' net worth. Thus, any increase in net worth flowing from net income or other comprehensive income will be swept by Treasury. Beginning January 1, 2013, the Companies have been required to pay Treasury a quarterly dividend equal to their *entire net worth*, minus a capital reserve amount that starts at $3 billion and decreases to $0 by January 1, 2018.

71.     The Net Worth Sweep also mandated the winding up of the Companies in contravention of HERA.  A company that cannot maintain a net worth cannot incur credit on its own balance sheet.  The Net Worth Sweep also accelerates the rate at which the Companies must shrink their mortgage asset holdings down to $250 billion each, from 10% per year to 15% per year.  This accelerated forced shrinkage reinforces that the Net Worth Sweep was designed to make it more difficult if not impossible for the Companies to return to normal business operations.

72.     The Companies did not receive any consideration for agreeing to the Net Worth Sweep.  Because the Companies always had the option to pay dividends "in kind" at a 12% interest rate, the Net Worth Sweep did not provide the Companies with any additional flexibility or benefit.  Rather than accruing a dividend at 12% (which never had to be paid in cash), FHFA unlawfully agreed to make a cash payment of substantially all the Companies' net worth each quarter.

73.     The Net Worth Sweep also provides that the Companies will not have to pay a periodic commitment fee under the PSPA while the Net Worth Sweep is in effect.  But Treasury

had consistently waived the periodic commitment fee before the Net Worth Sweep, and it could only set the amount of such a fee with the agreement of the Companies and at a market rate. Further, the purpose of the fee was to compensate Treasury for its ongoing support in the form of the commitment to invest in the Companies' Government Stock.  By the time of the Net Worth Sweep, the 10 percent return on the Government Stock and the warrants for 79.9 percent of the common stock provided a more than adequate return on the government's stand-by commitment, and thus any additional fee would have been inappropriate.  In August of 2012, the Companies had returned to stable profitability and were no longer drawing from Treasury's commitment. And, of course, by the time of the Net  Worth Sweep Treasury's temporary authority to purchase the Companies' securities had already expired, making any further purchases contrary to law. Finally, even if a market-rate fee had been agreed between Treasury and FHFA and imposed pursuant to the PSPA, the Companies had sufficient market power to pass the entire amount of this fee through to their customers—as the Companies do for other operating and financing costs—without affecting profitability or the value of the Companies' equity securities.

74.     As noted above, FHFA agreed to sweep all of the Companies' profits to Treasury at the very moment that the Companies had returned to stable profitability, as demonstrated in the table below.  At a dividend rate of 10%, Treasury's approximately $189 billion in outstanding Government Stock earn annual dividends of some $18.9 billion, payable in quarterly installments of approximately $4.7 billion. Thus, in any quarter in which the Companies' combined profits exceed $4.7 billion (or more precisely, any quarter in which Fannie or Freddie's profits exceed the dividend owed on their Government Stock), that value would redound to the benefit of the private shareholders but for the Net Worth Sweep.

**Net Income for Fannie and Freddie**
**(in billions)**

|        |    | Fannie | Freddie | Combined |
|--------|----|--------|---------|----------|
| 2011   | Q1 | ($6.5) | $0.7    | ($5.8)   |
|        | Q2 | ($2.9) | ($2.1)  | ($5.0)   |
|        | Q3 | ($5.1) | ($4.4)  | ($9.5)   |
|        | Q4 | ($2.4) | $0.6    | ($1.8)   |
| 2012   | Q1 | $2.7   | $0.6    | $3.3     |
|        | Q2 | $5.1   | $3.0    | $8.1     |
|        | Q3 | $1.8   | $2.9    | $4.7     |
|        | Q4 | $7.6   | $4.5    | $12.1    |
| 2013   | Q1 | $58.7  | $4.6    | $63.3    |
|        | Q2 | $10.1  | $5.0    | $15.1    |
|        | Q3 | $8.7   | $30.5   | $39.2    |

75.     As the above chart shows, the Companies have been profitable since the beginning of 2012.  On August 7 and 8, 2012, the Companies reported results for the second quarter for 2012, showing collective profits of more than $8 billion.  Ten days later, Treasury and FHFA announced the Net Worth Sweep, acknowledging that its avowed purpose was to ensure that none of the Companies' profits would redound to the benefit of the private shareholders. Indeed, the President and CEO of Fannie confirmed the obvious in October of 2012 when he stated: "The company is no longer run for the benefit of private shareholders." Timothy J. Mayopoulos, President and CEO, Fannie Mae, Remarks Prepared for Delivery at MBA Annual Conference (Oct. 22, 2012).

76.     The Net Worth Sweep is squarely contrary to FHFA's statutory responsibilities as conservator of Fannie and Freddie.  Again, as conservator FHFA is obligated to "take such action as may be—(i) necessary to put the regulated entity in a sound and solvent condition; and

(ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D).  As FHFA itself has acknowledged, the agency "has a statutory charge to work to restore a regulated entity in conservatorship to a sound and solvent condition . . . ." 76 Fed. Reg. at 35,727.  Accordingly, "allowing capital distributions to deplete the entity's conservatorship assets would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity." *Id.* Thus, the FHFA's own regulations generally prohibit Fannie and Freddie from making a "capital distribution while in conservatorship," subject to certain exceptions. 12 C.F.R. § 1237.12(a).

