**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| CONTINENTAL WESTERN INSURANCE COMPANY, <br><br>              Plaintiff, <br><br> v. <br><br> THE FEDERAL HOUSING FINANCE AGENCY, in its capacity as Conservator of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, MELVIN L. WATT, in his official capacity as Director of the Federal Housing Finance Agency, and THE DEPARTMENT OF THE TREASURY, <br><br>            Defendants. | No. 4:14-cv-00042 |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS, TRANSFER, OR STAY BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR FOR FANNIE MAE AND FREDDIE MAC, AND FHFA DIRECTOR MELVIN L. WATT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 4

I.   The Importance of the Enterprises to the National Economy, and Their Collapse .............. 4

II.   FHFA Is Appointed Statutory Conservator and Succeeds by Operation of Law to All the
     Rights of the Enterprises and Their Shareholders ................................................................. 5

III.   The PSPAs Are Structured to Provide Unprecedented Financial Support in Consideration
      for Senior Preferred Rights That Protect Taxpayers ............................................................ 6

     A.   **Treasury Agrees to Provide Unprecedented Financial Support to the Enterprises
          Through the PSPAs** ................................................................................................... 6

     B.   **The Conservator Agrees to Terms in the PSPAs That Facilitate Treasury's
          Satisfaction of Its Statutory Obligation to "Protect the Taxpayer"** ........................ 8

IV.   The Third Amendment Preserves and Extends the Treasury Commitment by Replacing the
     Dividend and Periodic Commitment Fee with a Variable Dividend Based on Net Worth ... 9

RELATED ACTIONS .......................................................................................................... 10

STANDARD OF REVIEW .................................................................................................. 11

ARGUMENT ........................................................................................................................ 12

V.   The Court Lacks Jurisdiction over Plaintiff's Claims Seeking Declaratory and Equitable
     Relief .................................................................................................................................... 12

     A.   **Section 4617(f) Bars Declaratory and Equitable Relief Where, as Here, the
          Conservator Is Carrying Out a Statutory Power or Function** ................................ 12

          1.   *The Conservator Acted Within Its Statutory Authority When It Arranged for and
               Acted to Preserve Treasury's Capital Commitment* ............................................. 14

          2.   *Plaintiff's Attempt to Second Guess the Conservator's Means of Addressing its
               Treasury Dividend Obligations is Impermissible* .................................................. 18

          3.   *The Third Amendment Falls Well Within the Conservator's Power to Transfer
               Enterprise Assets* .................................................................................................. 21

     B.   **The Third Amendment Is Not an Unauthorized "Wind Down" of the Enterprises**
          .................................................................................................................................... 22

VI.   HERA Bars Shareholder Claims During Conservatorship, Including Plaintiff's Contract
     and Fiduciary Duty Claims ................................................................................................. 24

     A.   **The Conservator Succeeds to All Shareholder Rights** ............................................ 24

**B.** **The Conservator's Succession to All Shareholder Rights Includes Shareholders' Voting Rights** ................................................................................................ 27

VII. In the Alternative, the Court Should Transfer this Case to the U.S. District Court for the District of Columbia ................................................................................................ 30

**A.** **The First-Filed Rule Compels Transfer** .................................................................. 31

**B.** **Transfer is Warranted Under 28 U.S.C. § 1404** ..................................................... 33

   1.  *The D.D.C Is An Available Forum* ........................................................................ 34

   2.  *The Interests of Justice Favor Transfer* ............................................................... 34

   3.  *The Convenience of the Parties and Witnesses Favors Transfer* ......................... 36

CONCLUSION ................................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahlstrom v. Clarent Corp.*,
   No. 02-780, 2002 WL 31856386 (D. Minn. Dec. 19, 2002) ....................................................34

*Ameristar Fin. Servicing, Co., LLC v. United States*,
   75 Fed. Cl. 807 (2007) ...............................................................................................................23

*Bank of Am. N.A. v. Colonial Bank*,
   604 F.3d 1239 (11th Cir. 2010) ....................................................................................13, 19, 20

*Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*,
   922 A.2d 1169 (Del. Ch.2006)....................................................................................................26

*Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*,
   906 A.2d 827 (Del. Ch. 2006).....................................................................................................26

*CarrAmerica Realty Corp. v. Kaidanow*,
   331 F.3d 999 (D.C. Cir. 2003) ...................................................................................................30

*Cnty. of Sonoma v. FHFA*,
   710 F.3d 987 (9th Cir. 2013) .............................................................................................13, 19

*Continental Grain Co. v. The Barge FBL-585*,
   364 U.S. 19 (1960).......................................................................................................................34

*Courtney v. Halleran*,
   485 F.3d 942 (7th Cir. 2007) .....................................................................................................22

*CruiseCompete, LLC v. Smolinski & Assocs., Inc.*,
   859 F. Supp. 2d 999 (S.D. Iowa 2012) .......................................................................................31

*Dimpfel v. Ohio & Miss. Ry. Co.*,
   110 U.S. 209 (1884)....................................................................................................................30

*Dittmer Props., LP v. FDIC*,
   708 F.3d 1011 (8th Cir. 2013) ............................................................................................ passim

*EBW, Inc. v. Environ Prods., Inc.*,
   No. 1:96–CV–144, 1996 WL 550020 (W.D. Mich. July 8, 1996) .........................................33

*Esther Sadowsky Testamentary Trust v. Syron*,
   639 F. Supp. 2d 347 (S.D.N.Y. 2009).......................................................................24, 25, 27

*Federated Capital Corp. v. Nev. C.K. Inc.*,
No. 4:09CV01806, 2010 WL 1704400 (E.D. Mo. Apr. 28, 2010) ........................................36

*Fuller v. Abercrombie & Fitch Stores, Inc.*,
370 F. Supp. 2d 686 (E.D. Tenn. 2005) .............................................................................31

*Furgatch v. Resolution Trust Corp.*,
No. 93-20304 SW, 1993 WL 149084 (N.D. Cal. Apr. 30, 1993) ...........................................13

*Gosnell v. FDIC*,
No. 90-1266L, 1991 WL 533637 (W.D.N.Y. Feb. 4, 1991), *aff'd sub nom. Gosnell v. Fed. Deposit Ins. Corp.*, 938 F.2d 372 (2d Cir. 1991) ...............................................21, 22

*Great Plains Trust Co. v. Union Pac. R.R. Co.*,
492 F.3d 986 (8th Cir. 2007) ...................................................................................16, 22

*Gross v. Bell Sav. Bank PaSA*,
974 F.2d 403 (3d Cir. 1992) .............................................................................14, 18, 19

*Hanson v. FDIC*,
113 F.3d 866 (8th Cir. 1997) ...........................................................................................13

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......................................................................................................12

*Hennepin Cnty. v. Fed. Nat. Mortgage Ass'n*,
742 F.3d 818 (8th Cir. 2014) ...........................................................................................24

*Hindes v. F.D.I.C.*,
No. CIV. A. 94-2355, 1995 WL 82684 (E.D. Pa. Feb. 28, 1995), *aff'd*, 137 F.3d 148 (3d Cir. 1998) ...............................................................................................................................20

*Home Fire Ins. Co. v. Barber*,
93 N.W. 1024 (Neb. 1903) ..............................................................................................30

*Horizon Asset Mgm't Inc. v. H&R Block, Inc.*,
580 F.3d 755 (8th Cir. 2009) .............................................................................................9

*In re Apple, Inc.*,
602 F.3d 909 (8th Cir. 2010) ......................................................................................33, 37

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*,
643 F. Supp. 2d 790 (E.D. Va. 2009), *aff'd sub nom. La. Mun. Police Emps. Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. May 5, 2011) .................................................................25

*Kellmer v. Raines*,
674 F.3d 848 (D.C. Cir. 2012) ....................................................................................24, 25

*Koehler v. Pepperidge Farm, Inc.*,
   13-CV-02644-YGR, 2013 WL 4806895 (N.D. Cal. Sept. 9, 2013) ........................................32

*Kuriakose v. Federal Home Loan Mortg. Co.*,
   674 F. Supp. 2d 483 (S.D.N.Y. 2009)...................................................................................13

*Larsen v. Pioneer Hi-Bred Int'l*,
   No. 06-cv-0077, 2007 WL 3341698 (S.D. Iowa Nov. 9, 2007) ............................................35

*Leon Cnty. v. FHFA*,
   700 F.3d 1273 (11th Cir. 2012) .............................................................................................13

*Leon Cnty. v. FHFA*,
   816 F. Supp. 2d 1205 (N.D. Fla. 2011), *aff'd*, 700 F.3d 1273 (11th Cir. 2012)....................21

*Mattes v. ABC Plastics, Inc.*,
   323 F.3d 695 (8th Cir. 2003) ................................................................................................11

*Maverick Tube, LP v. Westchester Surplus Lines Ins. Co.*,
   4:07 CV 298 DDN, 2007 WL 5115436 (E.D. Mo. Aug. 6, 2007)..........................................32

*MCG Capital Corp. v. Maginn*,
   No. CIV. A. 4521-CC, 2010 WL 1782271 (Del. Ch. May 5, 2010)........................................26

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
   No. 10 CIV. 5762 PAE, 2013 WL 489020 (S.D.N.Y. Feb. 8, 2013) .....................................26

*Nat'l Health Fed'n v. Weinberger*,
   518 F.2d 711 (7th Cir. 1975) ...........................................................................................33, 35

*Nat'l Trust for Historic Preserv. in U.S. v. FDIC*,
   21 F.3d 469 (D.C. Cir. 1994)................................................................................................13

*Nat'l Trust for Historic Preserv. v. FDIC*,
   995 F.2d 238 (D.C. Cir. 1993)..............................................................................................18

*Nw. Airlines, Inc. v. Am. Airlines, Inc.*,
   989 F.2d 1002 (8th Cir. 1993) .........................................................................................12, 31

*Omega Healthcare Investors, Inc. v. Res-Care, Inc.*,
   475 F.3d 853 (7th Cir. 2007) ................................................................................................28

*Omnicare, Inc. v. NCS Healthcare, Inc.*,
   809 A.2d 1163 (Del. Ch. 2002)..............................................................................................30

*Orthmann v. Apple River Campground, Inc.*,
   765 F.2d 119 (8th Cir. 1985) ................................................................................................31

*Pareto v. FDIC*,
    139 F.3d 696 (9th Cir. 1998) ........................................................................26, 29

*Scottsdale Ins. Co. v. Detco Indus., Inc.*,
    426 F.3d 994 (8th Cir. 2005) ...............................................................................31

*Sissel v. Klimley*,
    No. 3:08-CV-00062-JAJ, 2009 WL 700186 (S.D. Iowa Mar. 16, 2009) ...............34

*St. George Maronite Catholic Church v. Green*,
    No. SA-94-CA-334, 1994 WL 763743 (W.D. Tex. July 25, 1994).......................14

*Stahl v. U.S. Dep't of Agric.*,
    327 F.3d 697 (8th Cir. 2003) ...............................................................................29

*Stalley v. Catholic Health Initiatives*,
    509 F.3d 517 (8th Cir. 2007) ...........................................................................11, 12

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ...................................................................................26

*Town of Babylon v. FHFA*,
    699 F.3d 221 (2d Cir. 2012).................................................................................13

