**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

_____ )
CONTINENTAL WESTERN )
INSURANCE COMPANY, )
 )
           *Plaintiff*, )
 )
        v. )     Case 4:14-cv-00042-RP-RAW
 )     Oral Argument Requested
THE FEDERAL HOUSING FINANCE )
AGENCY, *et al.*, )
 )
           *Defendants.* )
_____ )

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 8

STANDARD OF REVIEW ......................................................................................... 22

ARGUMENT .............................................................................................................. 23

I.  HERA's Jurisdictional Bar Does Not Prohibit Plaintiff's Claims. ................... 23

    A.  Section 4617(f) Does Not Bar Plaintiff's Claims Against FHFA ......................... 24

        1.  This Court Has Jurisdiction To Enjoin FHFA from Exceeding Its Statutory Authority. ............................................................... 24

        2.  FHFA Exceeded Its Statutory Authority When It Agreed to the Net Worth Sweep. ...................................................................... 30

            a.  Defendants' Self-Serving Characterizations of Disputed Facts Do Not Provide a Basis for Dismissing Plaintiff's Claims for Equitable Relief. ........................................................... 30

            b.  FHFA Exceeded Its Statutory Authority by Agreeing to the Net Worth Sweep at Treasury's Direction. .............................. 32

            c.  The Net Worth Sweep Violated FHFA's Statutory Duty To Preserve and Conserve the Companies' Assets and To Place Them in a Sound and Solvent Condition. ...................................... 34

                i.  As Conservator, FHFA Is Obligated To Preserve and Conserve Assets with the Aim of Rehabilitating the Companies. ....................................................................... 34

                ii.  The Net Worth Sweep Failed To Preserve and Conserve the Companies' Assets but Instead Set Them on an Inexorable Path To Wind Down. ................... 39

d.      Defendants' Purported Justifications for the Net Worth Sweep Lack Merit. ..........................................................................43

e.      FHFA Exceeded Its Statutory Authority by Drawing on Treasury Funds To Pay Treasury Dividends. ................................50

B.      Section 4617(f) Does Not Bar Plaintiff's Claims Against Treasury.....................52

II.      Section 4617(b)(2)(A) Does Not Strip Plaintiff of Its Rights in Its Stock........................57

A.      Plaintiff Has Standing To Bring Direct Claims Arising from Its Ownership of Stock. ...............................................................................................57

B.      Plaintiff Has Standing To Bring Even Derivative Claims Where, as Here, the Conservator Has a Manifest Conflict of Interest. .............................................64

C.      HERA Does Not Deprive Plaintiff of its Contractual Rights. ...............................68

III.      Plaintiff's Claims Are Ripe...............................................................................69

IV.      The Court Should Not Transfer Plaintiff's Complaint or Stay These Proceedings...........72

CONCLUSION.....................................................................................................80

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Admiral Fin. Corp. v. United States*, 329 F.3d 1372 (Fed. Cir. 2003) .............................................58

*Allen v. El Paso Pipeline GP Co.*, 90 A.3d 1097 (Del. Ch. 2014) ...............................................61

*Ameristar Fin. Servs. Co. v. United States*, 75 Fed. Cl. 807 (2007)...............................................45

*Arkansas State Bank Comm'r v. RTC*, 745 F. Supp. 550 (E.D. Ark.) ..........................................24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................................................................33

*Bank of America Nat'l Ass'n v. Colonial Bank*, 604 F.3d 1239 (11th Cir. 2010) ........................26

*Bartlett v. Bowen*, 816 F.2d 695 (D.C. Cir. 1987) ..................................................................28, 65

*Battaglia v. General Motors Corp.*, 169 F.2d 254 (2d Cir. 1948)................................................65

*Beck v. PACE Int'l Union*, 551 U.S. 96 (2007) ..........................................................................50

*Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827 (Del. Ch. 2006) ...................63

*Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667 (1986)...........................23, 28, 65

*Bragdon v. Abbott*, 524 U.S. 624 (1998) .....................................................................................34

*Castleglen, Inc. v. Commonwealth Sav. Ass'n*, 728 F. Supp. 656 (D. Utah 1989) .......................71

*Chemical Futures & Options, Inc. v. RTC*, 832 F. Supp. 1188 (N.D. Ill. 1993) ....................25, 30

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988)...............................................76

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) ................................................................ *passim*

*Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp.*,
   489 U.S. 561 (1989)...............................................................................24, 28, 46, 55

*Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193 (2000)...................................39

*County of Sonoma v. FHFA*, 710 F.3d 987 (9th Cir. 2013)...............................................24, 25, 26

*Courtney v. Halleran*, 485 F.3d 942 (7th Cir. 2007) ..................................................................49

*CruiseCompete, LLC v. Smolinski & Assocs., Inc.*, 859 F. Supp. 2d 999 (S.D. Iowa 2012).........73

*Del E. Webb McQueen Dev. Corp. v. RTC*, 69 F.3d 355 (9th Cir. 1995)...............................35, 43

*Delta Savings Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001).....................................66, 67

*Dittmer Props., LP v. FDIC*, 708 F.3d 1011 (8th Cir. 2013)................................................ *passim*

*Domaine Serene Vineyards & Winery, Inc. v. Rynders*, 2009 WL 81079
   (D. Minn. Jan. 9, 2009).........................................................................................78

*EBS Litig., LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302 (3d Cir. 2002) ...........32, 50, 51

*EFCO Corp. v. Aluma Sys., USA, Inc.*, 983 F. Supp. 816 (S.D. Iowa 1997)................................77

*Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051 (Del. Ch. 1987) ....................................63

*Elmco Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914 (4th Cir. 1996) .......................47

*Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530 (1st Cir. 1995) .............................70

*ERW, Inc. v. Environ Prods., Inc.*, 1996 WL 550020 (W.D. Mich. July 8, 1996) .................74, 75

*Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347 (S.D.N.Y. 2009) ..........59, 67

*FAIC Secs., Inc. v. United States*, 768 F.2d 352 (D.C. Cir. 1985)...........................................64, 69

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .............................................45

*First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279
      (Fed. Cir. 1999)..................................................................................................58, 64, 65, 66

*First Ind. Fed. Savs. Bank v. FDIC*, 964 F.2d 503 (5th Cir. 1992) ...............................................72

*Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331 (1990) ...................................64

*Freeman v. FDIC*, 56 F.3d 1394 (D.C. Cir. 1995) ............................................................... *passim*

*Fuller v. Abercrombie & Fitch Stores, Inc.*, 370 F. Supp. 2d 686 (E.D. Tenn. 2005).................74

*Furgatch v. RTC*, 1993 WL 149084 (N.D. Cal. Apr. 30, 1993) .....................................................54

*Gatz v. Ponsoldt*, 2004 WL 3029868 (Del. Ch. Nov. 5, 2004).................................................62, 63

*Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) ...........................................................................61, 63

*Gilardi v. United States Dep't of Health & Human Servs.*, 733 F.3d 1208
      (D.C. Cir. 2013) ..............................................................................................................64

*Gosnell v. FDIC*, 1991 WL 533637 (W.D.N.Y. Feb. 4, 1991).........................................29, 30, 49

*Grayson v. Imagination Station, Inc.*, 2010 WL 3221951 (Del. Ch. Aug. 16, 2010)...................62

*Greater Slidell Auto Auction, Inc. v. American Bank & Trust Co. of Baton Rouge*,
      32 F.3d 939 (5th Cir. 1994) ...........................................................................................46

*Grimes v. Donald*, 673 A.2d 1207 (Del. 2000)............................................................................62

*Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403 (3d Cir. 1992)....................................................24, 27

*Hanson v. FDIC*, 113 F.3d 866 (8th Cir. 1997).............................................................................55

*Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162 (3d Cir. 1982)...........................................76

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
      971 F. Supp. 2d 49 (D.D.C. 2013) .................................................................................64

*Hennepin Cnty. v. Federal Nat'l Mortg. Ass'n*, 742 F.3d 818 (8th Cir. 2014)............................67

*Hindes v. FDIC*, 137 F.3d 148 (3d Cir. 1998) ..............................................................................53

*Home Fire Ins. Co. v. Barber*, 93 N.W. 1024 (Neb. 1903) ..........................................................69

*Houk v. Kimberly-Clark Corp.*, 613 F. Supp. 923 (W.D. Mo. 1985) ...........................................72

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790
      (E.D. Va. 2009)............................................................................................................66, 67

*In re Fed. Nat'l Mortg. Ass'n Secs., Derivative, & ERISA Litig.*, 629 F. Supp. 2d 1
      (D.D.C. 2009) .................................................................................................................66

*In re Freddie Mac*, 643 F. Supp. 2d 790 (E.D. Va. 2009) ..............................................59

*In re Kaplan*, 143 F.3d 807 (3d Cir. 1998) ..................................................................64

*In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447 (Del. Ch. Apr. 18, 2001).......................69

*Integrated Health Servs. of Cliff Manor, Inc. v. THCI Co.*, 417 F.3d 953 (8th Cir. 2005) ...........78

*Iowa v. United States Cellular Corp.*, 2000 WL 33915909 (S.D. Iowa Aug. 7, 2000)................75

*Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377 (Del. Ch. 1999).........................................63

*Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584 (Del. Ch. 1986)................................................63

*Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012) ............................................58, 64, 66

*Kenney v. Glickman*, 96 F.3d 1118 (8th Cir. 1996) ....................................................................23

*Klett v. Pim*, 965 F.2d 587 (8th Cir. 1992) ..............................................................74, 78

*Koehler v. Pepperidge Farm, Inc.*, 2013 WL 4806895 (N.D. Cal. Sept. 9, 2013) .......................74

*Landis v. North Am. Co.*, 299 U.S. 248 (1936)..........................................................76, 77

*Larsen v. Pioneer Hi-Bred Int'l, Inc.*, 2007 WL 3341698 (S.D. Iowa Nov. 9, 2007)...................78

*Leon Cnty. v. FHFA*, 700 F.3d 1273 (11th Cir. 2012)................................................24, 25, 34, 50

*LNV Corp. v. Outsource Serv. Mgmt., LLC*, 2014 WL 834977 (D. Minn. Mar. 4, 2014).............54

*Lockerty v. Phillips*, 319 U.S. 182 (1943)..................................................................................65

*Lorillard v. Pons*, 434 U.S. 575 (1978) ..............................................................58, 67

*Marshak v. Reed*, 2000 WL 33152076 (E.D.N.Y. Oct. 17, 2000)..............................................74

*Maverick Tube, LP v. Westchester Surplus Lines Ins. Co.*, 2007 WL 5115436
(E.D. Mo. Aug. 6, 2007) ....................................................................................................74

*MBIA Ins. Corp. v. FDIC*, 816 F. Supp. 2d 81 (D.D.C. 2011) ................................................37, 47

*MBIA Ins. Corp. v. FDIC*, 708 F.3d 234 (D.C. Cir. 2013) ............................................35

*McAllister v. RTC*, 201 F.3d 570 (5th Cir. 2000) ........................................................37

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ..............................................50

*MCG Capital Corp. v. Maginn*, 2010 WL 1782271 (Del. Ch. May 5, 2010) ..............................63

*Medicap Pharms., Inc. v. Faidley*, 416 F. Supp. 2d 678 (S.D. Iowa 2006)..................77, 78, 79

*Monsanto Tech. LLC v. Syngenta Crop Prot., Inc.*, 212 F. Supp. 2d 1101 (E.D. Mo. 2012)........74

*National Health Found. v. Weinberger*, 518 F.2d 711 (7th Cir. 1975) ........................................74

*National Trust for Historic Pres. in United States v. FDIC*, 995 F.2d 238
(D.C. Cir. 1993) ........................................................................................................24, 27

*Nebraska Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032 (8th Cir. 2000)....................70

*Orthmann v. Apple River Campground*, 765 F.2d 119 (8th Cir. 1985) ........................................73

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) ................................................................................................................70

*Pareto v. FDIC*, 139 F.3d 696 (9th Cir. 1998) ................................................58, 59, 67

*Parsch v. Massey*, 72 Va. Cir. 121 (2006) ...............................................................60

*Plaintiffs in All Winstar-Related Cases at the Court v. United States*, 44 Fed. Cl. 3 (1999) ..................................................................................................58, 71

*Rechler P'ship v. RTC*, 1990 WL 711357 (D.N.J. Sept. 7, 1990) ...............................28

*Reich v. Collins*, 513 U.S. 106 (1994) ...............................................................28, 65

*Reno v. Catholic Soc. Servs.*, 509 U.S. 43 (1993) .....................................................23

*RTC v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446 (8th Cir. 1992).................35, 36, 37, 46

*San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171 (Del. Ch. Oct. 28, 2010)..................................................................................................62

*Schultz Douglass Farms LLC v. XC Networks, Ltd.*, 2008 WL 5100807 (D. Neb. Nov. 26, 2008) .......................................................................................78

*Schultz v. Ginsburg*, 965 A.2d 661 (Del. 2009).........................................................69

*Sharpe v. FDIC*, 126 F.3d 1147 (9th Cir. 1997)................................23, 24, 27, 68

*Sierra Club v. FDIC*, 992 F.2d 545 (5th Cir. 1993)...................................................55

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007)...........76, 78

*Smart v. Sunshine Potato Flakes, LLC*, 307 F.3d 684 (8th Cir. 2002) ......................73

*Stafford v. Briggs*, 444 U.S. 527 (1980) ...................................................................79

*Stommel v. LNV*, 2014 WL 1340676 (D. Utah Apr. 4, 2014).....................................54

*SV Inv. Partners v. ThoughtWorks, Inc.*, 7 A.3d 973 (Del. Ch. 2010)........................51

*Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703 (1st Cir. 1992) ..........53

*Tennesee Gas Pipeline Co. v. FERC*, 926 F.2d 1206 (D.C. Cir. 1991).......................42

*Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688 (8th Cir. 1997)...............72

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)........................ *passim*

*Trooien v. Mansour*, 608 F.3d 1020 (8th Cir. 2010)..................................................60

*UAW v. Donovan*, 756 F.2d 162 (D.C. Cir. 1985)....................................................76

*Ulrich v. Pope Cnty.*, 715 F.3d 1054 (8th Cir. 2013) .................................................22

*United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487 (8th Cir. 1990).........73

*United States v. Rogers*, 461 U.S. 677 (1983) ..........................................................39

*United States v. Security Indus. Bank*, 459 U.S. 70 (1982) .......................................48

*Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014) .....................................50

*Volges v. RTC*, 32 F.3d 50 (2d Cir. 1994).........................................................27, 49

*Ward v. RTC*, 996 F.2d 99 (5th Cir. 1993) ......................................................26, 27, 28

*Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696 (D.C. Cir. 1997)............................49, 57

*Webster v. Doe*, 486 U.S. 592 (1988) ............................................................................65

*Whatley v. RTC*, 32 F.3d 905 (5th Cir. 1994) .............................................................46

*Zavanna, LLC v. RoDa Drilling Co.*, 2009 WL 3720177 (D.N.D. Nov. 3, 2009) .................75, 78

<u>**Statutes, Rules, and Legislative Materials**</u>

5 U.S.C.

§ 702.......................................................................................................................... 23
§ 706(2) .......................................................................................................................29

12 U.S.C.

§ 1455(*l*) .............................................................................................. *passim*
§ 1719(g)................................................................................................ *passim*
§ 1821(d)(2)(A)(i) .................................................................................58, 65
§ 1821(j) ................................................................................................23, 24, 25
§ 4614(e) ...............................................................................................51
§ 4617(a) ...............................................................................................45
§ 4617(a)(2) ..........................................................................................3, 11, 44, 45
§ 4617(a)(4) ..........................................................................................46
§ 4617(a)(7) ..........................................................................................3, 32, 34, 44
§ 4617(b)................................................................................................29, 45, 46
§ 4617(b)(1) ..........................................................................................29
§ 4617(b)(2) ..........................................................................................29
§ 4617(b)(2)(A) .................................................................................... *passim*
§ 4617(b)(2)(B)......................................................................................39, 48, 51
§ 4617(b)(2)(D).................................................................................... *passim*
§ 4617(b)(2)(E)......................................................................................10, 43, 45
§ 4617(b)(2)(G)......................................................................................47, 48
§ 4617(b)(2)(H)......................................................................................48
§ 4617(b)(3)(B)......................................................................................10
§ 4617(c)(1) ..........................................................................................59, 71
§ 4617(d)................................................................................................29
§ 4617(e) ...............................................................................................70, 71, 72
§ 4617(f)................................................................................................ *passim*
§ 4617(i) ................................................................................................70, 71

28 U.S.C.

§ 1391(e)(1)(C) .....................................................................................72, 79
§ 1404.....................................................................................................73, 77, 78, 79

12 C.F.R.

§ 1237.....................................................................................................29
§ 1237.3(b).............................................................................................45

§ 1237.9(a)(4) ...........................................................................................59
§ 1237.13...................................................................................................40

Conservatorship and Receivership, 76 Fed. Reg. 35,724 (June 20, 2011) ........................... *passim*

DEL. CODE tit. 8, § 170(a) ...........................................................................32

H.R. REP. NO.

101-54 (1989)............................................................................................28
101-222 (1989)..........................................................................................71
110-767 (2008), *reprinted in* 2008 WL 2814663 ................................................56

Pub. L. No.

89-695, 80 Stat. 1033 ...............................................................................55
101-73 ......................................................................................................55

*Recent Developments in U.S. Financial Markets and Regulatory Responses to Them:*
*Hearing before S. Comm. on Banking, Hous., & Urban Affairs*, 110th Cong. 9 (2008)........56

FED. R. CIV. P. 12(B)(1) ..............................................................................22

FED. R. CIV. P. 12(B)(6) ..............................................................................22

LOCAL RULE 7 .............................................................................................80

## **Other**

12B FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS (1984)............................................60

3 Michael P. Malloy, *Banking Law and Regulation* (2011) .......................................35, 43

15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER ET AL., FEDERAL PRACTICE & PROCEDURE
(4th ed. 2014).............................................................................................78

BLACK'S LAW DICTIONARY (9th ed. 2009) ................................................................44

DAVID H. CARPENTER & M. MAUREEN MURPHY, CONG. RESEARCH SERV., RL34657,
FINANCIAL INSTITUTION INSOLVENCY:   FEDERAL AUTHORITY OVER FANNIE MAE,
FREDDIE   MAC,   AND   DEPOSITORY   INSTITUTIONS   (2008),   *available   at*
http://fpc.state.gov/documents/organization/110098.pdf......................................34, 35, 37, 38

DEP'T OF TREASURY, FY 2010 CONGRESSIONAL JUSTIFICATION, HOUSING GOVERNMENT
SPONSORED ENTERPRISE PROGRAMS, http://goo.gl/yRsRne ...................................................4

DEP'T OF TREASURY, FY 2011 CONGRESSIONAL JUSTIFICATION, HOUSING GOVERNMENT
SPONSORED ENTERPRISE PROGRAMS, http://goo.gl/wAqYDH................................4, 5, 32, 38

DEP'T OF TREASURY & HUD, REFORMING AMERICA'S HOUSING FINANCE MARKET, A
REPORT TO CONGRESS (Feb. 2011), http://goo.gl/Twym5i.................................17, 18

Donald Resseguie, *Banks & Thrifts: Government Enforcement & Receivership* (2013)........35, 36

Fannie Bylaws, Corporate Governance Practices & Procedures, Art. 1, § 1.05, *available at*
http://goo.gl/rnWwth.....................................................................................60

Fannie Government Stock Certificate (Sept. 7, 2008)......................................................14, 32, 51

Fannie, Preferred Stock Purchase Agreement (Sept. 7, 2008)....................................13, 14, 15, 16

Fannie, Third Amendment to Preferred Stock Purchase Agreement (Aug. 17, 2012),
http://goo.gl/FgCpco .............................................................................................................19

Fannie, 2013 Annual Report (Form 10-K) (Feb. 21, 2014).....................................................20, 51

Fannie, Cert. Design. of Series O Preferred Stock ........................................................................69

Fannie, First Quarter Report (Form 10-Q) (May 8, 2014).............................................................20

Fannie, Second Quarter Report (Form) 10-Q (Aug. 7, 2014)..................................................20, 21

Fannie Offering Circular, *Universal Debt Facility* (May 14, 2013), http://goo.gl/q2GCX2.........42

FDIC, *Managing the Crisis: The FDIC and RTC Experience* (1998)..........................................35

FHFA, A STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIPS: THE NEXT CHAPTER IN A
STORY THAT NEEDS AN ENDING (Feb. 21, 2012), http://goo.gl/JkdbpR ..................................18

FHFA FACT SHEET, QUESTIONS AND ANSWERS ON CONSERVATORSHIP (Sept. 7, 2008),
www.treasury.gov/press-center/press-releases/Documents/fhfa_consrv_faq_090708.
pdf .....................................................................................................................................11, 12

FHFA, ANNUAL PERFORMANCE PLAN (Mar. 14, 2011), www.fhfa.gov/AboutUs
/Reports/ReportDocuments/FHFA_FY_2011_APP_508.pdf............................................17, 36

FHFA, TREASURY AND FEDERAL RESERVE PURCHASE PROGRAMS FOR GSE AND
MORTGAGE-RELATED SECURITIES (Aug. 8, 2014), http://goo.gl/sVgMAV .............................7

Freddie Bylaws, Corporate Governance Practices & Procedures, *available at*
http://goo.gl/V9NRrU .............................................................................................................60

Freddie Government Stock Certificate, *available at* http://goo.gl/IId4fs .........................14, 32, 51

Freddie, Preferred Stock Purchase Agreement (Sept. 7, 2012), *available at*
www.treasury.gov/press-center/pressreleases/Documents/seniorpreferred
stockpurchaseagreementfrea.pdf.........................................................................13, 14, 15, 16

Freddie, Third Amendment to Preferred Stock Purchase Agreement (Aug. 17, 2012),
http://goo.gl/U6Olyc ...............................................................................................................19

Freddie, 2013 Annual Report (Form 10-K) (Feb. 27, 2014) ........................................................20

Freddie, Cert. Design. of Series S Preferred Stock.......................................................................69

Freddie, First Quarter Report (Form 10-Q) (May 8, 2014) ..........................................................20

Freddie, Second Quarter Report (Form 10-Q) (Aug. 7, 2014) ...............................................20, 21

Freddie, Third Quarter Report (Form 10-Q) (Nov. 7, 2013) ........................................................21

John W. Head, *Lessons from the Asian Financial Crisis:  The Role of the IMF and the
United States*, 7 KAN. J.L. & PUB. POL'Y 70 (1998) .............................................................37, 38

Letter from Edward J. DeMarco, Acting Director, FHFA, to United States Senators (Nov.
10, 2011), http://goo.gl/JIHglN.........................................................................................17, 36

Joint Status Report, Doc. 18-1, Attachment A, *McKinley v. FHFA*, No. 10-1165
(D.D.C. Sept. 16, 2011) ................................................................................................36, 38, 59

OXFORD ENGLISH DICTIONARY ONLINE (Dec. 2013)....................................................................44

Statement by Kelli Parsons, Senior Vice President and Chief Communications Officer,
Fannie, on Stress Test Results (Apr. 30, 2014), http://goo.gl/g4pSNB ..................................40

*The Present Condition and Future Status of Fannie Mae and Freddie Mac: Hearing Before
the H. Comm. on Fin. Servs., Subcomm. of Capital Markets, Ins. & Gov't Sponsored
Enters.* 111th Cong. (2009), http://goo.gl/UWq6nu .......................................................39, 40

## INTRODUCTION

In early August 2012, two privately-owned, for-profit American Corporations—the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation ("Fannie" and "Freddie," respectively, and "the Companies," collectively)—reported record profits of more than $11 billion for the first half of 2012.  Complaint ¶ 58.  Just days later, on August 17, two agencies of the federal government—the Department of the Treasury ("Treasury") and the Federal Housing Finance Agency ("FHFA"), the latter purportedly acting as conservator of Fannie and Freddie, but in reality acting at the direction of Treasury—entered into an agreement forcing the Companies to pay *all*—100%—of their future profits to Treasury in perpetuity.  *Id.* ¶¶ 68, 78.  The purpose and effect of this "Net Worth Sweep" was to nationalize Fannie and Freddie, expropriate for the benefit of the federal government the value of stock held by Fannie's and Freddie's private shareholders, and to make it impossible for the Companies to rebuild their capital reserves, exit conservatorship, and return to normal business operations.  *Id.* ¶¶ 12-13, 93.  The Companies received no meaningful corresponding benefit in return.  *Id.* ¶ 13.

