**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| _____ ) | |
| CONTINENTAL WESTERN ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Case 4:14-cv-00042-RP-RAW |
| ) | |
| THE FEDERAL HOUSING FINANCE ) | |
| AGENCY, *et al.*, ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

## PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...................................................................................................... 2

ARGUMENT ............................................................................................................ 4

I.     The *Perry* Court's Boundless Interpretation of Section 4617(f) Is Wrong. ........................ 4

       A.     The Net Worth Sweep Exceeds FHFA's Powers and Functions as Conservator. ................................................................................................ 4

              1.     As conservator, FHFA has no power to take the Companies' profits for itself or to give them to its sister federal agency. ....................... 5

              2.     As conservator, FHFA must work to preserve and conserve the Companies' assets and to place the Companies in a sound and solvent condition. ..................................................................... 10

              3.     As conservator, FHFA must exercise its independent judgment and cannot make decisions at Treasury's direction. ......................... 11

              4.     As conservator, FHFA may not take steps to wind down the Companies. .................................................................................. 12

              5.     As conservator, FHFA may not make arbitrary and capricious decisions. .................................................................................... 14

       B.     HERA's Jurisdictional Bar Does Not Shield Treasury's Unlawful Conduct. ..................................................................................................... 15

II.    The *Perry* Court's Reading of HERA's Subrogation Provision Contradicts the Uniform Weight of Authority and Leaves Shareholders with No Redress when a Federal Conservator Engages in Self-Dealing. ................................................. 17

III.   Plaintiff's Breach of Contract Claims Are Ripe for Review. ........................... 21

CONCLUSION ....................................................................................................... 24

i

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*1185 Ave. of Americas Assocs. v. RTC*, 22 F.3d 494 (2d Cir. 1994) ...............................5

*Abbott Labs v. Gardner*, 387 U.S. 136 (1967)...............................................21, 22, 23

*American Casualty Co. v. FDIC*, 39 F.3d 633 (6th Cir. 1994)....................................18

*Bob's Home Service, Inc. v. Warren Cnty.*, 755 F.2d 625 (8th Cir. 1985) ...................23

*Branch v. FDIC*, 825 F. Supp. 384 (D. Mass. 1993) .......................................................18

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) .........................................................14

*County of Sonoma v. FHFA*, 710 F.3d 987 (9th Cir. 2013).............................................7

*DeKalb Cnty. v. FHFA*, 741 F.3d 795 (7th Cir. 2013) ...................................................5

*Del E. Webb McQueen Dev. Corp. v. RTC*, 69 F.3d 355 (9th Cir. 1995)........................5

*Delta Sav. Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001) ...........................17, 18

*Dittmer Props., LP v. FDIC*, 708 F.3d 1011 (8th Cir. 2013)..........................................15

*EBS Litig., LLC v. Barclays Global Investors*, 304 F.3d 302 (3d Cir. 2002) .................8

*Edward J. Debartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988)..............................................................................................14, 15

*Elmco Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914 (4th Cir. 1996) .........5

*EPA v. National Crushed Stone Ass'n*, 449 U.S. 64 (1980) ...........................................21

*First Hartford Corp. Pension Plan & Trust v. United States*,
    194 F.3d 1279 (Fed. Cir. 1999)..............................................................17, 18, 19, 20

*Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*,
    934 F.2d 1127 (10th Cir. 1991) ...............................................................................5, 6

*Gelles v. TDA Indus., Inc.*, 44 F.3d 102 (2d Cir. 1994) .................................................16

*Hennessy v. FDIC*, 58 F.3d 908 (3d Cir. 1995) ...............................................................5

*Hindes v. FDIC*, 137 F.3d 148 (3d Cir. 1998) ...............................................................15

*In re Sunshine Secs. Litig.*, 916 F.2d 874 (3d Cir. 1990)...............................................18

*James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996)......................5

*Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012) ...........................................18, 19, 20

*Leon Cnty. v. FHFA*, 700 F.3d 1273 (11th Cir. 2012)....................................................7

*Lorillard v. Pons*, 434 U.S. 575 (1978) ........................................................................18

*Lubin v. Skow*, 382 Fed. App'x. 866 (11th Cir. 2010)...................................................20

*Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604 (2000)...................22

*McAllister v. RTC*, 201 F.3d 570 (5th Cir. 2000) ...........................................................5

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ...................................................................14

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983).................................................................................................22

*Pareto v. FDIC*, 139 F.3d 696 (9th Cir. 1998) ..........................................................20

*Parrish v. Dayton*, 761 F.3d 873 (8th Cir. 2014).......................................................21

*Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*,
674 F. Supp. 2d 562 (D. Del. 2009).........................................................................22

*Redd v. Federal Land Bank of St. Louis*, 851 F.2d 219 (8th Cir. 1988) .....................18

*RTC v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446 (8th Cir. 1992)................5, 13, 14

*Sackett v. EPA*, 132 S. Ct. 1367 (2012) .....................................................................21

*Suess v. United States*, 33 Fed. Cl. 89 (1995) ...........................................................18

*Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703 (1st Cir. 1992) ..........15

*Texas v. United States*, 523 U.S. 296 (1998) .............................................................22

*United States v. Security Indus. Bank*, 459 U.S. 70 (1982) .......................................15

*Vogel v. Foth & Van Dyke Assocs.*, 266 F.3d 838 (8th Cir. 2001) .............................23

## **Constitutional and Statutory Provisions**

5 U.S.C. § 702(2)(A).....................................................................................................4

12 U.S.C.

§ 1455(*l*)(4) ........................................................................................................16

§ 1719(g)(4) .......................................................................................................16

§ 1821(d)(2)(A).........................................................................................17, 18, 19

§ 4513(a)(1) .......................................................................................................10

§ 4617(a)(7) .......................................................................................................11

§ 4617(b)(2)(A)(i) ..........................................................................................17, 19

§ 4617(b)(2)(D)..........................................................................................4, 10, 13

§ 4617(f)......................................................................................4, 5, 6, 7, 8, 14

Conservatorship and Receivership, 76 Fed. Reg. 35,724 (June 20, 2011) ................2, 3

Restatement (Second) of Contracts (1981)...........................................................22

Del. Code tit. 8, § 170(a) ...........................................................................................8

## **Other**

Fannie Government Stock Certificate .............................................................................8

Rev. Rul. 56-654, 1956 WL 10781 (IRS 1956)...........................................................16

Plaintiff Continental Western Insurance Company ("Plaintiff") respectfully submits this supplemental brief concerning the recent district court decision in *Perry Capital v. Lew*, No. 13-1025 (D.D.C. Sept. 30, 2014), Doc. 51 (hereinafter "Op.").  On October 6, the Defendants in this action—the Department of Treasury ("Treasury") and the Federal Housing Finance Agency and its Director, Melvin L. Watt ("FHFA")—filed a notice of supplemental authority, Doc. 48, suggesting that this Court should follow the *Perry* court's decision in resolving the various legal issues presented by the Defendants' pending motions to dismiss.  But as this supplemental brief explains, the *Perry* court's decision—which is being appealed and is not binding on this court in any event—misinterprets the scope of FHFA's statutory authority and should be accorded no weight.