77.     The Net Worth Sweep's quarterly sweep of all net profits thus plainly harms, rather than promotes, the soundness and solvency of the Companies by effectively prohibiting them from rebuilding their capital.  Nor can distributing the entire net worth of the Companies to Treasury be reconciled with FHFA's statutory obligation to preserve and conserve their assets and property.  Indeed, Fannie has identified the dividend obligations imposed by the Net Worth Sweep as posing a "specific risk to [its] business" by prohibiting it from "build[ing] capital reserves." Fannie Mae, Universal Debt Facility, Offering Circular (May 14, 2013).

78.     Furthermore, on information and belief, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury.  Treasury, however, lacks the authority to impose such direction and supervision, and FHFA lacks the authority to submit to it.  HERA expressly provides that "[w]hen acting as conservator, . . . [FHFA] shall not be subject to the direction or supervision of any other agency of the United States . . . ." 12 U.S.C. § 4617(a)(7).

79.     Contrary to statutory authority, both Treasury and FHFA understood the Net Worth Sweep to be a step toward the liquidation, not the rehabilitation, of the Companies.  In February 2012, FHFA stated that "[Fannie and Freddie's] losses are of such magnitude that the companies cannot repay taxpayers in any foreseeable scenario," and stated that its statutory mandate to "preserve and conserve" now required it not to save the Companies from insolvency, but rather to "minimize losses on behalf of taxpayers." FHFA, A Strategic Plan for Enterprise Conservatorships: The Next Chapter in a Story that Needs an Ending at 7, 9 (Feb. 21, 2012). This was in stark contrast to FHFA's then-Acting Director's statement two years earlier that, absent legislative action, "the only [post-conservatorship option] that FHFA may implement today under existing law is to reconstitute [Fannie and Freddie] under their current charters." February 2, 2010 Letter of Acting Director DeMarco to Chairmen and Ranking Members of the Senate Committee on Banking, Housing, and Urban Affairs and the House Committee on Financial Services.  Similarly, Treasury saw the need for implementing the Net Worth Sweep because "[l]onger term, [Fannie and Freddie] will not generate enough income to meet their dividend requirement *due to [the Companies] being wound down*." Treasury, Treasury's Capital Support For The GSEs: Summary Review and Key Considerations at 4 (Aug. 8, 2012) (emphasis in original).

80.     Statements by both FHFA and Treasury provide further confirmation that the Net Worth Sweep violates FHFA's statutory restrictions as conservator.  Treasury, for example, said the Net Worth Sweep would "expedite the wind down of Fannie Mae and Freddie Mac," and it emphasized that the "quarterly sweep of every dollar of profit that each firm earns going forward" would make "sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers."  Press Release, U.S. Dep't of the Treasury, Treasury

Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012). Indeed, Treasury emphasized that the Net Worth Sweep would ensure that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." *Id.* As early as December 2010, internal Treasury documents acknowledged the "Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future." Action Memorandum for Secretary Geithner (Dec. 20, 2010). The Net Worth Sweep thus implemented this internal Administration decision.

81. Likewise, FHFA Acting Director Edward DeMarco stated that the Net Worth Sweep reflected the agency's goal of "gradually contracting [the Companies'] operations." Edward J. DeMarco, Acting Director, FHFA, Statement on Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements. Acting Director DeMarco later informed a Senate Committee that the "recent changes to the PSPAs, replacing the 10 percent dividend with a net worth sweep, reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status." Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Sen. Comm. on Banking & Urban Affairs 3 (Apr. 18, 2013). Likewise, in its 2012 report to Congress, FHFA explained that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac." FHFA, 2012 REP. at 13. Thus, according to FHFA, the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital." *Id.* at 1, 13. In short, the Net Worth Sweep plainly is central to the FHFA's new plan to "wind[] up the affairs of Fannie and Freddie," Remarks of Edward J. DeMarco, Getting Our House in Order at 6 (Wash., D.C., Oct. 24, 2013), and thus

32

cannot be reconciled with the agency's statutory obligations as conservator of Fannie and Freddie.

82.    The dramatically negative impact of the Net Worth Sweep on the Companies' balance sheets is demonstrated by Fannie's results in the first quarter of 2013.  At the end of the first quarter Fannie's net worth stood at $62.4 billion.  Under the prior versions of the PSPAs, if Fannie chose to declare a cash dividend it would have been obligated to pay Treasury a dividend of only $2.9 billion, and the balance—$59.5 billion—would have been credited to its capital. The Net Worth Sweep, however, required Fannie to pay Treasury $59.4 billion.  Treasury and FHFA knew or should have known upon entry into the Net Worth Sweep that Treasury would obtain such a windfall.  Indeed, FHFA's Office of Inspector General recognized that, as a result of the Net Worth Sweep, reversal of the Companies' deferred tax assets valuation allowances could result in "an extraordinary payment to Treasury." FHFA Inspector General Report at 15.

83.    Contrary to FHFA's statutory authority, FHFA has ensured that the Companies cannot operate independently and must be a ward of the Federal Government.  FHFA has announced that, during the conservatorship, existing statutory and FHFA-directed regulatory capital requirements will not be binding on the Companies.  And at the end of 2012, Fannie had a deficit of core capital in relation to statutory minimum capital of $141.2 billion.  This deficit decreased to $88.3 billion by the end of the first quarter of 2013.  When adjusted for the $59.4 billion dividend payment to Treasury, however, Fannie's core capital deficit jumped back up to $147.7 billion.  Thus, because of the Net Worth Sweep, Fannie was in a *worse* position with respect to its core capital than it was before the record-breaking profitability it achieved in the first quarter of 2013.