*U.S. Bank Nat'l Ass'n v. First Nat'l Bank of Keystone*,
    394 F. Supp. 2d 829 (S.D. W. Va. 2005)..............................................................28

*United Liberty Life Ins. Co. v. Ryan*,
    985 F.2d 1320 (6th Cir. 1993) ..............................................................................22

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989)..............................................................................................25

*Vann v. Indus. Processes Co.*,
    247 F. Supp. 14 (D.D.C 1965) .............................................................................30

*Villa v. Salazar*,
    933 F. Supp. 2d 50 (D.D.C. 2013) .......................................................................35

*Volges v. Resolution Trust Corp.*,
    32 F.3d 50 (2d Cir. 1994) .........................................................................14, 20, 22

*Ward v. Resolution Trust Corp.*,
    996 F.2d 99 (5th Cir. 1993) ..................................................................................19

*Waterview Management Co. v. FDIC*,
    105 F.3d 696 (D.C. Cir. 1997) .............................................................................21

**Statutes**

5 U.S.C. § 701(a) ...........................................................................................................12, 17

12 U.S.C. § 1719(g)(1) .....................................................................................................6, 8, 9

12 U.S.C. § 1821(d)(2)(A)(i) ..................................................................................................26

12 U.S.C. § 1821(d)(2)(G)(i) .............................................................................................21, 22

12 U.S.C. § 1821(j) ......................................................................................................13, 19, 22

12 U.S.C. § 4513(a)(1)(B) ................................................................................................5, 6

12 U.S.C. § 4617(a)(4) .......................................................................................................7

12 U.S.C. § 4617(a)(5)(A) .................................................................................................15

12 U.S.C. § 4617(b)(2)(A) .............................................................................................24, 29

12 U.S.C. § 4617(b)(2)(B) ...................................................................................................29

12 U.S.C. § 4617(b)(2)(D) ...................................................................................14, 17, 20, 29

12 U.S.C. § 4617(b)(2)(G) .............................................................................................21, 23

12 U.S.C. § 4617(b)(2)(J) ...................................................................................................29

12 U.S.C. § 4617(b)(2)(K)(i) ..............................................................................................26

12 U.S.C. § 4617(b)(6) .........................................................................................................26

12 U.S.C. § 4617(f) .................................................................................................... passim

28 U.S.C. § 1404(a) .......................................................................................................33, 34

Del. Code Ann. tit. 8, § 327 (2001) ....................................................................................30

**Other Authorities**

Fed. R. Civ. P. 23.1(b) ........................................................................................................30

Restatement (First) of Contracts § 451 (1932) ...................................................................28

**INTRODUCTION**

This litigation challenges the Federal Housing Finance Agency's (FHFA) ongoing response to the most calamitous economic crisis in generations.  During the fall of 2008, FHFA concluded that Fannie Mae and Freddie Mac (together the "Enterprises"), with combined assets in excess of $5 trillion, were on the precipice of failure, which would have had a devastating effect on an already weakened national economy.  Accordingly, on September 6, 2008, FHFA exercised the power that Congress had granted to it in the Housing and Economic Recovery Act of 2008 ("HERA") to place Fannie Mae and Freddie Mac into conservatorships.

HERA also authorized Treasury, subject to statutory requirements intended to protect federal taxpayers, to invest into the Enterprises the billions of dollars of capital necessary to enable the Enterprises to avoid mandatory receivership and liquidation and continue their critical operations.  Treasury and FHFA had no viable choice but to exercise these emergency powers, as there was no other investor—private or public—able and willing to rescue the Enterprises.  To be clear, Plaintiff to this litigation supplied not a single dollar of capital into Fannie Mae and Freddie Mac after the exhaustion of existing shareholder equity.

FHFA, acting as the Enterprises' Conservator, entered into preferred stock purchase agreements ("PSPAs") with Treasury whereby Treasury committed a massive amount of taxpayer funds to the Enterprises—ultimately infusing more than $187 billion—in exchange for senior preferred stock in the Enterprises and additional economic rights designed to compensate it for the value of its unprecedented commitment to the Enterprises.  Under these PSPAs, Treasury provided funds to each Enterprise for each calendar quarter in which the Enterprise's net worth was negative (liabilities in excess of assets).  In return for these funds, Treasury received senior preferred stock in the Enterprises and the Enterprises agreed, among other things,

to pay a dividend to Treasury on that stock equal to 10 percent per year of the total amount of funds that Treasury had provided.

But as events unfolded, there was concern that even this massive commitment of federal tax dollars might not suffice.  The concern arose because the Enterprises were unable to pay the 10% dividend without drawing more from Treasury, threatening a downward spiral of repaying preexisting obligations *to* Treasury through additional draws *from* Treasury.  Thus, once the amount of available Treasury funds became capped in 2013, satisfaction of the Enterprises' fixed dividend would erode the Treasury commitment.  The very real possibility that the Enterprises might exhaust the Treasury commitment rattled the confidence of key investors (holders of debt and mortgage-backed securities) and threatened to upend the housing finance markets once again.

In response, FHFA and Treasury, through the Third Amended PSPAs, acted to avoid further erosion of the Treasury Commitment by replacing the fixed, 10% dividend with a variable dividend equal to the net worth of the Enterprises.  The Third Amendment worked: it ended the practice of drawing down the Treasury commitment to pay dividends to Treasury, keeping the commitment available to the Enterprises and restoring market confidence in the Enterprises.

The national crisis having eased, due, in part, to the actions of FHFA and Treasury, Plaintiff now asks the Court to re-write the agreements that FHFA (on behalf of the Enterprises) and Treasury executed, pursuant to express congressional authority, to stabilize the Enterprises and the national economy.  Plaintiff wants to maintain those aspects of the agreements that it likes—namely, the unprecedented financial support from Treasury at a time when the Enterprises required billions of dollars in capital—and discard the parts it does not like—namely, the Third

Amended PSPAs—now that nearly two hundred billion dollars of federal taxpayer capital infusions and commitments have allowed the Enterprises to remain in business and produce positive (at least for the time being) earnings, rather than being placed into mandatory receivership and then liquidation.  Plaintiff also wants to second guess the authorized operational judgments of the Conservator, alleging that the Conservator should have taken alternative steps to preserve the Treasury commitment.

Plaintiff's after-the-fact attempt to reward itself at the expense of federal taxpayers, who risked and continue to risk billions of dollars to save the Enterprises from receivership and liquidation, directly contravenes the relevant statutory authorities as implemented by the PSPAs. First, the Court has no jurisdiction over Plaintiff's claims seeking declaratory or equitable relief, including Plaintiff's APA claims and fiduciary duty claims, because "no court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator." 12 U.S.C. § 4617(f).  Because the Conservator was acting within its statutory power to enter the Third Amended PSPAs, the Court is barred from ordering declaratory or equitable relief, despite Plaintiff's allegations that the Third Amendment was unwise, ineffective, or in violation of other laws.   Second, Plaintiff's contract and fiduciary duty claims fail because FHFA as Conservator has "succeed[ed]" by operation of law to "all" shareholder rights during conservatorship, including Plaintiff's ability to pursue claims based on its stock certificates and/or on behalf of the Enterprises.  Only upon the end of the conservatorships or the appointment of FHFA as receiver—neither of which has occurred—would shareholders regain the ability to pursue the types of claims Plaintiff attempts to assert here.

In the alternative, if the Court denies FHFA's motion to dismiss, the Court should transfer this action to the U.S. District Court for the District of Columbia, where ten essentially

identical actions—asserting the same claims against the same defendants arising out of the same facts—are pending.  Indeed, Plaintiff's own corporate parent, represented by the same counsel representing Plaintiff here, is one of the plaintiffs in those D.D.C. actions.  Not only is transfer warranted under the well-established first-filed rule, it is also in the interests of justice and convenience under 28 U.S.C. § 1404(a).

## STATEMENT OF FACTS

**I.      The Importance of the Enterprises to the National Economy, and Their Collapse**

Fannie Mae and Freddie Mac are federally chartered corporations created by Congress to provide liquidity to the national housing finance system and to stabilize the nation's residential mortgage market.  To fulfill their congressional mandate, the Enterprises purchase residential mortgages originated by banks and other qualified lenders, which then can use the sale proceeds to originate additional mortgages.  To finance their purchases, the Enterprises borrow funds from large investors, and also bundle the mortgages into mortgage-backed securities ("MBS") that are sold to investors.  *See* Compl. ¶ 28.

By 2007, following an unprecedented rise in house prices, the housing market began to collapse, with homeowners defaulting on their mortgages at accelerating rates.  At that time, the Enterprises owned or guaranteed mortgages worth more than $5 trillion, nearly half of the U.S. mortgage market.  *See* Compl. ¶ 1.  As a result of the housing crisis, the value of the Enterprises' assets substantially deteriorated and the Enterprises suffered major credit losses in their portfolios.  *See* Compl. ¶ 3.

## II.  FHFA Is Appointed Statutory Conservator and Succeeds by Operation of Law to All the Rights of the Enterprises and Their Shareholders

Through HERA, Congress created FHFA in July 2008 as an independent agency to supervise and regulate the Enterprises, as well as the Federal Home Loan Banks, and to serve if necessary as the statutory conservator or receiver for the Enterprises.  HERA charges FHFA as regulator with ensuring that the Enterprises operate in a "safe and sound manner," while "foster[ing] liquid, efficient, competitive, and resilient national housing finance markets."  12 U.S.C. § 4513(a)(1)(B).  HERA also authorizes FHFA's Director to "appoint the [FHFA] as conservator or receiver for a regulated entity . . . for the purpose of reorganizing, rehabilitating, or winding up [its] affairs."  *Id.* § 4617(a)(1), (2).

On September 6, 2008, in light of the dire economic circumstances, and having concluded that the Enterprises could not continue to operate safely and soundly and fulfill their critical public mission without intervention, FHFA's Director placed the Enterprises in FHFA's conservatorship.  FHFA as Conservator "immediately succeed[ed] to . . . all rights, titles, powers, and privileges of the [Enterprises], and of ***any stockholder***, officer, or director of [the Enterprises]."  *Id.* § 4617(b)(2)(A) (emphasis added).

As Conservator, FHFA has statutory authority to take any action that is "necessary to put [the Enterprises] in a sound and solvent condition" and "appropriate to carry on the business of [the Enterprises]."  *Id.* § 4617(b)(2)(D).  FHFA thus has express plenary authority as Conservator to:

- "conduct all business of the [Enterprises]," *id.* § 4617(b)(2)(B)(i);

- "perform all functions of the [Enterprises] in the name of the [Enterprises] which are consistent with the appointment as conservator," *id.* § 4617(b)(2)(B)(iii);

- "preserve and conserve the assets and property of the [Enterprises]," *id.* § 4617(b)(2)(B)(iv);

- "take over the assets of and operate the [Enterprises] with all the powers of the shareholders, the directors, and the officers," *id.* § 4617(b)(2)(B)(i);

- "transfer or sell any asset or liability of the [Enterprises] . . . without any approval, assignment, or consent with respect to such transfer or sale," *id.* § 4617(b)(2)(G); and

- "take any [authorized action], which the Agency determines is in the best interests of the [Enterprises] or the Agency," *id.* § 4617(b)(2)(J)(ii).