These are the essential factual allegations of the Complaint, as this Court has itself noted.  *See* Order on Motion To Compel at 3 (Doc. 42) ("The sweep resulted in all of the Companies' future profits going to Treasury, effectively, as Continental Western characterizes it, nationalizing the Companies and resulting in the confiscation of the value of Continental Western's preferred stock.  The core of Continental Western's Complaint is that FHFA, at Treasury's prompting, acted in excess of its . . . statutory authority and without legitimate motive when it agreed to the net worth sweep . . . ."); *id.* at 4 ("Continental Western's 56-page Complaint is highly fact specific.  The Complaint alleges the net worth sweep was not necessary,

other options were available, and the sweep was the product of a Treasury directive aimed simply at giving Treasury all of the Companies' profits.").

And it is well-established that in resolving FHFA's and Treasury's motions to dismiss, Plaintiff's factual allegations must be taken to be true.  As the Court has recognized, however, FHFA's and Treasury's motions do not faithfully adhere to this bedrock principle: "in their briefs on the motions to dismiss defendants make factual assertions about the necessity and purpose of the net worth sweep inconsistent with the Complaint's allegations on the same subjects."  *Id*. at 4.  But, as the Court also has recognized, FHFA and Treasury have now "disclaimed a factual challenge" to the Complaint to avoid discovery into the bona fides of their assertions.  Thus, "the Court must take Continental Western's factual assertions . . . that *the net worth sweep was unnecessary and improperly motivated . . . as true*."  *Id*. at 6 (emphasis added).

The motions to dismiss are therefore dead on arrival, for it is inconceivable that the United States Congress would authorize the federal government to expropriate peremptorily and without any procedural protections whatsoever, the rights of private shareholders to the future profits of publicly-traded companies generating billions of dollars of earnings.  But FHFA and Treasury insist that is precisely what Congress did in enacting the Housing and Economic Recovery Act of 2008 ("HERA").  Indeed, FHFA and Treasury insist that Congress ousted the courts of jurisdiction even to hear Plaintiff's challenge to the Net Worth Sweep.  FHFA and Treasury are wrong, and their attempt to evade judicial review should be disallowed.

At every opportunity FHFA and Treasury repeatedly emphasize that Section 4617(f) of HERA bars equitable relief that would "restrain or affect the exercise of powers or functions of the [FHFA] as a conservator . . . ."  12 U.S.C. § 4617(f).  But this restriction has no application here because, under the facts alleged in the Complaint, it is clear that FHFA exceeded its

conservatorship authority in agreeing to the Net Worth Sweep.  As conservator, FHFA is charged with the statutory duty of "rehabilitating" Fannie and Freddie by, among other things, taking actions to put them "in a sound and solvent condition" and "preserve and conserve [their] assets and property."  *Id.* §§ 4617(a)(2), (b)(2)(D).  This rehabilitative purpose is not unique to conservatorships established under HERA, but rather is the *raison d'être* of all conservatorships, everywhere.  And it stands in marked contrast to the defining purpose of a receivership, which is to wind down the affairs and liquidate the assets of a failed company.

Moreover, HERA mandates that FHFA exercise its conservatorship authority independently; the statute expressly forbids FHFA from being "subject to the direction or supervision of any other agency of the United States" when "acting as conservator."  *Id.* § 4617(a)(7).

The Net Worth Sweep is wholly irreconcilable with these statutory mandates—it guarantees that Fannie and Freddie will *not* be rehabilitated, will *not* operate in a sound and solvent condition, and will *not* preserve and conserve their assets.  Furthermore, we believe, and have alleged, that FHFA agreed to the Net Worth Sweep not on the basis of its independent assessment of the action in relation to its statutory responsibilities as conservator, but rather on the basis of pressure from Treasury.  *See* Complaint ¶¶ 16, 78, 93, 102.  Indeed, surely no independent conservator, including FHFA, ever would agree to sign away all rights to the future profits of the companies under its care in exchange for virtually nothing.

FHFA's and Treasury's own public statements confirm that the Net Worth Sweep exceeded FHFA's statutory authority.  When the conservatorship was established in September 2008, FHFA Director Lockhart described its "objective" as "returning [Fannie and Freddie] to normal business operations."  *Id.* ¶ 35.  Accordingly, FHFA explained that the conservatorship

would be "terminat[ed]" when FHFA determined "that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully." *Id*. ¶ 40.  What is more, FHFA reassured Fannie's and Freddie's private shareholders that they would "continue to retain all rights in the stock's financial worth." *Id*. ¶ 39.  Director Lockhart reiterated that "both the preferred and common shareholders have an economic interest in the companies," and he represented that "going forward there may be some value" in that interest.  *Id*.

These statements simply reaffirmed FHFA's essential, and common-place, statutory duties as a conservator under HERA.  And FHFA continued to make similar statements during the conservatorship's early years.  In 2010, for example, FHFA Acting Director DeMarco explained to Congress that "the only [post-conservatorship option] that FHFA may implement today under existing law is to reconstitute [Fannie and Freddie] under their current charters." *Id*. ¶ 79.  And in 2011, FHFA emphasized that "[a] conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition."  *Id*. ¶ 38.

For its part, Treasury explained in its FY 2010 Congressional Justification of Appropriations that "Fannie Mae and Freddie Mac remain as private shareholder-owned companies," and that "[c]onservatorship preserves the status and claims of the preferred and common shareholders."  DEP'T OF TREASURY, FY 2010 CONGRESSIONAL JUSTIFICATION, HOUSING GOVERNMENT SPONSORED ENTERPRISE PROGRAMS at GSE-4, http://goo.gl/yRsRne (last visited Aug. 29, 2014).  Treasury's FY 2011 Congressional Justification of Appropriations reiterated these statements and further noted that Treasury's investments in Fannie Mae and Freddie Mac were intended "to enhance market stability by providing additional confidence to holders of Fannie Mae and Freddie Mac securities that the GSEs will remain viable entities." DEP'T OF TREASURY, FY 2011 CONGRESSIONAL JUSTIFICATION, HOUSING GOVERNMENT

SPONSORED ENTERPRISE PROGRAMS at GSE-1, http://goo.gl/wAqYDH (last visited Aug. 29, 2014).

While these public statements by FHFA and Treasury appear to respect the limitations of FHFA's conservatorship authority, the Administration privately resolved early on that Fannie and Freddie would *never* be allowed to return to private control under their current charters and that all of their future profits would be captured entirely by the federal government.  Indeed, an internal Treasury document from December 2010 indicates that the Administration had made a "commitment to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future."  *Id.* ¶ 80.

The Net Worth Sweep implemented this internal Administration decision.  *Id.*  Indeed, Treasury publicly heralded the Net Worth Sweep as ensuring "that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers."  *Id.*  Treasury also praised the Net Worth Sweep for ensuring that Fannie and Freddie "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  *Id.* FHFA Acting Director DeMarco likewise explained that the Net Worth Sweep "reinforce[d] the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status."  *Id.* ¶ 81.  Treasury's and FHFA's own statements thus confirm that the Net Worth Sweep is completely contrary to a conservator's defining purpose: namely, to rehabilitate a company and return it to normal operations.

Although Treasury, for its part, purported to exercise rights in connection with its status as a shareholder of Fannie and Freddie in entering the Net Worth Sweep, HERA provided Treasury with only temporary authority to purchase Fannie's and Freddie's securities.  That authority expired on December 31, 2009, *see* 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4), and the shares

of "Government Stock" Treasury acquired before that date did not give it the right to all of the Companies' future profits in perpetuity.  Treasury had no authority to acquire securities in Fannie and Freddie giving it that right in 2012, whether by purchasing new securities or by "amendment" of its existing securities.  The Net Worth Sweep also cannot be reconciled with Congress' desire "to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]," a factor that HERA requires Treasury to "take into consideration" when exercising its authority to purchase the Companies' securities and that Treasury expressly acknowledges in its FY 2010, FY 2011, and FY 2012 Congressional Justification for Appropriations.  *Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C).  Section 4617(f) plainly does not bar the Court from requiring Treasury to operate within its statutory authority, as an injunction remedying *Treasury*'s unlawful conduct will not "restrain or affect" *FHFA*'s actions as conservator.

FHFA and Treasury also rely on another provision of HERA, Section 4617(b)(2)(A)(i), which provides that when FHFA took over as conservator it "immediately succeed[ed] to . . . all rights, titles, powers, and privileges of . . . any stockholder . . . of [Fannie and Freddie] with respect to the [Companies] and the assets of the [Companies] . . . ."  While this provision may preclude shareholders of a company in conservatorship from bringing certain *derivative* claims on the company's behalf, Plaintiff is asserting its own *direct* claims.  In any event, it surely was not intended by Congress to give FHFA control over the litigation of a lawsuit *against itself and a sister federal agency.*

In addition to transgressing the bounds Congress set for it as a conservator, FHFA has violated the common-law rights of Fannie's and Freddie's private shareholders.  As conservator, FHFA must act as a fiduciary for *all* of Fannie's and Freddie's shareholders, not just their controlling shareholder, Treasury.  Yet the Net Worth Sweep disregarded FHFA's fiduciary

duties to Fannie's and Freddie's private shareholders.  Indeed, Fannie's CEO acknowledged in

October 2012 that "[t]he company is no longer run for the benefit of private shareholders."

Complaint ¶ 75.  What is more, FHFA, as an agency of the federal government, sat on both sides

of the transaction by assigning the rights to all of Fannie's and Freddie's earnings to Treasury,

another agency of the federal government.  That is a paradigmatic violation of the fiduciary duty

of loyalty.

The Net Worth Sweep also effectively nullified Plaintiff's contracts and transferred their

entire value to Treasury, breaching both the express terms of the contracts and the implied

covenant of good faith and fair dealing that inheres in all contractual relationships.  Furthermore,

by granting Treasury the right to receive all of the firms' residual profits, the Net Worth Sweep

effectively transformed Treasury's Government Stock into 100% of the Companies' common

stock.  By paying dividends on this common stock without first paying dividends to Fannie's and

Freddie's private preferred shareholders, FHFA has breached the private preferred shareholders'

contractual priority rights.  As with Plaintiff's claims arising under federal law, nothing in HERA

bars this Court from granting relief for FHFA's violations of Plaintiff's common-law claims.

The Net Worth Sweep has been tremendously profitable for the federal government.  *See,*

*e.g.*, *id.* ¶ 87.  Under the original terms of the Government Stock, Treasury would have received

approximately $33 billion in dividends during 2013 and the first three quarters of 2014 had the

Companies elected to pay cash dividends (approximately $4.7 billion a quarter, *id.* ¶ 74).  But

under the Net Worth Sweep, Treasury will receive *over $163 billion* during that time.  FHFA,

TREASURY AND FEDERAL RESERVE PURCHASE PROGRAMS FOR GSE AND MORTGAGE-RELATED

SECURITIES at 3 (Aug. 8, 2014), http://goo.gl/sVgMAV (last visited Aug. 29, 2014).  Indeed,

Fannie and Freddie will have soon returned to Treasury over $218 billion—approximately $31

billion more than Treasury's $187 billion investment.  *Id.* at 2-3.  And still Fannie's and

Freddie's private shareholders are guaranteed *never* to receive *anything* in the future.

     Congress did not authorize FHFA and Treasury to effectuate this result, and this Court

has both the jurisdiction and the responsibility to hold the agencies to account for their unlawful

behavior.  The motions to dismiss should be denied.

**STATEMENT OF FACTS**

     Fannie and Freddie are stockholder-owned corporations that operate under Federal

charters.  Complaint ¶ 28-29.  The Companies operate for profit, and, among other things, they

purchase and guarantee mortgages originated by private banks and bundle the mortgages into

securities that can be sold to investors.  *Id.*  ¶ 28.

     Plaintiff Continental Western owns non-cumulative preferred stock ("Preferred Stock")

issued by Fannie and Freddie.  *Id.* ¶ 31.  As an owner of Preferred Stock, Plaintiff is

contractually entitled to non-cumulative dividends when declared by the Companies and is also

contractually entitled to a liquidation preference should the Companies liquidate.  *Id.* ¶ 30.  The

Companies' Preferred Stock has priority over their common stock with respect to dividend

payments and the distribution of assets in any liquidation.  *Id.*  Fannie and Freddie are

contractually prohibited from unilaterally changing the terms of the Companies' Preferred Stock

to materially and adversely affect the rights of preferred shareholders.  *Id.*  As of September 30,

2013, the Companies had outstanding Preferred Stock with an aggregate liquidation preference

of $33 billion.  *Id.*

     Prior to 2007, Fannie and Freddie were consistently profitable.  *Id.* ¶ 32.  In fact, Fannie

had not reported a full-year loss since 1985, and Freddie had never reported a full-year loss since

8

becoming owned by private shareholders in 1989. *Id.* In addition, both Companies regularly declared and paid dividends on their respective Preferred Stock. *Id.*

Beginning in late 2006, and accelerating in 2008, the nation's housing market and mortgage banking industry suffered significant book losses and a substantial decline in value. *Id.* ¶ 33. As the housing and economic crisis deepened, Congress responded by enacting HERA. *Id.* ¶ 34. HERA created FHFA (which succeeded to the regulatory authority over Fannie and Freddie previously held by the Office of Federal Housing Enterprise Oversight) and authorized FHFA, under certain statutorily prescribed and circumscribed conditions, to place those Companies into conservatorship or receivership. *Id.*

Under HERA, conservatorship and receivership are distinct statuses aimed at distinct ends: the former toward rehabilitation and return to private control, the latter toward liquidation and wind down of operations. In FHFA's words, "[t]he ultimate responsibility of FHFA as receiver is to resolve and liquidate the existing entity. A conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition." Conservatorship and Receivership, 76 Fed. Reg. 35,724, 35,730 (June 20, 2011). These distinctions are grounded in the text of HERA. The Act empowers and obligates FHFA as conservator to carry on a company's business, preserve and conserve its assets and property, and return it to sound and solvent condition:

> Powers as conservator:
> The Agency may, as conservator, take such action as may be—
> (i) necessary to put the regulated entity in a sound and solvent condition; and
> (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.

12 U.S.C. § 4617(b)(2)(D).

Only as receiver does HERA empower FHFA to liquidate a company and wind down its operations:

> Additional powers as receiver:
> In any case in which the Agency is acting as receiver, the Agency shall place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity in such manner as the Agency deems appropriate . . . .

*Id.* § 4617(b)(2)(E).  To facilitate this process, HERA establishes specific claims determination procedures to be followed by FHFA as receiver "in any case involving the liquidation or winding up of the affairs of a closed regulated entity."  *Id.* § 4617(b)(3)(B)(i).

In addition to creating FHFA, HERA also gave Treasury limited, temporary authority to purchase Fannie's and Freddie's securities.  The limitations on this authority make clear that it was not intended to allow Treasury to nationalize the Companies.  Indeed, HERA does not in any way obligate the Companies to issue securities to Treasury, and Treasury may not engage in open market purchases of Fannie's and Freddie's common stock without the Companies' agreement.  *Id.* §§ 1455(*l*)(1)(A), 1719(g)(1)(A).

HERA also required Treasury to make an "emergency determination" before purchasing Fannie's and Freddie's stock, *id.* §§ 1455(*l*)(1)(B), 1719(g)(1)(B), and in exercising its authority Treasury was required to consider, among other things, "the need to maintain [Fannie's and Freddie's] status as . . . private shareholder-owned [Companies]" and their "plan for the orderly resumption of private market funding or capital market access," *id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C).

Finally, Treasury's authority to invest in Fannie's and Freddie's securities expired on December 31, 2009.  *Id.* §§ 1455(*l*)(4), 1719(g)(4).  While Treasury may continue to hold its shares and exercise rights received in connection with them, it is no longer authorized to purchase new or additional securities.

HERA was signed into law on July 30, 2008.  Five weeks later, on September 6, 2008, FHFA placed Fannie and Freddie into conservatorship.  Complaint ¶ 35.  FHFA accomplished this by securing the consent of Fannie's and Freddie's Boards of Directors.  *See* 12 U.S.C. § 4617(a)(2)(I); Complaint ¶ 3.

In announcing the conservatorship, FHFA Director James Lockhart publicly emphasized that the purpose of the conservatorship was, as clearly prescribed by HERA, to rehabilitate Fannie and Freddie, return them to a safe and sound financial condition, and then release them from conservatorship.  Conservatorship, he explained, "is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations."  Complaint ¶ 35 (quoting Statement of James B. Lockhart, Director, FHFA, at 5-6 (Sept. 7, 2008) ("Lockhart Conservatorship Statement")).  Thus, FHFA would "act as the conservator to operate [the Companies] until they are stabilized."  *Id*. ¶ 39 (quoting Lockhart Conservatorship Statement at 6).  FHFA made clear that it understands its powers as conservator to be those specified in HERA, explaining that "[t]he purpose of appointing the Conservator is to preserve and conserve the Compan[ies'] assets and property and to put the Compan[ies] in a sound and solvent condition."  FHFA FACT SHEET, QUESTIONS AND ANSWERS ON CONSERVATORSHIP at 2 (Sept. 7, 2008), www.treasury.gov/press-center/press-releases/Documents/fhfa_consrv_faq_090708.pdf (last visited Aug. 28, 2014).

FHFA and Director Lockhart repeatedly emphasized that, as required by HERA, Fannie and Freddie would be maintained as "private shareholder-owned compan[ies]" during conservatorship, 12 U.S.C. §§ 1455(*l*)(1)(C)(v), 1719(g)(1)(C)(v),  and that their common and preferred shareholders would retain an economic interest in the Companies.  *See* Complaint ¶ 39 ("the common and all preferred stocks [of the Companies] will continue to remain outstanding"

11

(alteration in original) (quoting Lockhart Conservatorship Statement at 8)); *id.* (during the conservatorship, the Companies' stockholders "will continue to retain all rights in the stock's financial worth" (quoting FHFA FACT SHEET at 3)); *id.* (the Companies' shareholders "are still in place; both the preferred and common shareholders have an economic interest in the companies" and "going forward there may be some value" (quoting *Oversight Hearing To Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs: Hearing Before H. Comm. on Fin. Servs.*, 110th Cong. (Sept. 25, 2008) (Statement of James B. Lockhart, Director, FHFA))).

Finally, FHFA and Director Lockhart publicly vowed, in keeping with the requirements of HERA, that the conservatorship would, if successful in restoring the Companies to financial health, be *temporary*.  *See* Complaint ¶ 39 ("FHFA will act as the conservator to operate [Fannie and Freddie] *until they are stabilized*." (emphasis added) (quoting Lockhart Conservatorship Statement at 6)); *id.* ¶ 40 ("Upon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship." (quoting FHFA FACT SHEET at 2)).

As discussed in detail below, by adopting the Net Worth Sweep, FHFA repudiated all of these emphatic public representations and, more importantly, violated HERA's unambiguous limits on its powers and functions as conservator.

On September 7, 2008, the day after it had taken control of the Companies, FHFA announced that it had entered into materially identical "Preferred Stock Purchase Agreements" ("PSPAs") with Treasury on behalf of each Company.  *Id.* ¶¶ 6, 41, 44.  Under the PSPAs, Treasury agreed to invest up to $100 billion in each Company.  *Id.* ¶ 44.  But Treasury did not invest the full $100 billion at once.  Rather, the PSPAs provide that FHFA, on behalf of the Companies, may request quarterly draws from Treasury's funding commitment to maintain a

positive net worth.  *Id.*  By default, the most FHFA may request is the amount by which each

Company's liabilities exceed its assets pursuant to Generally Accepted Accounting Principles,

although it may request and receive more with Treasury's written agreement.  *See* Fannie PSPA

1-2, 4 (Exhibit A to FHFA Br. (Doc. 23-1)); Freddie PSPA 1-2, 4, www.treasury.gov/press-

center/press-releases/Documents/seniorpreferredstockpurchaseagreementfrea.pdf (last visited

Aug. 28, 2014).