The *Perry* decision may in part be explained by that court's misunderstanding of applicable background principles.  First, the *Perry* court erroneously interpreted the original 10% cash dividend agreement as creating an obligation that *must* be paid—a complete inversion of the normal rule of corporate finance and financial institution regulation that undercapitalized entities cannot declare or pay cash dividends until they are again adequately capitalized.  Second, the *Perry* court focused exclusively on the Companies' profitability rather than their soundness and solvency, the statutory standard.  That a company is operating profitably does not mean that it is sound and solvent, especially if *all* of its profits (and, indeed, its entire net worth) are being distributed to a single shareholder.  Third, the *Perry* court erred in holding in effect that a conservator can—through powers designed to protect an operating business—give all current and future profits of that business to one among many stakeholders without following the claims process required for winding up the company in receivership.

1

# INTRODUCTION

When FHFA, after full public notice and comment, implemented HERA's provisions governing the agency's powers and functions as a conservator, it recognized the settled principle of federal law that "the essential function of a conservator is to preserve and conserve the institution's assets." 76 Fed. Reg. 35,724, 35,727 (June 20, 2011). HERA's plain text adopts this familiar understanding of the defining role of a conservator, charging the agency with, in FHFA's own words, the "statutory mission to restore soundness and solvency to insolvent regulated entities and to preserve and conserve their assets and property." *Id.* at 35,726. Quoting the key language of HERA itself, the agency further emphasized: "As Conservator, FHFA is authorized to take such action as may be 'necessary to put the regulated entity in a sound and solvent condition' and 'appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.' " *Id.* at 35,725 (quoting 12 U.S.C. § 4617(b)(2)(G)).

FHFA likewise fully understood that "allowing capital distributions to deplete the entity's conservatorship assets would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity." *Id.* at 35,727.

Nowhere in the *Perry* court's recent decision upholding the Net Worth Sweep can one find the words "preserve and conserve the assets and property of the regulated entity" or "put the regulated entity in a sound and solvent condition." This is not surprising, for only by ignoring these familiar, fundamental, and statutorily required duties of a conservator could the *Perry* court have upheld FHFA's decision, as conservator for Fannie and Freddie, to succumb to Treasury's demand, just as the Companies were returning to robust profitability, that FHFA pay to Treasury

in perpetuity "every dollar of earnings that Fannie Mae and Freddie Mac generate."  Compl. ¶ 80 (quoting Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps To Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012) ("Treasury Press Release")).  To date, FHFA's capital distributions to Treasury under the Net Worth Sweep have depleted the Companies' conservatorship assets by more than *$130 Billion*, a huge sum that would otherwise have been credited entirely to Fannie's and Freddie's impoverished capital accounts, as plainly required by FHFA's self-described "statutory mission."  76 Fed. Reg. at 35,726.

To the district court in *Perry*, however, it mattered not at all that the Net Worth Sweep is utterly antithetical to a conservator's defining statutory purpose of preserving and conserving the institution's assets and restoring it to a sound and solvent condition.  To the contrary, according to the *Perry* court, HERA "grants the agency expansive discretion to act as it sees fit" as conservator, even if it sees fit to "substantially change[ ] the flow of profits, directing billions of dollars [from Fannie and Freddie] into Treasury's coffers" and thereby to ensure the failure of the mission it is charged to pursue.  Op. 24-25.

The *Perry* decision is simply wrong.  In enacting HERA, Congress did not depart sharply from the settled principles governing conservatorships under all prior federal laws and inexplicably grant FHFA *carte blanche* over the assets of an institution that the agency places in conservatorship.  Rather, it granted FHFA the familiar, defining power of all conservators to "preserve and conserve" the financial institution's assets in order to restore it to a "sound and solvent" financial condition.  And if these words have the same meaning they have always had in our law—indeed, if they have *any meaning at all*—then surely they were violated when FHFA entered a self-dealing "agreement" with its sister (and dominant) federal agency to hold two

3

privately owned, highly profitable corporations in perpetual captivity so that the sister agency can use them as an ATM machine for the federal government.

The Net Worth Sweep violates HERA, as well as FHFA's contractual and fiduciary duties to Plaintiff and other preferred stockholders, and this Court has both the jurisdiction and the responsibility to vacate it.

**ARGUMENT**

**I.      The *Perry* Court's Boundless Interpretation of Section 4617(f) Is Wrong.**

**A.  The Net Worth Sweep Exceeds FHFA's Powers and Functions as Conservator.**

HERA says that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency *as a conservator or a receiver*."  12 U.S.C. § 4617(f) (emphasis added).  It follows that Section 4617(f) bars review of Plaintiff's claims only if FHFA was legitimately acting within its authority as a "conservator" when it yielded to Treasury's demand to impose the Net Worth Sweep.  *See* Plaintiff's Response to Defendants' Motions To Dismiss at 24-29, Doc. 45 ("MTD Opp.").  The *Perry* court, however, never explained how FHFA's decision to donate to its sister agency all of Fannie's and Freddie's massive profits in perpetuity could possibly be viewed as the legitimate act of a "conservator."  Our research discloses no act of a conservator in the annals of financial regulatory history that is even remotely comparable to Defendants' looting of privately owned companies.  Nor have Defendants been able to point to a comparable precedent.

The *Perry* court likewise failed to explain how FHFA's actions could possibly be squared with HERA's specific statutory requirements that FHFA, as conservator, "preserve and conserve [the Companies'] assets and property" and strive to place them "in a sound and solvent condition."  12 U.S.C. § 4617(b)(2)(D); 5 U.S.C. § 706(2)(A).  To the contrary, the *Perry*

4

opinion simply ignored these statutory provisions.  For these and other reasons detailed below, the *Perry* court erred in concluding that Section 4617(f) barred Plaintiff's claims for equitable relief.