84.     Furthermore, under FHFA's conservatorship Fannie has elected to pay Treasury its dividend in cash, even though its net worth includes changes in both cash and non-cash assets. In the first quarter of 2013, for example, over $50 billion of Fannie's profitability resulted from the release of the Company's deferred tax assets valuation allowance—the same non-cash asset that previously created massive paper losses for the Company.  As a result, Fannie was required to "fund [its] second quarter dividend payment of $59.4 billion primarily through the issuance of debt securities."  Fannie, 2013 First Quarter Report, at 42.

85.     Borrowing money to pay an enormous dividend on a paper profit is clearly contrary to FHFA's statutory obligations as conservator, as FHFA is operating the Companies in an unsafe and unsound manner and hindering the ability of the Companies to restore their financial health so that they can be returned to normal business operations.

86.     Fannie and Freddie are poised to realize additional significant non-cash profits in the future.  For example, at the end of the third quarter of 2013, Fannie had a $45 billion loan loss reserve.  During that quarter, Fannie had credit losses of approximately $1.1 billion, or about $4.4 billion annualized.  Fannie thus has a ten year loss reserve, while a typical financial institution may have a two or three year reserve.  As this loss reserve is decreased in the future, the resulting profits will be swept to the Federal Government under the Net Worth Sweep.

87.     The Net Worth Sweep has become a major revenue source for the United States Government at the expense of Plaintiff and other holders of Preferred Stock.  For example, the Federal Government's record-breaking $53.2 billion surplus for the month of December 2013 was driven in large part by the $39 billion swept from Fannie and Freddie.  The Congressional Budget Office treats the Companies as part of the Federal Government by reporting the Companies as consolidated with the Federal Government for revenue purposes.  However, the

indebtedness of Fannie and Freddie—including the borrowing to fund Fannie's extraordinary cash dividends to Treasury—is not considered debt of the United States.

88.     As previously noted, Treasury's temporary statutory authority to purchase the securities of the Companies was conditioned on its consideration of certain statutory factors, including "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and the Companies' plans "for the orderly resumption of private market funding or capital market access." *See* 12 U.S.C. §§ 1455(*l*)(1)(C), 1719(g)(1)(C).  There is no public record that Treasury considered these factors before executing the Net Worth Sweep, and Treasury has asserted that it did not need to consider them.  Indeed, the terms of the Net Worth Sweep requiring the quarterly payment of all profits and the winding down of the Companies' operations are wholly inconsistent with these factors.  There is also no evidence that Treasury adequately considered alternatives to the Net Worth Sweep that would have been consistent with its statutory obligations, less harmful to Plaintiff and other holders of Preferred Stock and other equity interests, and more likely to ensure the Companies' future solvency.

89.     FHFA made no public record of its contemporaneous decision-making processes in agreeing to the Net Worth Sweep.  There is no public record that FHFA adequately considered whether the Net Worth Sweep is consistent with its statutory obligations as conservator of the Companies.  Treasury's stated purpose of winding down the Companies, which necessarily involves liquidating their assets and property, is incompatible on its face with FHFA's charge to put the Companies back into "a sound and solvent condition" and to "conserve [their] assets and property."  There is also no evidence that FHFA adequately considered alternatives to the Net Worth Sweep that would have been both consistent with its statutory obligations and less harmful to holders of Preferred Stock and other equity interests.  Instead, there are statements by

FHFA—including in its own Strategic Plan for the Companies—that the role of the conservator was to "minimize taxpayer losses" rather than protect and conserve the enterprises.

90.     Finally, there is no public record that either government agency—Treasury or FHFA—considered whether the Net Worth Sweep is consistent with the contractual and fiduciary duties to holders of the Preferred Stock and other equity interests.  And the Net Worth Sweep is wholly inconsistent with those duties.

### Dividend Payments Under the Purchase Agreements

91.     Fannie has drawn approximately $116 billion from Treasury under the PSPAs. Through the end of 2013, Fannie has paid Treasury $113.9 billion in purported dividends under the PSPAs—or approximately 98% of Treasury's investment.  Freddie has drawn approximately $71 billion from Treasury under the Purchase Agreements.  Through the end of 2013, Freddie has paid back that entire $71 billion in purported dividends.  Combined, Fannie and Freddie have paid back to Treasury 99% of what they received.  Indeed, $26 billion of Fannie's and Freddie's draws were made simply to pay the Government Stock's 10% dividend, even though the Companies were not obligated to pay the Government a dividend in cash.

92.     Yet, under the Net Worth Sweep, these purported dividend payments do not operate to pay down the liquidation preference or otherwise redeem any of Treasury's Government Stock.  The liquidation preference of Treasury's Government Stock in the Companies purportedly remains at approximately $189 billion (due to the Companies' draws and the $1 billion initial valuation of Treasury's Government Stock in each) and will remain at that amount regardless of how many billions of dollars the Companies pay to Treasury in dividends going forward.  The Government's rate of return is infinite, like that of a common equity holder.

93.     Indeed, the Net Worth Sweep changes the fundamental nature of Treasury's investment in the Companies to be the equivalent of a junior equity security.  After giving effect to the Net Worth Sweep, Treasury has both the right to receive all profits of the Companies as well as control over the manner in which the Companies conduct business.  Accordingly, following the Net Worth Sweep Treasury's Government Stock should be characterized in a manner consistent with its economic fundamentals as 100% of the Companies' common stock.  That FHFA and Treasury continue to label the Government Stock as a preferred equity security is not controlling, particularly in light of the fact that the Net Worth Sweep was not an arms-length business transaction.  Rather it was a deal between two agencies of the Federal Government for the benefit of the Federal Government and, upon information and belief, one of those agencies (FHFA) was acting at the direction of the other (Treasury).  Moreover, as explained above, statements by Treasury and FHFA make clear that the Net Worth Sweep was designed with the intent to grant the Federal Government the right to all of Fannie's and Freddie's future profits and to ensure that the Companies will remain under the control of the Federal Government and not return to the control of their private shareholders.