Reinforcing and facilitating the exercise of the Conservator's plenary operational authority, Congress insulated the Conservator's actions from judicial review. Under 12 U.S.C. § 4617(f), "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator."

## III. The PSPAs Are Structured to Provide Unprecedented Financial Support in Consideration for Senior Preferred Rights That Protect Taxpayers

### A. Treasury Agrees to Provide Unprecedented Financial Support to the Enterprises Through the PSPAs

In connection with the conservatorship appointments, Treasury and FHFA—expressly in its capacity as Conservator of the Enterprises—entered into two Senior Preferred Stock Purchase Agreements (together, the "PSPAs"), one for each Enterprise.[1] Treasury agreed to infuse billions of taxpayer dollars into the Enterprises through the PSPAs to provide the capital needed for the Enterprises to remain in operation and avoid mandatory receivership and liquidation. *See* Amended and Restated Senior Preferred Stock Purchase Agreement (September 26, 2008) ("PSPAs") (attached with amendments as Exhibit A); *see also* Certificate of Designation of

---

[1]   HERA specifically amended the statutory charters of the Enterprises to grant Treasury the authority to enter into such transactions for the purchase of securities issued by the Enterprises, so long as Treasury and the Enterprises reached a "mutual agreement" for such a purchase. *See* 12 U.S.C. § 1719(g)(1)(A) (Fannie Mae); *id.* § 1455(l)(1)(A) (Freddie Mac).

Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 (September 7, 2008) ("Treasury Stock Certificate") (attached as Exhibit B).[2]

If in any calendar quarter an Enterprise's net worth is negative—defined as liabilities exceeding assets in accordance with US GAAP—then the Enterprise draws funds from Treasury under the PSPAs in the amount necessary to cure its negative net worth and bring it back up to zero.  Ex. A at 4, 18.(PSPAs § 2.2).  Thus, Treasury's funding under the PSPAs, by definition, saves the Enterprise from mandatory receivership, triggered if an Enterprise's liabilities were to exceed its assets.  *See* 12 U.S.C. § 4617(a)(4).

By late 2008, the Enterprises' liabilities exceeded their assets.  Accordingly, both Enterprises began drawing on the Treasury commitment in amounts needed to cure that deficit and raise the Enterprises' net worth back up to zero.  To date, the Enterprises have drawn over $187 billion from Treasury—$116.1 billion for Fannie Mae, and $71.3 billion for Freddie Mac. Compl. ¶ 15.

While the PSPAs initially capped Treasury's commitment at $100 billion per Enterprise, the parties subsequently amended the PSPAs (via the "First Amendment") to double the cap to $200 billion per Enterprise.  Ex. A at 29, 34 (Amended and Restated PSPAs (May 6, 2009)).  Thereafter, the parties again amended the PSPAs (via the "Second Amendment") to increase the cap to an amount that became fixed again as of January 1, 2013.  *Id*. at 40, 46 (Amended and Restated PSPAs (Dec. 24, 2009)).  On that date, the remaining capacity to the cap on Treasury's commitment to Fannie Mae became fixed at $117.6 billion (over and above the $116.1 billion

_____

[2]    Because the PSPAs and Treasury Stock Certificates are "integral to the claims," and thereby incorporated by reference into the complaint, the Court may consider the PSPAs in resolving this motion to dismiss.  *Dittmer Props., LP v. FDIC*, 708 F.3d 1011, 1021 (8th Cir. 2013).

already infused), and the remaining capacity to the cap on Treasury's commitment to Freddie

Mac became fixed at $140.5 billion (over and above the $71.3 billion already infused), pursuant

to a formula set forth in the Second Amendment.  *Id.*

### B.      The Conservator Agrees to Terms in the PSPAs That Facilitate Treasury's Satisfaction of Its Statutory Obligation to "Protect the Taxpayer"

In consideration of its unprecedented commitment to invest hundreds of billions of

federal tax dollars into the Enterprises, and in order to protect this massive investment, the

PSPAs gave Treasury a comprehensive and integrated bundle of rights, entitlements, and

financial commitments.  Indeed, the statutory authority by which Treasury is permitted to

provide funding to the Enterprises specifically requires that any such investment by Treasury be

structured so as to "protect the taxpayer."  12 U.S.C. § 1719(g)(1)(B)-(C).  The original PSPAs

granted Treasury the following entitlements:

- Initial Commitment Fee: consisting of (a) an initial senior liquidation preference of $1 billion for each Enterprise and (b) warrants to acquire 79.9% of the Enterprises' common stock for a nominal payment.  Ex. A (PSPAs § 3.1).

- Senior Liquidation Preference: equal to the total amount of Enterprise draws on Treasury funds, plus the $1 billion initial liquidation preference (*id.*)—currently $189 billion. Thus, if the Enterprises are liquidated through receivership, Treasury must be paid $189 billion from the proceeds of the liquidation before preferred and common shareholders may recover anything.

- Dividends:  requiring the Enterprises to pay Treasury a 10% annual dividend, assessed quarterly, based on the total amount of the liquidation preference.  Ex. B (Treasury Stock Certificate § 2).  The dividend was mandatory and cumulative, and if the Enterprises failed to pay the dividend in cash, then the dividend would be accrued at a rate of 12% and added to Treasury's outstanding liquidation preference.  *Id.* at § 2(c).

- Periodic Commitment Fee: entitling Treasury to recover, *over and above the dividends*, an annual fee that was "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment."  Ex. A (PSPAs § 3.2(b)).  The amount of the Periodic Commitment Fee, to be imposed beginning January 2010, was to reflect "the market value of the Commitment as then in effect."  *Id.*  The PSPAs gave Treasury the right, in its sole discretion, to waive the Periodic Commitment Fee for a year at a time "based on adverse conditions in the United States mortgage market."  *Id.*  Treasury waived the Periodic Commitment Fee for 2010 and 2011, years in which the Enterprises had

insufficient funds to pay the 10% dividend, let alone an additional Periodic Commitment Fee. *See* Compl. ¶ 48.[3]

- PSPA Covenants: imposing a series of covenants that preclude the Enterprises from paying dividends on common stock and preferred stock, redeeming stock, and exiting from conservatorship (other than through receivership) without Treasury consent, and that make clear that shareholders are not third-party beneficiaries to the PSPAs. *See* Ex. A (PSPAs §§ 5.1, 5.3, 5.6, 6.1).

In sum, the PSPAs effectively assured that the federal taxpayers, who saved the Enterprises from mandatory receivership, would be the beneficiaries of the federal rescue. Indeed, the draws on the PSPAs were triggered only after a determination that liabilities exceeded assets, *i.e.* insolvency that rendered the common shares worthless.

## IV. The Third Amendment Preserves and Extends the Treasury Commitment by Replacing the Dividend and Periodic Commitment Fee with a Variable Dividend Based on Net Worth

By mid-2012, the Enterprises had demonstrated that they could not consistently generate enough income to pay the 10% dividend. Thus, the Enterprises drew funds from Treasury in order to pay the dividends back to Treasury. Of the $187 billion the Enterprises have drawn from Treasury, approximately $26 billion was drawn solely to pay the 10% annual dividend back to Treasury. Compl. ¶ 9. Additionally, each time the Enterprises drew funds to pay the 10% dividend, the total amount of the Treasury draw increased, in turn increasing the amount of the next 10% dividend payment. *See id.* ¶ 8. By mid-2012, the amount of the annual 10% dividend

---

[3]    *See also* Fannie Mae Form 10-Q Q2, at 54 (Aug. 8, 2012) (attached as Exhibit C) (describing Treasury's waiver of the Periodic Commitment Fee)). Because Fannie Mae's August 8, 2012 10-Q is "expressly mentioned in the complaint" (*see* Compl. ¶ 59), the Court may consider it here. *Dittmer Props.*, 708 F.3d at 1021. Additionally, courts frequently take judicial notice of SEC filings. *See Horizon Asset Mgm't Inc. v. H&R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009) (in resolving a motion to dismiss, courts "may take judicial notice of . . . public SEC filings").

had grown — to $11.7 billion for Fannie Mae and $7.2 billion for Freddie Mac.  *Id.* ¶ 55.

Because the amount of the Treasury commitment became fixed starting in 2013, drawing funds

to pay this 10% annual dividend would erode the remaining amount of the commitment, calling

into question its adequacy.  These concerns undermined one of the primary purposes of the

PSPAs: to demonstrate financial support to holders of Enterprise debt (*i.e.*, bondholders) and

MBS.  The strength of that support depends upon the Enterprises having a sufficiently large pool

of available funds from Treasury to permit the Enterprises to continue operating under any

adverse market conditions that may arise.

On August 17, 2012, FHFA and Treasury executed the Third Amendment, which

(1) eliminated the fixed annual dividend, (2) added a quarterly variable dividend in the amount

(if any) of each Enterprise's positive net worth, and (3) suspended the Periodic Commitment Fee

for as long as the quarterly variable dividend is in effect.  Ex. A at 51-66 (Amended and Restated

PSPAs (Aug. 17, 2012)).  The new dividend structure eliminated the risk that taking draws to

make the 10% dividend payment would lead to the exhaustion of the Treasury commitment,

eliminated doubts about the financial viability of the Enterprises moving forward, and made it

unnecessary to calculate the Periodic Commitment Fee.

### RELATED ACTIONS

Plaintiff's complaint is similar to 19 other complaints filed in the U.S. District Court of

the District of Columbia (the "D.D.C. Actions") and the U.S. Court of Federal Claims (the

"C.F.C. Actions") concerning the Third Amendment.[4]  Plaintiff in this action and plaintiffs in the

D.D.C. Actions are all shareholders of the Enterprises, asserting the same claims based on their

status as shareholders, including claims for breach of the identical contracts.  Plaintiff is also a

plaintiff in one of the CFC Actions.[5]  Moreover, one of the plaintiffs in the D.D.C. Actions is

Plaintiff's corporate parent, which is also represented by lead counsel to Plaintiff in the present

action.   All Defendants in this action are also defendants in the D.D.C. actions.  The D.D.C.

Actions have been pending for nine months with briefing on dispositive motions scheduled to

close on June 2, 2014.  FHFA respectfully requests that, in the alternative to dismissal, the Court

transfer this action to the D.D.C. to be coordinated with the D.D.C. Actions.  *See infra* Sec. III.

## STANDARD OF REVIEW

FHFA moves to dismiss all claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil

Procedure.  Where, as here, a motion to dismiss for lack of jurisdiction is limited to a facial

attack on the pleadings, it is subject to the same standard as a motion brought under Rule

12(b)(6).  *See Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003).  The Court thus

"accept[s] as true all factual allegations in the complaint, giving no effect to conclusory

allegations of law."  *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007).