The structure of the PSPAs and the terms of the Government Stock were designed to

"enhance the probability of both Fannie Mae and Freddie Mac ultimately repaying amounts

owed."  Complaint ¶ 49 (quoting Action Memorandum for Secretary Paulson (Sept. 7, 2008)

("2008 Paulson Memorandum")).  In return for its funding commitment, Treasury received one

million shares of "Government Stock" in each Company and a warrant to purchase 79.9% of the

common stock of each Company at a nominal price.  *Id.* ¶ 45.  Thus, the very structure of the

government's investment in the Companies underscores that the publicly-owned common and

preferred stock remained outstanding and had value.  These warrants gave Treasury the potential

for an upside return in addition to the dividends on its Government Stock in the event that the

conservatorship succeeded and the Companies returned to stable profitability.  *Id.*; *see also*

*id.* ¶ 51 ("Conservatorship preserves the status and claims of the preferred and common

shareholders." (original alteration omitted) (quoting 2008 Paulson Memorandum)).

Treasury's Government Stock in each Company had an initial liquidation preference of

$1 billion.  *Id.* ¶ 46.  This liquidation preference increases dollar-for-dollar with funds drawn

from Treasury's funding commitment.  *Id.*  Payments pursuant to the funding commitment, in

other words, amount to purchases of additional Government Stock.  *See id.* ¶ 56 ("Treasury's

[PSPAs] provide[ ] for the purchase of up to $100 billion of [Government Stock] from each

[Company] to help ensure that they each maintain a positive net worth" (quoting 2008 Paulson Memorandum)).  In the event the Companies liquidate, Treasury is entitled to recover the full liquidation value of its shares before Plaintiff and other public shareholders may recover anything.  *Id.* ¶ 46.

The PSPAs entitled Treasury to quarterly dividends on its Government Stock at an annualized rate of 10% if Fannie and Freddie elected to pay the dividends in cash or 12% if the Companies elected to pay them in kind (by adding the amount of the dividend payment to the existing liquidation preference).  *See id.* ¶ 47; Fannie Government Stock Certificate 1-2 (Exhibit B to FHFA Br. (Doc. 23-2)); Freddie Government Stock Certificate 1-2, *available at* http://goo.gl/IId4fs (last visited Aug. 29, 2014).  If the Companies chose the latter option, known in financial circles as the "payment-in-kind" or "PIK" option, the dividend rate would remain at 12% until the Companies had paid all dividends in cash by redeeming Government Stock attributable to in-kind dividend payments.  Fannie Government Stock Certificate 1-2; Freddie Government Stock Certificate 1-2.  In quarters in which the Companies chose the PIK dividend, the size of the remaining amount of Treasury's commitment would be unaffected, and thus the Companies could preserve the commitment simply by electing to pay a 12% dividend in kind whenever they did not generate sufficient cash to pay a 10% cash dividend.

The PSPAs also provided for a quarterly "periodic commitment fee."  *See* Fannie PSPA 6; Freddie PSPA 6.  The purpose of the fee was to compensate Treasury for the support provided by its ongoing commitment to purchase Government Stock, and it too could be paid in cash or in kind.  *Id.*  The fee was to be set for five-year periods by mutual agreement of Treasury and the Companies, but Treasury could elect to waive it for up to a year at a time.  *Id.*  Treasury has

14

elected to waive this fee; it has never received a periodic commitment fee under the PSPAs.
Complaint ¶ 48.

The PSPAs provide Treasury with dominating control over the Companies, starting with
its warrants to purchase 79.9% of the Companies' common stock.  In addition, while the
Government Stock remains outstanding the PSPAs require the Companies to obtain Treasury's
consent before taking actions such as paying dividends on other classes of stock, issuing new
stock, transferring certain assets, making certain fundamental changes to their operations, and
increasing their indebtedness above a specified amount.  *See* Fannie PSPA 8-9; Freddie PSPA 8-
9.  The PSPAs also require FHFA to obtain Treasury's consent before returning Fannie and
Freddie to private control by terminating the conservatorship.  Fannie PSPA 8; Freddie PSPA 8.

Treasury and FHFA amended the PSPAs twice before expiration of Treasury's purchase
authority under HERA.  The first amendment increased Treasury's funding commitment to $200
billion per Company.  Complaint ¶ 52.  The second amendment, entered one week before
Treasury's purchase authority expired, replaced the $200 billion commitment amount with a
formula that would allow Treasury's commitment to exceed (but not fall below) $200 billion
depending upon any deficiencies experienced in 2010, 2011, and 2012 and any surplus existing
as of December 31, 2012.  *Id*. ¶ 53.  Treasury's temporary purchase authority under HERA
expired on December 31, 2009, and Treasury acknowledged that its "ability to make further
changes to the PSPAs . . . [was] constrained."  *Id.* ¶ 54 (alterations in original) (quoting Action
Memorandum for Secretary Geithner at 3 (Dec. 22, 2009)).

From 2008 through the second quarter of 2012, Treasury invested a total of $187 billion
in Fannie and Freddie under the PSPAs, *id.* ¶ 9, bringing the total liquidation preference of the
Government Stock to $189 billion.  The net investment was $161 billion, given that $26 billion

of the gross investment was used to pay cash dividends to Treasury. *Id.* ¶ 55. As explained above, the Companies were under no obligation to make these draws because they could have paid the dividends in kind with additional Government Stock. Indeed, the PSPAs expressly "*exclude* any obligation in respect of . . . [Government] Stock" for purposes of establishing the default maximum draw from Treasury. Fannie PSPA 2 (emphasis added); Freddie PSPA 2 (emphasis added).

The Companies' draws from Treasury's commitment were made in large part to fill holes in their balance sheets created by reserves for large non-cash losses based on the government's exceedingly pessimistic views of the Companies' financial prospects, and by write-downs of the value of significant deferred tax assets. Complaint ¶ 55. Deferred tax assets are assets (such as net operating loss carryforwards) that may be utilized to offset future tax liability, but they must be written down to the extent they are not expected to be used. *Id.* ¶ 62. Deferred tax assets are written back up if it is subsequently determined that they are likely to be used. And through loan loss reserves a company books expected loan losses before the losses are actually incurred. *See id.* ¶ 86. Reserves for non-cash losses such as these temporarily decreased Fannie's and Freddie's net worth by hundreds of billions of dollars. *Id.* ¶ 55.

As explained above, *supra* at 11-12, at the outset of conservatorship FHFA publicly emphasized that conservatorship was a process aimed at rehabilitating Fannie and Freddie and returning them to normal operations as private, shareholder-owned Companies. Acting Director DeMarco reiterated to Congress in February 2010 that "the only [post-conservatorship option] that FHFA may implement today under existing law is to reconstitute [Fannie and Freddie] under their current charters." *Id.* ¶ 79 (alterations in original) (quoting Letter of Edward J. DeMarco, Acting Dir., FHFA, to Chairmen and Ranking Members of the S. Comm. on Banking, Hous., &

Urban Affairs and the H. Comm. on Fin. Servs. at 7 (Feb. 2, 2010) ("DeMarco Letter to

Chairmen and Ranking Members")).  FHFA further emphasized in 2011 that the agency

"preserves and conserves the assets and property of the Enterprises . . . and facilitates their

financial stability and emergence from conservatorship.  The conservatorships of Fannie Mae

and Freddie Mac allow[ ] FHFA to . . . ensure they . . . are positioned to emerge from

conservatorship financially strong . . . ."  FHFA, ANNUAL PERFORMANCE PLAN at 16 (Mar. 14,

2011), www.fhfa.gov/AboutUs/Reports/ReportDocuments/FHFA_FY_2011_APP_508.pdf (last

visited Aug. 28, 2014).  And later that year, Acting Director DeMarco informed the Senate that,

"[b]y law, the conservatorships are intended to rehabilitate [Fannie and Freddie] as private

firms."  Letter from Edward J. DeMarco, Acting Dir., FHFA, to United States Senators (Nov. 10,

2011) ("Letter from DeMarco to Senators"), http://goo.gl/JIHglN (last visited Aug. 29, 2014).

At some point, however, the Administration decided that Fannie and Freddie should not

be rehabilitated and returned to private control but rather nationalized, looted of all profits, and

wound down.  As early as December 2010, an internal Treasury document acknowledged the

"Administration's commitment to ensure existing common equity holders will not have access to

any positive earnings from the [Companies] in the future."  *Id.* ¶ 80 (alteration in original)

(quoting Action Memorandum for Secretary Geithner (Dec. 20, 2010)).  In February 2011,

Treasury and the Department of Housing and Urban Development ("HUD") issued a white paper

announcing the Administration's intention to "work with FHFA to determine the best way to

responsibly reduce Fannie Mae and Freddie Mac's role in the market and ultimately wind down

both institutions."  DEP'T OF TREASURY & HUD, REFORMING AMERICA'S HOUSING FINANCE

MARKET, A REPORT TO CONGRESS at 12 (Feb. 2011), http://goo.gl/Twym5i (last visited Aug. 29,

2014).  Indeed, Treasury emphasized that "[a]s the market begins to heal" it would "seek

opportunities, wherever possible, to accelerate Fannie Mae and Freddie Mac's withdrawal." *Id.*
at 13.  Treasury reiterated that its "commitment to ensuring Fannie Mae and Freddie Mac have
sufficient capital to honor any guarantees issued now or in the future and meet any of their debt
obligations remains unchanged," but insisted that "under the PSPAs, there is sufficient funding
to ensure the orderly and deliberate wind down of Fannie Mae and Freddie Mac." *Id.* at 12.

In February 2012, FHFA followed suit with the release of a new "strategic plan" for
conservatorship "consistent with . . . the housing finance reform framework[ ] set forth in the
white paper produced [in 2011] by . . . Treasury and [HUD]."  FHFA, A STRATEGIC PLAN FOR
ENTERPRISE CONSERVATORSHIPS: THE NEXT CHAPTER IN A STORY THAT NEEDS AN ENDING at 4
(Feb. 21, 2012), http://goo.gl/JkdbpR (last visited Aug. 29, 2014).  The plan did "not anticipate
Fannie Mae and Freddie Mac continuing as they existed before conservatorship," and the "next
chapter of conservatorship" would "focus[ ] in earnest on building a secondary mortgage market
infrastructure that will live beyond the Enterprises themselves." *Id.* at 20, 21.

Fannie and Freddie, however, threatened these plans by returning to strong and consistent
profitability.  "Due to rising house prices and reductions in credit losses, in early August 2012
the Companies reported significant income for the second quarter 2012 . . . and neither required a
draw from Treasury under the [PSPAs]."  Complaint ¶ 59 (first alteration in original) (quoting
FHFA, Office of Inspector General, Analysis of the 2012 Amendments to the Senior Preferred
Stock Purchase Agreements at 11 (Mar. 20, 2013) ("FHFA Inspector General Report")).  In fact,
in the first two quarters of 2012 the Companies posted sizable profits totaling more than $11
billion, more than enough to pay a 10% dividend. *Id.* ¶ 58.

On August 17, 2012, just days after the Companies announced their positive second
quarter results, Treasury and FHFA amended the PSPAs for a third time, replacing the existing

dividend structure of the Government Stock with one that entitles Treasury to *all*—100%—of the Companies' profits going forward. *See id.* ¶¶ 68-70. On information and belief, FHFA agreed to this one-sided Net Worth Sweep at the direction of Treasury. *Id.* ¶ 93. Under the Net Worth Sweep, since January 1, 2013, the Companies have been required to make quarterly dividend payments equal to their entire net worth, minus a $3 billion reserve amount that steadily decreases to $0 by January 1, 2018. *Id.* ¶ 68-70. In light of the fact that the Net Worth Sweep entitles Treasury to all the Companies' profits, it officially suspended payment of periodic commitment fees, which, as explained above, Treasury had never sought in the past. *See* Fannie, Third Amendment to PSPA 5 (Aug. 17, 2012), http://goo.gl/FgCpco (last visited Aug. 29, 2014); Freddie, Third Amendment to PSPA 5 (Aug. 17, 2012), http://goo.gl/U6Olyc (last visited Aug. 29, 2012). The effect of the Net Worth Sweep was thus to ensure that despite their profitability, Fannie and Freddie would be wound down and their existing private shareholders would not receive any benefit from their investments. In short, the Net Worth Sweep nationalized the Companies and expropriated for the Treasury all value of Plaintiff's and other public shareholders' stock in the Companies.

In direct repudiation of FHFA's and Treasury's earlier public representations, Treasury trumpeted the "quarterly sweep of every dollar of profit that each firm earns going forward" as advancing its goal of "mak[ing] sure that *every dollar of earnings* that Fannie Mae and Freddie Mac generate *will be used to benefit taxpayers* for their investment in those firms" and "[a]cting upon the commitment made in the Administration's 2011 White Paper that the GSEs *will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form*." Complaint ¶ 80 (emphasis added) (quoting Press Release, Treasury Department Announces Further Steps To Expedite Wind Down of Fannie Mae and Freddie Mac

(Aug. 17, 2012) ("Treasury Net Worth Sweep Press Release"), http://goo.gl/DKxNPs (last visited Aug. 29, 2014)).  FHFA likewise emphasized that the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers" and reinforces that "the [Companies] will not be building capital as a potential step to regaining their former corporate status."  Complaint ¶ 81 (alterations in original) (quoting FHFA, 2012 Rep. to Cong. (2013) at 1; *Oversight of FHFA: Evaluating FHFA as Regulator and Conservator: Hearing Before the S. Comm. on Banking, Hous. & Urban Affairs* at 3, 113th Cong. (Apr. 18, 2013) (statement of Edward J. DeMarco, Acting Director, FHFA) ("DeMarco Statement Before S. Comm. on Banking, Hous. & Urban Affairs")).[1]

Fannie and Freddie have enjoyed record-breaking profitability since the imposition of the Net Worth Sweep.  For the year 2012, Fannie and Freddie reported net income of $17.2 billion and $11 billion, respectively.  Complaint ¶¶ 61, 63.  Fannie and Freddie have been even more profitable since 2012, respectively reporting 2013 net income of *$84.0 billion* and *$48.7 billion*,[2] first quarter 2014 net income of $5.3 billion and $4.0 billion,[3] and second quarter 2014 net income of $3.7 and $1.4 billion.[4]

---

[1] Treasury and FHFA have claimed that the Net Worth Sweep also "end[ed]" the circular practice of the Treasury advancing funds to the [Companies] simply to pay dividends back to Treasury."  Treasury Net Worth Sweep Press Release.  But, as explained above, the Companies were under no obligation to pay Treasury dividends in cash and thus were under no obligation to draw funds from Treasury for that purpose.

[2] Fannie, 2013 Annual Report (Form 10-K) at 2 (Feb. 21, 2014); Freddie, 2013 Annual Report (Form 10-K) at 1 (Feb. 27, 2014).

[3] Fannie, First Quarter Report (Form 10-Q) at 3 (May 8, 2014); Freddie, First Quarter Report (Form 10-Q) at 1 (May 8, 2014).

[4] Fannie, Second Quarter Report (Form 10-Q) at 2 (Aug. 7, 2014); Freddie, Second Quarter Report (Form 10-Q) at 1 (Aug. 7, 2014).

These profits reflect in part the reversal of accounting decisions that led Fannie and Freddie to experience large non-cash losses during the housing crisis. For example, under the accounting rules it was inevitable that the Companies would release their deferred tax asset valuation allowances when they returned to profitability, and that is precisely what has happened. Fannie released $50.6 billion of the Company's deferred tax assets valuation allowance in the first quarter of 2013, and based on its results that quarter was required by FHFA under the Net Worth Sweep to pay Treasury a dividend of *$59.4 billion*. *Id.* ¶¶ 62, 82. Freddie released $23.9 billion of its deferred tax assets valuation allowance in the third quarter of 2013, and it was required to pay Treasury a dividend of *$30.4 billion*. *Id.* ¶ 63; Freddie, Third Quarter Report (Form 10-Q) at 1 (Nov. 7, 2013). In fact, FHFA and Treasury knew (or should have known) that when the Companies returned to profitability the deferred tax assets would be written back up, generating huge windfall profits. *Id.* ¶ 66.

Treasury has now received many billions of dollars more from the Companies than it paid them under its commitment. In particular, by the end of the third quarter of 2014, Fannie will have returned $130.5 billion on Treasury's $116.1 billion investment, Fannie, Second Quarter Report (Form 10-Q) at 2 (Aug. 7, 2014), and Freddie will have returned $88.2 billion on Treasury's $71.3 billion investment, Freddie, Second Quarter Report (Form 10-Q) at 87-88 (Aug. 7, 2014). Yet, according to Treasury, the combined liquidation preference of the Government Stock remains at $189 billion, and the Companies' profits continue to be swept to Treasury with no end in sight.

In sum, FHFA and Treasury have effected a *de facto* nationalization of Fannie and Freddie and have expropriated all value of private shareholders' interests in the Companies, all while purporting to operate under statutory authorities that require FHFA, as conservator, "to put

the [Companies] in a sound and solvent condition" and "to carry on the business of the [Companies] and preserve and conserve the[ir] assets."  12 U.S.C. § 4617(b)(2)(D).

## STANDARD OF REVIEW

Treasury and FHFA moved to dismiss Plaintiff's Complaint for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim for relief under Rule 12(b)(6).  "[I]n their briefs on the motions to dismiss defendants make factual assertions about the necessity and purpose of the net worth sweep inconsistent with the Complaint's allegations on the same subjects."  Order on Motion to Compel at 4.  Plaintiff moved to compel the production of an administrative record so that it could rebut Defendants' contested factual assertions.  *See* Plaintiff's Motion to Compel Production of the Administrative Record (Doc. 31). Defendants opposed Plaintiff's motion by disavowing a factual challenge to the Court's subject matter jurisdiction and declaring that they accept the allegations in the Complaint as true for purposes of their motions.  FHFA Opposition to Plaintiff's Motion to Compel at 3-7 (Doc. 33) ("FHFA Opp."); Treasury Opposition to Plaintiff's Motion to Compel at 3 (Doc. 32).  In view of Defendants' position, the Court denied Plaintiff's motion, explaining that in lieu of compelling production of an administrative record at this stage of the litigation it would "take Continental Western's factual assertions bearing on its jurisdictional theory—that the net worth sweep was unnecessary and improperly motivated—as true."  Order on Motion to Compel at 6. Accordingly, the Court must accept the factual allegations in the Complaint when resolving the motions to dismiss.  Dismissal of the Complaint " 'is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' "  *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1058 (8th Cir. 2013) (brackets omitted).

**ARGUMENT**

**I.     HERA's Jurisdictional Bar Does Not Prohibit Plaintiff's Claims.**

Treasury and FHFA contend that HERA's limitation on judicial review, 12 U.S.C.

§ 4617(f), prohibits all claims for equitable relief that in any way touch on the Net Worth Sweep.

It does not.  Courts embrace a "strong presumption that Congress intends judicial review of

administrative action."  *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670

(1986); *Kenney v. Glickman*, 96 F.3d 1118, 1124 (8th Cir. 1996); *see also* 5 U.S.C. § 702 ("A

person suffering legal wrong because of agency action, or adversely affected or aggrieved by

agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").

Indeed, the Court should only conclude that judicial review of administrative action is

unavailable "if presented with clear and convincing evidence" that this was Congress' intent.

*Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 63-64 (1993) (internal quotation marks omitted).

Here, Section 4617(f)'s instruction that courts not "restrain or affect the exercise of powers or

functions of the Agency as a conservator or a receiver" is no barrier to claims that the Net Worth

Sweep exceeded FHFA's "powers" and "functions" under HERA.  *See Sharpe v. FDIC*, 126

F.3d 1147, 1155 (9th Cir. 1997) (applying virtually identical provision under the Financial

Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(j)).[5]  Nor

does Section 4617(f) preclude Plaintiff's claims against Treasury, for insisting that FHFA's

---

[5] By its terms, Section 4617(f) only applies to claims for equitable relief.  12 U.S.C.
§ 4617(f) ("[N]o court may take any action *to restrain or affect* the exercise of powers or
functions of the agency as a conservator or a receiver." (emphasis added)); *see Dittmer Props.,
LP v. FDIC*, 708 F.3d 1011, 1016 (8th Cir. 2013) (observing that analogous provision of
FIRREA "constrain[s] the court's equitable powers"); *Sharpe*, 126 F.3d 1155 (damages claim
"not affected" by FIRREA's jurisdictional bar).  Thus, even if the Court agrees with Defendants'
virtually unbounded understanding of that provision's restriction on equitable remedies, it should
not dismiss Plaintiff's claims for damages resulting from FHFA's breach of contract and breach
of the implied covenant of good faith and fair dealing.

counterparties honor their own legal obligations does not "restrain or affect" FHFA's exercise of its conservatorship powers.