### 1. As conservator, FHFA has no power to take the Companies' profits for itself or to give them to its sister federal agency.

As the Eighth Circuit has explained, the conservator of a distressed financial institution is "empowered to take action necessary to restore [it] to a solvent position and to carry on the business of the institution and preserve and conserve the assets and property of the institution." *RTC v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1453 (8th Cir. 1992) (internal quotation marks omitted).  Indeed, "a conservator *only* has the power to take actions necessary to restore a financially troubled institution to solvency."  *McAllister v. RTC*, 201 F.3d 570, 579 (5th Cir. 2000) (emphasis added).[1]  It follows that a conservator is not the beneficial owner of the institution it oversees.  To the contrary, it must manage the institution for the benefit of creditors and equity holders, not to enrich itself or support the public fisc.  *Franklin Sav. Ass'n v. Director,*

---

[1] *See also DeKalb Cnty. v. FHFA*, 741 F.3d 795, 798 (7th Cir. 2013) ("A conservatorship is like a receivership, except that a conservator, like a trustee in a reorganization under Chapter 11 of the Bankruptcy Code, tries to return the bankrupt party to solvency, rather than liquidating it."); *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1090 (D.C. Cir. 1996) ("The principal difference between a conservator and receiver is that a conservator may operate and dispose of a bank as a going concern, while a receiver has the power to liquidate and wind up the affairs of an institution."); *Elmco Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914, 922 (4th Cir. 1996) ("Unlike its role as receiver, the RTC as conservator cannot initiate the administrative claims process or liquidate a failed bank.  Instead, the conservator's function is to restore the bank's solvency and preserve its assets."); *Del E. Webb McQueen Dev. Corp. v. RTC*, 69 F.3d 355, 361 (9th Cir. 1995) ("The RTC, as conservator, operates an institution with the hope that it might someday be rehabilitated.  The RTC, as receiver, liquidates an institution and distributes its proceeds to creditors according to the priority rules set out in the regulations."); *Hennessy v. FDIC*, 58 F.3d 908, 916 (3d Cir. 1995) ("A receiver, unlike a conservator, does not have as its purpose the preservation of an institution as a going concern."); *1185 Ave. of Americas Assocs. v. RTC*, 22 F.3d 494, 497-98 (2d Cir. 1994) (comparing the "distinct roles" of conservator and receiver to those of Chapter 11 and Chapter 7 bankruptcy trustees).

*Office of Thrift Supervision*, 934 F.2d 1127, 1141 (10th Cir. 1991) ("The decision to appoint a conservator is not a judgment to divest the owner of his property. Rather, it is a judgment that the owner is unable or unwilling to properly manage or control the assets and it is an attempt to put the institution back into a safe and sound condition.").

In direct contradiction of the rehabilitative mission that defines the role of a conservator, the *Perry* court concluded that only "two facts" mattered to its inquiry under Section 4617(f): because Fannie and Freddie (1) "continue to operate" and (2) "have now regained profitability," FHFA's actions cannot be challenged as beyond the scope of its powers as conservator.  Op. 24. To that court, it mattered not that by stripping all profits from Fannie and Freddie, FHFA was depleting the Companies' capital by billions of dollars every quarter and leaving them just one bad quarter from insolvency.

On the *Perry* court's understanding of Section 4617(f), then, FHFA need not offer any rehabilitative rationale for its actions or otherwise even pretend to pursue the traditional goals and actions of a conservator to avail itself of immunity from suit.  So long as Fannie and Freddie continue to operate profitably, FHFA is free to give all of the Companies' assets to *anyone, for any reason*.  Congress surely did not intend Section 4617(f) to bring about such absurd results.

While Section 4617(f) furthers the important goal of allowing a conservator to preserve and rehabilitate an insolvent financial institution in a time of distress without fear of unwarranted judicial disruption, the facts alleged by Plaintiff are fundamentally different from the cases relied on by the *Perry* court, which have uniformly applied the provision to protect such legitimate conservation decisions, as the *sale* of specific assets or the elimination of particular product lines. This case is about the distribution of every dollar of a solvent financial institution's profits with no legitimate conservation purpose.  The cases relied on by the *Perry* court examined, for

example, whether FHFA properly exercised its judgment in *conserving* the Companies' assets by refusing to purchase certain types of mortgages. *See, e.g.*, *Leon Cnty. v. FHFA*, 700 F.3d 1273, 1278 (11th Cir. 2012); *County of Sonoma v. FHFA*, 710 F.3d 987, 994 (9th Cir. 2013) (holding that FHFA acted as a conservator when its action "was animated by a concern for the soundness of the Enterprises' assets"). The premise embodied in the cases cited by the *Perry* court is not controversial, and the courts have looked to the challenged act's "subject matter, *its purpose*, [and] its outcome" to determine that FHFA acted in furtherance of its conservatorship goals and therefore may benefit from Section 4617(f). *Leon Cnty.*, 700 F.3d at 1278 (emphasis added).

The *Perry* court's extraordinary expansion of the reach of Section 4617(f) is illustrated by the fact that Section 4617(f) is materially identical to the provisions of FIRREA that govern FDIC's conservatorships and receiverships of banks. *Perry* has dire implications for financial institutions that may seek to raise capital in the future: if FHFA as conservator can donate the entire value of the Companies to deficit reduction, then the same is true for the FDIC when it acts as conservator for a bank, even a highly profitable one.

In declaring FHFA's purpose for entering the Net Worth Sweep irrelevant to the jurisdictional analysis, the *Perry* court said that it would consider only "*what* has happened, not *why* it happened." Op. 21. Even if the *Perry* court were correct, in this case it is ironically not Plaintiff but Defendants who have sought to shift the focus away from *what* the Net Worth Sweep did to *why* it was done. Perhaps recognizing that "what" the Net Worth Sweep does cannot be squared with the most fundamental duties of a conservator under HERA, Defendants have attempted to defend the Net Worth Sweep by offering a patently pretextual purpose. Specifically, in contravention of the Complaint's allegations, Defendants argue that this extraordinary action was necessary to arrest a "downward spiral" supposedly caused by the

Companies' practice of drawing on Treasury's funding commitment to pay cash dividends back to Treasury.  *See*, *e.g.*, Treasury MTD Reply at 5-6, Doc. 46; FHFA MTD Reply at 14, Doc. 47. While the *Perry* court claimed to have deemed this explanation irrelevant to the Section 4617(f) analysis, it appears to have largely credited Defendants' economic narrative.  Op. 6 n.7 (concluding that FFHA was required to pay dividends to Treasury even if it had to draw on Treasury's funding commitment to do so).[2]  But even if that narrative were accurate—it is not— Defendants' purported good intentions would not change the fact that the Net Worth Sweep gave away the assets that FHFA was supposed to "preserve and conserve" as conservator and guaranteed that the Companies will never be able to rebuild capital and resume normal business operations.  Such actions, whatever their motive, are not those of a conservator.