## CLAIMS FOR RELIEF

### COUNT I

### FHFA's Conduct Exceeds Its Statutory Authority As Conservator

94.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

95.     The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law."  5 U.S.C. § 706(2)(C), (D).

96.     In any event, and in addition to the limitations established under the APA, FHFA's authority as conservator of the Companies is strictly limited by statute.  *See* 12 U.S.C. § 4617(b)(2)(D).

97.     As conservator, FHFA is without authority to wind down the Companies.  Only a receiver for the Companies can undertake such actions, as FHFA acknowledges.  FHFA has not been appointed as receiver.

98.     As Treasury has acknowledged, the Net Worth Sweep is designed to wind down the Companies' operations.  The Net Worth Sweep intentionally impairs the Companies' ability to operate as going concerns, requiring them to pay *all* of their net earnings to Treasury and thus preventing them from ever rebuilding capital and returning to normal business operations under private control.  In fact, the Net Worth Sweep requires the Companies to accelerate the dissolution of their holdings.  The Net Worth Sweep thus effectively imposes a receivership on the Companies in violation of HERA.

99.     The Net Worth Sweep is thus in direct contravention of the statutory command that FHFA as conservator must undertake those actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to carry on the business of the [Companies] and preserve and conserve [their] assets and property."  12 U.S.C. § 4617(b)(2)(D).  Indeed, rather than seeking to put the Companies in a "sound and solvent" condition and to preserve and conserve the Companies' assets and property, FHFA has expropriated the Companies' entire net worth for the benefit of the Federal Government, to the detriment of the Companies and holders of Preferred Stock such as Continental Western.

100.     Further, even if it were acting as a receiver, FHFA would be required to wind down the Companies in accordance with specific claims-determination procedures.  Among

other things, FHFA must "promptly publish a notice to the creditors of the regulated entity to present their claims," provide creditors with no fewer than ninety days in which to file a claim, and "establish such alternative dispute resolution processes as may be appropriate for the resolution of claims."  12 U.S.C. § 4617(b)(3)(B)(i), (b)(7)(A)(i).

101.    FHFA's decision, as conservator, to transfer all of the Companies' net worth to Treasury is a blatant end-run around these procedural requirements.  The Net Worth Sweep allows Treasury to be paid amounts that far exceed the value of its claims against the Companies, and create an extraordinary windfall profit, while making it impossible to satisfy claims of holders of the Preferred Stock and other equity interests.  The Net Worth Sweep, in other words, is a *de facto* receivership, effectively "terminat[ing] all rights and claims that the [private] stockholders . . . may have against the assets" of Fannie and Freddie, 12 U.S.C. § 4617(b)(2)(K)(i), but it precludes such stockholders from availing themselves of statutory protections to contest that nullification.

102.    On information and belief, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury.  But because HERA mandates that FHFA perform its duties as conservator independent of the "direction or supervision of any other agency," 12 U.S.C. § 4617(a)(7), FHFA was not authorized to subject itself to Treasury's will.

103.    FHFA also acted beyond its authority by requesting draws from Treasury to pay Treasury dividends in cash under the original dividend structure, rather than paying those dividends in kind.   If FHFA had instead paid such dividends in kind, Fannie and Freddie would have been entitled under the PSPAs to pay down the corresponding increase in the Government Stock's liquidation preference when they generated sufficient earnings to do so. This practice of

declaring cash dividends and drawing cash from Treasury to pay them cannot be squared with the statutory command that FHFA as conservator must undertake those actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to carry on the business of the [Companies] and preserve and conserve [their] assets and property." 12 U.S.C. § 4617(b)(2)(D).

104.    FHFA also acted beyond its authority by re-interpreting its statutory duty as a conservator under HERA to be a duty to "minimize taxpayer losses" and then acting on that purported duty in violation of the clear language of HERA, as provided in the 2012 Strategic Plan for the Companies and, on information and belief, contemporaneous documents.

105.    FHFA's conduct was therefore outside of FHFA's authority under HERA and "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiff is therefore entitled to relief against FHFA pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

## COUNT II

### Violation of the Administrative Procedure Act:
### FHFA's Conduct Was Arbitrary and Capricious

106.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

107.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary" or "capricious" if it is not the product of "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). This means, among other things, that an agency must provide an adequate evidentiary basis for its action, consider all important aspects of the problem before it, examine every responsible alternative, and rely upon consistent, logical reasoning in reaching its decision.

108.     FHFA acted arbitrarily and capriciously when it announced in February 2012 that the Companies would not be able to repay taxpayers, as well as when it decided that as a result, its statutory duty to "preserve and conserve" meant that it must minimize taxpayer losses.  FHFA did not establish an evidentiary basis nor provide an adequate explanation for these decisions.

109.     In entering into the Net Worth Sweep in August 2012, when both Companies were profitable and otherwise able to pay the 10% dividend on Treasury's Government Stock, FHFA once again acted in an arbitrary and capricious manner.  There is no public record evidence that FHFA engaged in a reasoned decision-making process or considered important aspects of the supposed problem it believed it faced.  Nor did it establish an evidentiary basis nor provide an adequate explanation for its decision.  And FHFA could not have provided an adequate explanation for entering the Net Worth Sweep, for that Amendment is wholly antithetical to FHFA's responsibilities as conservator of the Companies.