The plaintiff must "assert facts that affirmatively and plausibly suggest that the pleader has the

---

[4]     The D.D.C Actions are: *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigs.*, No. 13-mc-1288 (consolidating *Liao v. Lew*, No. 1:13-cv-01094; *Cacciapelle v. Fed. Nat'l Mortg. Ass'n*, No. 1:13-cv-01149; *Am. European Ins. Co. v. Fed. Nat'l Mortg.Ass'n, et al*, No. 1:13-cv-01169; *Cane v. FHFA, et al.*No. 1:13-cv-01184; *Dennis v. FHFA, et al*, No. 1:13-cv-01208; *Marneu Holdings, Co, et al v. FHFA, et al.*, No. 1:13-cv-01421; and *Barry P. Borodkin v. Fed. Nat'l Mortg.Ass'n, et al.*, No. 1:13-cv-01443); *Arrowood, et al. v. Fed. Nat'l Mortg. Ass'n  et al.*, No. 1:13-cv-01439; *Perry Capital LLC v. Lew*, No. 1:13-cv-01025; *Fairholme Funds, Inc. et al. v. FHFA, et al.* , No. 1:13-cv-01053.

[5]     *Fairholme Funds, Inc., et al. v. United States*, No. 1:13-cv-00465.

right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with

such a right." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  The decision

whether to transfer a case to another district court is committed to this Court's discretion.  *See*

*Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1006 (8th Cir. 1993).

## ARGUMENT

### V. The Court Lacks Jurisdiction over Plaintiff's Claims Seeking Declaratory and Equitable Relief

Plaintiff seeks far-reaching declaratory and equitable relief for each of its claims.  *See*

Compl. ¶ 167.[6]  Indeed, the majority of Plaintiff's claims—including its APA claims and breach

of fiduciary duty claims—seek exclusively injunctive relief.  *See id.* ¶¶ 105, 113, 125, 136, 145,

167; *see also id.* ¶ 167(o) (seeking money damages only for claims for breach of contract and

implied duty of good faith and fair dealing).  These claims are expressly barred by federal

statute, 12 U.S.C. § 4617(f), which provides that "no court may take any action to restrain or

affect the exercise of powers or functions of the Agency as a conservator."[7]

### A. Section 4617(f) Bars Declaratory and Equitable Relief Where, as Here, the Conservator Is Carrying Out a Statutory Power or Function

Courts across the country consistently and routinely apply Section 4617(f) to bar any

claims seeking relief that would "restrain or affect" the exercise of the powers of FHFA as

---

[6]    Plaintiff asks the Court to, *inter alia*, (1) vacate and set aside the Third Amendment; (2) enjoin the Conservator from implementing the Third Amendment; (3) order Treasury to return to FHFA as Conservator all dividends distributed pursuant to the Third Amendment; (4) vacate and set aside all draws taken from Treasury to pay the Treasury dividend; (5) vacate and set aside all draws taken from Treasury after 2009; and (6) declare that the Third Amendment violates the APA, breaches Plaintiff's stock certificates, and is a breach of fiduciary duty.  Compl. ¶ 167.

[7]    APA review is unavailable because another statute—namely Section 4617(f)—"preclude[s] judicial review."  5 U.S.C. § 701(a)(1); *see also Heckler v. Chaney*, 470 U.S. 821, 828 (1985) ("[B]efore any [APA] review at all may be had, a party must first clear the hurdle of § 701(a).").

Conservator of the Enterprises.[8]  These decisions are consistent with the substantial body of case

law interpreting the materially identical provision that governs the operation of FDIC

conservatorships and receiverships, 12 U.S.C. § 1821(j), which "effect[s] a sweeping ouster of

courts' power to grant equitable remedies . . . regardless of the claimant's likelihood of success

on the merits of his underlying claims."  *Hanson v. FDIC*, 113 F.3d 866, 871 (8th Cir. 1997)

(quoting *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995)).[9]  This statutory language is to

be "construed broadly to constrain the court's equitable powers."  *Dittmer Props., L.P. v. FDIC*,

708 F.3d 1011, 1016 (8th Cir. 2013).  Indeed, "given the breadth of the statutory language . . .

the statute would appear to bar a court from acting in virtually all circumstances."  *Nat'l Trust*

*for Historic Preserv. in U.S. v. FDIC*, 21 F.3d 469, 472 (D.C. Cir. 1994) (Wald, J., concurring).

　　　　The Court's "jurisdictional inquiry" under Section 4617(f) is "quite narrow."  *See Bank of*

*Am. N.A. v. Colonial Bank*, 604 F.3d 1239, 1243 (11th Cir. 2010).  "[T]he only relevant

question" is "whether the conservator or receiver is carrying out a statutory function or power.  If

so, no injunction may issue."  *Furgatch v. Resolution Trust Corp.*, No. 93-20304 SW, 1993 WL

149084, at *2 (N.D. Cal. Apr. 30, 1993); *see also Dittmer*, 708 F.3d at 1017 (applying Section

1821(j) after "determin[ing] whether the challenged action [wa]s within the receiver's power or

function").  Only when the Conservator is "acting *clearly outside* its statutory powers" is Section

---

[8]　　*See, e.g., Cnty. of Sonoma v. FHFA*, 710 F.3d 987, 993 (9th Cir. 2013) (holding Section
4617(f) barred adjudication of APA claims against FHFA); *Leon Cnty. v. FHFA*, 700 F.3d 1273,
1278-79 (11th Cir. 2012) (same); *Town of Babylon v. FHFA*, 699 F.3d 221, 228 (2d Cir. 2012)
(same).

[9]　　Section 1821(j) states that "no court may take any action . . . to restrain or affect the exercise
of powers or functions of the [FDIC] as a conservator or a receiver."  12 U.S.C. § 1821(j).  "In
analyzing the limits of the Court's authority under § 4617(f), the Court may turn to precedent
relating to [Section 1821(j)]."  *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 674 F. Supp. 2d 483,
493 (S.D.N.Y. 2009) (citing cases).

4617(f) inapplicable. *See Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403, 407 (3d Cir. 1992) (emphasis added). Allegations that a conservator or receiver acted improperly or unlawfully—or even in violation of a contract—"does not alter the calculus" so long as the conservator or receiver is carrying out one of its powers or functions. *Volges v. Resolution Trust Corp.*, 32 F.3d 50, 52 (2d Cir. 1994).

    **1.**    ***The Conservator Acted Within Its Statutory Authority When It Arranged for and Acted to Preserve Treasury's Capital Commitment***

    The Conservator had the unfettered authority to seek additional capital for the Enterprises, including the infusion of taxpayer money from Treasury, to enable the Conservator to "carry on the business" of the Enterprises and "put the [Enterprises] in a sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D). This is precisely what the Conservator did, both when it entered into the PSPAs and subsequently when it executed the First, Second, and Third Amendments. Because the Conservator acted within its statutory powers, Section 4617(f) precludes the Court from vacating, altering, or modifying in any way the terms of the PSPAs, including the variable net worth dividend, because any such action would "restrain or affect the exercise of powers or functions of the Agency as a conservator." *See Kuriakose*, 674 F. Supp. 2d at 494 (holding Section 4617(f) precludes claims that "restrain[] the FHFA from enforcing [a] contractual provision in the future"); *see also St. George Maronite Catholic Church v. Green*, No. SA-94-CA-334, 1994 WL 763743, at *6-7 (W.D. Tex. July 25, 1994) (holding Section 1821(j) "bars any relief that would affect the contract between [conservator or receiver] and [a third party], whether that relief is termed rescission, declaratory, or anything else.").

    Plaintiff does not—and cannot—dispute that the Conservator acted within its statutory authority in agreeing to the terms of the *original* PSPAs and the First and Second Amendments. Indeed, Plaintiff recognizes that the original PSPAs "reassured markets" and "honored" the

stockholders' rights.  Compl. ¶ 20.  In so doing, Plaintiff effectively concedes that this Court

lacks the authority to restrain or affect the terms of the pre-Third Amendment PSPAs.[10]

Plaintiff attempts to avoid the preclusive effect of Section 4617(f) by challenging only an

*amendment* to the PSPAs, rather than the original PSPAs.  Plaintiff seeks reinstatement of the

earlier and, in Plaintiff's view, preferable version of the PSPAs.  This attempt to invest the Court

with jurisdiction expressly withheld by Congress fails because the Conservator exercised the

same statutory powers in authorizing the Third Amendment as it did in authorizing the original

PSPAs: the power to keep the Enterprises operating in a sound and solvent condition.

From the earliest months of the PSPAs, the Enterprises had insufficient capital to pay the

10% dividend to Treasury, and thus consistently drew funds *from* Treasury in order to make the

dividend payments back *to* Treasury.  *See* Compl. ¶ 91 ("$26 billion of Fannie's and Freddie's

draws were made simply to pay the Government Stock's 10% dividend").  When the Third

Amendment was executed in August 2012, both Enterprises announced that, absent the Third

Amendment, this circular practice likely would continue over the long term because the

Enterprises still could not afford the 10% dividend, which had grown to $11.7 billion for Fannie

Mae and $7.2 billion for Freddie Mac.  For example, on August 7, 2012, Freddie Mac

announced:  "Over time, our dividend obligation to Treasury will increasingly drive future

draws.  Although we may experience period-to-period variability in earnings and comprehensive

---

[10]    Though Plaintiff alleges that the Enterprises "consented to their conservatorships," Plaintiff also includes conclusory allegations that the appointment of the Conservator was "initiated at the direction of Treasury" without "a finding of its necessity" or sufficient "fiduciary scrutiny." Compl. ¶ 3.  Nevertheless, Plaintiff does not seek any relief in connection with the appointment of the Conservator.  Even if it did, such efforts would be doomed to failure because Congress explicitly provided a 30-day window for any challenges to the appointment of FHFA as Conservator, and barred all challenges thereafter.  *See* 12 U.S.C. § 4617(a)(5)(A).

income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term." Freddie Mac Form 10-Q Q2, at 10 (Aug. 7, 2012) (attached as Exhibit D); *see also* Ex. C  (Fannie Mae Form 10-Q Q2, at 12 (Aug. 8, 2012)) ("we do not expect to generate . . . income in excess of our annual dividend obligation to Treasury over the long term").

Because under the formula of the Second Amendment the cap on the Treasury commitment became fixed on January 1, 2013, each dollar drawn from Treasury merely to pay the Treasury dividend was one less dollar available to the Enterprises to draw upon in the event the Enterprises suffered losses due, for example, to a decline in the housing market or broader economic turbulence.  The prospect of the Enterprises continuing this circular practice raised concerns in the marketplace (holders of Enterprise debt and mortgage backed securities) over the adequacy of the remaining Treasury funds.[11]

On August 17, 2012, the Conservator entered into the Third Amendment, which arrested this erosion of Treasury's commitment and of public confidence.  In announcing the Third Amendment, the Conservator stated:  "Replacing the current fixed dividend in the PSPAs with a variable dividend based on net worth will . . . eliminate the need for Fannie Mae and Freddie Mac to continue to borrow from the Treasury Department to pay dividends.  As Fannie Mae and

---

[11]   *See* FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements*, ("OIG Report (Mar. 20, 2013)") (attached as Exhibit E), at 1, *also available at* http://www.fhfaoig.gov/Content/Files/WPR-2013-002_2.pdf).  The Court may consider this OIG report in resolving this motion to dismiss because it is quoted and referenced throughout the complaint.  *See* Compl. ¶¶ 59, 67, 68, 82; *see also Dittmer Props.*, 708 F.3d at 1021 (documents "referred to either directly . . . or by inference . . . in the complaint" may be considered in resolving a motion to dismiss when "their authenticity is not questioned").  The Court may also take judicial notice of the OIG Report as a publically available government report.  *See Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995-96 (8th Cir. 2007).