### A. Section 4617(f) Does Not Bar Plaintiff's Claims Against FHFA.

#### 1. This Court Has Jurisdiction To Enjoin FHFA from Exceeding Its Statutory Authority.

a.        HERA's jurisdictional bar is inapplicable to Plaintiff's claims that FHFA exceeded its statutory authority.  By its terms, Section 4617(f) applies only to actions that would "restrain or affect *the exercise of powers or functions of [FHFA] as conservator or receiver*"; it thus "is inapplicable when FHFA acts beyond the scope of its conservator power."  *County of Sonoma v. FHFA*, 710 F.3d 987, 992 (9th Cir. 2013) (emphasis added).  Courts uniformly agree on this point.  *Id.*; *Leon Cnty. v. FHFA*, 700 F.3d 1273, 1278 (11th Cir. 2012).  And their interpretations mirror the judicial treatment of Section 1821(j), the provision on which Section 4617(f) was modeled.  Courts have uniformly held that Section 1821(j) "does not bar injunctive relief when the FDIC has acted or proposes to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions."  *National Trust for Historic Pres. in United States v. FDIC*, 995 F.2d 238, 240 (D.C. Cir. 1993); *see also, e.g.*, *Sharpe*, 126 F.3d 1155 (same); *Arkansas State Bank Comm'r v. RTC*, 745 F. Supp. 550, 556 n.4 (E.D. Ark.), *rev'd on other grounds*, 911 F.2d 161 (8th Cir. 1990); *cf. Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 572 (1989).  *Sharpe* is illustrative.  In that case, the Ninth Circuit concluded that "the FDIC did not act within its statutorily granted powers" when it breached a contract and therefore held FIRREA's jurisdictional bar inapplicable.  126 F.3d at 1155.  The same analytical framework applies here.

Even while refusing to accept the established limits of HERA's jurisdictional bar, Defendants acknowledge that it does not apply where FHFA " 'is acting *clearly* outside its

24

statutory powers.' "  Treas. Br. 15 (quoting *Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403, 407 (3d

Cir. 1992) (emphasis added)); *see also* FHFA Br. 13-14.  FHFA's *ipse dixit* that the Net Worth

Sweep was an exercise of its statutory authority does not affect this analysis:  "FHFA cannot

evade judicial scrutiny by merely labeling its actions with a conservator stamp." *Leon Cnty.*, 700

F.3d at 1278; *see also County of Sonoma*, 710 F.3d at 994 ("FHFA cannot evade judicial review

. . . simply by invoking its authority as conservator."); *Chemical Futures & Options, Inc. v. RTC*,

832 F. Supp. 1188, 1192-93 (N.D. Ill. 1993) ("[S]ection 1821(j) does not elevate the FDIC to the

position of a sacred cow which may graze upon the rights of others at will, unchecked by the

courts.").  As explained in Section I.A.2, *infra*, FHFA clearly exceeded its conservatorship

powers, thus satisfying even the artificially high bar to judicial review that Defendants attempt to

erect.[6]

In grabbing hold of *Gross*'s "clearly outside" language, Defendants argue, in effect, that

courts are powerless to prevent FHFA from engaging in unlawful conduct, so long as FHFA's

conduct is not *too obviously* unlawful.  *See* Treas. Br. 15-16; FHFA Br. 13-14, 18-20.  That is not

the law.  Indeed, the law of this Circuit is clear that the Court must simply "determine whether

the challenged action is within" the scope of FHFA's authority as conservator. *Dittmer*, 708

F.3d at 1017.  And just last Term, the Supreme Court rejected the notion that a meaningful

distinction can be drawn between an agency acting unlawfully and an agency acting beyond the

scope of its powers, explaining that agencies' "power to act and how they are to act is

authoritatively prescribed by Congress, so that when they act improperly, no less than when they

---

[6] To the extent that Treasury argues that it benefits from a similarly flaccid mode of
judicial review, it "clearly" exceeded its authority under HERA by continuing to purchase the
Companies' stock after its statutory authority to do so expired on December 31, 2009. *See* 12
U.S.C. §§ 1455(*l*)(4), 1719(g)(4); Complaint ¶¶ 116-25.

act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013).  FHFA either violated HERA and therefore exceeded its powers when it executed the Net Worth Sweep, or it did not.  Thus, before the Court can determine whether Section 4617(f) has any applicability to the claims in this lawsuit, it must first determine whether the Net Worth Sweep was not within FHFA's authority as conservator.  *See, e.g.*, *County of Sonoma*, 710 F.3d at 994 ("Analysis of any challenged action is necessary to determine whether the action falls within . . . conservator authority.").

FHFA and Treasury also argue that this Court cannot rule on Plaintiff's APA claims because Section 4617(f)'s jurisdictional bar applies even if the conservator is "improperly or even unlawfully exercising" its conservatorship powers.  Treas. Br. 12 (quoting *Ward v. RTC*, 996 F.2d 99, 103 (5th Cir. 1993)); *see also id.* at 15; FHFA Br. 14, 19.  But this argument is foreclosed by *City of Arlington*, quoted above.  133 S. Ct. at 1869.  In any event, Plaintiff alleges that FHFA acted *outside* of its statutory authority, not that it exercised that authority in an improper manner or that it might make a mistake in the future.  *See Bank of America Nat'l Ass'n v. Colonial Bank*, 604 F.3d 1239, 1244 (11th Cir. 2010).  And HERA does not prohibit courts from enjoining FHFA if it exceeds its statutory authority as conservator.  *See County of Sonoma*, 710 F.3d at 992; *National Trust for Historic Pres.*, 995 F.2d at 240.

*Ward*, at any rate, was nothing like this case.  It concerned a plaintiff's attempt to thwart the sale of a single property as part of a larger group sale—an action the court determined was clearly authorized by statute.  996 F.2d at 103-04; *see also id.* at 103 (case involved challenge to "method, terms and conditions" of sale).  Here, by contrast, Plaintiff challenges the FHFA's decision to enter the Net Worth Sweep, which effectively nationalizes Fannie and Freddie and ensures that the Companies will never be rehabilitated and returned to private control, an action

that directly contravenes the authority granted the FHFA as conservator under HERA, including the authority to sell assets. *See infra* at 34-39, 43-50.

Furthermore, *Ward*'s endorsement of "unlawful" conduct refers to the fact that HERA bars injunctions where the conservator—acting perfectly within its conservatorship authority—happens to violate a separate substantive law, as demonstrated by *Ward*'s citations to *National Trust for Historic Preservation* and *Gross*. *Ward*, 996 F.2d at 103-04. In *National Trust for Historic Preservation*, the court held that FIRREA's analogous jurisdictional bar prohibited a suit requiring the FDIC as receiver to comply with the National Historic Preservation Act. 955 F.2d at 238-39. And in *Gross*, the plaintiffs sought recovery of pension assets on the ground that the RTC had violated ERISA. 974 F.2d at 405. *See also Volges v. RTC*, 32 F.3d 50, 52 (2d Cir. 1994) (plaintiff could not enjoin sale of home in reliance on oral modification to contract). By contrast, Defendants have violated HERA, the statute that gives FHFA its conservatorship powers in the first place—and, in doing so, have necessarily violated the APA as well. *See Sharpe*, 126 F.3d at 1155 (equivalent provision of FIRREA did not prevent court from enjoining FDIC from evading limitations on its authority to repudiate contracts).

But if Defendants are correct in ascribing to *Ward* the view that a federal court is impotent to enjoin a conservator or receiver from violating the very statute from which its authority is derived, then *Ward* is plainly wrong after *City of Arlington*. And the Eighth Circuit has taken a different approach. *Dittmer* holds that this Court's task is to "determine whether the challenged action is within [FHFA]'s power or function," 708 F.3d at 1017, and conduct that violates HERA is plainly beyond the scope of FHFA's powers and functions under HERA. The Supreme Court adopted the same interpretation of FIRREA's predecessor, holding that a provision similar to Section 4617(f) was not an obstacle to judicial review where the federal

receiver had purported to adjudicate a claim the statute did not authorize it to adjudicate. *Coit*, 489 U.S. at 572-79; *see also* H.R. REP. NO. 101-54 (1989), at 130 (FIRREA's jurisdictional bar prevents courts, "to the same extent as the Home Owners' Loan Act does now under existing law, from restraining or affecting the exercise of the powers or functions of the FDIC as conservator or receiver"). To the extent that there is any tension in the case law, this Court must follow *City of Arlington*, *Coit*, and *Dittmer*, rather than *Ward*.

Finally, the contention that no court may enjoin FHFA from unlawfully exercising its conservatorship powers is itself a reason to construe FHFA's conservatorship powers narrowly. On FHFA's view, so long as it is purportedly exercising its powers as conservator, no court could issue an injunction to stop it from dumping toxic waste into the Mississippi River. That is an extraordinary claim, wholly at odds with the "strong presumption that Congress intends judicial review of administrative action." *Bowen*, 476 U.S. at 670; *see Rechler P'ship v. RTC*, 1990 WL 711357, at *3 (D.N.J. Sept. 7, 1990) (interpreting FIRREA's similar jurisdictional bar and observing that "Congress . . . clearly did not create a fourth branch of government beyond the scrutiny of the law"). And because Defendants read Section 4617(f) to bar constitutional as well as statutory claims, their interpretation runs afoul of the principle that Congress may not use its control over jurisdiction to completely foreclose all remedies for a constitutional claim. *See Bartlett v. Bowen*, 816 F.2d 695, 705 (D.C. Cir. 1987); *see also Reich v. Collins*, 513 U.S. 106, 109-10 (1994). For those reasons, any unreviewable authority FHFA has under Section 4617(f) to violate the law—defined by the scope of its "conservatorship powers"—should be understood to extend only to situations in which it is genuinely taking action within its authority to preserve and conserve its ward's assets for purposes of seeking to rehabilitate it and return it to private control. FHFA's more sweeping understanding of its own powers conflicts with the case law,

with the longstanding presumption in favor of judicial review of administrative action, and with the carefully circumscribed and enumerated list of conservatorship powers that appears in Section 4617(b).[7]

b.      Just as Section 706(2) of the APA requires that agency conduct be both "in accordance with law" and within "statutory . . . authority or limitations," it also prohibits agency conduct that is "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A), (C).  Indeed, there is no bright line distinguishing between the exercise of an agency's discretion and the limits of its statutory authority, as a prior exercise of agency discretion can limit the agency's statutory authority.  *Cf. City of Arlington*, 133 S. Ct. at 1869-70.  The APA thus establishes that no agency has authority to act arbitrarily and capriciously, and it is against that background that Plaintiff's challenge to FHFA's authority must be evaluated.

HERA spells out the powers and obligations of the conservator in some detail, 12 U.S.C. § 4617(b)(2), (d), and it grants FHFA rulemaking authority regarding the conduct of conservatorships, *id.* § 4617(b)(1); *see also* 12 C.F.R. § 1237.  FHFA's statutory powers as conservator do not include the power to act arbitrarily, capriciously, or irrationally, and therefore Section 4617(f) cannot preclude claims that FHFA acted arbitrarily and capriciously in agreeing to the Net Worth Sweep.  *See Gosnell v. FDIC*, 1991 WL 533637, at *6 (W.D.N.Y. Feb. 4, 1991)

---

[7] The Eighth Circuit's observation in *Hanson v. FDIC* that an analogous provision of FIRREA effects a "sweeping ouster of courts' power to grant equitable remedies" is not to the contrary.  113 F.3d 866, 871 (8th Cir. 1997) (quoting *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995)).  The fact that the set of *remedies* Section 4617(f) forecloses is "sweeping"— including not only injunctions but also the constructive trust at issue in *Hanson* and the declaratory judgment sought in *Freeman*—does not imply that a conservator's *powers* are likewise "sweeping."  To the contrary, the unavailability of most remedies when a conservator is exercising, rather than exceeding or violating, its statutory powers is a reason to construe those powers narrowly.

(interpreting FIRREA's analogous provision and observing that receiver is not "wholly above the law" and that "truly ultra vires or arbitrary and capricious acts on its part may be enjoined").

As FHFA itself observed in issuing its conservatorship regulations, "[a]s Conservator, FHFA is authorized to take such action as may be 'necessary to put the regulated entity in a sound and solvent condition' and 'appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.' "  76 Fed. Reg. at 35,725 (quoting 12 U.S.C. § 4617(b)(2)(D)).  Those powers do not embrace the power to act arbitrarily without regard to FHFA's congressionally sanctioned goals, to confiscate for the government all of the net profits of the Companies, to pay massive dividends to the government far in excess of the funds it provided under the PSPAs, to expropriate the value of private stockholdings in the Companies, or to act at the direction of another federal agency.  Section 4617(f) therefore cannot preclude judicial review of Plaintiff's claims that FHFA's decision to enter into the Net Worth Sweep was arbitrary and capricious.  Far from "restrain[ing] or affect[ing]" the "exercise" of FHFA's powers as conservator, Plaintiff's APA claims operate only to ensure that FHFA is not "above the law."  *See Chemical Futures & Options*, 832 F. Supp. at 1192.

## 2.   FHFA Exceeded Its Statutory Authority when It Agreed to the Net Worth Sweep.

### a.   Defendants' Self-Serving Characterizations of Disputed Facts Do Not Provide a Basis for Dismissing Plaintiff's Claims for Equitable Relief.

Although the scope of judicial review allowed under Section 4617(f) is sharply contested, the Court need not resolve that dispute to reject Defendants' motions to dismiss.  That is because Defendants acknowledge that a court may intervene when FHFA acts "clearly outside" its statutory powers, *see* FHFA Br. 13-14; Treas. Br. 15, and the facts alleged in Plaintiff's Complaint, which must be assumed to be true, amply satisfy even that artificially high standard.

The Complaint alleges that by the time of the Net Worth Sweep the Companies "had regained the earnings power to redeem Treasury's Government Stock and exit conservatorship," Complaint ¶ 68, that the Net Worth Sweep "effectively nationalized the Companies and confiscated the existing and potential value of all privately held equity interests" in the Companies, *id.* ¶ 69, and that "[t]he Companies did not receive any consideration" in return for permanently forfeiting the ability to build capital reserves, *id.* ¶¶ 72, 77.[8]  The Complaint also cites specific instances in which Defendants publicly declared their intention to abdicate their fiduciary duties to the Companies' minority shareholders and to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers."  *Id.* ¶ 80 (quoting Treasury Net Worth Sweep Press Release); *see also id.* ¶¶ 19, 69, 81.  The gravamen of Plaintiff's Complaint is thus that Defendants placed the Companies in a financial coma, unable to rebuild their capital reserves, in order to harvest all of their sizable future profits for the Treasury.  Whatever the precise metes and bounds of FHFA's statutory powers as conservator, looting the Companies is "clearly outside" of them.[9]

---

[8] Suspension of the periodic commitment fee, which under the original terms of the PSPAs was to be set by mutual agreement of the Companies and Treasury at a market rate, was not consideration for the Net Worth Sweep.  As the Complaint alleges and this Court must assume for present purposes, dividends on the Government Stock and the warrants to acquire 79.9% of the Companies' common stock already more than compensated Treasury for its remaining commitment in August 2012, and "any additional fee would have been inappropriate." Complaint ¶ 73.  Furthermore, by the time the Net Worth Sweep was announced Treasury's authority to purchase additional securities issued by the Companies had already expired, making additional PSPA draws unlawful and Treasury's remaining "commitment" worthless. *See* 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4).  And in any event, relief from the periodic commitment fee is no more adequate consideration for the Companies giving up their entire net worth than relief from property taxes is adequate consideration for the government seizing someone's home.

[9] To the extent that Defendants' briefing could be read as arguing that Plaintiff's claims fail because the Net Worth Sweep was something other than a blatant effort to loot the Companies and expropriate private shareholders' investments, Defendants have disavowed those arguments and accepted the factual allegations in the Complaint for purposes of their motions to

### b.   FHFA Exceeded Its Statutory Authority by Agreeing to the Net Worth Sweep at Treasury's Direction.

To ensure that FHFA would exercise its best *independent* judgment in protecting the interests of *all* creditors and shareholders of the Companies, Congress mandated that when FHFA acts as conservator, it "shall not be subject to the direction or supervision of any other agency of the United States."  12 U.S.C. § 4617(a)(7).  Plaintiff alleged that FHFA violated that provision of HERA by agreeing to the Net Worth Sweep at Treasury's direction.  Complaint ¶¶ 16, 78, 102, 124.  FHFA's only answer is to characterize Plaintiff's allegations as "conclusory" and to assert that "an allegedly improper motive or intent when carrying out its statutory powers . . . is irrelevant to the Section 4617(f) analysis . . . ."  FHFA Br. 21 n.13.  FHFA is wrong on both counts.

Far from conclusory, Plaintiff's allegations are detailed and specific, and must be accepted as true for purposes of adjudicating Defendants' motions to dismiss.  The Complaint alleges, in terms, that "FHFA agreed to the Net Worth Sweep only at the insistence and under the

---

dismiss.  FHFA Opposition to Plaintiff's Motion to Compel at 3-7 (Doc. 33); Treasury Opposition to Plaintiff's Motion to Compel at 3 (Doc. 32).  Accordingly, "the Court must take Continental Western's factual assertions bearing on its jurisdictional theory—that the net worth sweep was unnecessary and improperly motivated—as true."  Order on Motion to Compel at 6.  In any case, the only contrary explanation for the Net Worth Sweep Defendants have proffered— that it was necessary to arrest a "downward spiral" in which the Companies drew on Treasury funds to pay Treasury dividends—flatly ignores that the Companies could have paid the those dividends in kind rather than in cash.  *See* Fannie Government Stock Certificate § 2(c); Freddie Government Stock Certificate § 2(c); *see also* TREASURY FY 2011 CONGRESSIONAL JUSTIFICATION at GSE-13 ("The senior preferred stock accrues dividends at 10 percent per year.  The rate will increase to 12 percent if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid in cash.").  Indeed, Defendants' description of the dividend on the Government Stock as a liability the Companies had an "obligation" to pay ignores the fact that a corporation is never legally required to declare a cash dividend and may not do so if paying the dividend would render the corporation insolvent.  *See EBS Litig., LLC v. Barclays Global Investors*, 304 F.3d 302, 305-06 (3d Cir. 2002); DEL. CODE tit. 8, § 170(a).  And that is to say nothing of the fact that the Net Worth Sweep was imposed at a time when the Companies were poised to generate record profits that would have enabled them to pay Treasury's dividends in cash with little difficulty for many years.  Complaint ¶¶ 55-67.

direction and supervision of Treasury," Complaint ¶ 78, and that "FHFA was not authorized to subject itself to Treasury's will" in this way, *id.* ¶ 102.   And the Complaint further alleges facts supporting these allegations, including that the Net Worth Sweep transfers to Treasury, in perpetuity, every penny that the Companies earn while leaving the principal of the Companies' obligation to Treasury untouched, *id.* ¶¶ 70, 92, that it was entered into almost immediately after the Companies announced their return to substantial profitability, *id.* ¶¶ 11, 58-61, 68, and that it provides the Companies with no relief from their obligation to pay cash dividends that they did not already enjoy, *id.* ¶ 72.   FHFA would no doubt have understood all this had it exercised its independent judgment, for it was clear that the recognition of deferred tax assets, the release of loan loss reserves, and proceeds from legal settlements would all soon make enormous contributions to the Companies' net worth.  *Id.* ¶¶ 65, 84, 86.   And that is to say nothing of the real and very substantial profits the Companies were poised to earn from their core businesses of guaranteeing and securitizing mortgages as the housing market recovered.  *Id.* ¶ 60.   Only a conservator that has given up the will to exercise its independent judgment could agree to forfeit so much under such circumstances.   Further reinforcing the conclusion that Treasury was the driving force behind the Net Worth Sweep, it was entered into against the backdrop of the Administration's previously undisclosed policy decision to exclude Fannie's and Freddie's common equity holders from having access to any of the Companies' positive earnings, and Treasury trumpeted the Net Worth Sweep as making "sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers."  *Id.* ¶ 80.   These allegations are more than enough to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff need not do more at this stage of the litigation.

Furthermore, FHFA is wrong when it suggests that its purpose in agreeing to the Net

Worth Sweep is "irrelevant to the Section 4617(f) analysis."  FHFA Br. 21 n.13.  Surely if

FHFA's purpose was, as the Complaint plainly alleges, to expropriate the value of Plaintiff's

shares in the Companies in faithful obedience to the wishes of Treasury, its conduct directly

violates Section 4617(a)(7), and cannot be shielded from this Court's review by Section 4617(f).

Indeed, courts regularly look to the purpose and function of an act when deciding whether it may

be enjoined as beyond the statutory powers of a conservator or receiver.  *See Leon Cnty.*, 700

F.3d at 1278 (court tasked with deciding whether FHFA acted outside its conservatorship powers

"must consider all relevant factors," including the action's "subject matter, its purpose, [and] its

outcome").  Nor is this Court bound, as FHFA suggests, FHFA Opp. 10; *see* FHFA Br. 18-21, to

accept whatever "facial purpose" it asserts in explanation of its conduct, no matter how facially

implausible or pretextual.  And here, where the manifest aim of the conservator's actions is to

cannibalize its ward for the benefit of another federal agency, that reality is relevant to whether

the conservator should be found to have impermissibly acted at the other agency's direction (or,

for that matter, to have acted in contravention of the core responsibilities of a conservator to

preserve and conserve an entity's assets and seek to restore it to safety and soundness and,

ultimately, private control).

> **c.  The Net Worth Sweep Violated FHFA's Statutory Duty To Preserve and Conserve the Companies' Assets and To Place Them in a Sound and Solvent Condition.**
>
> **i.  As Conservator, FHFA Is Obligated To Preserve and Conserve Assets with the Aim of Rehabilitating the Companies.**

When Congress enacts a statute using "a well-established term," courts presume that

"Congress intended the term to be construed in accordance with pre-existing . . . interpretations."

*Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).  "Conservatorship" is among those "well-

established term[s]," familiar to anyone even remotely acquainted with financial regulation.  As the Congressional Research Service has explained, "a conservator is appointed to operate the institution, conserve its resources, and restore it to viability."  DAVID H. CARPENTER & M. MAUREEN MURPHY, CONG. RESEARCH SERV., RL34657, FINANCIAL INSTITUTION INSOLVENCY: FEDERAL AUTHORITY OVER FANNIE MAE, FREDDIE MAC, AND DEPOSITORY INSTITUTIONS 5 (2008), *available at* http://fpc.state.gov/documents/organization/110098.pdf (last visited Aug. 28, 2014).  This authority stands in contrast to that of a "receiver," which "is appointed to liquidate the institution, sell its assets, and pay claims against it to the extent available funds allow."  *Id.*

Courts, and regulators, including FHFA itself, have emphasized that a conservator's purpose is to revive a troubled entity.  The Eighth Circuit, for example, has explained that "[t]he conservator's mission is to conduct an institution as an ongoing business," *RTC v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1454 (8th Cir. 1992), and other courts uniformly agree, *e.g.*, *Del E. Webb McQueen Dev. Corp. v. RTC*, 69 F.3d 355, 361 (9th Cir. 1995) (noting that conservatorship is intended to operate entities so that they "might someday be rehabilitated"); *MBIA Ins. Corp. v. FDIC*, 708 F.3d 234, 236 (D.C. Cir. 2013) (noting that conservatorship is intended to "carry on the business of the institution").  The FDIC also understands the defining purpose of conservatorship.  *See* FDIC, *Managing the Crisis: The FDIC and RTC Experience* 216 (1998) ("A conservatorship is designed to operate the institution for a period of time in order to return the institution to a sound and solvent operation.").  And commentators explain that a conservatorship's "basic statutory assumption is that the institution may well return to the transaction of its business."  3 Michael P. Malloy, *Banking Law and Regulation* § 11.3.4.2 (2011); *see also* Donald Resseguie, *Banks & Thrifts: Government Enforcement & Receivership*

§ 11.01 (2013) ("The intent of conservatorship is to place the insured depository institution in a sound and solvent condition, rather than liquidating the institution as in the case of a receivership.").

Outside the context of this litigation, FHFA has often expressed the same view.  As previously noted, when FHFA placed the Companies in conservatorship in September 2008, it publicly announced that its purpose was "to stabilize [the Companies] with the objective of returning the entities to normal business operations."  Complaint ¶ 35; *see also id.* ¶¶ 4, 36, 39. And it has often repeated this understanding of its goal as a conservator.  *E.g.*, Joint Status Report, Attachment A at .pdf 7, *McKinley v. FHFA*, No. 10-1165 (D.D.C. Sept. 16, 2011), Doc. 18-1 (hereinafter "FHFA Internal Memo") ("The goal of a conservator is to return the entity to a sound and solvent condition, carry on the business of the entity and preserve/conserve the entity's assets and property."); 76 Fed. Reg. at 35,727 (The conservator "has a statutory charge to work to restore a regulated entity . . . to a sound and solvent condition."); Complaint ¶ 76 ("[T]he only [post-conservatorship option] that FHFA may implement today under existing law is to reconstitute [Fannie and Freddie] under their current charters." (quoting DeMarco Letter to Chairmen and Ranking Members at 7)); FHFA, Annual Performance Plan at 16 (FHFA as conservator "preserves and conserves the assets and property of the Enterprises . . . and facilitates their financial stability and emergence from conservatorship.  The conservatorships of Fannie Mae and Freddie Mac allows FHFA to . . . ensure they . . . are positioned to emerge from conservatorship financially strong . . . ."); Letter from DeMarco to Senators at 1 ("By law, the conservatorships are intended to rehabilitate [Fannie and Freddie] as private firms.").[10]

---

[10] In view of the understanding of a conservator's duties expressed in FHFA's regulations, the Net Worth Sweep violates those regulations—and thus the APA—quite apart from the question whether it violates HERA.

This defining purpose—rehabilitation and a return to viability as a going concern—informs the scope of a conservator's power.  For example, in *CedarMinn* the Eighth Circuit concluded that the RTC was not required to exercise its statutory authority to repudiate contracts immediately upon its appointment as conservator because this would put the conservator "in the untenable position of trying to operate the business as an ongoing concern with one hand, while at the same time calculating the . . . repudiation issue as if it were shutting the business down." *CedarMinn Bldg. Ltd. P'ship*, 956 F.2d at 1454; *see also MBIA Ins. Corp. v. FDIC*, 816 F. Supp. 2d 81, 96-97 (D.D.C. 2011) (same).  The Fifth Circuit explained that "a conservator *only* has the power to take action necessary to restore a financially troubled institution to solvency" and that it cannot "as a matter of law" take actions reserved to a receiver.  *See McAllister v. RTC*, 201 F.3d 570, 579 (5th Cir. 2000) (emphasis added); *see also id.* ("Expenses of liquidation cannot be incurred by a conservator as a matter of law, as liquidation is not a function of the conservator."). Thus, when exercising its powers as conservator, FHFA must always act consistent with the overarching purpose of rehabilitating its charges.

A conservator's "mission . . . to conduct an institution as an ongoing business" contrasts with that of a receiver, "whose interest, by definition, is shutting the business down." *CedarMinn Bldg. Ltd. P'ship*, 956 F.2d at 1454.  Unlike conservators, receivers act to "liquidat[e] [an] institution and wind[ ] up its affairs."  *See* CARPENTER & MURPHY, *supra*, at 6. During this process of liquidation a receiver gathers and sells the financial institution's assets and distributes the proceeds to creditors and others with claims against the failed entity in accordance with the statutory priority scheme.  *See* John W. Head, *Lessons from the Asian Financial Crisis: The Role of the IMF and the United States*, 7 KAN. J.L. & PUB. POL'Y 70, 76-78 (1998) ("[T]he bank's assets would be sold and the proceeds from that sale would be distributed among

depositors and other selected creditors."); *see Freeman*, 56 F.3d at 1401 (Receivership "ensure[s] that the assets of a failed institution are distributed fairly and promptly among those with valid claims against the institution."). As this distribution process leaves the receivership entity with no remaining assets, receivership requires a "determination . . . that the institution is not viable." *See* CARPENTER & MURPHY, *supra*, at 6. Indeed, "[p]lacing a bank in receivership acknowledges that restoration is impossible." *See* Head, *supra*, at 77. *See also* FHFA Internal Memo, at .pdf 7 ("The appointment of the FHFA as receiver—*as opposed to conservator*—terminates all rights and claims that the stockholders and creditors have against the assets or charter of the regulated entity or the Agency arising as a result of their status as stockholders . . . , except for their right to payment, resolution or other satisfaction of their claims." (emphasis added)); TREASURY FY 2011 CONGRESSIONAL JUSTIFICATION at GSE-6 ("Conservatorship preserves the status and claims of the preferred and common shareholders.").

The fundamental distinction between a conservator and a receiver was well understood by Congress in enacting HERA, and by FHFA in promulgating regulations implementing its conservatorship powers under HERA. HERA requires FHFA as conservator to "put the [Companies] in a sound and solvent condition" and "carry on the business of the [Companies] and preserve and conserve [their] assets and property." 12 U.S.C. § 4617(b)(2)(D). FHFA's regulations explain that these statutory powers "charge [FHFA] with rehabilitating the regulated entity." 76 Fed. Reg. at 35,727; *id.* ("[T]he essential function of a conservator is to preserve and conserve the institution's assets . . . ."); *id.* at 35,730 ("A conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition."). Indeed, FHFA's regulations generally prohibit distributions of capital such as dividends precisely because they would "deplete the entity's conservatorship assets" and

therefore "would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity." *Id.* at 35,727.[11] Even FHFA's briefing in related litigation has emphasized that a conservator must act to "preserv[e] the capital available to the [Companies]." FHFA Discovery Opp. 17, *Fairholme v. FHFA*, No. 13-1053 (D.D.C. Mar. 3, 2014).

### ii. The Net Worth Sweep Failed To Preserve and Conserve the Companies' Assets but Instead Set Them on an Inexorable Path To Wind Down.

The Net Worth Sweep contravenes FHFA's basic obligations under HERA and its own regulations to "preserve and conserve the [Companies'] assets and property," 12 U.S.C. § 4617(b)(2)(D)(ii) and to "put the [Companies] in a sound and solvent condition" with the goal of rehabilitating them, *id.* § 4617(b)(2)(D)(i).

First, the Net Worth Sweep depletes the Companies' capital, a consequence that FHFA has elsewhere determined is "inconsistent with [its] statutory goals." 76 Fed. Reg. at 35,727. Indeed, former Director Lockhart emphasized that, "[a]s the conservator, FHFA's *most important goal* is to preserve the assets of Fannie Mae and Freddie Mac over the conservatorship period. That is our statutory responsibility." *The Present Condition and Future Status of Fannie*

---

[11] Treasury offers the puzzling argument that FHFA had no obligation to "preserve and conserve" the Companies' assets because HERA "expresse[s]" this power "in permissive, not mandatory, terms." Treas. Br. 17-18; *see also* 12 U.S.C. § 4617(b)(2)(B)(iv) ("The Agency may, as conservator . . . preserve and conserve."). But FHFA's own conservatorship regulations recognize that preserving and conserving assets is its "statutory charge" as a conservator. 76 Fed. Reg. at 35,727. While use of the word "may" "usually implies some degree of discretion," it can have a mandatory meaning when, as here, "the structure and purpose of the statute" dictate as much. *See United States v. Rogers*, 461 U.S. 677, 706 (1983); *see also Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 198 (2000) ("[T]he mere use of 'may' is not necessarily conclusive of congressional intent to provide for a permissive or discretionary authority"). In any event, FHFA's power to "preserve and conserve" the Companies' assets cannot be read to authorize it to nationalize those assets for the exclusive benefit of the government.

*Mae and Freddie Mac: Hearing Before the H. Comm. on Fin. Servs., Subcomm. of Capital Markets, Ins. & Gov't Sponsored Enters.* 111th Cong. (2009) (statement of James B. Lockhart, III, Dir., FHFA) (emphasis added), http://goo.gl/UWq6nu (last visited Aug. 29, 2014). Rather than allow the Companies to build up their capital, the Net Worth Sweep places the Companies in an untenable position, siphoning off every dollar earned by the Companies into Treasury's coffers, precluding them from strengthening along with the improving housing market. Indeed, Treasury made clear at the time of the Net Worth Sweep that its very purpose was to prevent the Companies from "retain[ing] profits" or "rebuild[ing] capital." Complaint ¶ 80 (quoting Treasury Net Worth Sweep Press Release). This perpetual and complete giveaway to Treasury is certainly more offensive to the Companies' chances of rehabilitation than other capital distributions that FHFA has prohibited altogether. *See* 12 C.F.R. § 1237.13 (prohibiting payment of securities litigation claims). Indeed, the Net Worth Sweep has the perverse effect of prohibiting Fannie and Freddie from "retain[ing] capital to withstand a sudden, unexpected economic shock . . . ." Statement by Kelli Parsons, Senior Vice President and Chief Communications Officer, Fannie, on Stress Test Results (Apr. 30, 2014), http://goo.gl/g4pSNB (last visited Aug. 29, 2014). Accordingly, the Net Worth Sweep is antithetical to FHFA's duty to "preserve and conserve the assets and property" of the Companies. 12 U.S.C. § 4617(b)(2)(D)(ii).

The Net Worth Sweep's effect on the Companies' ability to retain capital also violates FHFA's obligation to "put the [Companies] in a sound and solvent condition." *Id.* § 4617(b)(2)(D)(i). At the core of American regulation of financial institutions are capital requirements, with capital defined as the excess of assets over liabilities. Such capital serves as a buffer against the inevitable vicissitudes of the economic cycle that affect all financial

institutions.  Institutions with sufficient capital are deemed safe, and those without capital are deemed unsound.  The Net Worth Sweep condemns the Companies into the ranks of the undercapitalized on a permanent basis.  It is difficult to imagine a regulatory action more calculated to undermine the "soundness and solvency" of a financial institution than the Net Worth Sweep.

Second, the Net Worth Sweep has caused the Companies to incur tens of billions of dollars in additional debt to finance dividends at a time when FHFA continues to say that the Companies' capital position "remains extremely precarious."  FHFA Motion To Dismiss at 19, *Samuels v. FHFA*, No. 13-22399 (S.D. Fla. Dec. 6, 2013), Doc. 38.  Because many of the Companies' assets are valued based on assumptions about future financial performance or marked to market (i.e., valued according to variable market prices), increases in the Companies' net worth are not necessarily associated with corresponding increases in cash on hand.  Deferred tax assets, for example, appear on the Companies' balance sheets when management concludes that it is likely that the Companies will eventually be able to use them to offset future tax liability, but the recognition of those assets is an accounting decision that does not generate any cash.  Similarly, the Companies hold numerous assets—including many billions of dollars of derivatives and available-for-sale securities—that are valued on the balance sheets at the prevailing market price.  When such assets appreciate, the Companies' net worth increases but their cash on hand does not.  The result is that a cash dividend linked solely to net worth may need to be financed through borrowing.  Indeed, the Companies incurred substantial additional debt in 2013 in order to pay cash dividends under the Net Worth Sweep.  *See* Complaint ¶¶ 84-85.  Ordering the Companies to pay debt-financed dividends when they are undercapitalized is

inimical to FHFA's statutory duties to "preserve and conserve" the Companies' assets, 12 U.S.C. § 4617(b)(2)(D)(ii), and to place them in a "sound and solvent" condition, *id.* § 4617(b)(2)(D)(i).

Third, the Net Worth Sweep guarantees that the Companies will never resume "normal business operations." "Normal" companies recovering from financial distress save their profits to withstand the next downturn. But today the Companies' opportunities to operate as normal, private companies exist in name only because the Net Worth Sweep depletes every dollar of their net worth, depriving them of the "future income flows" that represent a company's "fundamental value." *See Tennessee Gas Pipeline Co. v. FERC*, 926 F.2d 1206, 1208 n.2 (D.C. Cir. 1991). Indeed, the Companies themselves have described the Net Worth Sweep as a "risk factor" because it "do[es] not allow [them] to build capital reserves." *See* Fannie Offering Circular, *Universal Debt Facility* at 11 (May 14, 2013), http://goo.gl/q2GCX2 (last visited Aug. 29, 2014). FHFA has clearly and impermissibly abandoned its conservatorship duty to "rehabilitate" the Companies and has instead converted them into a government revenue stream, prohibited from "retain[ing] profits" or "rebuild[ing] capital." *See* Complaint ¶ 80; 76 Fed. Reg. at 35,727, 35,730.

Fourth, the government has openly vowed that, far from rehabilitation, the Net Worth Sweep is aimed specifically at winding down the Companies' operations. At the time of the Net Worth Sweep, Treasury proclaimed that it would help "expedite the wind down of Fannie Mae and Freddie Mac" and make "sure that every dollar of earnings that [each firm] generate[s] will be used to benefit taxpayers," such that the Companies will not be allowed to "retain profits [or] rebuild capital." Complaint ¶ 80 (quoting Treasury Net Worth Sweep Press Release). FHFA similarly told Congress that its goal was to "move the housing industry to a new state, one without Fannie Mae and Freddie Mac." Complaint ¶ 81 (quoting FHFA, 2012 REP. TO CONG. at

42

13). FHFA's Acting Director tied the Net Worth Sweep to this goal, telling Congress that it "reinforce[d] the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status." *Id.* (second alteration in original) (quoting DeMarco Statement Before S. Comm. on Banking, Hous. & Urban Affairs).

These actions—agreeing to pay "every dollar of earnings" to the Treasury, borrowing money to pay cash dividends on paper profits, depleting capital, eliminating the possibility of rehabilitation and a return to normal business operations, and doing so with the intent to slowly wind down the Companies—neither "preserve and conserve" the Companies' assets, 12 U.S.C. § 4617(b)(2)(D)(ii), nor "put the [Companies] in a sound and solvent condition," *id.* § 4617(b)(2)(D)(i). And they are plainly not the actions of a conservator. *See Del E. Webb McQueen Dev. Corp.*, 69 F.3d at 361. These actions instead are those of a *de facto* receiver, determined to "ensure that the assets of [the Companies] are distributed" and the Companies wound down. *See Freeman*, 56 F.3d at 1401. But that liquidation function belongs solely to a receiver, not a conservator. *See* 12 U.S.C. § 4617(b)(2)(E). As conservator, FHFA must "assum[e]" that the Companies "may well return to the transaction of [their] business" outside of governmental control. *See* Malloy, *supra*, § 11.3.4.2. FHFA's actions to the contrary exceeded its authority under HERA and its own regulations and, therefore, violated the APA.

### d. Defendants' Purported Justifications for the Net Worth Sweep Lack Merit.

FHFA argues that even if the Net Worth Sweep was a step towards "winding up" the Companies' affairs, it has authority as conservator to shrink the Companies in preparation for liquidation. This argument is meritless.

1. FHFA contends that it has "ample statutory authority" to wind down the Companies and to "prepare them for potential liquidation," and need not maintain an objective of

43

"rehabilitation." FHFA Br. 23. FHFA is wrong. Again, liquidation is exclusively the province of a receiver, as both HERA's text and FHFA's regulations provide, and FHFA's *de facto* liquidation of the Companies under conservatorship ignores the important procedural protections provided during receivership.

HERA lays out a complex procedure for processing claims against the Companies during liquidation that applies only during receivership. 12 U.S.C. § 4617(b)(3)-(9). By prohibiting FHFA from liquidating the Companies while it acts as their conservator, HERA also prohibits FHFA from "winding [them] up" in preparation for liquidation. Indeed, HERA, case law, commentators, and even dictionaries all use "liquidation" and "wind up" synonymously. For example, HERA imposes specific requirements on FHFA when it initiates "the *liquidation* or *winding up* of the [Companies'] affairs." *Id.* § 4617(b)(3)(B) (emphases added). Similarly, case law regarding the FDIC's receivership authority underscores this point, holding that the purpose of a receivership is "to expeditiously 'wind up the affairs of failed banks.' " *Freeman*, 56 F.3d at 1401 (quoting *Local 2 v. FDIC*, 962 F.2d 63, 64 (D.C. Cir. 1992)). Treatises explain that receivers "liquidate the institution and wind up its affairs." Resseguie, *supra*, § 11.01. Dictionaries also define "liquidation" and "winding up" as virtually the same. *See* BLACK'S LAW DICTIONARY 1738 (9th ed. 2009) (winding up: "The process of settling accounts and liquidating assets in anticipation of a partnership's or a corporation's dissolution."); OXFORD ENGLISH DICTIONARY ONLINE (Dec. 2013) ("liquidation, n." defined as "[t]he action or process of winding up the affairs of a company"). Because HERA prohibits FHFA as conservator from liquidating the Companies, it also prohibits FHFA as conservator from winding them up.

FHFA argues that HERA—contrary to the traditional limitations of conservatorship authority—empowers conservators to wind down regulated entities because Section 4617(a)(2)

44

states that FHFA may "be appointed *conservator or receiver* for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity." *See* FHFA Br. 23 (emphasis added); *see also* Treas. Br. 16-17, 19.  FHFA misreads the statute.  It does not follow that the powers articulated in Section 4617(a)(2) belong to conservators and receivers alike.  After all, "the words of a statute must be read in their context." *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  As explained above, HERA, case law, commentators, and dictionaries use "liquidation" and "winding up" as synonyms.  And given that liquidating the Companies is beyond FHFA's conservatorship powers, it follows that steps to wind down the Companies are also forbidden to FHFA as conservator.  Further, concluding that FHFA as conservator may wind down the Companies generates absurd results:  If FHFA as conservator has all three powers listed in Section 4617(a)(2)—"reorganizing, rehabilitating, [and] winding up"—it follows that FHFA as receiver must also have these three powers, including rehabilitation.  But that cannot be, as even FHFA explains that as receiver it "shall place the [Companies] in liquidation," leaving no room to rehabilitate them.  12 C.F.R. § 1237.3(b) (quoting 12 U.S.C. § 4617(b)(2)(E)).  Section 4617(a)(2) thus is best read as listing the authorities that HERA collectively grants FHFA as conservator and receiver, while the following provisions of the statute specify which authorities FHFA may exercise in a particular capacity.  The structure of HERA's various provisions provides further support for this interpretation.  *See* 12 U.S.C. § 4617(a) ("Appointment of the Agency as conservator or receiver"); *id.* § 4617(b) ("Powers and duties of the Agency as conservator or receiver"); *id.* § 4617(b)(2)(D) ("Powers as conservator"); *id.* § 4617(b)(2)(E) ("Additional powers as receiver").

FHFA's reliance on *Ameristar Financial Services Co. v. United States*, 75 Fed. Cl. 807 (2007), is similarly misplaced.  *Ameristar*'s statement that a conservator "manage[s] and

protect[s] the troubled institution's assets until the institution has stabilized or has been closed by the chartering authority," *id.* at 808 n.3, merely acknowledges that a conservatorship can be successful (with the "stabilized" entity exiting conservatorship), or it can fail, ending in receivership and closure.  *See* 12 U.S.C. § 4617(a)(4)(D) ("Receivership terminates conservatorship.").  FHFA's view that a conservator can wind down an entity toward eventual liquidation—contrary to the language of HERA and FHFA's own expressed goal of using the conservatorship to "return[ ] the [Companies] to normal business operations," Complaint ¶ 35 (quoting Lockhart Conservatorship Statement at 5-6)—is simply "untenable," *CedarMinn Bldg. Ltd. P'ship*, 956 F.2d at 1454.

If FHFA were correct—and it could wind down the Companies as conservator—FHFA would have license to evade the procedural protections afforded by receivers.  HERA requires FHFA, "as receiver, [to] determine claims in accordance with the requirements of" Section 4617(b).  12 U.S.C. § 4617(b)(3)(A).  These rules require FHFA as receiver, "in any case involving the liquidation *or winding up* of the affairs of a closed regulated entity," to "promptly publish a notice to the creditors of the regulated entity to present their claims, together with proof . . . not less than 90 days after the date of publication of such notice," and to provide a mailing to the same effect.  *Id.* § 4617(b)(3)(B), (C) (emphasis added).  After considering these claims, FHFA may allow or disallow a creditor's claim under its prescribed rules.  *Id.* § 4617(b)(5)(B), (C).  These rules ensure that receivers "fairly adjudicate[ ] claims against failed financial institutions."  *Whatley v. RTC*, 32 F.3d 905, 909-10 (5th Cir. 1994) (describing similar procedures for FDIC and RTC).  Indeed, several Courts of Appeals have recognized that a receiver's failure to provide statutorily required notice raises "serious due process concerns."  *Freeman*, 56 F.3d at 1403 n.2; *see also Greater Slidell Auto Auction, Inc. v. American Bank &*

*Trust Co. of Baton Rouge*, 32 F.3d 939, 942 (5th Cir. 1994) ("Mailing of notice to claimants known to the receiver is constitutionally required."); *Elmco Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914, 922 (4th Cir. 1996) ("[I]t would violate the Due Process Clause of the Fifth Amendment to allow the RTC to treat Elmco's claim as untimely, hence permanently denied.").