---

[2] The *Perry* court's reasoning rests on the demonstrably mistaken premise that prior to the Net Worth Sweep the Companies were *required* to pay Treasury a 10% cash dividend even when they could not do so without drawing on Treasury funds.  The *Perry* court's reading of the Stock Certificates is inconsistent with the plain language of the contract and applicable law. First, as we have previously demonstrated, MTD Opp. 31 n.9, the plain terms of Treasury's senior preferred stock certificates gave the Companies another option, specifying that "[t]o the extent" dividends were not paid in cash, "dividends on the Senior Preferred Stock shall accrue and shall be added to the Liquidation Preference."  Fannie Government Stock Certificate § 2(b) (Exhibit B to Doc. 23-2).  The *Perry* court determined that declining to declare cash dividends was not an "option" available to the Companies because the Stock Certificates say that if the Companies "*fail[ ] to pay dividends in cash in a timely manner as required by this Certificate*, then immediately following such *failure*" the dividend rate increases to 12% until all accrued dividends are paid in cash.  Op. 7 n.7 (quoting Fannie Government Stock Certificate § 2(c)).  But another provision of the Stock Certificates makes clear that Treasury is only entitled to cash dividends "when, as and if declared by the Board of Directors, in its sole discretion."  Fannie Government Stock Certificate § 2(a).  The *Perry* court ignored that provision, and its oversight is particularly glaring because 31 pages later it pointed to the very same language in the plaintiffs' stock certificates as the basis for its conclusion, this time correct, that the plaintiffs had no contractual right to be paid undeclared cash dividends.  Op. 37.  Second, even if no such language appeared in the Treasury Stock Certificates, it would not change the fundamental principle that a corporation is never legally required to pay undeclared cash dividends and may not do so when paying them would render it insolvent.  *See EBS Litig., LLC v. Barclays Global Investors*, 304 F.3d 302, 305-06 (3d Cir. 2002).  Under Delaware corporate law, a dividend cannot be mandatory.  DEL. CODE tit. 8, § 170(a) (directors "may" pay dividends out of surplus but "shall not" declare or pay dividends out of a corporation that lacks a capital surplus).

In all events, this Court has held that it "must take Continental Western's factual assertions . . . as true"—including Plaintiff's assertions "that the net worth sweep was unnecessary and improperly motivated."  Order on Motion To Compel at 6, Doc. 42 ("MTC Order").  To the extent that the Court considers why FHFA imposed the Net Worth Sweep, it cannot dismiss the Complaint on the basis of Defendants' contested economic narrative.

At bottom, however, the *Perry* court's fundamental error was in mistaking what it termed "[t]he extraordinary breadth of HERA's statutory grant to FHFA as a conservator," Op. 21, for beneficial ownership of the Companies.  An owner is of course free to give away his property for any reason or no reason, but a conservator is not so unconstrained.  Perhaps no passage of the *Perry* opinion better illustrates this error than its startling conclusion that the Companies' private shareholders do not retain a property interest in their stock:

> Whether the defendants executed the Third Amendment to generate profits for taxpayers or to escape a "downward spiral" of the GSEs seeking funding in order to pay owed dividends back to Treasury, it does not change the fact that it was executed during a period of conservatorship and, thus, after *the plaintiffs' property interests . . . were extinguished.*

Op. 46 (emphasis added).  Even FHFA, in announcing its decision to place the Companies in conservatorship, acknowledged that under a conservatorship the shareholders "are still in place; both the preferred and common shareholders have an economic interest in the companies." Compl. ¶ 39 (quoting *Oversight Hearing To Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs: Hearing Before H. Comm. on Fin. Servs.*, 110th Cong. (Sept. 25, 2008) (Statement of James B. Lockhart, III, Dir., FHFA)); *id.* (during the conservatorship, the Companies' stockholders "will continue to retain all rights in the stock's financial worth" (quoting FHFA FACT SHEET, QUESTIONS AND ANSWERS ON CONSERVATORSHIP 3 (Sept. 7, 2008)); *see* MTD Opp. 11-12.  FHFA's donative transfer to Treasury was the act of an owner,

not a conservator pursuing its self-avowed "statutory mission to restore soundness and solvency to [Fannie and Freddie] and to preserve and conserve their assets and property." 76 Fed. Reg. at 35,726.

**2. As conservator, FHFA must work to preserve and conserve the Companies' assets and to place the Companies in a sound and solvent condition.**

The *Perry* court wholly disregarded HERA's express limits on FHFA's actions as conservator. As conservator, FHFA is supposed to "preserve and conserve the assets and property" of the Companies, 12 U.S.C. § 4617(b)(2)(D), but the Net Worth Sweep has resulted in the payment of $130 billion in additional dividends that the Companies otherwise could have retained as a capital cushion to ensure their soundness and long-term viability, *see* MTD Opp. 7, 39-40. Especially given FHFA's statutory "dut[y] . . . to ensure that . . . each regulated entity . . . maint[ains] . . . adequate capital," 12 U.S.C. § 4513(a)(1), the Court need not "substitute its judgment for FHFA's" to recognize that depletion of the Companies' assets was the logical and inevitable result of agreeing to give away all of their profits in perpetuity in exchange for nothing. *See* Op. 22 (brackets omitted). [3]

Much the same analysis applies with respect to FHFA's statutory responsibility as conservator to place the Companies "in a sound and solvent condition," 12 U.S.C. § 4617(b)(2)(D), for the Net Worth Sweep guarantees that the Companies will never be able to

---

[3] FHFA's mission to ensure the safety and soundness of the Companies is further confirmed by 12 U.S.C. § 4614, which requires the agency as regulator to classify either company as "undercapitalized" if it: (1) does not maintain an amount of total capital that is equal to or exceeds the risk-based capital level established for the enterprise; and (2) maintains an amount of core capital that is equal to or exceeds the minimum capital level established for the enterprise. The statute also states that "A regulated entity shall make no capital distribution if, after making the distribution, the regulated entity would be undercapitalized." 12 U.S.C. § 4614(e).