110.     FHFA has not offered any legitimate reasoned justification for the Net Worth Sweep, which Treasury has acknowledged is designed to wind down the Companies.  FHFA has not adequately explained how the Net Worth Sweep is consistent with its statutory obligation to "conserve [the Companies'] assets and property" and to return the Companies to "a sound and solvent condition," 12 U.S.C. § 4617(b)(2)(D).  FHFA also has not explained whether it considered alternatives to the Net Worth Sweep that would have been both consistent with its statutory obligations and less harmful to Plaintiff and other holders of Preferred Stock and other equity interests in the Companies.

111.     Plaintiff and other holders of Preferred Stock invested substantial sums for the right to dividends and liquidation preferences should market conditions make such payments possible.  By sweeping all of the Companies' net worth to Treasury in perpetuity via quarterly

dividend payments, the Net Worth Sweep makes it impossible for holders of the Preferred Stock to realize the benefit of their investment, no matter how well the Companies perform in the market or how much their assets may be worth in liquidation. FHFA had an obligation to consider whether the Net Worth Sweep was consistent with duties it owes to the Companies' Preferred Stockholders. FHFA failed to do so. FHFA therefore failed to consider an important aspect of the issue addressed by its action, rendering the Net Worth Sweep arbitrary and capricious.

112.    FHFA also acted arbitrarily and capriciously by requesting draws from Treasury to pay Treasury dividends in cash under the original dividend structure, rather than paying those dividends in kind. As with the Net Worth Sweep, there is no public record evidence that FHFA engaged in a reasoned decision-making process, considered important aspects of the problem it believed it faced, or considered alternatives that would have been both consistent with its statutory obligations and less harmful to Plaintiff and other holders of Preferred Stock. In particular, there is no public record evidence supporting FHFA's decision to request draws to pay cash dividends instead of paying those dividends in kind. The latter option would have preserved Fannie's and Freddie's ability to pay down the liquidation preference of the Government Stock to the extent attributable to in-kind dividend payments. Paying down the liquidation preference would have the effect of reducing Fannie's and Freddie's dividend obligations going forward, and it would also make it more likely that there would be money left to pay holders of Preferred Stock in the event Fannie and Freddie are formally liquidated.

113.    FHFA's conduct was therefore arbitrary and capricious, and Plaintiff is therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(C).

## COUNT III

### Treasury's Conduct Exceeded Its Statutory Authority

114.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

115.     The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law."  5 U.S.C. § 706(2)(C), (D).

116.     Treasury's statutory authority to purchase securities issued by the Companies expired on December 31, 2009.  12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4).

117.     Even before the Net Worth Sweep, Treasury violated this limitation on its authority every time it invested in Fannie and Freddie under the terms of the PSPAs after December 31, 2009.  These investments in the Companies, which totaled $76.9 billion and increased the Government Stock's liquidation preference by a corresponding amount, constituted purchases of securities in violation of HERA's sunset provision.  Indeed, Secretary Paulson has acknowledged that such investments amounted to "purchasing preferred shares" and that Treasury "turned temporary authority to invest in Fannie and Freddie, which would expire at year-end 2009, into what effectively was a permanent guarantee on all their debt."  PAULSON, ON THE BRINK 11, 168.

118.     The Net Worth Sweep, which was executed on August 17, 2012, also contravenes this unambiguous limit on Treasury's authority.

119.     The Net Worth Sweep created an entirely new security.  Under the original Purchase Agreements, Treasury purchased Government Stock that entitled it to a 10% quarterly dividend on an amount equal to the aggregate liquidation preference of the Government Stock. The Government Stock was a fixed income security not otherwise entitled to participate in the earnings of the Companies.  By contrast, the Net Worth Sweep entitles Treasury to a quarterly

distribution of *all* of the Companies' net worth for as long as they remain in operation.  The Net Worth Sweep thus effected a wholesale change to the nature of Treasury's securities after its statutory authority to purchase new securities had expired, and converted Treasury's Government Stock into new securities that nationalize the Companies and entitle Treasury to 100% of their net worth as if Treasury were the outright owner of all common and preferred stock in the Companies.  Treasury cannot evade this clear statutory restriction on its authority to purchase securities of the Companies by the simple expedient of calling these new securities an "amendment" to the old securities.

120.    In addition, before exercising its temporary authority to purchase securities, Treasury is required to "determine that such actions are necessary to . . . (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."  12 U.S.C. § 1719(g)(1)(B).  In making the statutorily required determinations, Treasury must consider such factors as "the [Companies'] plan[s] for the orderly resumption of private market funding or capital market access" and "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]," among other factors.  *Id.* § 1719(g)(1)(C)(iii), (v).

121.    These statutory criteria must apply to any and all "amendments" to the Purchase Agreements.  Were it otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired and effectively turn Treasury's limited, temporary grant of authority to purchase the Companies' securities under certain conditions, into an unconstrained and permanent authority and subvert the statutory limitations imposed by Congress.

122.    As far as the public record discloses, Treasury did not make any of the required determinations or consider any of the necessary factors before imposing the Net Worth Sweep. It therefore exceeded its statutory authority.

123.    The Net Worth Sweep is beyond Treasury's authority because it is not compatible with due consideration of factors that Treasury must consider before purchasing the Companies' securities or amending its agreements to purchase such securities.  The Net Worth Sweep destroys the value of Preferred Stock and all other equity security interests in the Companies. The Net Worth Sweep is therefore wholly incompatible with "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and with the "orderly resumption of private market funding or capital market access."