Freddie Mac shrink,[12] the continued payment of a fixed dividend could have called into question the adequacy of the financial commitment contained in the PSPAs." Ex. E (OIG Report (Mar. 20, 2013) at 24 App'x B)). As FHFA's Inspector General observed: "The change to the dividends provides the market with greater assurance that the Enterprises will have sufficient capital to fulfill their obligations on their bonds and MBS, which encourages continued liquidity in the mortgage market." *Id.* at 14.

In sum, the Conservator determined the Third Amendment successfully resolved a very real problem—drawing funds from Treasury to pay the 10% dividend to Treasury—which threatened to drain the Treasury commitment and disrupt the housing market that FHFA is charged to protect. By executing the Third Amendment, the Conservator took action to preserve and effectively extend the Treasury commitment, thereby reassuring the Enterprises' debt and MBS holders that the Enterprises would not default on their obligations. These actions were squarely within the Conservator's statutory powers and functions because they "carry on the business" of the Enterprises, "put the [Enterprises] in a sound and solvent condition," 12 U.S.C. § 4617(b)(2)(D), and promote "the best interests of the [Enterprises] or the [FHFA]." *Id.* § 4617(b)(2)(J)(ii). That is the Conservator's express statutory prerogative. Section 4617(f) thus bars equitable and declaratory claims, including Plaintiff's APA claim. *See* 5 U.S.C. § 701(a).

---

[12]   The original PSPAs require the Enterprises to shrink their portfolio by 10% each year (Ex. A at 9, 24 (PSPAs § 5.7) (Sept. 26, 2008)), thereby reducing the Enterprises' income streams going forward, and further reducing their ability to afford the 10% dividend payments.

### 2. *Plaintiff's Attempt to Second Guess the Conservator's Means of Addressing its Treasury Dividend Obligations is Impermissible*

Plaintiff does not and cannot dispute that drawing funds *from* Treasury in order to pay dividends *to* Treasury was problematic because it decreased Treasury's funding commitment. *See* Compl. ¶ 9.  In fact, Plaintiff alleges that the Enterprises should never have drawn Treasury funds to pay the 10% dividend in the first place.  *Id.* ¶¶ 11, 55, 103.  Plaintiff alleges that the Conservator instead should have directed the Enterprises to accrue the Treasury dividends at a 12% rate, and that the Conservator's failure to do so means that it "acted beyond its [statutory] authority."  *Id.* ¶ 103.  Plaintiff thus requests additional declaratory and injunctive relief— beyond vacating the Third Amendment—in the form of an order "[v]acating and setting aside FHFA's requests for draws to pay Treasury cash dividends and ordering an according reduction in the liquidation preference of the Government Stock."  *Id.* ¶ 167(g).

Plaintiff's claims strike at the core of the bar Congress granted through Section 4617(f). They constitute unalloyed "outside second-guessing" of the *means* by which the Conservator exercised its discretion in operating the Enterprises.  *See Nat'l Trust for Historic Preserv. v. FDIC*, 995 F.2d 238, 240 (D.C. Cir. 1993).  Allegations that the Conservator could have done its job better, or in a manner that would have been more preferable to Plaintiff, simply cannot surmount the sweeping language of Section 4617(f).

Plaintiff cannot avoid Section 4617(f)'s bar on judicial review merely by alleging that the Conservator's exercise of its powers was improper, unwarranted, unwise, or even in violation of other law.  So long as the Conservator takes an action that is not "clearly outside" its statutory powers and functions (*Gross*, 974 F.2d at 407), Section 4617(f) applies and "immuniz[es]" the Conservator from "outside second-guessing."  *Nat'l Trust*, 995 F.2d at 240-41 (holding Section 1821(j) precluded injunction of property sale, despite allegation that sale would violate another

statute, the National Historic Preservation Act).  Put simply, the application of Section 4617(f)

"does not hinge on [the court's] view of the proper exercise of otherwise-legitimate powers."

*Gross* 974 F.2d at 408 (applying Section 1821(j)); *see also Cnty. of Sonoma*, 710 F.3d at 993

("[I]t is not our place to substitute our judgment for FHFA's" as Conservator).

For example, in *Ward v. Resolution Trust Corp.*, 996 F.2d 99, 103 (5th Cir. 1993), the

plaintiff alleged that the receiver acted outside of its statutory powers because it allegedly failed

to properly carry out its role as receiver.  The court rejected these arguments, holding that the

materially-identical Section 1821(j) barred plaintiffs' claims for equitable relief.  *Id.* at 104.  The

court recognized that, as long as the conservator or receiver acts within its powers and functions,

allegations that those actions are otherwise improper are irrelevant:

> Ward fails (or refuses) to recognize the difference between the exercise of a function or power that is clearly outside the statutory authority of the [conservator or receiver] on the one hand, and improperly or even unlawfully exercising a function or power that is clearly authorized by statute on the other.  None can question that the [conservator or receiver] is statutorily authorized to sell real estate of an institution which is under RTC conservatorship or receivership . . . .  Therefore, even assuming arguendo, that (as alleged by Ward) the [conservator or receiver] exercised the power or function of selling the Building in a way that failed to maximize the net present value return or to afford fair and consistent treatment to all offerors, Ward could not prevail.  For, even if the [conservator or receiver] improperly or unlawfully exercised an authorized power or function, it clearly did not engage in an activity outside its statutory powers.  Yet only the latter type of act could conceivably subject the [conservator or receiver] to injunction . . . .

*Id.* at 103.  Likewise, in *Bank of Am. N.A. v. Colonial Bank*, 604 F.3d 1239, 1244 (11th Cir.

2010), the Eleventh Circuit applied Section 1821(j) to bar plaintiff's claim (and vacate the

district court's injunction) notwithstanding plaintiff's "fear" that the receiver would "make an

erroneous determination" in the exercise of its duties.  The Court held that such a concern is

"immaterial to our analysis because it is merely a fear of the [receiver]'s improper performance

of its legitimate receivership functions." *Id.*; *see also Volges*, 32 F.3d at 52 (holding "the fact

that the [conservator or receiver's] actions might violate some other provision of law does not

render the anti-injunction provision inapplicable"); *Hindes v. F.D.I.C.*, No. CIV. A. 94-2355,

1995 WL 82684, at *1 (E.D. Pa. Feb. 28, 1995), *aff'd*, 137 F.3d 148 (3d Cir. 1998) (holding that

allegations of "misconduct and derelictions of duty" by conservator or receiver "do not give the

Court jurisdiction to issue the injunction plaintiffs seek here").

Here, Plaintiff attacks the manner in which the Conservator directed the Enterprises to

satisfy their dividend obligations under the PSPAs and Treasury Certificates.  But Plaintiff

concedes—as it must—that accepting the massive infusion of funds via the PSPAs was squarely

within the Conservator's authority to "carry on the business" of the Enterprises and "put the

[Enterprises] in a sound and solvent condition."  12 U.S.C. § 4617(b)(2)(D).  *See* Compl. ¶ 20

(alleging that the PSPAs "reassured" markets and "honored" shareholder rights).  The

Enterprises' dividend obligation to Treasury was a fundamental element of the unchallenged

PSPAs.  Thus, Plaintiff's claims boil down to its belief that accruing dividends at a 12% rate,

rather than paying them at a 10% rate, would have been more beneficial to the shareholders and

the Enterprises.  Again, alleging that the Conservator could have done its job in a more effective

manner cannot overcome Section 4617(f).  Plaintiff's contention fails on this basis alone, even if it were to be assumed that there was any merit to Plaintiff's contention (which there is not).[13]

### 3. *The Third Amendment Falls Well Within the Conservator's Power to Transfer Enterprise Assets*

In addition to being a statutorily authorized act to secure and extend the Enterprises' capital backstop, the Third Amendment also falls squarely within the Conservator's power to "transfer" Enterprise assets.  HERA authorizes the Conservator to "transfer or sell any asset" of the Enterprises "without any approval, assignment, or consent."  12 U.S.C. § 4617(b)(2)(G).  In light of this broad statutory authority, courts consistently hold that suits seeking equitable remedies in challenging a conservator or receiver's transfer of assets are barred by Sections 1821(j) and 4617(f).[14]  For example, in *Waterview Management Co. v. FDIC*, 105 F.3d 696, 700-02 (D.C. Cir. 1997), the D.C. Circuit held that a plaintiff's claim for declaratory relief and specific performance of a real estate purchase option contract with the receiver, which the

---

[13]   For the same reasons, Section 4617(f) forecloses Plaintiff's conclusory allegations that the Conservator failed to act independently of Treasury or allegedly entered into the Third Amendment only at Treasury's behest.  *See, e.g.*, Compl. ¶¶ 16, 78, 102, 124.  Whether the Conservator possessed an allegedly improper motive or intent when carrying out its statutory powers and functions—such as to accede to Treasury's demands—is irrelevant to the Section 4617(f) analysis; there is simply no "bad motive" exception to Section 4617(f).  *See Leon Cnty. v. FHFA*, 816 F. Supp. 2d 1205, 1208 (N.D. Fla. 2011), *aff'd*, 700 F.3d 1273 (11th Cir. 2012) ("Congress surely knew, when it enacted § 4617(f), that challenges to agency action sometimes assert an improper motive.  But Congress barred judicial review of the conservator's actions without making an exception for actions said to be taken from an improper motive.").

[14]   Section 4617(b)(2)(G) is materially identical to a corresponding provision in FIRREA (*see* 12 U.S.C. § 1821(d)(2)(G)(i)), which courts have interpreted broadly: "It is hard to imagine more sweeping language."  *See Gosnell v. FDIC*, No. 90-1266L, 1991 WL 533637, at *6 (W.D.N.Y. Feb. 4, 1991) (interpreting FIRREA), *aff'd sub nom. Gosnell v. Fed. Deposit Ins. Corp.*, 938 F.2d 372 (2d Cir. 1991).  The statute exemplifies "FIRREA's goal of giving the [conservator or receiver] broad discretion in disposing of the assets under its control."  *Gosnell*, 938 F.2d at 376.  It is "sweeping" in that it "does not provide any limitation" and "contains no directives concerning the manner and procedure by which the [conservator or receiver] is to accomplish this task."  *Gosnell*, 1991 WL 533637 at *6.

receiver had breached, was barred because Section 1821(d)(2)(G)(i) authorized the receiver to transfer assets, including the property that was the subject of the option contract, and Section 1821(j) precluded judicial review of such transfers.

Thus, when these two statutory provisions are read together—the Conservator's unlimited power to transfer assets, and the courts' inability to restrain or affect Conservator actions—"it is evident that [the statutory scheme] empowers [conservators] to sell a failed institution's assets, whatever they may be, free of interference by the courts." *Gosnell*, 1991 WL 533637 at *5.[15]  Plaintiff's claims fail on this basis alone.