At bottom, FHFA's argument is that the Net Worth Sweep allows it to circumvent this adjudication process. The Net Worth Sweep transfers all of the Companies' future profits to Treasury, leaving Plaintiff and other private shareholders with nothing, no matter how valuable or profitable the Companies' assets may become. This result is identical to what would happen if FHFA as receiver had adjudicated, and disallowed, Plaintiff's claims. *See MBIA Ins. Corp.*, 816 F. Supp. 2d at 87 (describing FDIC receivership notice that the entity's funds "are insufficient to pay claims below the depositor class and that all non-depositor creditor claims have no value"). Yet FHFA provided no notice to Plaintiff, which has valid claims against the Companies' assets. FHFA's action, if permitted, would deprive Plaintiff of due process. *See Freeman*, 56 F.3d at 1403 n.2. Judicial endorsement of FHFA's effort to side-step Congress' procedural protections will simply provide other agencies with a roadmap for similar evasion and overreach.

2. Clearly prohibited from winding up the Companies, FHFA further argues that it may accomplish the same end by virtue of its authority under HERA to " 'transfer or sell any asset' of the [Companies] 'without any approval, assignment, or consent.' " FHFA Br. 21-22 (citing 12 U.S.C. § 4617(b)(2)(G)). As an initial matter, this death-by-a-thousand-cuts argument is undermined by Treasury's and FHFA's decision to wind down the Companies. FHFA cannot be

heard to argue that it is just going about its business as a conservator in light of this declared purpose.

FHFA's remarkable claim fails on its own terms.  FHFA as conservator may engage in a wide array of conduct while it oversees the Companies:  For example, it may "collect all obligations and money due" to the Companies, or contract with third parties to "fulfill[ ] any function, activity, action, or duty of the Agency as conservator," or pay valid obligations incurred by the Companies.  *See* 12 U.S.C. § 4617(b)(2)(B)(ii), (b)(2)(B)(v), (b)(2)(H).  But transferring the entirety of the Companies' residual economic value from private investors to another government agency in exchange for virtually nothing is not among the basic powers of a conservator.  To the contrary, when FHFA transfers the Companies' assets, HERA specifically requires it to "maximize[ ] the net present value return" the Companies receive.  *Id.* § 4617(b)(11)(E)(i).  HERA would raise grave constitutional concerns if it authorized giveaways to the government of the sort at issue here.  *See United States v. Security Indus. Bank*, 459 U.S. 70, 78-82 (1982) (construing statute narrowly to avoid takings difficulty).

In any event, FHFA does not exercise its power to transfer the Companies' assets in a vacuum, devoid of statutory goals or its own regulatory guidance.  Again, the provision on which FHFA relies specifies that the agency may only transfer assets "*as conservator or receiver*," 12 U.S.C. § 4617(b)(2)(G) (emphasis added), and HERA instructs FHFA as conservator to "preserve and conserve" the Companies' assets, which FHFA has explained requires it to use its powers to "rehabilitate" the Companies for eventual return to normal business operations.  *Id.* § 4617(b)(2)(D)(ii); 76 Fed. Reg. at 35,730.  And in the context of a conservatorship, FHFA lacks the authority to "transfer assets" to *prevent*, rather than to *promote*, rehabilitation of the Companies.

48

FHFA attempts to prop up its argument by citing a flotilla of cases in which courts ruled that FIRREA barred plaintiffs from suing receivers to enjoin various transfers of assets.  FHFA Br. 21-22 & n.15 (citing *Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696, 700-02 (D.C. Cir. 1997); *Gosnell v. FDIC*, 1991 WL 533637, at *6 (W.D.N.Y. Feb. 4, 1991); *Courtney v. Halleran*, 485 F.3d 942, 949 (7th Cir. 2007); *Volges v. RTC*, 32 F.3d 50, 53 (2d Cir. 1994); *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1328-29 (6th Cir. 1993)).  But all of those cases involved *receivership* and thus did not implicate the specific issue here: whether FHFA as conservator may effect an otherwise impermissible wind down of the Companies' affairs by transferring all of their profits in perpetuity to another federal agency.  Moreover, the transfers at issue in FHFA's cases were all routine exercises of a receiver's powers; none involved self-dealing or waste on the scale alleged here.

The Seventh Circuit's decision in *Courtney*, on which Treasury relies, Treas. Br. 18-19, is very far afield.  In that case, the FDIC as receiver entered into an agreement with a third party to pursue legal claims against another entity and divide the proceeds of any recovery.  The Seventh Circuit held that the receiver's power to settle legal claims under Section 1821(p)(3)(A), "if it is to mean anything at all," must "operate independently" of any statutory priority distribution scheme.  *Courtney*, 485 F.3d at 949.  That ruling provides no support at all for Defendants' argument here that a conservator's power to transfer assets is unrestrained by the statutory goals of conservatorship.

The Court should reject FHFA's unbounded understanding of its authority to transfer assets, which runs roughshod over HERA's careful enumeration of a conservator's powers and obligations.  *See Coit Independence Joint Venture v. Federal Sav. & Loan Ins. Corp.*, 489 U.S. 561, 573-74 (1989) (interpreting FIRREA's predecessor and concluding that particular provision

did not give agency power to adjudicate claim in light of other provisions enumerating its

authority); *see also Beck v. PACE Int'l Union*, 551 U.S. 96, 108 (2007) (looking to ERISA's

overall structure to interpret specific provision); *Utility Air Regulatory Grp. v. EPA*, 134 S. Ct.

2427, 2440-41 (2014) (same with respect to Clean Air Act).

3.   FHFA further claims that the Net Worth Sweep was within its statutory authority to

take actions in the "best interests of the [Companies] or . . . [FHFA]" and to "carry on the

business" of the Companies.   FHFA Br. 17 (quoting 12 U.S.C. § 4617(b)(2)(D), (b)(2)(J)(ii)).

FHFA does not muster any support for this stunning proposition that it can disregard its

conservatorship obligations if it, in its sole discretion, concludes that an action may benefit the

Companies, or even itself.   That is not the law, and "FHFA cannot evade judicial scrutiny by

merely labeling its actions with a conservator stamp."   *Leon Cnty.*, 700 F.3d at 1278.   Indeed,

HERA makes clear that FHFA's "[i]ncidental power[ ]" to take actions that FHFA determines

are in the best interests of FHFA or the Companies is limited to actions otherwise "authorized by

this section [of HERA]."   12 U.S.C. § 4617 (b)(2)(J).   There thus is no basis for reading a broad,

free-floating grant of authority into a provision that provides merely for the exercise of authority

incidental to that expressly granted by HERA to FHFA.   *Cf. McCulloch v. Maryland*, 17 U.S. (4

Wheat.) 316, 411 (1819) ("[A] great substantive and independent power . . . cannot be implied as

incidental to other powers, or used as a means of executing them.").

### e.   FHFA Exceeded Its Statutory Authority by Drawing on Treasury Funds To Pay Treasury Dividends.

Finally, even before consummation of the Third Amendment, FHFA exceeded its

statutory authority by directing the Companies to declare cash dividends on the Government

Stock that could only be financed through additional draws on Treasury's funding commitment.

*See* Complaint ¶¶ 103, 112.   Again, Fannie and Freddie were under no obligation to pay those

50

dividends in cash, *see supra* at 14, 32 n.9, and the law generally forbids a corporation to declare dividends that would make it insolvent. *See EBS Litig., LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 304-05 (3d Cir. 2002); *SV Inv. Partners v. ThoughtWorks, Inc.*, 7 A.3d 973, 987 (Del. Ch. 2010). Surely FHFA was aware of its obligation as conservator to avoid paying discretionary cash dividends out of inadequately capitalized entities, as evidenced by the fact that one of its first acts as conservator was to immediately order the suspension of dividend payments on Fannie's and Freddie's preferred and common stock. We are not aware of any similar situation in which a financial institution in conservatorship has paid a voluntary dividend to equity holders while significantly undercapitalized. *See, e.g.*, Fannie, 2013 Annual Report (Form 10-K) at 63 (Feb. 21, 2014) (discussing statutory restrictions on dividend payments by Fannie and noting that, absent FHFA approval, Fannie is "not permitted to make a capital distribution if, after making the distribution, [it] would be undercapitalized" (referencing 12 U.S.C. § 4614(e) ("Restrictions on capital distributions"))). Such dividend payments are entirely inconsistent with a conservator's obligation to "preserve and conserve" an entity's assets while in conservatorship.

Furthermore, Fannie and Freddie may freely redeem Government Stock used to pay in-kind dividends, unlike Government Stock used to draw $26 billion from Treasury's commitment to pay back to Treasury a like amount in cash dividends. *See* Fannie Government Stock Certificate § 3(a); Freddie Government Stock Certificate § 3(a). FHFA's decision to nevertheless order the Companies to pay cash dividends thus cannot be squared with its statutory obligation to "preserve and conserve" the Companies' assets, 12 U.S.C. § 4617(b)(2)(B)(iv), and place them in a "sound and solvent condition," *id.* § 4617(b)(2)(D)(i).

FHFA's only answer is to accuse Plaintiff of impermissibly "second-guessing . . . the *means* by which the Conservator exercised its discretion in operating the Enterprises." FHFA

51

Br. 18. This is a straw man. Plaintiff's contention is that FHFA exceeded its statutory authority as conservator by authorizing cash dividend payments that FHFA itself characterizes as "a very real problem." *Id.* at 17. FHFA cannot hide behind its discretion as conservator where its own filings declare that its actions so threatened the Companies' financial health that the only solution was to nationalize them.

### B. Section 4617(f) Does Not Bar Plaintiff's Claims Against Treasury.

Though HERA includes no provision limiting judicial review of claims against Treasury, Treasury nevertheless argues that Section 4617(f) bars judicial review of its conduct with respect to the Net Worth Sweep because a court's setting aside the Net Worth Sweep would "affect" FHFA's power to enter into it. Treas. Br. 11-20. If Treasury were correct, FHFA would be empowered to immunize a wide range of illegal conduct. For example, courts would be impotent to enjoin a decision of, say, the Department of Education to begin guaranteeing the Companies' mortgage-backed securities under an agreement with FHFA, even though the Department of Education has no statutory authority to do so. Treasury's reading of Section 4617(f) would also immunize private unlawful conduct. Under Treasury's theory, FHFA could transfer mortgage-backed securities to companies statutorily prohibited from owning them; it could hire employees barred from the mortgage finance industry; it could authorize the Companies' underwriters to engage in insider trading; and in each case, no court could stop FHFA's counterparty from violating the law. HERA does not mandate such absurdities. Put simply, a court does not "affect" the conservator's exercise of its powers and functions when it orders a third party to satisfy its own independent legal obligations. Even accepting FHFA's argument that Section 4617(f) exists to prevent "second-guessing" of the conservator's decisions, FHFA Br. 18, questioning *Treasury's* statutory authority does not require this Court to "second-guess" FHFA's actions as conservator.

52

Resisting this straightforward interpretation of Section 4617(f), Treasury cites several cases in which courts have refused to issue injunctions against third parties on the ground that doing so would "affect" a federal receiver's exercise of its powers or functions. Treas. Br. 14-15. But these cases concerned efforts to enforce the legal obligations of *a federal receiver or conservator or its charge* through an injunction against a third party. Thus, in *Dittmer Properties, LP v. FDIC*, the plaintiff argued that a debt a third party had acquired from FDIC was void because the failed bank that originally issued the debt could not have enforced it. 708 F.3d 1011, 1015-16 (8th Cir. 2013). The Eighth Circuit held that the courts could no more enjoin the third party from enforcing the debt than they could have enjoined FDIC from doing so prior to the debt's transfer. *Id.* at 1016-20. In so ruling, the Eighth Circuit emphasized that the plaintiff's claim ultimately turned on "the act or omission of a failed banking institution"—not the unrelated legal obligations of the third party that eventually acquired the debt. *Id.* at 1019.

The other two published decisions cited by Treasury are distinguishable for similar reasons. In *Telematics International, Inc. v. NEMLC Leasing Corp.*, the First Circuit refused to issue an order declaring that the plaintiff was not liable for a debt owed to a bank that FDIC had placed in receivership. 967 F.2d 703, 707 (1st Cir. 1992). As in *Dittmer*, the plaintiff's claim was that it had never become indebted to the failed bank in the first place. Accordingly, the court did not have occasion to decide the question presented here: whether a federal conservator or receiver's contract with a third party can relieve the third party of its own independent legal obligations that it did not inherit from the conservator or receiver. Similarly, the plaintiff in *Hindes v. FDIC* challenged FDIC's acquisition of a failed bank's assets on the ground that the bank should never have been placed in receivership. 137 F.3d 148, 154, 160-61 (3d Cir. 1998). Indeed, because the challenged determination "directly and proximately" caused the closing of

the bank and the appointment of FDIC as receiver, the relief requested by the plaintiff would have "throw[n] into question every act of FDIC-Receiver." *Id*. at 161.  In other words, the *Hindes* plaintiff effectively was challenging the very appointment of the receiver and the continuing validity of the receivership; the court's authority to order a federal conservator's contracting counterparty to follow its own legal obligations was not at issue.  In contrast to the claims against third parties in *Dittmer*, *Telematics*, and *Hindes*, Plaintiff's claims here against Treasury allege that Treasury's *own* conduct was unlawful and do not depend on the legal obligations of FHFA or the Companies.

Treasury's only other authority—*Furgatch v. RTC*, 1993 WL 149084 (N.D. Cal. Apr. 30, 1993)—is also distinguishable.  The plaintiff in that case asked the court to enjoin a foreclosure trustee's sale of a parcel of real property on behalf of a conservator for a failed bank.  The plaintiff conceded that the trustee had "complied with the [California foreclosure] statute," but nevertheless argued that the sale should be stopped because the failed bank knew his address and did not give him actual notice of the foreclosure.  *Id.* at *1.  Thus, although the *Furgatch* court's opinion is not a model of clarity, it is apparent that the plaintiff in that case did not allege that the trustee had violated any independent legal obligation it had not inherited from the conservator.

In the end, Treasury is left with no authority to support the extraordinary claim on which its Section 4617(f) argument depends: that FHFA has *carte blanche* to use contracts to exempt its counterparties from their ordinary, independent legal obligations.  Other federal courts have rejected similar arguments.  *See Stommel v. LNV*, 2014 WL 1340676, at *5 (D. Utah Apr. 4, 2014) (FIRREA's jurisdictional bar did not preclude claims against third party that "focus[ed] on [the third party's] actions not the actions of the FDIC."); *LNV Corp. v. Outsource Serv. Mgmt., LLC*, 2014 WL 834977, at *4 (D. Minn. Mar. 4, 2014) ("At bottom, OSM seeks to recover from

LNV, and such relief simply would not 'restrain or affect' the FDIC[ ] in any way.").  And given the lengthy history of Section 4617(f)'s predecessors,[12] the fact that Treasury is unable to cite any authority that directly supports its theory strongly suggests that FHFA lacks the suspension power from which Treasury seeks to benefit.

Citing cases in which courts have interpreted the word "affect" in unrelated contexts, Treasury says that Section 4617(f)'s use of that word forbids a court to take any action that would, among other things, "act upon, influence, move, touch, or have an effect on" FHFA's exercise of its powers and functions.  Treas. Br. 14-15 (quoting *United States v. Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010)).  But as used in the present context, the word "affect" reaches only "collateral attacks attempting to restrain the receiver from carrying out its basic functions." *Coit*, 489 U.S. at 575.  Immunizing Treasury from liability for violations of its independent obligations under HERA and the APA is not among those basic functions, and the word "affect" in Section 4617(f) cannot be used to bootstrap that or any other power onto the carefully circumscribed list of conservatorship powers found elsewhere in HERA.  *See id.* at 574.

Reference to the jurisdictional bar's purpose confirms that it does not prevent a court from ordering a third party to satisfy its independent legal obligations.  The aim of the jurisdictional bar is to ensure that a federal conservator or receiver can "act in a quick and decisive manner in reorganizing, operating, or dissolving failed financial institutions." *Sierra Club v. FDIC*, 992 F.2d 545, 550 (5th Cir. 1993) (internal quotation marks omitted); *accord Hanson v. FDIC*, 113 F.3d 866, 871 (8th Cir. 1997).  FHFA hardly needs the expansive power

---

[12] Statutory text materially identical to Section 4617(f) has applied to receivers and conservators for failed banks since 1989.  *See* Pub. L. No. 101-73, § 212(a).  Even before that, FIRREA's predecessor, enacted in 1966, forbade a court to "restrain or affect the exercise of powers or functions of a conservator or receiver."  Pub. L. No. 89-695, 80 Stat. 1033.  *See generally Coit*, 489 U.S. at 574.

Treasury claims for it—the power to suspend any law as it applies to a contractual

counterparty—in order to effectively rehabilitate the Companies or (in the case of receivership)

expeditiously wind them down.

 Finally, HERA's legislative history confirms that Congress had no intention of allowing

Treasury to hide behind FHFA's conservatorships to avoid judicial review of whether Treasury

violated the Act's temporal limit on when it may invest in the Companies.  *See* 12 U.S.C.

§§1455(*l*)(4), 1719(g)(4) (requiring that Treasury complete purchases of Fannie and Freddie

securities by December 31, 2009).  HERA's legislative history makes clear that the temporal

limit placed on Treasury's authority to acquire the Companies' stock was key to the Bush

Administration's success in persuading Congress to pass it.  *See, e.g.*, *Recent Developments in*

*U.S. Financial Markets and Regulatory Responses to Them: Hearing before S. Comm. on*

*Banking, Hous., & Urban Affairs*, 110th Cong. 9 (2008) (Chairman Dodd: "[Y]ou are seeking an

unprecedented grant of authority to purchase GSE debt and stocks.  What kind of assurances can

we offer taxpayers—because we do not have a number here, this is an unlimited amount we are

looking at potentially.  . . .  The big question we are going to be faced with our constituents is

how much is this going to potentially cost us."  Treasury Secretary Paulson: "We are asking for it

for a temporary period of time."); *id.* at 12 (Ranking Member Shelby: "Are you basically saying

that this is a temporary involvement by Treasury, it is not open-ended . . . ?"  Paulson: "Right. . .

. You said it very well."); H.R. REP. NO. 110-767 (2008), *reprinted in* 2008 WL 2814663, at *2

(HERA "increases Treasury authority . . . for the next 18 months, giving Treasury standby

authority to buy stock or debt in [Fannie and Freddie] if it determines an emergency exists and

the purchase is necessary to provide market stability, prevent disruptions to availability of

mortgages, protect the taxpayer, and restore orderly markets.").  Treasury nevertheless reads

HERA to give it unreviewable power to invest any amount in the Companies so long as they remain in conservatorship.  Congress plainly did not intend to create such a loophole, and Treasury is bound by HERA's clear limits on when it may invest in the Companies.

## II.  Section 4617(b)(2)(A) Does Not Strip Plaintiff of Its Rights in Its Stock.

FHFA and Treasury contend that HERA vested FHFA, as the Companies' conservator, with any "rights, titles, powers, and privileges" that inhered in Plaintiff's stock, and that Plaintiff accordingly has no rights in that stock left to vindicate.  *See* FHFA Br. 24-30 (citing 12 U.S.C. § 4617(b)(2)(A)); Treas. Br. 20-23 (same).  This argument is meritless for two independent reasons.  First, HERA does not bar Plaintiff from asserting direct claims that relate to its ownership of stock, and all of the claims at issue here are direct.  Second, courts have uniformly recognized an exception to the general rule that shareholders may not bring derivative claims during conservatorship where, as here, the conservator has a manifest conflict of interest.

### A.  Plaintiff Has Standing To Bring Direct Claims Arising from Its Ownership of Stock.

1.  HERA does not grant the conservator *all* of the rights of the shareholders; if it had, it would have effected a taking, and it would have meant that FHFA's assurances that it was retaining the Companies' existing capital structure were lies from the day they were uttered.  *See Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696, 699 (D.C. Cir. 1997) ("[T]o hold that the federal government could simply vitiate the terms of existing assets, taking rights of value from private owners with no compensation in return, would raise serious constitutional issues.").  Rather, consistent with well-established principles of conservatorship, the conservator succeeds to the shareholders' rights "*with respect to the regulated entity and the assets of the regulated entity*." 12 U.S.C. § 4617(b)(2)(A)(i) (emphasis added).  That does not include the shareholders' right to

bring direct claims to vindicate the shareholders' *own* property rights, as opposed to the rights of the regulated entity.

Courts interpreting a materially identical provision of FIRREA—12 U.S.C. § 1821(d)(2)(A)(i)—have held that, notwithstanding that provision, shareholders have standing to assert direct claims for breach of contract and even "derivative" claims where the recovery would be distributed to the shareholder. Thus, in the *Winstar* cases the Court of Federal Claims acknowledged that as receiver FDIC succeeded to most shareholder derivative claims brought on behalf of failed banks but nevertheless denied FDIC's motion to substitute itself for plaintiffs who brought *direct* takings and breach of contract claims against the United States. *Plaintiffs in All Winstar-Related Cases at the Court v. United States*, 44 Fed. Cl. 3, 9-11 (1999). The Federal Circuit approved that approach. *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1287-88, 1293 (Fed. Cir. 1999) (shareholder was entitled to pursue claim where it would receive recovery if suit succeeded); *see also Admiral Fin. Corp. v. United States*, 329 F.3d 1372, 1382 (Fed. Cir. 2003) (assuming that FDIC could not assert direct claims owned by shareholders). Those cases are particularly instructive because Congress is presumed to adopt the accepted judicial interpretation of a statute when it enacts the same language a second time. *See Lorillard v. Pons*, 434 U.S. 575, 581 (1978). If Congress objected to the prevailing judicial view that FIRREA allows direct claims of shareholders to go forward against a financial institution in conservatorship or receivership, it would not have used the same language again in HERA.