achieve that statutory objective. Worse still, the Companies *borrowed* billions of dollars to finance their cash dividend payments under the Net Worth Sweep, thereby becoming even less financially sound. *See* Compl. ¶¶ 84-85. The *Perry* court simply ignored this statutory language, focusing instead on the fact that the Companies are operating at a profit. Op. 24-26. But profitability is not synonymous with soundness. Soundness requires a capital cushion so a financial institution can withstand the normal vicissitudes of the economic cycle. The Net Worth Sweep, however, robs the Companies of their capital, no matter how profitable they may be. The Net Worth Sweep is a commitment by the FHFA and Treasury, as Treasury proclaimed in announcing it, that Fannie and Freddie "will not be allowed to retain profits, to re-build capital, and return to the market in their prior form." Compl. ¶ 80 (quoting Treasury Press Release). Thus, FHFA not only violated, but *openly defied* its statutory mission to place the Companies in a sound and solvent condition. And yet the *Perry* court did nothing.

> **3. As conservator, FHFA must exercise its independent judgment and cannot make decisions at Treasury's direction.**

The *Perry* court correctly acknowledged that it could set aside the Net Worth Sweep if FHFA acceded to that change in violation of HERA's proscription "not [to] be subject to the direction or supervision of any other agency of the United States." 12 U.S.C. § 4617(a)(7); *see* Op. 23. That court erred, however, in dismissing the plaintiffs' claim on the ground that "there is nothing in the pleadings or the administrative record provided by Treasury that hints at coercion actionable" under Section 4617(a)(7). Op. 23.

Regardless of whether there was any merit to the *Perry* court's conclusion that "nothing in the pleadings . . . hints at coercion actionable under § 4617(a)(7)," Op. 23, this Court has already recognized that the Complaint in this case alleges that the Net Worth Sweep "was the product of *a Treasury directive* aimed simply at giving Treasury all of the Companies' profits."

MTC Order 4 (emphasis added); *see* Compl. ¶ 78 ("FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury."); MTD Opp. 32-33. Indeed, the Court has previously ruled that it must accept that allegation, like all of the facts alleged in the Complaint, as true in resolving the Defendants' pending motions to dismiss.  MTC Order 6.

It was, of course, quite improper for the *Perry* court to dismiss a claim on the basis of the incomplete "administrative record provided by Treasury," *id.*,[4] while at the same declaring that it "need not view the full administrative record" to dismiss the suit.  *See* Op. 22.[5]  But even if that court's approach were sound (and it is not), it is not available to this Court because, as we have previously demonstrated, MTD Opp. 22, 32-33,  the Defendants here made the calculated choice not to submit administrative records or to move for summary judgment in this case.

**4.  As conservator, FHFA may not take steps to wind down the Companies.**

The *Perry* court also rejected the plaintiffs' argument that the Net Worth Sweep effects an impermissible wind down of the Companies during conservatorship, reasoning that "[i]f the Third Amendment were really part of a scheme to liquidate the GSEs, then the GSEs would,

---

[4] Noticeably absent from the administrative record materials submitted by the Defendants in the *Perry* case was *any* communication between FHFA and the Department of Treasury regarding the Net Worth Sweep.  Accordingly, the  court's glib dismissal of the plaintiffs' allegations that FHFA was coerced or directed to donate the Companies' massive profits to its sister federal agency, or did so under the agency's direct supervision, was wholly unwarranted and is thus entitled to no weight here.

[5] The plaintiffs in *Perry* moved for supplementation of the administrative record and discovery, arguing that the materials the Defendants produced in that case were incomplete on their face.  *See* Memorandum in Support of Plaintiffs' Motion for Supplementation of the Administrative Records, No. 13-1053 (D.D.C. Feb. 12, 2014), Doc. 32.  Ignoring clear evidence that pertinent materials were excluded from the administrative record—and despite relying on the materials Defendants submitted—the *Perry* court denied the plaintiffs' motion as moot. Order on Motion to Supplement, No. 13-1053 (D.D.C. Sept. 30, 2014), Doc. 58.

presumably, be in liquidation rather than still be 'immensely profitable.' " Op. 24. The *Perry* court's analysis rests on the false premise that only an act that *completes* the Companies' liquidation could be at odds with FHFA's mission as conservator "to carry on [their] business . . . and preserve and conserve" their assets. 12 U.S.C. § 4617(b)(2)(D). Here, FHFA as "conservator" for Fannie and Freddie has publicly declared that the Companies "will not be building capital as a potential step to regaining their former corporate status,"[6] and it is taking steps to wind down their operations. These are the acts of a *de facto* receiver, and the *Perry* court erred in holding otherwise. Regardless of whether Fannie and Freddie continue to operate and generate profits, the Net Worth Sweep is an unlawful step towards the impermissible end of winding down and liquidating the Companies.

The *Perry* court sought to buttress its conclusion by reasoning that a conservator may undertake "a fluid progression from conservatorship to receivership without violating HERA, and that progression could very well involve a conservator that acknowledges an ultimate goal of liquidation." Op. 25 n.20. But this interpretation of HERA contradicts the long-settled difference between conservatorship and receivership. As discussed above, the Eighth Circuit has explained in the closely related context of FIRREA that "[t]he conservator's mission is to conduct an institution as an ongoing business" and that this mission "stands apart from the strategy of a receiver, whose interest, by definition, is shutting the business down." *CedarMinn*

---

[6] Compl. ¶ 81 (quoting *Oversight of FHFA: Evaluating FHFA as Regulator and Conservator: Hearing Before the S. Comm. on Banking, Hous. & Urban Affairs* at 3, 113th Cong. (Apr. 18, 2013) (statement of Edward J. DeMarco, Acting Director, FHFA)). Observing that "there is no HERA provision that requires a conservator to abide by every public statement it has made," the *Perry* court discounted contemporaneous statements by the Defendants acknowledging that the Net Worth Sweep was a step towards winding down the Companies. Op. 25 n.20. But the significance of such statements is that they reveal that the Defendants themselves understood the Net Worth Sweep to be at odds with the basic mission of a conservator, not that they impermissibly failed to follow through on their stated plans.