124.    On information and belief, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury.  But because HERA mandates that FHFA "shall not be subject to the direction or supervision of any other agency" when performing its duties as conservator for the Companies, 12 U.S.C. § 4617(a)(7), Treasury acted in excess of its authority in imposing its will on FHFA.

125.    Treasury's conduct was therefore outside of Treasury's authority under HERA and "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiff is therefore entitled to relief against Treasury pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

## COUNT IV

### Violation of the Administrative Procedure Act:
### Treasury's Conduct Was Arbitrary and Capricious

126.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

127.     The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This means, among other things, that agency action is unlawful unless it is the product of "reasoned decisionmaking" that considers every responsible alternative.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52.  Decisionmaking that relies on inadequate evidence or that results in inconsistent or contradictory conclusions cannot satisfy that standard.

128.     Before Treasury exercises its temporary authority to purchase the Companies' securities, it is required to determine that the financial support is necessary to "provide stability to the financial markets," "prevent disruptions in the availability of mortgage finance," and "protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B).  In making these determinations, Treasury is further required to "take into consideration" several factors, including the "plan for the orderly resumption of private market funding or capital market access," and the "need to maintain [the] status [of Fannie and Freddie] as . . . private shareholder-owned compan[ies]." *Id.* §§ 1455(*l*)(1)(C); 1719(g)(1)(C).

129.     These statutory criteria plainly apply to any and all "amendments" of the Purchase Agreements.  Were it otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired and effectively turn Treasury's limited, temporary grant of authority to purchase the Companies' securities under certain conditions, into an unconstrained and permanent authority and subvert the statutory limitations imposed by Congress.

130.     There is no evidence in the public record that Treasury made the required determinations or considered the necessary factors before imposing the Net Worth Sweep.

Indeed, the available evidence reveals that none of the necessary conditions was satisfied. Further, Treasury also has not explained whether it considered alternatives to the Net Worth Sweep that would have been both consistent with its statutory obligations and less harmful to Plaintiff and other holders of Preferred Stock and other equity interests in the Companies. Treasury has thus arbitrarily and capriciously failed to provide a reasoned explanation for its conduct, which results in the Government's expropriation of all private shareholder value in the Companies' Preferred Stock and other equity securities.

131.    Treasury also arbitrarily and capriciously failed to consider alternatives to the Net Worth Sweep that would have better promoted stability in the mortgage markets by leaving the Companies on a sound financial footing.  The Net Worth Sweep undermines the Companies' financial health by preventing them from building up cash reserves in one quarter that can be used to service debt in another quarter.  Yet there is no evidence in the public record that Treasury considered alternatives to the Net Worth Sweep that would have provided greater assurance to investors that the Companies will be able to service their debts in the future.

132.    Treasury also acted in an arbitrary and capricious manner by failing to consider whether the Net Worth Sweep is consistent with its fiduciary duties to holders of the Preferred Stock as the Companies' dominant shareholder.

133.    Under applicable state law governing shareholders' relationship with Fannie and with Freddie, a corporation's dominant shareholders owe fiduciary duties to minority shareholders.

134.    Treasury is the dominant shareholder and de facto controlling entity of the Companies.  For example, Treasury serves as the Companies' only permitted source of capital, and Treasury must give permission to the Companies before they can issue other equity

securities and before they can sell assets valued above $250 million.  Treasury also is able to influence or control the actions of FHFA as conservator and the length and nature of the conservatorship.

135.    The Net Worth Sweep effectively transfers the value of the Preferred Stock and other equity securities from Plaintiff and other private holders to the Companies' dominant shareholder.  And as Treasury admits, the Net Worth Sweep's purpose is to wind down the Companies' operations.  Treasury's actions in preventing Plaintiff and other holders of Preferred Stock from receiving any dividends or value from their Preferred Stock, combined with Treasury's intent to wind down the Companies, render the Preferred Stock devoid of any value or prospect of return.

136.    Treasury's conduct was therefore arbitrary and capricious, and Plaintiff is therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A).

## COUNT V

### Breach of Contract Against FHFA as Conservator of Fannie and Freddie

137.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

138.    As a holder of Preferred Stock in Fannie and Freddie, Plaintiff has certain contractual rights.  In particular, Plaintiff is entitled to a contractually specified, non-cumulative dividend and to a contractually specified liquidation preference.  Plaintiff's dividend and liquidation rights as a private preferred shareholder are prior to those of common shareholders. Fannie and Freddie may not pay dividends or make distributions on account of its common stock in any quarter where dividends on the Preferred Stock are not paid in full.

139.    By entering the Net Worth Sweep, FHFA, as conservator for Fannie and Freddie, breached Fannie's and Freddie's obligations to Plaintiff by nullifying entirely Plaintiff's

contractual right as a holder of the Companies' Preferred Stock.  Thus, in addition to exceeding its authority as conservator under HERA, FHFA's agreement to the Net Worth Sweep breached or repudiated Fannie's and Freddie's contracts with Plaintiff and other holders of the Companies' Preferred Stock.

140.     Again, the Net Worth Sweep replaced the 10% dividend (if paid in cash) on Treasury's Government Stock with a perpetual requirement that the Companies pay their entire net worth to Treasury.  Amounts in excess of the 10% cash dividend on the Government Stock would otherwise be available to pay dividends on the Preferred Stock.  The Net Worth Sweep thus strips the Companies of their ability to generate and retain funds to distribute as dividends to holders of Preferred Stock.