**B.     The Third Amendment Is Not an Unauthorized "Wind Down" of the Enterprises**

Nothing pleaded by Plaintiff supports its charge that the Third Amendment effectuates a "wind down" of the Enterprises that would be beyond FHFA's powers as Conservator.  Plaintiff makes much of Treasury's press release that describes the Third Amendment as "help[ing] expedite the wind down of Fannie Mae and Freddie Mac" and "taking the next step toward responsibly winding down Fannie Mae and Freddie Mac."  Ex. E OIG Report (Mar. 20, 2013) at 22 App'x A (Press Release, Treasury, Treasury Department Announces Further Steps to

---

[15]    *See also Courtney v. Halleran*, 485 F.3d 942, 949 (7th Cir. 2007) (holding receiver's agreement to transfer assets was protected by Section 1821(j), even though the transfer was allegedly in violation of the receivership distribution priority scheme); *Volges v. Resolution Trust Corp.*, 32 F.3d 50, 53 (2d Cir. 1994) (holding receiver's transfer of assets, allegedly in breach of a contract, was authorized by Section 1821(d)(2)(G)(i) and thus Section 1821(j) barred the court from enjoining such transfers, "regardless of [plaintiff]'s ultimate chance of success on his contract claim"); *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1323, 1328-29 (6th Cir. 1993) (holding Section 1821(j) barred claims seeking rescission of a transaction in which the receiver "transferred substantially all" of the institution's assets).

Expedite Wind Down of Fannie Mae and Freddie Mac  (Aug. 17, 2012)).[16]  Plaintiff alleges that

this so-called "wind down" of the Enterprises "necessarily involves liquidating their assets and

property," and is therefore outside the statutory authority of the Conservator.  *See* Compl. ¶ 89.

Plaintiff misses the mark.

The Conservator's powers extend well beyond Enterprise rehabilitation; the Conservator

is empowered with ample statutory authority to shrink the Enterprises and prepare them for

potential liquidation.  Plaintiff simply ignores the fact that in addition to authorizing the

Conservator to pursue Enterprise rehabilitation, HERA simultaneously expressly authorized the

Conservator to pursue Enterprise reorganization and wind-up.  Section 4617(a)(2) provides:

"[t]he Agency may, at the discretion of the Director, be appointed *conservator* or receiver for the

purpose of reorganizing, rehabilitating, *or winding up* the affairs of [the Enterprises]." (emphasis

added).[17]  The Conservator has the obligation to stabilize the troubled financial institution and

ready it *either* for return to the marketplace *or* liquidation.  *See Ameristar Fin. Servicing, Co.,

LLC v. United States*, 75 Fed. Cl. 807, 808 n.3 (2007) (describing a conservator as "operat[ing] a

troubled financial institution in an effort to conserve, manage, and protect the troubled

institution's assets until the institution has stabilized *or has been closed by the chartering

authority*") (emphasis added) (citation omitted).  This Conservator "wind up" authority includes

the ability, described above, to transfer Enterprise assets without any approvals or consents, 12

_____

[16]   The Treasury Press Release may be considered in resolving this motion to dismiss because it
is incorporated by reference in the Complaint, (Compl. ¶¶ 13, 80); *Dittmer Props.*, 708 F.3d at
1021), and because it is a judicially-noticeable government document.  *See Great Plains Trust*,
492 F.3d at 995-96.

[17]   Significantly, there is no analogue in FIRREA to this provision of HERA that explicitly
grants FHFA as both conservator and receiver "winding up" authority.

U.S.C. § 4617(b)(2)(G), and necessarily includes the ability to shrink the Enterprises' operations to ensure their safety and soundness. "Winding up" and "liquidation" are not synonymous under HERA; the Conservator has the express authority to do the former in order to prepare it for the possibility of the latter.

## VI.     HERA Bars Shareholder Claims During Conservatorship, Including Plaintiff's Contract and Fiduciary Duty Claims

Plaintiff's claims for breach of contract, breach of the implied duty of good faith and fair dealing, and breach of fiduciary duty fail because the Conservator has "succeed[ed]" by operation of law to "all" shareholder rights during conservatorship, including the very "rights" Plaintiff attempts to vindicate through these claims.

### A.     The Conservator Succeeds to All Shareholder Rights

Congress could not have been more clear: upon its appointment, the Conservator "immediately succeed[ed] to . . . *all rights, titles, powers, and privileges* of the [Enterprises], and *of any stockholder*, officer, or director *of [the Enterprises]* with respect to the [Enterprises] and the assets of the [Enterprises]." 12 U.S.C. § 4617(b)(2)(A) (emphases added). This broad, unequivocal language evidences Congress's intent to ensure "that nothing was missed" and to "transfer[] everything it could to the [Conservator]." *Kellmer v. Raines*, 674 F.3d 848, 851 (D.C. Cir. 2012) (quoting *Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir. 1998); *see also Hennepin Cnty. v. Fed. Nat. Mortgage Ass'n*, 742 F.3d 818, 822 (8th Cir. 2014) (applying the "interpretive rule" of "all means all" to HERA's exemption of FHFA from "all taxation") (internal citation omitted). Accordingly, "[t]he shareholders' rights are now the FHFA's." *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 351 (S.D.N.Y. 2009).

Courts have uniformly interpreted this provision of HERA to bar claims asserted by the Enterprises' shareholders during the conservatorships. For example, in *Kellmer*, the D.C. Circuit

affirmed the district court's substitution of the Conservator in place of the plaintiffs—

shareholders of Fannie Mae—who had asserted a variety of shareholder derivative claims,

including breach of fiduciary duty.  The Court held:

> [T]o resolve this issue, we need only heed Professor Frankfurter's timeless advice: " '(1) Read the statute; (2) read the statute; (3) read the statute!' " *See* Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes, in* Benchmarks 196, 202 (1967). HERA provides that FHFA "shall, as conservator or receiver, and by operation of law, immediately succeed to . . . all rights, titles, powers, and privileges . . . of any stockholder."  12 U.S.C. § 4617(b)(2)(A).  ***This language plainly transfers shareholders' ability to bring derivative suits—a "right[ ], title[ ], power[ ], [or] privilege[ ]"—to FHFA.***

674 F.3d  at 850 (emphasis added).[18]  Numerous other courts are in accord.  *See, e.g., In re Fed.*

*Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 795 (E.D. Va. 2009) ("*In re*

*Freddie Mac*") (substituting FHFA in place of shareholder plaintiffs, holding that "the plain

meaning of the statute is that *all* rights previously held by Freddie Mac's stockholders, including

the right to sue derivatively, now belong exclusively to the FHFA") (emphasis in original), *aff'd*

*sub nom. La. Mun. Police Emps. Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. May 5, 2011);

*Sadowsky*, 639 F. Supp. 2d at 351 (same, holding that "Congress has clearly announced that

FHFA has inherited all rights and powers of the Freddie Mac shareholders. . . [including] the

---

[18]    It appears Plaintiff seeks to avoid HERA's plain language by inviting the Court to create a "manifest conflict of interest" exception to the statute.  *See* Compl. ¶ 161.  But HERA's plain language provides for no exception—based on purported conflicts of interest or otherwise—to the transfer of "all" shareholder rights, titles, powers, and privileges to the Conservator.  *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.") (internal quotation marks and citation omitted).  Indeed, Congress could not have crafted a broader transfer of shareholder rights to the Conservator.  *See Kellmer*, 674 F.3d at 851 (Congress ensured that "nothing was missed" when it "*transferred everything it could to the* [Conservator]") (emphasis added).

right to substitute for shareholders in suits such as this one."); *Pareto*, 139 F.3d at 700 (holding

shareholder plaintiffs lacked standing to pursue claims, holding that "Congress has transferred

everything it could to the FDIC, and that includes a stockholder's right, power, or privilege to

demand corporate action or to sue directors or others when action is not forthcoming)

(interpreting materially identical 12 U.S.C. § 1821(d)(2)(A)(i)).  The same outcome is warranted

here:  Plaintiff's claims based on its status as a shareholder of the Enterprises are barred because

the Conservator alone holds "all" shareholder rights during conservatorship.[19]  Accordingly,

Plaintiff's contract and fiduciary duty claims, which are premised upon their rights as

shareholders and asserted against FHFA while it serves as Conservator, must be dismissed.[20]

---

[19]    Although these cases concerned derivative, not direct, claims asserted by shareholders, such a distinction is immaterial.  HERA grants the Conservator "all" shareholder rights without qualification.  In any event, Plaintiff's contract and fiduciary duty claims are derivative, not direct.  Plaintiff seeks contract damages based on an injury to its stock value.  *See, e.g.,* Compl. ¶¶ 13, 19, 69, 74, 135.  But "shareholders cannot sue in their own names and on their own behalf to recover for a loss resulting from depreciation of the value of their stock as the result of an injury to the corporation."  12B Fletcher Cyc. Corp. § 5913; *see also NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10 CIV. 5762 PAE, 2013 WL 489020, at *6 (S.D.N.Y. Feb. 8, 2013) ("[T]he Delaware Supreme Court has repeatedly emphasized that a decrease in a shareholder's stock's value can be asserted only as a derivative claim.") (citing, *inter alia, Gentile v. Rossette*, 906 A.2d 91 (Del. 2006)).  Moreover, because Plaintiff alleges that the Third Amendment was harmful to the Enterprises (*see, e.g.,* Compl. ¶¶ 77, 83, 99), and because the relief Plaintiff seeks—namely, to vacate the Third Amendment and to return to the Enterprises all dividend payments made pursuant to the Third Amendment (*id.* ¶ 167)—would flow directly to the corporation and only indirectly to the shareholders, Plaintiff's claims are necessarily derivative, not direct.  *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004); *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1179 (Del. Ch.2006) (claim is direct only where "no relief flows to the corporation").  Finally, even if direct, Plaintiff's fiduciary duty claims fail because holders of preferred stock, such as Plaintiff, cannot assert breach of fiduciary duty claims; preferred shareholder rights are "unique[ly] contractual." *MCG Capital Corp. v. Maginn*, No. CIV. A. 4521-CC, 2010 WL 1782271, at *15 (Del. Ch. May 5, 2010); *see also Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 833-34 (Del. Ch. 2006).

[20]    The Conservator's succession to all shareholder rights does not leave Plaintiff without a remedy.  HERA expressly permits shareholders of institutions in conservatorship that enter receivership to pursue claims after the conservatorships end, through the receivership claims process.  *See* 12 U.S.C. § 4617(b)(2)(K)(i) and 12 U.S.C. § 4617(b)(6).

B.     **The Conservator's Succession to All Shareholder Rights Includes Shareholders' Voting Rights**

Plaintiff's claims for breach of contract and breach of the implied duty of good faith and fair dealing fail for the additional reason that they are premised upon a purported right to vote on the passage of the Third Amendment.  Plaintiff alleges that, by entering into the Third Amendment, the Conservator breached the stock certificate agreement by depriving Plaintiff of the ability to recover dividends and a liquidation preference.  *See* Compl. ¶¶ 137-54.  Even though the PSPAs do not mention—let alone amend—Plaintiff's stock certificates, Plaintiff nevertheless alleges that the Third Amendment effected a unilateral amendment to the terms of *its* stock certificate (*id.* ¶¶ 142-43), and thus is invalid because Plaintiff was not permitted to vote on it.[21]  To the extent Plaintiff's stock certificate ever gave it any such right—it did not—the Conservator has succeeded to that right and thus Plaintiff's contract claims fail.