Defendants' cases are not to the contrary. As they acknowledge, FHFA Br. 26 n.19; Treas. Br. 21, all of the authorities they cite involved *derivative* claims rather than direct claims like those at issue here, *see Kellmer v. Raines*, 674 F.3d 848, 850-51 (D.C. Cir. 2012); *Pareto v.*

*FDIC*, 139 F.3d 696, 700 (9th Cir. 1998) (noting FIRREA's analogue to Section 4617(b)(2)(A) "vests all rights and powers of a stockholder of the bank to bring a derivative action in the FDIC"); *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 350 (S.D.N.Y. 2009) (substituting FHFA for private shareholder, where shareholder brought a derivative suit and did not argue that the FHFA had a manifest conflict of interest); *In re Freddie Mac*, 643 F. Supp. 2d 790, 795 (E.D. Va. 2009).  Defendants' argument thus ultimately rests on nothing more than an unexplained and unsupported assertion that direct and derivative claims must be treated the same.

Further confirming this analysis, HERA and FHFA's implementing regulations themselves identify certain rights retained by shareholders, making clear that Section 4617(b)(2)(A) does not supplant all shareholder rights.  For example, Section 4617(c)(1)(D) provides for payment by FHFA as receiver of "[a]ny obligation to shareholders or members arising as a result of their status as shareholder or members" after specified higher priority claims are paid.  *See also* 12 C.F.R. § 1237.9(a)(4) (same).  And when FHFA acts not as receiver but as conservator, FHFA has previously recognized that shareholders retain additional rights as well. *See* FHFA Internal Memo at .pdf 7 ("The appointment of the FHFA as receiver—*as opposed to conservator*—terminates all rights and claims that the stockholders . . . have against the assets or charter of the regulated entity or the Agency arising as a result of their status as stockholders . . . . except for their right to payment, resolution or other satisfaction of their claims." (emphasis added)).

Finally, FHFA's actions belie its contention that it has succeeded to all shareholder rights to dividends and a liquidation preference.  For example, FHFA expressly suspended payment of dividends to private shareholders of Fannie and Freddie during conservatorship.  But if FHFA

had in fact succeeded to the shareholders' contractual dividend rights, any payment of dividends would have been to FHFA itself, not to shareholders. FHFA then would have had no need to announce *to itself* that it was halting the payment of dividends. Moreover, FHFA entered into contractual agreements with Treasury—a *shareholder* in the Companies—that provided Treasury with dividend and liquidation rights, and FHFA has paid billions of dollars in dividends under those agreements. If the government's assertion were correct, Treasury's dividend rights would belong to FHFA, and there would have been absolutely no reason to amend the PSPAs. Thus, the logic of Defendants' arguments suggests that FHFA is improperly paying dividends to Treasury because those dividend rights belong to *FHFA*, not Treasury.

2. There can be no serious dispute that Plaintiff's claims are direct rather than derivative. The leading Delaware case explains that "whether a stockholder's claim is derivative or direct" depends "*solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004); *see Trooien v. Mansour*, 608 F.3d 1020, 1032 (8th Cir. 2010) (applying *Tooley*); *Parsch v. Massey*, 72 Va. Cir. 121, 128 (2006).[13] Plaintiff's claims easily qualify as direct under both prongs of that standard.[14]

---

[13] Fannie and Freddie's corporate governance practices are governed by Delaware law and Virginia law, respectively. *See* Fannie Bylaws, Corporate Governance Practices & Procedures, Art. 1, § 1.05, *available at* http://goo.gl/rnWwth (last visited Aug. 29, 2014); Freddie Bylaws, Corporate Governance Practices & Procedures, Art. 11, § 11.3, *available at* http://goo.gl/V9NRrU (last visited Aug. 29, 2014).

[14] Defendants' apparent contention that Plaintiff's APA claims are derivative is especially problematic, for deeming APA suits derivative would be at odds with the plain language of the APA and with important principles of federalism. This approach would subject every federal APA claim by a shareholder to the patchwork complexities of state corporate law. *See* 12B FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5908 (1984) ("[T]he shareholders'

The harms for which Plaintiff seeks redress—the unlawful transfer of the value of its preferred stock to a dominant shareholder, in violation of HERA and of the Companies' fiduciary and contractual obligations to Plaintiff—were suffered by Plaintiff directly.  While Plaintiff believes that the Net Worth Sweep also injured Fannie and Freddie, Plaintiff's injury is direct because it "is not dependent on an injury to [either] corporation."  *Tooley*, 845 A.2d at 1036; *see also Gentile v. Rossette*, 906 A.2d 91, 102-03 (Del. 2006) ("Although the corporation suffered harm (in the form of a diminution of its net worth), the minority shareholders also suffered a harm that was unique to them and independent of any injury to the corporation.").[15] Indeed, even if Defendants' facially implausible factual assertion (which must be ignored for purposes of deciding their motions to dismiss) that the Net Worth Sweep somehow benefitted Fannie and Freddie were correct, *see* FHFA Br. at 14-17, Plaintiff was still directly injured because the Net Worth Sweep destroyed the value of its investments through the transfer of the entities' entire net worth to a single, dominant shareholder.  The gravamen of Plaintiff's Complaint is not that the Net Worth Sweep has diminished Fannie's and Freddie's overall corporate profits and thus harmed all shareholders indirectly, but rather that it has improperly allocated whatever profits those corporations do make and destroyed the specific dividend and liquidation preference rights to which Plaintiff is contractually entitled as a holder of preferred stock.  *See Allen v. El Paso Pipeline GP Co.*, 90 A.3d 1097, 1111 (Del. Ch. 2014) (noting "the

---

derivative action is surrounded by numerous restrictions that stem from the nature of the corporate structure.").  Notably, Defendants cite not one example in which a conservator or receiver moved to substitute itself as the proper party when shareholders sued federal agencies under the APA.

[15] The effect of the Net Worth Sweep was to transfer Plaintiff's stock to Treasury.  Thus, to the extent that *Gentile* is limited to cases in which the corporation overpays a majority shareholder in the form of capital stock, *see Gentile*, 906 A.2d at 100 n.21, that requirement is satisfied here.

longstanding recognition in *Tooley* and other decisions that investors can sue directly for violations of their contractual rights"). It follows that Plaintiff "can prevail without showing an injury" to the Companies, *Tooley*, 845 A.2d at 1036, and thus that Plaintiff—not Fannie and Freddie—suffered the specific injuries complained of here.

Given that Plaintiff's claims easily qualify as direct under the first prong, "[t]he second prong of the analysis should logically follow." *Id.* at 1036. "[C]ourts have been more prepared to permit the plaintiff to characterize the action as direct when the plaintiff is seeking only injunctive or prospective relief," as is the case with respect to Plaintiff's APA and fiduciary duty claims. *See Grimes v. Donald*, 673 A.2d 1207, 1213 (Del. 2000), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000); *Tooley*, 845 A.2d at 1038 (citing *Grimes* with approval). Thus, in *Gatz v. Ponsoldt*, the Delaware Court of Chancery held that a shareholder's claim was direct where the plaintiff asked the court to unwind a transaction entered into by the corporation to the advantage of certain insider shareholders at the expense of others. 2004 WL 3029868, at *7-8 (Del. Ch. Nov. 5, 2004); *see also Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *6 (Del. Ch. Aug. 16, 2010); *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *9 (Del. Ch. Oct. 28, 2010). Because Plaintiff's APA and fiduciary duty claims seek similar relief, Plaintiff is entitled to press those claims directly. Plaintiff's claim for contract damages is similarly direct because any damages would be paid to Plaintiff, not the Companies. In short, Plaintiff's claims are direct because, however the relief affects Fannie and Freddie, Plaintiff would benefit from the requested relief in a way that is unique and independent from Fannie and Freddie, since the relief would either (1) restore the balance of value between Treasury's holdings and the other classes of stock or (2) award Plaintiff damages for breach of contract.

Defendants are wrong to the extent that they maintain that a stockholder who brings a direct claim must show that the challenged action harmed only his or her own interests and did not also harm the corporation.  To the contrary, some wrongs harm *both* the corporation and its stockholders directly and can be challenged through *either* derivative or direct actions.  *See, e.g.*, *Gatz*, 925 A.2d at 1278 (The "claim could have been brought either as a direct or as a derivative claim."); *Gentile*, 906 A.2d at 99 (holding that claim "was both derivative and direct"); *see also Tooley*, 845 A.2d at 1036 (distinguishing "individual action for injuries affecting [stockholder's] legal rights as a stockholder" from derivative action seeking redress for "an injury caused to the corporation *alone*" (emphasis added)).[16]

---

[16] In a footnote, FHFA cites Delaware cases for the proposition that "holders of preferred stock, such as Plaintiff, cannot assert breach of fiduciary duty claims."  FHFA Br. 26 n.19.  Delaware law is clear, however, that those who control a corporation owe fiduciary duties to preferred shareholders.  *See, e.g.*, *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987) ("CMC's directors are fiduciaries for the Preferred stockholders, whose interests they have a duty to safeguard, consistent with the fiduciary duties owed by those directors to CMC's other shareholders and to CMC itself.").  Specifically, while preferred shareholders are not owed fiduciary duties "with respect to matters relating to preferences or limitations that distinguish preferred stock from common," they are owed fiduciary duties when the "right asserted is not to a preference as against the common stock but rather a right shared equally with the common."  *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 594 (Del. Ch. 1986); *see also Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 386-87 (Del. Ch. 1999) ("Whether a given claim asserted by preferred stockholders is governed by contract or fiduciary duty principles . . . depends on whether the dispute arises from rights and obligations created by contract or from 'a right or obligation that is not by virtue of a preference but is shared equally with the common.' ").

It is true that Plaintiff's contract claims allege that the Net Worth Sweep breached its contractual rights as a preferred shareholder—rights that are not shared with the common stockholders.  Plaintiff's fiduciary duty claims, by contrast, seek to vindicate the fiduciary duty of loyalty owed equally to the common shareholders as well as Plaintiff, all of whom were injured when FHFA engaged in self-dealing that transferred the entire net worth of Fannie and Freddie to Treasury.  *See Jackson Nat'l Life Ins.*, 741 A.2d at 387 ("Delaware courts have not hesitated to state that a fiduciary duty of loyalty is one such right shared equally between the common and preferred stockholders.").  The cases cited by FHFA reflect the same distinction, dismissing fiduciary claims where it is determined "that (1) the same facts that underlie the plaintiff's implied contract claim also form the basis of his fiduciary duty claim, *and that (2) the*

Because Plaintiff's claims seek to vindicate rights that are personal—including its rights to priority dividends and a liquidation preference—and are not claims of the Companies, the fact that the conservator has succeeded to the shareholders' rights "with respect to [the Companies]" has no relevance here.[17]

### B.  Plaintiff Has Standing To Bring Even Derivative Claims Where, as Here, the Conservator Has a Manifest Conflict of Interest.

FHFA and Treasury argue that FHFA as conservator succeeded under Section 4617(b)(2)(A) to Plaintiff's right to bring an action against FHFA and Treasury themselves.  In other words, FHFA says that Congress intended FHFA to litigate claims *against itself and its sister federal agency*.  Not surprisingly, the uniform weight of precedent—including all of the decisions cited by Defendants that actually discuss this issue—makes clear that shareholders of an entity in conservatorship or receivership retain the right to bring claims, whether direct or derivative, when the federal conservator or receiver has a "manifest conflict of interest."

---

*duty sought to be enforced arose out of the parties' contractual, as opposed to their fiduciary, relationship.*"  *Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 832-33 (Del. Ch. 2006) (emphasis added); *see also MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *15 (Del. Ch. May 5, 2010).

[17] For similar reasons, Treasury is mistaken when it argues that Plaintiff's claims run afoul of the shareholder standing doctrine, which does not apply to direct claims.  *Tooley*, 845 A.2d at 1036; *Alcan Aluminium*, 493 U.S. at 336; *In re Kaplan*, 143 F.3d 807, 812-13 (3d Cir. 1998) (Alito, J.); *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 971 F. Supp. 2d 49, 72-73 (D.D.C. Sept. 20, 2013); *Gilardi v. United States Dep't of Health & Human Servs.*, 733 F.3d 1208, 1216 (D.C. Cir. 2013) (citing *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008)), *vacated on other grounds*, 134 S. Ct. 2902 (2014); *see* Treas. Br. 25-26.  Moreover, even if Plaintiff's APA claim were derivative, Treasury fails to cite any cases in which a court has held that the shareholder standing doctrine applies in APA cases, and there are good reasons to conclude it does not.  *See FAIC Secs., Inc. v. United States*, 768 F.2d 352, 357 (D.C. Cir. 1985) ("The zone of interests adequate to sustain judicial review is particularly broad in suits to compel federal agency compliance with law, since Congress itself has pared back traditional prudential limitations by the Administrative Procedure Act, which affords review to any person 'adversely affected or aggrieved by [federal] agency action within the meaning of a relevant statute.' " (alteration in original) (citation omitted)).

*Kellmer*, 674 F.3d at 850 (citing *First Hartford*, 194 F.3d at 1295).[18]  These decisions are

undoubtedly correct, for it is well settled that Congress may not exercise its authority to regulate

federal jurisdiction "to deprive a party of a right created by the Constitution."  *Bartlett v. Bowen*,

816 F.2d 695, 705 (D.C. Cir. 1987); *see also Reich v. Collins*, 513 U.S. 106, 109-10 (1994);

*Battaglia v. General Motors Corp.*, 169 F.2d 254, 257 (2d Cir. 1948).  In light of this bedrock

constitutional principle, HERA cannot reasonably be read to bar shareholders from obtaining

meaningful judicial review of claims—including constitutional claims—where FHFA has a

manifest conflict of interest that prevents it from adequately safeguarding shareholders' rights.

*See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 603 (1988) (interpreting statute to avoid similar

constitutional concern); *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 680 n.12

(1986) (same); *Lockerty v. Phillips*, 319 U.S. 182, 188 (1943) (same).

      In *First Hartford*, a shareholder of a mutual savings bank placed in receivership by the

FDIC pursuant to FIRREA brought suit against the United States alleging that certain actions

taken by the FDIC had, *inter alia*, breached the Government's contract with the bank.  *See* 194

F.3d at 1282-86.  Relying on Section 1821(d)(2)(A)(i), a provision of FIRREA that is materially

indistinguishable from the subrogation provision of HERA urged by Defendants here, the

government argued, and the Court of Federal Claims in that case held, that the FDIC had the

exclusive right to bring suit for the injuries urged by the shareholder.  *See id*. at 1294.  The

Federal Circuit, however, reversed.  While it agreed "that, *as a general proposition*, the FDIC's

statutory receivership authority includes the right to control the prosecution of legal claims on

---

      [18] Contrary to Treasury's suggestion, Treas. Br. 22-23, the *First Hartford* rule does not
allow shareholders to bring *any* derivative action during a conservatorship, for not every such
suit involves a "manifest conflict of interest" like the one at issue here.  Indeed, Treasury itself
cites numerous cases in which courts have ruled that shareholders lacked standing to sue, but
have also recognized a conflict of interest exception.

behalf of the insured depository institution now in its receivership," *id*. at 1295 (emphasis

added), the Federal Circuit held that given "the manifest conflict of interest of the FDIC, First

Hartford [the shareholder plaintiff] has standing to raise those claims," *id*. at 1296.  As that court

explained, "in the circumstances presented in this case, the FDIC was asked to decide on behalf

of the depository institution in receivership whether it should sue the federal government based

upon a breach of contract, which, if proven, was caused by the FDIC itself." *Id*. at 1295.

Accordingly, it faced a "conflict of interest . . . in determining whether to bring suit." *Id.*; *see*

*also id*. at 1283 (finding standing to sue "because of the FDIC's conflict of interest by which it is

both alleged to have caused the breach and controls the depository institution").[19]

Other courts have consistently followed *First Hartford*.  For example, in *Delta Savings*

*Bank v. United States*, the Ninth Circuit followed *First Hartford* in recognizing "a common-

sense, conflict of interest exception to the commands of FIRREA."  265 F.3d 1017, 1024 (9th

Cir. 2001).  It thus permitted a shareholder, rather than the FDIC as receiver, to bring suit against

one of the FDIC's "closely-related, sister agencies." *Id*.  And in the specific context of HERA,

even the authorities on which Defendants principally rely recognize a "conflict of interest

exception" to the general subrogation rule urged by Defendants here.  *See Kellmer*, 674 F.3d at

850 ("absent a manifest conflict of interest by the conservator not at issue here, the statutory

language bars shareholder derivative actions"); *see also id*. (citing *First Hartford*); *In re Fed.*

*Nat'l Mortg. Ass'n Secs., Derivative, & ERISA Litig.*, 629 F. Supp. 2d 1, 4 n.5 (D.D.C. 2009)

("[C]ourts have recognized an exception whereby a conflict between the conservator or receiver

and the defendant saves a derivative plaintiff's standing"); *In re Fed. Home Loan Mortg. Corp.*

---

[19] Treasury unconvincingly attempts to distinguish *First Hartford* on the ground that it concerned a "pre-receivership claim."  Treas. Br. 22.  But none of the relevant analysis turned on the timing of the claim, and Treasury gives no reason this should matter.

*Derivative Litig.*, 643 F. Supp. 2d 790, 798 (E.D. Va. 2009) ("Absent a showing of a clear conflict of interest similar to the conflicts at issue in *First Hartford* and *Delta Savings*, the plaintiffs lack standing to pursue these claims."); *Esther Sadowsky Testamentary Trust*, 639 F. Supp. 2d at 350 ("The Trust's argument concerning *Delta Savings Bank* . . . is unconvincing.  In that case, substitution would have resulted in the FDIC stepping into a case against a government agency with which it had close ties.  The Trust has pointed to no such conflict of interest here . . . ."); *see also Esther Sadowsky Testamentary Trust*, 639 F. Supp. 2d at 350-51 (finding "no apparent conflict in the FHFA's substitution" for shareholders where suit was "against former officers and directors" and there were "no claims against any governmental agency").[20]

Both agencies complain that Section 4617(b)(2)(A)—in speaking generally of "rights, titles, powers, and privileges"—makes no mention of a conflict-of-interest exception for derivative suits.  *See* FHFA Br. 25 n.18; Treas. Br. 23.  But in borrowing from FIRREA language that the courts had repeatedly construed to contain a conflict-of-interest exception, Congress should be understood to have approved and adopted this exception.  *See, e.g.*, *Lorillard*, 434 U.S. at 581.  And as *Delta Savings Bank* explained, the exception rests on the derivative right itself, which recognizes special rules when those running the corporation have a conflict of interest.  *See* 265 F.3d at 1022.  Those points distinguish FHFA's last remaining authority—*Hennepin Cnty. v. Federal Nat'l Mortg. Ass'n*, 742 F.3d 818, 822 (8th Cir. 2014)—a case in which there was no alleged conflict of interest, the dispute concerned a wholly unrelated provision of HERA, and shareholder derivative rights were not at issue.

---

[20] FHFA also relies on *Pareto*, 139 F.3d 696, a case in which the court said nothing about a conflict of interest exception.  As the Ninth Circuit's subsequent decision in *Delta Savings Bank* shows, its earlier silence cannot be understood as rejecting the "common-sense, conflict of interest exception" that is now the law of that circuit.  *Delta Sav. Bank*, 265 F.3d at 1024.

In this case, Plaintiff challenges the Net Worth Sweep—an "agreement" between FHFA, the conservator, and the Department of Treasury, a sister federal agency which has acquired a direct and controlling interest in Fannie and Freddie and with which FHFA has obediently coordinated its actions as conservator.  It cannot plausibly be disputed that FHFA has a "manifest conflict of interest" within the meaning of *First Hartford* and the numerous other authorities recognizing this common-sense exception, and that Plaintiff, rather than FHFA, is thus the proper party to seek redress for the injury inflicted by the Net Worth Sweep.

### C.  HERA Does Not Deprive Plaintiff of its Contractual Rights.

FHFA argues that under Section 4617(b)(2)(A), it succeeded to the contractual rights that Plaintiff seeks to vindicate here.  FHFA Br. at 27-30.  Again, FHFA is unable to cite a single case in which a court held that a conservator or receiver succeeds to a shareholder's *direct* claims, and any such holding here would be at odds with HERA, the PSPAs, and FHFA's own prior actions, all of which acknowledge that shareholders retain their personal rights in their stock during conservatorship.  *See supra* at 57-60; *see also Sharpe v. FDIC*, 126 F.3d 1147, 1155 (9th Cir. 1997) (observing that FIRREA's equivalent statutory scheme "does not authorize the breach of contracts").  There can be no serious dispute that in seeking damages for breach of contract, Plaintiff is asserting a direct claim—Plaintiff seeks money damages that would be paid directly to it and other preferred shareholders—and FHFA does not contend otherwise.  And again, even if Section 4617(b)(2)(A) applied, Plaintiff's contract claims could still proceed given FHFA's manifest conflict of interest.  *See supra* at 60-64.