*Bldg.*, 956 F.2d at 1454.  To be sure, an unsuccessful conservatorship may ultimately end in receivership and liquidation, but that does not give the pessimistic conservator license to begin winding down the institution before the appointment of a receiver.  The *Perry* court's contrary reading of HERA would lead to the absurd, and lawless, result that FHFA could evade HERA's strict procedural requirements and order of priorities during receivership by winding down the Companies as their conservator.  But HERA specifically instructs FHFA as to how it must go about liquidating the Companies during receivership, and Congress could not have intended for those instructions to be so easily circumvented.  *See* MTD Opp. 46-47.

### 5.  As conservator, FHFA may not make arbitrary and capricious decisions.

The *Perry* court was also wrong to conclude that it lacked jurisdiction under Section 4617(f) to set aside as arbitrary and capricious FHFA's decision to enter into the Net Worth Sweep.  Op. 13-15.  That court's reasoning turned on "a distinction between acting beyond the scope of the constitution or a statute, and acting within the scope of a statute, but doing so arbitrarily and capriciously."  Op. 14 (citation omitted).  But the Supreme Court recognized two Terms ago that no coherent distinction can be drawn between an agency acting unlawfully and an agency acting beyond the scope of its powers.  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869-70 (2013).  Furthermore, neither HERA nor any other statute authorizes FHFA to act arbitrarily so long as it does so as a conservator, and if such a statute existed it would raise serious constitutional concerns where, as here, an arbitrary conservatorship decision results in a deprivation of property.  *See Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).  Courts are bound to read statutes to avoid such constitutional problems where the statutory text readily admits of another interpretation.  *See, e.g.*, *Edward J. Debartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a

statute would raise serious constitutional problems, the Court will construe the statute to avoid

such problems unless such construction is plainly contrary to the intent of Congress."); *United

States v. Security Indus. Bank*, 459 U.S. 70, 78-82 (1982) (construing statute narrowly to avoid

takings difficulty).  Accordingly, because the Net Worth Sweep was arbitrary and capricious, it

was also unlawful and ultra vires.

### B.  HERA's Jurisdictional Bar Does Not Shield Treasury's Unlawful Conduct.

Further compounding the troubling implications of the *Perry* court's ruling that virtually

all of FHFA's acts, no matter how inconsistent with its express statutory mission, are immune

from suits for equitable relief when FHFA purports to act as conservator for an institution

operating profitably, the *Perry* court also held that FHFA effectively can extend that immunity to

the lawless acts of any federal agency—or anyone else—merely by signing a contract.  Op. 15-

16.  Plaintiff has found no other case that has adopted such a broad understanding of what it

means for judicial relief to "restrain or affect" FHFA's exercise of its conservatorship powers,

and the *Perry* court did not cite any.  To be sure, courts have rebuffed efforts "to use the

technical wording of [a] complaint . . . as an end-run around" the jurisdictional bars found in

HERA and FIRREA.  Op. 15-16; *see, e.g.*, *Dittmer Props., LP v. FDIC*, 708 F.3d 1011, 1017-18

(8th Cir. 2013); *Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 707 (1st Cir.

1992); *Hindes v. FDIC*, 137 F.3d 148, 160 (3d Cir. 1998).  But as Plaintiff has previously

explained, such cases invariably involve efforts to force a third party to comply with legal duties

it inherited from a federal conservator or receiver or its charge.  MTD Opp. 53-55.  Here, in

contrast, Plaintiff claims that *Treasury* violated its *own independent* legal obligations under

HERA and the APA when it agreed to the Net Worth Sweep.  These claims cannot be dismissed

as a technical pleading device, for Plaintiff's substantive allegations that Treasury impermissibly

purchased the Companies' securities after 2009 and that it did so arbitrarily and capriciously would not be cognizable if made against FHFA or the Companies.

The *Perry* court's contrary reading of HERA would confer on FHFA as conservator the power to suspend by contract the application of virtually any law to any person.  Congress could not have possibly intended to immunize patently unlawful contractual arrangements, yet the *Perry* opinion would bless them on the basis of little more than a penumbra surrounding the word "affect."

The *Perry* court appeared to recognize one exception to FHFA's general power to approve lawless acts by contract: as conservator, FHFA may not authorize third parties to violate HERA.  *See* Op. 16.  Yet when the court rejected the plaintiffs' claim that Treasury had violated HERA by purchasing additional Fannie and Freddie securities after its authority to do so expired in 2009, it reduced those limits on Treasury's authority to empty formalisms.  *See* 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4); Op. 17-19.  In the *Perry* court's view, so long as Treasury continued to own 1,000 shares of preferred stock in each Company, it was free to agree to fundamentally alter the economic substance of those shares and to invest tens of billions of additional dollars in the Companies after its authority to purchase new securities had expired.  Op. 18-19.  Some changes to a stock are so fundamental as to convert it into a new security for purposes of the securities and tax laws.  *See, e.g.*, *Gelles v. TDA Indus., Inc.*, 44 F.3d 102, 104 (2d Cir. 1994) (new security is created where amendment is "such significant change in the nature of the investment or in the investment risks as to amount to a new investment"); Rev. Rul. 56-654, 1956 WL 10781, at *1 (IRS 1956) (concluding that amendment to preferred stock was "in substance, an exchange of the preferred stock" for new stock where amendment entitled preferred shareholders to dividend payment equal to corporation's entire net worth in the event

16

of redemption); *see also* 26 C.F.R. § 1.1001-3(b) (treating any "significant modification" to a debt security as a sale of the old security).  If HERA's sunset provision is to have any meaning at all, the same must be true here.

**II.     The *Perry* Court's Reading of HERA's Subrogation Provision Contradicts the Uniform Weight of Authority and Leaves Shareholders with No Redress when a Federal Conservator Engages in Self-Dealing.**

The *Perry* court also ruled that Section 4617(b)(2)(A)(i) strips shareholders of their ability to bring derivative actions on behalf of the Companies, even when that means shareholder rights will be vindicated only if FHFA decides to sue itself.  This Court need not decide whether the *Perry* court was correct in holding that only the fox can guard the hen house, for Plaintiff asserts only *direct* claims on behalf of itself, not derivative claims on behalf of the Companies. Although the *Perry* court, in dismissing the claims of both common and preferred shareholders in the Companies, suggested that a fiduciary duty claim similar to Plaintiff's was derivative, Op. 26 n.24, it was incorrect.  As we have explained previously, Plaintiff's common law claims are direct claims, including breach of contract claims where Plaintiff would directly benefit from the relief it requests.  *See* MTD Opp. 62.  Regardless of when common shareholders can bring direct claims, it is clear that preferred shareholders can sue directly for breach of contract.  In any event, even if some of Plaintiff's claims for equitable relief were derivative in nature, it could still pursue them notwithstanding HERA's subrogation provision.