141.     By essentially expropriating the entirety of the Companies' net worth for the Government, the Net Worth Sweep also nullified entirely the contractual right of Plaintiff and other holders of Preferred Stock to receive a liquidation preference upon the dissolution, liquidation, or winding up of Fannie and Freddie.

142.     Fannie and Freddie—and thus FHFA when acting as conservator for the Companies—are contractually prohibited from unilaterally changing the terms of the Companies' Preferred Stock to materially and adversely affect Plaintiff's rights as a preferred shareholder.  The Net Worth Sweep violates this prohibition by effectively eliminating the dividend and liquidation preference rights associated with Plaintiff's Preferred Stock.

143.     No provision of Plaintiff's contracts with Fannie and Freddie reserves to the Companies any right to *repudiate* or *nullify entirely* the Companies' contractual obligations to Plaintiff and other holders of the Companies' Preferred Stock by granting rights to another class of the Companies' stock.

144.    Furthermore, the Net Worth Sweep effectively transformed Treasury's Government Stock into 100% of the Companies' common stock by granting Treasury the right to 100% of the Companies' net worth.  The entitlement to receive all residual profit is the key attribute of common stock.  Paying dividends on this newly created common stock without paying dividends to Plaintiff and other holders of Preferred Stock violates those shareholders' contractual right to be paid a dividend in full in any quarter where the Companies pay a dividend on common stock.

145.    FHFA has therefore both exceeded its statutory authority under HERA and breached Fannie's and Freddie's contracts with the Plaintiff and other holders of Preferred Stock.

## COUNT VI

### Breach of Implied Covenant of Good Faith and Fair Dealing Against FHFA as Conservator of Fannie and Freddie

146.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

147.    Implicit in every contract is a covenant of good faith and fair dealing.  The implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.

148.    As a holder of Preferred Stock in Fannie and Freddie, Plaintiff is contractually entitled to a specified, non-cumulative dividend and to a contractually specified liquidation preference.  Plaintiff's dividend and liquidation rights as a private preferred shareholder are prior to those of common shareholders.

149.    FHFA's agreement to the Net Worth Sweep has arbitrarily and unreasonably prevented Plaintiff and other holders of the Companies' Preferred Stock from receiving any of the fruits of their investment.  Again, the Net Worth Sweep replaced the 10% dividend on

50

Treasury's Government Stock with a perpetual requirement that the Companies pay their entire net worth to Treasury.  The Net Worth Sweep thus strips the Companies of their ability to generate and retain funds to distribute as dividends to Plaintiff and other holders of Preferred Stock.

150.    The Net Worth Sweep also subverts Plaintiff's priority rights as a holder of Preferred Stock by effectively transforming Treasury's Government Stock into common stock in the Companies and requiring the Companies to pay dividends on that common stock without first paying dividends on Plaintiff's Preferred Stock.

151.    By essentially expropriating the entirety of the Companies' net worth for the Government, the Net Worth Sweep also nullified entirely the contractual right of Plaintiff and other holders of Preferred Stock to receive a liquidation preference upon the dissolution, liquidation, or winding up of the Companies.

152.    No provision of Plaintiff's contracts with Fannie and Freddie reserves to the Companies any right to *repudiate* or *nullify entirely* the Companies' contractual obligations to Plaintiff and other holders of the Companies' Preferred Stock by granting rights to another class of the Companies' stock.

153.    In sum, the Net Worth Sweep repudiates and nullifies entirely the scope, purpose, and terms of the contracts governing the relationships between the Companies and their preferred shareholders.

154.    FHFA has therefore both exceeded its statutory authority under HERA and breached the implied covenant of good faith and fair dealing.

## COUNT VII

**Breach of Fiduciary Duty Against FHFA as Conservator of Fannie and Freddie: Claim for Equitable and Declaratory Relief**

155.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

156.    By placing Fannie and Freddie into conservatorship, FHFA assumed control of the operations of those institutions.

157.    By taking control over the operations of Fannie and Freddie, FHFA assumed a fiduciary duty, including a duty of loyalty, to Fannie's and Freddie's shareholders, including Plaintiff and other holders of Preferred Stock.

158.    FHFA used its control over Fannie and Freddie to agree to and implement the Net Worth Sweep, which replaced the 10% dividend on Treasury's Government Stock (if paid in cash) with a perpetual requirement that the Companies pay their entire net worth to Treasury.

159.    Before the Net Worth Sweep, FHFA used its control over Fannie and Freddie to request draws from Treasury to pay Treasury $26 billion in cash dividends, which added $26 billion to the Government Stock's liquidation preference.  Had FHFA not agreed to the Net Worth Sweep and paid these dividends in kind, Fannie and Freddie would have been entitled under the PSPAs to pay down amounts added to the liquidation preference by virtue of such in-kind payments.  Consequently, in light of Fannie's and Freddie's tens of billions of dollars in net earnings since 2011, had FHFA paid these dividends in kind Fannie and Freddie would have been able redeem the resulting $26 billion worth of shares and reduce the Government Stock liquidation preference accordingly, making it more likely that Plaintiff and other holders of Preferred Stock would recover some value for their investment in the event the Companies were formally liquidated.

160.    As an agency of the Federal Government, FHFA was interested in, and benefited from, the Net Worth Sweep, which conferred an exclusive benefit upon the Federal Government by essentially expropriating for the Government the entirety of Fannie's and Freddie's net worth. The draws to pay cash dividends to Treasury also conferred an exclusive benefit upon the Federal Government.