During conservatorship, Plaintiff cannot exercise the very "contractual rights" it seeks to vindicate through its claims for breach of contract and the implied duty of good faith and fair dealing.  *See id.* ¶¶ 138-44, 148-52.  Instead, as described above, the Conservator possesses all of the rights of *both* the Enterprises *and* their shareholders—the two parties to the contracts at issue—during conservatorship.  *See Sadowsky*, 639 F. Supp. 2d at 351 ("The shareholders' rights

---

[21]    The preferred stock certificates provide that an affirmative vote "of at least 66 2/3% of all of the shares of [the specific series of preferred stock] . . . shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal of the provisions of [the Certificates] if such amendment, alteration, supplementation or repeal would materially and adversely affect the" rights under the Certificates of Designation.  *See, e.g.*, Freddie Mac, Cert. Design. for Series M Preferred Stock, § 9(h)(ii) (attached as Exhibit F).  The voting provision in the Certificates of Designation for Freddie Mac's common stock is similar, providing that at least 66 2/3% of all holders of common stock must affirmatively vote to amend, alter, or repeal the provisions of the certificate in a way that materially and adversely affects the common stockholders.  *See* Freddie Mac, Eighth Amended & Restated Cert. Design. for Common Stock, § 10(h)(ii) (attached as Exhibit G).

are now the FHFA's.").  The Conservator thus owes no contractual duties to this shareholder-Plaintiff.  *See Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 858 (7th Cir. 2007) (holding contract between two parties who later merged "could not have been breached" because "a party cannot contract with itself"); Restatement (First) of Contracts § 451 (1932) ("Where a person subject to a contractual duty . . . acquires the correlative right in the same capacity in which he owes the duty, the duty is discharged.").

Plaintiff's theory that the Third Amendment amended Plaintiff's stock certificate in a material way that triggered its voting rights (Compl. ¶¶ 141-43) is not only fanciful—the Third Amendment amended the *Treasury* stock certificates, not Plaintiff's—it fails because the Conservator's succession to "all rights" of the shareholders includes, at a minimum, shareholders' voting rights.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. First Nat'l Bank of Keystone*, 394 F. Supp. 2d 829, 835-36 (S.D. W. Va. 2005) ("When FDIC took over as receiver it succeeded to the rights [the institution] had under the contracts.").  Plaintiff's preferred stock certificate expressly provides that two-thirds of the preferred shareholders may vote to "authoriz[e], effect[] or validat[e] the amendment, alteration, supplementation or repeal of the provisions of this Certificate if such amendment, alteration, supplementation or repeal would materially and adversely affect the powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms or conditions of the" respective series of preferred stock.  Freddie Mac, Cert. of Design. for Series S Preferred Stock § 9(h)(ii) (attached as Exhibit H) (emphasis added); *see*

*also* Fannie Mae, Cert. Design. for Series O Preferred Stock, § 7 (attached as Exhibit I).[22]

Shareholders' voting powers expressly include the power to approve the alteration of any right

provided for under the certificate of designation.  Here, because the Conservator succeeded to

these voting rights, Plaintiff's allegations that the Conservator "violated this prohibition" against

"changing the terms of the Companies' Preferred Stock" absent its consent fails.  Compl. ¶¶ 142-

44, 152;  *see also* 12 U.S.C. § 4617(b)(2)(A).

Moreover, the Conservator's succession to all shareholder rights—including voting

rights—is a manifestation of Congress's direction that all control over the Enterprises be unified

under the Conservator, who alone bears the responsibility of operating the Enterprises.  *See, e.g.*,

12 U.S.C. § 4617(b)(2)(B), (D), and (J); *see also Pareto*, 139 F.3d at 700-01 (conservator or

receiver's succession "includes a stockholder's right, power, or privilege to demand corporate

action" and, "like all others who have some interest in recovering funds from the closed bank,

[shareholders] must simply rely upon the FDIC [as conservator or receiver] to do its job").[23]

Because the Conservator has succeeded to the shareholders' right to vote in connection with their

---

[22]    Like the PSPAs, the stock certificates governing Plaintiff's shares are incorporated by reference into the Complaint (Compl. ¶¶ 30-31, 142-44, 152) and may be considered by the Court on this basis.  *See Dittmer Props.,* 708 F.3d at 1021.  Moreover, in cases involving contract-related disputes  "the court may examine the contract documents in deciding a motion to dismiss."  *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).

[23]  Since appointment of FHFA as Conservator, no stockholder votes or annual shareholder meetings have occurred.  *See, e.g.*, Fannie Mae, Annual Report, at 57 (Form 10-K) (Feb. 24, 2011) (attached as Exhibit J) ("The rights and powers of our shareholders are suspended during the conservatorship. . . . [O]ur common shareholders do not have the ability to elect directors or to vote on other matters unless the conservator delegates this authority to them."); Fannie Mae, Annual Report (Form 10-K), at 201 (Feb. 26, 2010) (attached as Exhibit K) (noting that, "[i]n consultation with the conservator, we currently do not plan to hold an annual meeting of shareholders in 2010") .

shares, Congress has authorized the Conservator to take action that otherwise would require a

shareholder vote.  Plaintiff's contention that their consent was required fails as a matter of law.[24]

## VII.   In the Alternative, the Court Should Transfer this Case to the U.S. District Court for the District of Columbia

If the Court denies FHFA's motion to dismiss, the Court should transfer this action to the

U.S. District Court for the District of Columbia.  Numerous other shareholders of the

Enterprises—including Plaintiff's parent corporation, represented by Plaintiff's counsel—already

have filed suit in that court, asserting the *same* claims against the *same* Defendants based on the

*same* factual allegations concerning the *same* alleged misconduct (the "D.D.C. Actions").  *See*

*supra* n.4.  These actions have been pending for nine months and briefing on coordinated

dispositive motions is scheduled to close on June 2, 2014.  Plaintiff filed the present complaint in

this Court only after Defendants filed their motions to dismiss in the D.D.C. Actions.  This

---

[24]   Plaintiff also lacks standing for failure to allege the minimum contemporaneous stock ownership requirements.  A derivative shareholder-plaintiff must aver in its complaint that it either held shares at the time of the alleged misconduct or that the shares thereafter devolved upon the plaintiff by operation of law.  *See* Del. Code Ann. tit. 8, § 327 (2001); Fed. R. Civ. P. 23.1(b); *Dimpfel v. Ohio & Miss. Ry. Co.*, 110 U.S. 209, 211 (1884) (affirming dismissal because plaintiff could not show he "was a stockholder at the time of the transactions of which he complains, or that his shares have devolved on him since by operation of law"); *CarrAmerica Realty Corp. v. Kaidanow*, 331 F.3d 999, 1001 (D.C. Cir. 2003) (holding plaintiffs lacked the "requisite standing to challenge the propriety" of actions taken before plaintiffs acquired the stock).  The purpose of this long-standing rule is to prevent a speculating outsider from buying shares of stock in a corporation with the intent to sue to "upset an action that had been taken by the corporation at some previous time."  *Vann v. Indus. Processes Co.*, 247 F. Supp. 14, 18-19 (D.D.C 1965) (citing *Hawes v. Oakland*, 104 U.S. 450, 461 (1881)); *see also Home Fire Ins. Co. v. Barber*, 93 N.W. 1024, 1029 (Neb. 1903) (R. Pound, J.) ("[O]ne who held no stock at the time of the mismanagement ought not to be allowed to sue," but instead "ought to take things as he found them when he voluntarily acquired an interest.").  Moreover, because the contemporaneous ownership requirement is derived from equitable principles, it also "has been applied to preclude stockholders who later acquire their shares from prosecuting *direct* claims."  *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1170 (Del. Ch. 2002) (emphasis added).  Here, Plaintiff merely alleges that it "owns" shares of the Enterprises' preferred stock.  Compl. ¶ 31.  Plaintiff fails to allege that it owned those shares at the time of the alleged misconduct, including on August 17, 2012, the date the Conservator and Treasury executed the Third Amendment.  Thus, Plaintiff lacks standing to pursue its claims, whether direct or derivative.

complaint thus appears to be an effort by Plaintiff to hedge its bets by asserting the same claims

in this Court while adding additional (but immaterial) allegations—akin to an amended

complaint—to attempt to plead around the dispositive arguments for dismissal Defendants

already have asserted in the D.D.C. Actions.

### A.        The First-Filed Rule Compels Transfer

"In the absence of compelling circumstances, the court initially seized of a controversy

should be the one to decide the case." *Orthmann v. Apple River Campground, Inc.*, 765 F.2d

119, 121 (8th Cir. 1985) (internal quotation marks, alteration, and citation omitted).  Thus, courts

generally follow the "first to file" rule, a doctrine of federal comity (*id.*), which grants district

court judges the discretion to transfer, stay, or dismiss an action when a previously-filed

concurrent action is pending in another judicial district.  *See CruiseCompete, LLC v. Smolinski &*

*Assocs., Inc.*, 859 F. Supp. 2d 999, 1014 (S.D. Iowa 2012).  The first-filed rule applies "when

parallel litigation has been instituted in separate courts."  *Nw. Airlines*, 989 F.2d at 1006.  "Suits

are parallel if substantially the same parties litigate substantially the same issues in different

forums."  *Scottsdale Ins. Co. v. Detco Indus., Inc.*, 426 F.3d 994, 997 (8th Cir. 2005) (internal

quotation marks and citation omitted).

Because the present action involves substantially the same parties litigating substantially

the same issues as in the D.D.C. Actions, transfer is warranted under the first filed rule.

First, the parties are substantially similar.  Defendants in this action are defendants in the

D.D.C. Actions.  Plaintiff in this action and plaintiffs in the D.D.C. Actions are all shareholders

of the Enterprises, asserting the same claims based on their status as shareholders, including

claims for breach of the identical contracts.  *See Fuller v. Abercrombie & Fitch Stores, Inc.*, 370

F. Supp. 2d 686, 689-90 (E.D. Tenn. 2005) (transferring under first-filed rule where management

employee plaintiffs were "effectively identical" because their "claims [were] based on this

common characteristic").  Further, Plaintiff's corporate parent is a plaintiff in the D.D.C.

Actions.  *Compare* Pl.'s Statement of Interest at 1 (Doc. # 14) (identifying Berkley Regional

Insurance Company as "one of the Plaintiff's parent entities" having "at least an indirect

pecuniary interest in the outcome of Plaintiff's case against the Defendants by virtue of the

case's financial impact on Plaintiff's parent entities") *with* Fairholme Complaint ¶ 24,

(*Fairholme Funds, Inc., et al. v. FHFA, et al.*, No. 1:13-cv-01053 (D.D.C. Jul. 10, 2013))

(attached as Exhibit L) (identifying Berkley Regional Insurance Company as a plaintiff)).  This

case is thus akin to *Maverick Tube, LP v. Westchester Surplus Lines Ins. Co.*, 4:07 CV 298 DDN,

2007 WL 5115436, at *1-2 (E.D. Mo. Aug. 6, 2007) where—like here—the parent corporation

was a party to the first action and the subsidiary corporation filed the second action, and both

actions concerned substantially the same issues (whether the defendant insurer was required to

provide coverage).  The court ordered transfer under the first-filed rule.  *See id*. at *3.