FHFA also suggests in passing that Plaintiff's contract claim fails because the Net Worth Sweep "amended the *Treasury* stock certificates, not Plaintiff's."  FHFA Br. 28.  To the contrary, the Net Worth Sweep amended (indeed, extinguished) Plaintiff's stock, and Plaintiff had a contractual right to vote on that amendment regardless of whether the impairment of its rights

was literally written into its stock certificate or effectively brought about through an amendment to a different class of stock.  Plaintiff's broad right to vote on amendments that "materially and adversely affect the interests of the Holders of Series O Preferred Stock" would mean nothing under FHFA's cramped reading.  Fannie, Cert. Design. of Series O Preferred Stock, § 7(b) (Exhibit I to FHFA Br. (Doc. 23-9)).  *See also* Freddie, Cert. Design. of Series S Preferred Stock 19 (Exhibit H to FHFA Br. (Doc. 23-8)) (requiring two-thirds vote approving any change that "materially and adversely affect[s] the interests of the holders of the Variable Rate Preferred Stock").  The better and more natural reading of the contract—the reading that comports with the realities of the corporate world—is that alterations to the terms of other stock certificates may indeed "materially and adversely affect" Plaintiff's rights as a shareholder within the meaning of the contracts.[21]

## III.   Plaintiff's Claims Are Ripe.

Treasury argues that this case is not ripe because Plaintiff's claims are "contingent" on the Companies' liquidation—something that Treasury says has not yet occurred.  Treas. Br. 24

---

[21] FHFA says in a footnote that Plaintiff lacks standing because it did not allege that it owned the Companies' stock at the time of the Net Worth Sweep.  FHFA Br. 30 n.24.  But contemporaneous ownership is not required where a claim implicates "rights that inhere in the security itself" rather than the "personal rights of the holder."  *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001).  Thus, Delaware courts have declined to apply the contemporaneous ownership requirement to shareholder claims founded upon breach of contract, holding instead that such claims inhere in the stock and transfer with it.  *See Schultz v. Ginsburg*, 965 A.2d 661, 667-68 (Del. 2009); *In re Sunstates*, 2001 WL 432447, at *3.  Plaintiff's fiduciary duty claims—which seek injunctive relief from which former shareholders would not benefit—are likewise founded upon "rights that inhere in" its stock.  Finally, FHFA's argument plainly does not reach Plaintiff's APA claims.  FHFA's cases illustrate that the contemporaneous ownership requirement applies only to private claims against "the corporation and its managers," *Home Fire Ins. Co. v. Barber*, 93 N.W. 1024, 1029 (Neb. 1903)—not claims against federal agencies founded on provisions of public law such as the APA.  Well-established principles of federal law—not the state law of corporations—govern when shareholders may sue a federal agency under the APA.  *See FAIC Secs., Inc.*, 768 F.2d at 357.

(citing *Texas v. United States*, 523 U.S. 296, 300 (1988)).  But as explained above, the Net

Worth Sweep sets the Companies on an inexorable path to wind down by preventing them from

building capital, and it guarantees that Plaintiff will receive nothing when the liquidation process

is complete.  *See supra*, at 39-43.  There is nothing "hypothetical or speculative" about these

claims, *Nebraska Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000),

further factual development would not assist the Court in resolving them, *see Pacific Gas &*

*Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983), and a

judicial decision now would settle the parties' dispute, *see Ernst & Young v. Depositors Econ.*

*Prot. Corp.*, 45 F.3d 530, 539-40 (1st Cir. 1995).  In any event, Plaintiff's claims are not

circumscribed by the effect of the Net Worth Sweep on its liquidation preference; if upheld, the

Net Worth Sweep will have effectively extinguished *all* of Plaintiff's rights as a preferred

shareholder, not just its right to a liquidation preference.

Treasury attempts to buttress its ripeness argument by suggesting that Plaintiff would not

be entitled to anything during liquidation anyway because Section 4617(e)(2) caps Plaintiff's

recovery at what it would have received had the Companies been liquidated when the

conservatorships were imposed.  Treas. Br. 24.  Even were the Court to accept Treasury's factual

premise—unsupported by the Complaint—that Plaintiff would not have received anything had

the Companies been liquidated in September 2008, Treasury's interpretation of Section 4617(e)

is at odds with the plain meaning of the statute.  Section 4617(e) limits the "*liability of the*

*Agency*" to "not more than the amount that such claimant would have received if the Agency had

liquidated the assets and liabilities of the regulated entity *without exercising the authority of the*

*Agency under subsection (i)*."  12 U.S.C. § 4617(e)(2) (emphasis added).  Subsection (i), in turn,

authorizes FHFA "as receiver" to organize a "limited-life regulated entity."  *Id.* § 4617(i)(1).

70

Thus, Section 4617(e)(2) limits FHFA's liability only if FHFA places the regulated entity in receivership and if FHFA, *as receiver*, decides to create a limited-life regulated entity.[22]  FHFA has thus never exercised its authority under subsection (i), as that power is reserved solely to a receiver.  *See id.* § 4617(i)(1)(A).

By ignoring Section 4617(e)(2)'s reference to what a claimant "would have received" but for the establishment of a limited-life regulated entity, FHFA would have the Court conclude that the value of a shareholder's residual claim against a regulated entity in receivership remains fixed even if the entity's assets subsequently appreciate during the process, sometimes quite lengthy, of liquidation.  But that cannot be right.  A receiver that recovers unanticipated profits in liquidating the assets of a regulated entity is not entitled to keep those profits for itself, but must distribute them to claimants according to the statutory order of priority, with the entity's shareholders entitled to any residual funds that remain after all other claims have been satisfied.  *See id.* § 4617(c)(1); *Plaintiffs in All Winstar-Related Cases v. United States*, 44 Fed. Cl. 3, 10 (1999) (shareholders have a "direct, vested interest in the surplus of potential recoveries" after liquidation).  Furthermore, even if FHFA were to set up a limited-life regulated entity as part of its effort to wind down the Companies, the agency's liability would be fixed as of the date on which it placed the Companies into *receivership*—not the date on which it had established the conservatorships years before.  *See Castleglen, Inc. v. Commonwealth Sav. Ass'n*, 728 F. Supp. 656, 675 (D. Utah 1989) (where regulated entity was first placed into conservatorship and then

---

[22] This reading is consistent with Congress' explanation of a parallel provision applicable to the FDIC: "Current law is clarified with respect to FDIC's liability in the event it elects to arrange an assisted acquisition or transfer of assets and liabilities to a bridge bank in order to preserve or attempt to preserve the going concern value of an institution."  H.R. REP. NO. 101-222, at 397 (1989).

receivership, analogous provision of FIRREA capped regulator's liability as of day entity was placed into receivership).

It also bears emphasis that Section 4617(e) applies to "*any* person," not just shareholders, "having a claim against the receiver or the regulated entity."  Treasury's argument thus applies with equal force to the Companies' *creditors*, meaning that under its interpretation the Companies' bondholders would be limited during liquidation to whatever they could have recovered when the conservatorships were imposed on September 6, 2008—the day before Treasury and FHFA signed the PSPAs. *See First Ind. Fed. Savs. Bank v. FDIC*, 964 F.2d 503, 507 (5th Cir. 1992) (applying analogous provision of FIRREA to limit FDIC's liability to creditor).  FHFA's interpretation of Section 4617(e) would thus thwart the stated purpose of the PSPAs and expose the Administration's repeated assurances to creditors as fraudulent.

Finally, FHFA's interpretation misses the mark because Section 4617(e) sets the "maximum liability of the agency," not the Companies.  In other words, this statute just limits creditors' ability to look to the *receiver* to satisfy their claims against the Companies.  Section 4617(e)(2) does not limit at all Plaintiff's liquidation preference as to the Companies and is wholly irrelevant to the ripeness analysis.

## IV.    The Court Should Not Transfer Plaintiff's Complaint or Stay These Proceedings.

"In general, federal courts give considerable deference to a plaintiff's choice of forum," *Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 695 (8th Cir. 1997), "especially where the plaintiff is a resident of the judicial district in which the suit is brought, as is the case here," *Houk v. Kimberly-Clark Corp.*, 613 F. Supp. 923, 927 (W.D. Mo. 1985).  And Congress has specifically authorized a plaintiff suing federal agencies and officials located in the District of Columbia to bring the suit in the plaintiff's home district.  *See* 28 U.S.C. § 1391(e)(1)(C).  Yet FHFA and Treasury insist that, should this Court determine that it has jurisdiction over

Plaintiff's complaint, it nevertheless should transfer this case to the District of Columbia or stay it pending the outcome of cases filed in that court. Defendants invoke the "first-filed rule" and 28 U.S.C. § 1404, but neither supports transferring or staying this case.

1. "[T]he so-called 'first-filed rule' . . . is not a 'rule.' " *Smart v. Sunshine Potato Flakes, LLC*, 307 F.3d 684, 687 (8th Cir. 2002). While it gives a district court discretion to decide whether to transfer or stay a case in light of earlier-filed litigation, it "is not intended to be rigid, mechanical, or inflexible, but is to be applied in a manner best serving the interests of justice." *United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 488 (8th Cir. 1990) (citation and internal quotation marks omitted). Here, the "interests of justice" counsel in favor of this Court retaining jurisdiction and proceeding to decide the merits of the case.

The first-filed doctrine "is generally deemed to apply only in cases where two virtually identical cases are filed in two different federal judicial districts." *CruiseCompete, LLC v. Smolinski & Assocs., Inc.*, 859 F. Supp. 2d 999, 1014 (S.D. Iowa 2012) (emphasis omitted). The paradigmatic example of a situation in which the doctrine applies is when Party A sues Party B for violating its rights in one district court, while Party B files a declaratory judgment action seeking to establish that it did not violate Party A's rights in another district court. In such a situation, by "giv[ing] priority . . . to the party who first establishes jurisdiction," Treas. Br. 26-27 (quoting *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002, 1006 (8th Cir. 1990)), the first-filed doctrine advances, rather than frustrates, the plaintiff's forum choice by having the action go forward in the district "initially seized of [the] controversy," FHFA Br. 31 (quoting *Orthmann v. Apple River Campground*, 765 F.2d 119, 121 (8th Cir. 1985)). Likewise, when the same plaintiff brings the same case against the same defendant in two different district

courts, transfer of one of the cases is authorized.  *See, e.g.*, *Orthmann*, 765 F.2d at 121 (invoking

principle in such a situation but giving priority to the second-filed action).

This case is far from the heartland of the first-filed doctrine.  Continental Western is not a

party to the cases challenging the Net Worth Sweep in the D.D.C., and unlike the parties in those

cases, Continental Western challenges decisions pre-dating the Net Worth Sweep in addition to

the Net Worth Sweep itself.  *See, e.g.*, Complaint ¶¶ 103, 112 (alleging that FHFA violated the

APA and HERA by having Fannie and Freddie request draws from Treasury's funding

commitment to pay cash dividends rather than paying dividends in kind with additional

Government Stock); *id.* ¶ 117 (alleging that Treasury violated the APA and HERA by acquiring

Government Stock after the expiration of its temporary authority to purchase Fannie's and

Freddie's securities).

FHFA and Treasury, to be sure, cite cases indicating that the first-filed doctrine does not

require strict identity of the parties or claims presented.  But those cases are distinguishable and

do not establish that the first-filed doctrine should be applied here.  *See National Health Found.*

*v. Weinberger*, 518 F.2d 711, 713 (7th Cir. 1975) (plaintiffs not the same but "issues raised in

both complaints [were] identical"); *Koehler v. Pepperidge Farm, Inc.*, 2013 WL 4806895, at *4

(N.D. Cal. Sept. 9, 2013) (plaintiffs sought to represent overlapping classes); *Fuller v.*

*Abercrombie & Fitch Stores, Inc.*, 370 F. Supp. 2d 686, 689 (E.D. Tenn. 2005) (same);

*Monsanto Tech. LLC v. Syngenta Crop Prot., Inc.*, 212 F. Supp. 2d 1101, 1102-03 (E.D. Mo.

2012) (a plaintiff in the second case was a party in the first case); *Maverick Tube, LP v.*

*Westchester Surplus Lines Ins. Co.*, 2007 WL 5115436 (E.D. Mo. Aug. 6, 2007) (litigation

involved single contract between a parent corporation and an insurance company naming

subsidiaries as beneficiaries); *Marshak v. Reed*, 2000 WL 33152076, at *2-3 (E.D.N.Y. Oct. 17,

74

2000) (rights of defendants in second case "derived from" the plaintiffs in the first case, so the plaintiffs in the first case were "real parties in interest" in the second); *ERW, Inc. v. Environ Prods., Inc.*, 1996 WL 550020, at *1-2 (W.D. Mich. July 8, 1996) (cases involved questions of ownership of single patent; plaintiff in second not a party to first but was a party's "predecessor in interest").

At any rate, regardless of whether the first-filed doctrine *could apply* here, it should not *be applied* here.  As Defendants recognize, the first-filed doctrine aims to "conserve judicial resources and avoid conflicting rulings."  Treas. Br. 26-27 (quoting *Northwest Airlines*, 989 F.2d at 1006); *see also* FHFA Br. 33.  Neither purpose supports applying it here.

As an initial matter, this Court must invest considerable judicial resources in this case because Defendants ask for a transfer or a stay only if their motions to dismiss are denied.  FHFA Br. 30; Treas. Br. 26.  Defendants limit their transfer motion for good reason.  Because "a court without subject matter jurisdiction cannot transfer a case to another court," *Klett v. Pim*, 965 F.2d 587, 591 n.7 (8th Cir. 1992), this Court cannot "properly entertain . . . 'first-to-file' arguments" if it "lacks jurisdiction over the matter."  *Iowa v. United States Cellular Corp.*, 2000 WL 33915909, at *6 (S.D. Iowa Aug. 7, 2000).  This principle "necessarily require[s] . . . the transferring court to resolve any questions regarding its subject matter jurisdiction prior to transferring the case—at least when there exists a serious question regarding the court's jurisdiction."  *Zavanna, LLC v. RoDa Drilling Co.*, 2009 WL 3720177, at *14 (D.N.D. Nov. 3, 2009).  Because "the 'first-to-file' rule" only "would come into play if this court determined it has subject matter jurisdiction," *id.* at *13, this Court cannot avoid resolving the fundamental issues presented by Defendants in this case—whether Section 4617(f)'s jurisdictional bar or

FHFA's succession to shareholder rights precludes adjudication of Continental Western's claims.[23]

Furthermore, because the Court's resolution of the fundamental issues presented by the motions to dismiss will become law of the case regardless of whether the Court subsequently decides to transfer or stay the action, transfer or stay would not preclude the possibility of inconsistent rulings on those issues.  The law-of-the-case "doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions," and it posits that earlier rulings in a case should not be revisited "in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (internal quotation marks omitted); *see also UAW v. Donovan*, 756 F.2d 162, 165 nn.16-17 (D.C. Cir. 1985).  Indeed, "[a]dherence to law of the case principles is even more important in [the] context where the transferor judge and the transferee judge are not members of the same court," because "the principles of comity among courts of the same level of the federal system provide a further reason why the transferee court should not independently re-examine an issue already decided by a court of equal authority." *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982).

Nor should the Court stay this action while other plaintiffs pursue their rights in the federal court in the District of Columbia.  "Only in rare circumstances will a litigant in one cause

---

[23] The Supreme Court's decision in *Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422 (2007), is not to the contrary.  *Sinochem* held that, as a matter of the Article III judicial power, a federal court may dismiss a case under the doctrine of *forum non conveniens* without deciding whether it has subject matter jurisdiction.  *Id.* at 433.  Nothing in the Court's opinion calls into question the principle that two federal courts having concurrent jurisdiction is a prerequisite to transfer under the first-to-file rule.

be compelled to stand aside while a litigant in another settles the rule of law that will define the

rights of both." *Landis v. North Am. Co.*, 299 U.S. 248, 255 (1936); *see also EFCO Corp. v.*

*Aluma Sys., USA, Inc.*, 983 F. Supp. 816, 824 (S.D. Iowa 1997) ("Federal courts are reluctant to

decline jurisdiction solely on the basis of concurrent proceedings in another jurisdiction.").

Thus, one who seeks a stay pending resolution of parallel litigation "must make out a clear case

of hardship or inequity in being required to go forward." *Landis*, 299 U.S. at 255.  Defendants

have not come close to meeting that heavy burden.  The parallel cases in the District of Columbia

district court will not result in a binding decision that "settles the rule of law that will define the

rights" of the parties in this Court.  A stay, therefore, will only delay, not obviate, this Court's

resolution of this case.  And Plaintiff would be seriously prejudiced by any such delay because

the Net Worth Sweep will continue to interfere with the Companies' ongoing operations—thus

further undermining the value of Plaintiff's investment—so long as it is in place.

In sum, before deciding whether to transfer this case, the Court will be required to expend

considerable time and effort making decisions that will establish the law of the case on issues

that go to its very heart.  And simply putting off these matters pending resolution of litigation

brought by other litigants would cause Plaintiff to suffer serious prejudice.  These circumstances

compel the conclusion that the Court should not apply the first-filed doctrine to transfer or stay

the case.

2.  Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the

interest of justice, a district court may transfer any civil action to any other district or division

where it might have been brought . . . ."  "The burden is upon the party seeking transfer to make

a clear showing that the balance of interests weighs in favor of the proposed transfer, and unless

that balance is strongly in favor of the moving party, the plaintiff's choice of forum should not be

disturbed." *Medicap Pharms., Inc. v. Faidley*, 416 F. Supp. 2d 678, 686 (S.D. Iowa 2006).

FHFA and Treasury have failed to meet this "heavy burden" here. *Id.* at 690.

As with the first-to-file rule, a court may not transfer a case under Section 1404 until it

determines that it has subject-matter jurisdiction. *Integrated Health Servs. of Cliff Manor, Inc. v.

THCI Co.*, 417 F.3d 953, 957-58 (8th Cir. 2005) ("[A] court without subject matter jurisdiction

cannot transfer a case to another court under 28 U.S.C. § 1404(a)."); *Klett*, 965 F.2d at 591 n.7;

*see also* 15 Charles Alan Wright, Arthur R. Miller et al., Federal Practice &

Procedure § 3844 (4th ed. 2014) ("If subject matter jurisdiction is lacking, Section 1404(a)

provides no power to do anything with the case."). *Sinochem* does not say otherwise. *See* 549

U.S. at 433. As another district court from this circuit has explained, *Sinochem* did not address

the "statutory construction" question whether subject matter jurisdiction is a prerequisite for

transfer under 28 U.S.C. § 1404 and accordingly did not overrule Eighth Circuit precedent on

that issue. *Zavanna*, 2009 WL 3720177, at *14-15 (citing *Integrated Health Servs.*, 417 F.3d

953 and *Klett*, 965 F.2d at 591 n.7). Consistent with that reading of the cases, both this Court

and other district courts have continued to follow the Eighth Circuit's decisions in *Integrated

Health Services* and *Klett* after *Sinochem. See Larsen v. Pioneer Hi-Bred Int'l, Inc.*, 2007 WL

3341698, at *7 (S.D. Iowa Nov. 9, 2007); *Domaine Serene Vineyards & Winery, Inc. v. Rynders*,

2009 WL 81079, at *4 (D. Minn. Jan. 9, 2009); *Schultz Douglass Farms LLC v. XC Networks,

Ltd.*, 2008 WL 5100807, at *1 (D. Neb. Nov. 26, 2008). Thus, the Court must necessarily

expend substantial judicial resources resolving Defendants' jurisdictional arguments, which

largely obviates the purpose of transferring this case under Section 1404.[24]

---

[24] Because Continental Western's APA claims do not focus exclusively on the Net Worth
Sweep but also challenge earlier, independent actions by FHFA and Treasury, resolution of this

The convenience of the parties and witnesses likewise does not favor transfer. Continental Western, of course, resides in this judicial district. And while it may be true that "[a]ll Defendants reside in the District of Columbia" and that "[a]ll of the operative facts giving rise to this suit occurred in or near the District of Columbia," FHFA Br. 36, these circumstances do nothing to distinguish this suit from many others involving a decision made in Washington that affects citizens across the nation. Given that Congress has expressly authorized plaintiffs to bring suits against federal officials and agencies in the plaintiffs' home districts rather than in Washington, D.C., *see* 28 U.S.C. § 1391(e)(1)(C), these circumstances should not be used to deny Continental Western its choice of forum. "Requiring the Government to defend Government officials and agencies in places other than Washington [is not] a burdensome imposition." *Stafford v. Briggs*, 444 U.S. 527, 542 (1980).

So much for the convenience of the parties. And FHFA's passing reference to the convenience of "witnesses," FHFA Br. 36, does not suffice to carry its burden to justify a transfer. To the contrary, "[t]he party seeking the transfer must clearly specify the essential witnesses to be called and must make a general statement of what their testimony will cover." *Medicap Pharms.*, 416 F. Supp. 2d at 687. Defendants have done nothing of the sort.

Even when the plaintiff "has not indicated any reason beyond its incorporation in Iowa to have [a] case heard in this forum . . . it is ultimately the Defendants' burden to show that the § 1404(a) factors weigh strongly in their favor." *Id*. at 690 (internal quotation marks omitted). Because Defendants have failed to meet this burden, Continental Western's forum choice should be respected.

---

case should not involve "analysis of the same administrative record[ ]" as resolution of the D.D.C. actions. FHFA Br. 35.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss should be denied.  Pursuant to

LR 7(c), Plaintiff requests oral argument on the motions.  This case presents important issues

concerning the scope of FHFA's authority as conservator of Fannie and Freddie and of

Treasury's authority to invest in the Companies, and Plaintiff respectfully submits that oral

argument would assist this Court's resolution of the issues presented by the motions to dismiss.


Date: August 29, 2014

Matthew G. Whitaker
Matt M. Dummermuth
Kendra L. Mills Arnold
WHITAKER HAGENOW & GUSTOFF, LLP
400 E. Court Avenue, Suite 346
Des Moines, IA 50309
(515) 284-5001
(515) 864-0963 (facsimile)
mwhitaker@whgllp.com
mdummermuth@whgllp.com
karnold@whgllp.com

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper (*Lead Counsel*)
Vincent J. Colatriano
David H. Thompson
Peter A. Patterson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (facsimile)
ccooper@cooperkirk.com
vcolatriano@cooperkirk.com
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com

*ATTORNEYS FOR PLAINTIFF*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on August 29, 2014, I electronically filed this foregoing with the

Clerk of Court using the ECF system, and to my knowledge a copy of this document will be

served on the parties or attorneys of record by the ECF system.

/s/ Charles J. Cooper
Charles J. Cooper
ATTORNEY FOR PLAINTIFF