The *Perry* court candidly acknowledged that its reading of HERA conflicts with decisions of the Ninth and Federal Circuits that interpret a materially identical provision of FIRREA—12 U.S.C. § 1821(d)(2)(A)—to allow shareholders to assert derivative claims when the federal receiver has a "manifest conflict of interest."  Op. 28 (discussing *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1295-96 (Fed. Cir. 1999) and *Delta Sav.*

17

*Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001)).  The Third and Sixth Circuits have

likewise suggested that under FIRREA a shareholder can pursue a claim himself if the federal

receiver is "too involved in the alleged wrongdoing to determine fairly whether the claim should

be pursued by the corporation."  *In re Sunshine Secs. Litig.*, 916 F.2d 874, 879 n.5 (3d Cir.

1990); *see American Casualty Co. v. FDIC*, 39 F.3d 633, 636-637 (6th Cir. 1994).  Two federal

trial court decisions interpreting FIRREA reached the same result.  *Suess v. United States*, 33

Fed. Cl. 89, 94-97 (1995); *Branch v. FDIC*, 825 F. Supp. 384, 404 (D. Mass. 1993).  And all of

Defendants' applicable authorities, including the D.C. Circuit decision on which the *Perry* court

purported to rely, have acknowledged that Section 1821(d)(2)(A) may not apply when the

government conservator or receiver has a conflict of interest.  *Kellmer v. Raines*, 674 F.3d 848,

850 (D.C. Cir. 2012) (discussing many of Defendants' cases and observing that "[a]ll of these

courts have found that, *absent a manifest conflict of interest by the conservator* not at issue here,

the statutory language bars shareholder derivative actions" (emphasis added)); *see* MTD Opp.

66-67.  In short, the *Perry* opinion is at odds with every other federal court decision on point,

save the rulings reversed on appeal in *First Hartford* and *Delta Savings Bank*.

Regardless of whether one believes that *First Hartford* and similar cases interpreting 12

U.S.C. § 1821(d)(2)(A) were rightly decided in the first instance, it is beyond cavil that they

represented the federal courts' settled and uniform view when Congress used materially identical

language in HERA in 2008.  The *Perry* opinion overlooked that fact, but it is enormously

significant because Congress is presumed to adopt the accepted judicial interpretation of a statute

when it enacts the same language a second time.  *Lorillard v. Pons*, 434 U.S. 575, 581 (1978);

*Redd v. Federal Land Bank of St. Louis*, 851 F.2d 219, 222 (8th Cir. 1988).  That presumption

deserves extra weight here because Congress so extensively borrowed from FIRREA when it

enacted HERA, reenacting not only Section 1821(d)(2)(A) but most of FIRREA's statutory scheme.  Congress thus made clear that it expected the two statutes to be interpreted *in pari materia*, and in doing so it embraced the existing FIRREA caselaw.

The *Perry* court expressly rejected the uniform body of precedent because it thought the cases inconsistent with the statutory text, which says that as conservator or receiver FHFA "succeed[s] to . . . all rights, titles, powers, and privileges of the [Companies], and of any stockholder."  12 U.S.C. § 4617(b)(2)(A)(i); *see* Op. 28-29.  As a textual matter, however, it is not possible for a conservator to "succeed" to a "right"—here, a cause of action—that did not exist *before* the conservatorship was created and exists now only because of the conservator's post-appointment wrongdoing.  Rather, in this case the shareholders' authority to sue on behalf of the corporation because the conservator has a manifest conflict of interest originates with the conservatorship itself, springing into existence *after* the conservator succeeds to the shareholder's former rights.

In any event, the *Perry* court was mistaken when it suggested that allowing shareholders to sue when the conservator has a manifest conflict of interest would create "an exception [that] would swallow the rule."  Op. 30.  To the contrary, ordinary derivative suits involve a conflict of interest or failure to exercise business judgment on the part of the corporation's directors.  Such suits are entirely the province of the conservator under *First Hartford* and similar cases unless the acts of the conservator *itself* are at issue.  *Kellmer* is illustrative.  In that case, a group of shareholders sued Fannie's directors, and the shareholders were able to maintain their suit derivatively because the directors had an obvious personal interest in the litigation.  FHFA was subsequently appointed Fannie's conservator, and the D.C. Circuit held that as conservator the agency succeeded to the plaintiffs' right to pursue the suit.  *Kellmer*, 674 F.3d at 850-51.

19

Despite a conflict of interest on the part of the *directors* that justified the filing of a derivative action, the D.C. Circuit said that *First Hartford* was inapplicable because there was no allegation that *FHFA* was similarly conflicted.  *Id.* at 850.  As *Kellmer* illustrates, most derivative actions do not involve a conflict of interest on the part of the federal conservator or receiver itself and accordingly do not implicate the *First Hartford* rule.  *See also, e.g.*, *Pareto v. FDIC*, 139 F.3d 696, 701 (9th Cir. 1998); *Lubin v. Skow*, 382 Fed. App'x 866, 870-71 (11th Cir. 2010) (unpublished).

The *Perry* court was also wrong to conclude, as a factual matter, that there is no conflict of interest here.  On the one hand, FHFA has a plain and indisputable conflict of interest with respect to Plaintiff's allegations that FHFA itself violated HERA, as well as its contractual and fiduciary duties, in acquiescing to the Net Worth Sweep.  And even with respect to Plaintiff's allegations that Treasury acted unlawfully, FHFA has a manifest conflict of interest—not only because its entering into the Net Worth Sweep "was the product of a Treasury directive," MTC Order 4, but also because Treasury's unlawful conduct took the form of an illegal agreement *with FHFA*.  Indeed, FHFA could not bring Plaintiff's claims against Treasury without at least tacitly acknowledging its own unlawful actions and attempting to undo a contract it entered into and has vigorously defended.  And regardless of whether "the harsh economic realities facing the GSEs . . . when FHFA and Treasury executed the PSPAs in 2008" could somehow justify suspending the usual application of the *First Hartford* rule, Op. 32, this case concerns events that took place in *2012*—more than four years after the financial crisis, at a time when the Companies were about to report the largest profits in their history.