161.    FHFA had a manifest conflict of interest with respect to both the Net Worth Sweep and the practice of requesting draws to pay cash dividends to Treasury, and those transactions constituted self-dealing.

162.    Both the Net Worth Sweep, which essentially eliminated the dividend and liquidation preference rights associated with Plaintiff's Preferred Stock, and the practice of requesting draws to pay cash dividends to Treasury, were neither entirely nor intrinsically fair.

163.    The Net Worth Sweep and the practice of requesting draws to pay cash dividends to Treasury constituted waste, gross and palpable overreaching, and a gross abuse of discretion by FHFA as conservator of Fannie and Freddie.

164.    The Net Worth Sweep and the practice of requesting draws to pay cash dividends to Treasury did not further any valid business purpose or reasonable business objective of Fannie and Freddie, did not reflect FHFA's good faith business judgment of what was in the best interest of Fannie and Freddie, and was unfair to those institutions and to their shareholders, including Plaintiff and other holders of Preferred Stock.

165.    More generally, FHFA has breached its fiduciary duties to Plaintiff and other holders of Preferred Stock by operating the Companies for the benefit of the taxpayers rather than for the benefit of their shareholders.

166.     FHFA has therefore both exceeded its statutory authority under HERA and violated its fiduciary duty to Plaintiff and the other holders of Preferred Stock.

## PRAYER FOR RELIEF

167.     WHEREFORE, Plaintiff prays for an order and judgment:

a.     Declaring that the Net Worth Sweep, and its adoption, are not in accordance with and violate HERA within the meaning of 5 U.S.C. § 706(2)(C), and that FHFA and Treasury acted arbitrarily and capriciously within the meaning of 5 U.S.C. § 706(2)(A) by executing the Net Worth Sweep;

b.     Declaring that the FHFA's practice of requesting draws to pay cash dividends to Treasury was not in accordance with and violated HERA within the meaning of 5 U.S.C. § 706(2)(C), and that FHFA acted arbitrarily and capriciously within the meaning of 5 U.S.C. § 706(2)(A) by requesting such draws;

c.     Declaring that Treasury's post-2009 payments to Fannie and Freddie under the PSPAs are not in accordance with and violate HERA within the meaning of 5 U.S.C. § 706(2)(C);

d.     Declaring that, by entering the Net Worth Sweep, FHFA breached Fannie's and Freddie's contracts with Plaintiff and the covenant of good faith and fair dealing implicit in those contracts;

e.     Declaring that, by entering the Net Worth Sweep and by requesting draws to pay Treasury cash dividends, FHFA violated its fiduciary duty to Plaintiff;

f.     Vacating and setting aside the Net Worth Sweep, including its provision sweeping all of the Companies' net worth to Treasury every quarter;

g.       Vacating and setting aside FHFA's requests for draws to pay Treasury cash dividends and ordering an according reduction in the liquidation preference of the Government Stock;

h.       Vacating and setting aside Treasury's post-2009 payments to Fannie and Freddie under the PSPAs and ordering an according reduction in the liquidation preference of the Government Stock;

i.       Enjoining Treasury and its officers, employees, and agents to return to FHFA as conservator of the Companies all dividend payments made pursuant to the Net Worth Sweep or, alternatively, recharacterizing a portion of such payments as a pay down of the liquidation preference and a corresponding partial redemption of Treasury's Government Stock rather than mere dividends; or, as a final alternative, recharacterizing Treasury's Government Stock in a manner consistent with its economic fundamentals such that its liquidation preference is eliminated and it is considered junior in priority to the Companies' Preferred Stock for purposes of dividends and the right to payment upon liquidation;

j.       Enjoining Treasury and its officers, employees, and agents from making any further payments to the Companies pursuant to the PSPAs' funding commitment;

k.       Enjoining FHFA and its officers, employees, and agents from requesting draws to pay Treasury cash dividends;

l.       Enjoining FHFA and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Net Worth Sweep;

m.      Enjoining Treasury and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Net Worth Sweep;

n.      Enjoining FHFA and its officers, employees, and agents from acting at the instruction of Treasury or any other agency of the Government and from re-interpreting the duties of FHFA as conservator under HERA;

o.      Awarding Plaintiff damages resulting from FHFA's breach of contract and breach of the implied covenant of good faith and fair dealing, including without limitation contractually-due dividends on the Preferred Stock for each quarter when a dividend based on the net worth of the Companies was paid to Treasury;

p.      Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

q.      Granting such other and further relief as this Court deems just and proper.

Date:   February 5, 2014                          Respectfully submitted,

Charles J. Cooper* *Lead Counsel*              /s/ Matthew G. Whitaker
Vincent J. Colatriano*                          Matthew G. Whitaker
David H. Thompson*                              Matt M. Dummermuth
Peter A. Patterson*                             Kendra L. Mills Arnold
COOPER & KIRK, PLLC                             WHITAKER HAGENOW & GUSTOFF, LLP
1523 New Hampshire Avenue, N.W.                 400 E. Court Avenue, Suite 346
Washington, D.C. 20036                          Des Moines, IA 50309
(202) 220-9600                                  (515) 284-5001
(202) 220-9601 (facsimile)                      (515) 864-0963 (facsimile)
ccooper@cooperkirk.com                          mwhitaker@whgllp.com
vcolatriano@cooperkirk.com                      mdummermuth@whgllp.com
dthompson@cooperkirk.com                        karnold@whgllp.com
ppatterson@cooperkirk.com

*Pro hac vice* application forthcoming

*ATTORNEYS FOR PLAINTIFF*                        *ATTORNEYS FOR PLAINTIFF*