Second, the issues are substantially similar.  Both sets of actions concern the same

controversy:  whether the Conservator and Treasury acted unlawfully and to the unauthorized

detriment of the Enterprises' shareholders by executing the Third Amendment to the PSPAs.

Both sets of actions present the same claims:  (1) violation of the APA (exceeding statutory

authority); (2) violation of the APA (arbitrary and capricious conduct); (3) breach of contract, (4)

breach of the implied covenant of good faith and fair dealing, and (5) breach of fiduciary duty.

And in both sets of actions, plaintiffs ask the Court to vacate and set aside the Third Amendment,

undo the effects of that Amendment, and award plaintiffs damages based on the alleged breaches

of contract and fiduciary duty.

Finally, the same counsel representing Plaintiff's corporate parent in the D.D.C. Actions

also represents Plaintiff here, further confirming the similarity of parties in these cases.  *See*

*Nat'l Health Fed'n v. Weinberger*, 518 F.2d 711, 714 (7th Cir. 1975) (affirming dismissal under first-filed rule and noting that plaintiffs' counsel had participated in the first-filed suit); *Koehler v. Pepperidge Farm, Inc.*, 13-CV-02644-YGR, 2013 WL 4806895, at *2, *6 (N.D. Cal. Sept. 9, 2013) (transferring under first-filed rule where same counsel filed suits on behalf of two different putative class plaintiffs); *EBW, Inc. v. Environ Prods., Inc.*, No. 1:96–CV–144, 1996 WL 550020, at *4 (W.D. Mich. July 8, 1996) (transferring under first-filed rule where counsel for second-filed action represented a party in the first filed action).

Permitting this action to proceed concurrently with the ongoing D.D.C. Actions would result in the very outcomes the first filed rule intends to avoid—excess expenditure of judicial and party resources on duplicative litigation brought by the same parties concerning the same issues.  Further, permitting this action to proceed would run the risk of two courts making conflicting factual findings and/or legal conclusions pertaining to the exact same dispute between the substantially the same parties.  The Court should apply the first-filed rule and transfer this action to the U.S. District Court for the District of Columbia.  Alternatively, the Court may exercise its discretion under the first-filed rule to stay proceedings here until the resolution of the cases in that forum.

### B.    Transfer is Warranted Under 28 U.S.C. § 1404

Transfer also is warranted under 28 U.S.C. § 1404(a), which provides that, "[f]or the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  The Eighth Circuit has directed that district courts "should weigh any case-specific factors relevant to convenience and fairness to determine whether transfer is warranted."  *In re Apple, Inc.*, 602 F.3d 909, 912 (8th Cir. 2010) (internal quotation marks and citations omitted).

### 1.     *The D.D.C Is An Available Forum*

It is indisputable that this action "might have been brought" in the U.S. District Court for the District of Columbia.  *See* 28 U.S.C. § 1404(a).  Indeed, various shareholder plaintiffs already have brought ten essentially identical actions in that court asserting the same claims against the same defendants.  Plaintiff's own corporate parent initiated one of those actions and therein alleges that venue is proper in the D.D.C. "under 28 U.S.C. § 1391(e)(1)(A) and (B), because this is an action against officers and agencies of the United States, and Defendants all reside in this judicial district . . . and a substantial part of the events or omissions giving rise to this action occurred in this judicial district."  Ex. L (Fairholme Compl. ¶ 17).

### 2.     *The Interests of Justice Favor Transfer*

The interests of justice include questions of judicial economy, and "[t]he pendency of related litigation in another forum is a proper factor to be considered in resolving choice of venue questions."  *Ahlstrom v. Clarent Corp.*, No. 02-780, 2002 WL 31856386, at *6 (D. Minn. Dec. 19, 2002) (quoting *Codex Corp. v. Milgo Elec. Corp.*, 553 F.2d 735, 739 (1st Cir. 1977)).  Indeed, in *Continental Grain Co. v. The Barge FBL-585*, 364 U.S. 19 (1960), the Supreme Court observed that § 1404(a) "was designed to prevent" the "wastefulness of time, energy and money" that would accompany the "situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts."  *Id.* at 26.  This is precisely the situation before this Court.

The pending D.D.C. Actions involve substantially the same parties, claims, and issues as the present action, all of which revolve around Defendants' decision to execute the Third Amendment.  This Court and others routinely transfer cases in these circumstances to the forum in which the related action is pending.  *See, e.g.*, *Sissel v. Klimley*, No. 3:08-CV-00062-JAJ, 2009 WL 700186, at *6 (S.D. Iowa Mar. 16, 2009) (holding "judicial economy mandates

transfer" to forum in which the same plaintiff's counsel was already asserting "nearly identical claims against the same defendants"); *Larsen v. Pioneer Hi-Bred Int'l*, No. 06-cv-0077, 2007 WL 3341698, at *10-11 (S.D. Iowa Nov. 9, 2007) (ordering transfer to forum in which defendant was "already defending a substantially similar lawsuit," and observing that "[i]f the motion to transfer is denied, [defendant] will be forced to proceed in two districts and incur duplicative litigation costs").

The same approach applies here.  The D.D.C. Actions—like the action here—present APA claims and Defendants already have filed administrative records in the D.D.C. upon which that court will resolve the APA claims.  Absent transfer, this Court likely would be required to conduct the same analysis of the same administrative records to resolve the same APA claims asserted here, leading to further duplicative efforts and potentially inconsistent results.  This case is thus akin to *Villa v. Salazar,* 933 F. Supp. 2d 50 (D.D.C. 2013), in which the plaintiff brought an action raising APA claims while two other cases that "involve[d] APA challenges to the exact same decision at issue" were already pending in another court.  *Id*. at 56.  The court ordered that the later-filed action be transferred to the venue of the earlier-filed actions.  *Id*. at 57.  The court observed that: "***There is no reason to have two courts reviewing the same administrative record without extraordinary need or other distinguishing features***, which are not present here."  *Id*. (emphasis added).  The court thus held that "[i]n a potentially complex APA case like this one, which involves a lengthy factual history and a complicated statutory and regulatory scheme that the transferee district has begun dissecting, the interest of justice favors transfer."  *Id*. at 56; *see also Weinberger*, 518 F.2d at 714 (dismissing second filed action where it would have required review of an administrative record already being reviewed by another court).

### 3.    *The Convenience of the Parties and Witnesses Favors Transfer*

Litigating this case in the D.D.C., in conjunction with the ten other actions already pending in that court, would be far more convenient for the parties and witnesses.  All Defendants reside in the District of Columbia.  All of the operative facts giving rise to this suit occurred in or near the District of Columbia.  Plaintiff's corporate parent has recognized as much, alleging in the D.D.C. that "a substantial part of the events or omissions giving rise to this action occurred in this judicial district."  Ex. L (Fairholme Compl. ¶ 17).

The only apparent connection to this forum is that Plaintiff resides here.  *See* Compl. ¶ 24.  But Plaintiff's claims are premised upon its mere ownership of preferred stock in the Enterprise, not on any acts or omissions by Defendants that occurred in Iowa.  Moreover, Plaintiff and its counsel already have shown their willingness to litigate these issues in the District of Columbia: Plaintiff and its corporate parent have asserted takings claims in the U.S. Court of Federal Claims (located in the District of Columbia), and plaintiff's corporate parent is also a plaintiff in the D.D.C. Actions.  Both Plaintiff and its corporate parent are represented by the same counsel (Cooper & Kirk) in all three forums.  Indeed, Cooper & Kirk's sole office is in Washington D.C., further confirming the convenience of litigating in the D.D.C.

Finally, although courts generally give deference to Plaintiff's choice of forum in the transfer analysis, that choice is "accorded less weight where the operative events giving rise to the lawsuit took place in another forum."  *Federated Capital Corp. v. Nev. C.K. Inc.*, No. 4:09CV01806, 2010 WL 1704400, at *2 (E.D. Mo. Apr. 28, 2010).  Here, as explained above, the only apparent connection between Plaintiff's claims and this venue is that Plaintiff is a corporate resident of Iowa.  *See* Compl. ¶ 24.  Because the operative facts giving rise to this suit—including execution of the Third Amendment and the actions of the Conservator and Treasury leading up to the execution of the Third Amendment—occurred in or near the District

of Columbia, Plaintiff's choice of forum should be given little weight and, in all events, is

overcome by the numerous other factors that weigh heavily in favor of transfer.  *See In re Apple,*

*Inc.*, 602 F.3d at 914-15 (noting that the location of witnesses, documents, and "the site of

alleged misconduct" all "weigh[ed] strongly in favor of transfer").

## CONCLUSION

For the foregoing reasons, FHFA respectfully requests the Court dismiss with prejudice

all claims asserted against them, or, in the alternative, to transfer the action to the U.S. District

Court for the District of Columbia or stay proceedings in this case pending resolution of the

cases in that forum.

Respectfully submitted,

BELIN McCORMICK, P.C.

By: *Matthew C. McDermott*

    Matthew C. McDermott    AT0005085
    Stephen H. Locher    AT0010383
666 Walnut Street, Suite 2000
Des Moines, IA  50309-3989
Telephone:  (515) 283-4643; (515) 283-4610
Facsimile: (515) 558-0643; (515) 558-0610
E-Mail:  mmcdermott@belinmccormick.com;
shlocher@belinmccormick.com

Howard N. Cayne* *Lead Counsel*
Asim Varma*
David B. Bergman*
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C.  20004
Telephone:  (202) 942-5000
Facsimile: (202) 942-5999
E-Mail:  Howard.Cayne@aporter.com;
Asim.Varma@aporter.com;
David.Bergman@aporter.com
**Pro hac vice application pending*

Attorneys for Defendants Federal Housing Finance
Agency and Director Melvin L. Watt

PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was
served upon the parties to this action by serving a copy upon each
of the attorneys listed below on April 29, 2014 by

☐ U.S. Mail ☐ FAX

☐ Hand Delivered ☐ Electronic Mail

☐ FedEx/ Overnight Carrier ☒ CM / ECF

| | |
|---|---|
| Matthew Whitaker | Charles J. Cooper |
| Matt M. Dummermuth | David H. Thompson |
| Kendra Lou Mills Arnold | Peter A. Patterson |
| WHITAKER HAGENOW & GUSTOFF LLP | Vincent J. Colatriano |
| WHG | COOPER & KIRK PLLC |
| 400 E. Court Avenue, Suite 346 | 1523 New Hampshire Avenue NW |
| Des Moines, IA 50309 | Washington, DC 20036 |
| mwhitaker@whgllp.com; | ccooper@cooperkirk.com; |
| mdummermuth@whgllp.com; | dthompson@cooperkirk.com; |
| karnold@whgllp.com | ppatterson@cooperkirk.com; |
| *Attorneys for Plaintiff* | vcolatriano@cooperkirk.com |
| | *Attorneys for Plaintiff* |

Joel  McElvain
Thomas David Zimpleman
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
joel.mcelvain@usdoj.gov;
thomas.d.zimpleman@usdoj.gov
*Attorneys for Department of Treasury*

Signature:     */s/ Lori McKimpson*

F0717\0001\(01835676).DOCX