20

### III.   Plaintiff's Breach of Contract Claims Are Ripe for Review.

The *Perry* court erred yet again in holding that contract claims based on the Net Worth Sweep's breach of contract claims flowing from FHFA's nullification of the plaintiffs' liquidation preference will not be ripe for judicial review until the Companies are actually liquidated.  Op. 33-37.  Under both Supreme Court and Eighth Circuit precedent, a court deciding whether a claim is ripe must consider two factors: (1) "the 'fitness of the issues for judicial decision' "; and (2) " 'the hardship to the parties of withholding court consideration.' " *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967)).  The *Perry* opinion misapplies both prongs of that test.

As to the first prong, the *Perry* court thought the dispute over the plaintiffs' liquidation preference was currently unfit for judicial resolution because Defendants might someday decide to give back the contractual rights that the Net Worth Sweep took away.  Op. 35 ("[J]ust as there was a Third Amendment, the Court cannot definitively say there will be no Fourth or Fifth Amendment . . . .").  But government bodies and officials can *always* change their minds, and speculation that federal officials might reverse themselves after taking final agency action has never been thought sufficient to render a dispute unripe for judicial review—if it were, pre-enforcement suits would *never* be ripe.  *See Sackett v. EPA*, 132 S. Ct. 1367, 1372 (2012); *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 72 n.12 (1980); *Abbott Labs*, 387 U.S. at 151 (noting that dispute is ripe where there was "no hint" that challenged regulation was "informal, or only the ruling of a subordinate official, or tentative" (citations omitted)).  Likewise, the *Perry* court's ripeness analysis would nullify the settled doctrine of contract repudiation, which holds that where one party makes an unequivocal statement committing to a breach in the future that "substantially impairs the value of the contract to the injured party" or commits some act which

21

renders it unable or apparently unable to perform without committing such a breach, the counterparty may "recover damages based on all his remaining rights to performance." *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 608 (2000) (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 243, 250 (1979)); *see Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 674 F. Supp. 2d 562, 567 (D. Del. 2009); RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981).  Defendants have strenuously defended the Third Amendment, which was signed by the heads of two federal agencies and has already profited Treasury to the tune of $130 billion.  They have never suggested that the decisions challenged in this case are tentative or subject to further consideration.  Under these circumstances, the *Perry* court's far-fetched conjecture that Defendants might change their minds does not come close to making this case unfit for judicial review.

The *Perry* court also largely ignored the single most important consideration under *Abbott Labs*: whether, in light of the nature of the parties' dispute, further factual development would assist the Court in resolving it.  *Abbott Labs*, 387 U.S. at 149.  The ripeness requirement is less exacting where the question presented is "predominantly legal," *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983), yet the *Perry* court never explained how future developments could have influenced its resolution of the purely legal contract issues that were before it.  The Supreme Court's decision in *Texas v. United States*, 523 U.S. 296 (1998), on which the *Perry* court relied, does not suggest otherwise.  In that case, Texas asked the courts to opine on the general meaning of a statute that was "better grasped when viewed in light of a particular application."  *Id.* at 301.  Here, Plaintiff is asking this Court to apply basic principles of state contract law to the specific facts presented by the Net Worth

Sweep.  Because future events are highly unlikely to shed further light on whether Plaintiff's legal arguments are correct, this claim is ripe for judicial resolution.

The *Perry* court also erred in its application of the second *Abbott Labs* factor: whether the party seeking judicial review would suffer any hardship from delay.  In considering that factor, the court simply assumed away the injury the plaintiffs suffered in the present from the lost opportunity to receive a liquidation preference in the future.  Op. 34-35.  But binding Eighth Circuit precedent squarely holds that exactly that sort of injury—the loss of a contingent future use of property that precipitates "a reduction in [its] value" in the present—can render a case ripe for review.  *Bob's Home Serv., Inc. v. Warren Cnty.*, 755 F.2d 625, 627-28 (8th Cir. 1985).  In *Vogel v. Foth & Van Dyke Associates*, 266 F.3d 838 (8th Cir. 2001), for example, the plaintiffs sued a landfill operator for announcing that it was considering locating a new landfill next to property the plaintiffs planned to develop.  The Eighth Circuit held that the plaintiffs' claims were ripe despite the defendant's argument that any injury was contingent on a final decision about where to locate the landfill.  The court of appeals explained that the defendant's ripeness argument "misconstrue[d] the nature of the [plaintiffs'] alleged harm," and that a reduction in the present value of the property is a concrete injury for purposes of the ripeness analysis:

> The [plaintiffs] do not assert a contingent harm, but rather a current injury. That is, they do not allege that the landfill, if sited next to their property, might produce harm; they claim the announcement of the neighboring land as a potential site has directly and immediately harmed them by making their property less valuable for development and by driving away potential purchasers. . . . [W]hile the selection of the neighboring property as the final landfill site might increase the [plaintiffs'] alleged damages, it could not further ripen their claim.

*Id.* at 840.  So too here.  The Net Worth Sweep diminished the value of Plaintiff's investment by nullifying its right to a liquidation preference, and Plaintiff should not be

required to wait until the Companies are actually liquidated to vindicate its contractual

rights.[7]

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully submits that the Court should give the

*Perry* court's decision no weight and should deny Defendants' motions to dismiss.

Date: October 20, 2014

Matthew G. Whitaker
Matt M. Dummermuth
Kendra L. Mills Arnold
WHITAKER HAGENOW & GUSTOFF, LLP
400 E. Court Avenue, Suite 346
Des Moines, IA 50309
(515) 284-5001
(515) 864-0963 (facsimile)
mwhitaker@whgllp.com
mdummermuth@whgllp.com
karnold@whgllp.com

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper (*Lead Counsel*)
David H. Thompson
Howard C. Nielson, Jr.
Peter A. Patterson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (facsimile)
ccooper@cooperkirk.com
dthompson@cooperkirk.com
hnielson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com

*ATTORNEYS FOR PLAINTIFF*

---

[7] Of course, even if this Court were to accept the *Perry* court's ripeness analysis, Plaintiff would still have a ripe contract claim that the Net Worth Sweep breached its contract by converting Treasury's senior preferred stock into common stock and then requiring payment of dividends on common stock ahead of Plaintiff's preferred stock.  *See* Compl. ¶¶ 92-93, 144.

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on October 20, 2014, I electronically filed this foregoing with the

Clerk of Court using the ECF system, and to my knowledge a copy of this document will be

served on the parties or attorneys of record by the ECF system.

/s/ Charles J. Cooper
Charles J. Cooper
ATTORNEY FOR PLAINTIFF