IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| | * | |
| CONTINENTAL WESTERN INSURANCE COMPANY, | * | 4:14-cv-00042 |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| THE FEDERAL HOUSING FINANCE AGENCY, in its capacity as Conservator of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, MELVIN L. WATT, in his official capacity as Director of the Federal Housing Finance Agency, and THE DEPARTMENT OF THE TREASURY, | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | ORDER |
| | * | |
| Defendants. | * | |
| | * | |

Before the Court are two Motions to Dismiss and a Supplemental Motion to Dismiss filed

by the Federal Housing Finance Agency ("FHFA"), Melvin L. Watt ("Watt"), and the United

States Department of the Treasury ("Treasury") (collectively "Defendants"). Continental

Western Insurance Company ("Plaintiff" or "Continental Western") filed a complaint against

Defendants on February 5, 2014. Clerk's No. 1. On April 29, 2014, FHFA and Watt filed a

Motion to Dismiss, or in the alternative, a Motion to Transfer or Stay the Action. Clerk's No.

23. Treasury also filed a Motion to Dismiss, or in the alternative, a Motion to Transfer or Stay

the Action. Clerk's No. 24. Plaintiff filed a response to both motions on August 29, 2014.

Clerk's No. 45. On September 29, 2014, FHFA and Watt filed a reply (Clerk's No. 47), as did

Treasury (Clerk's No. 46). Plaintiff filed a supplemental brief in opposition to Defendants'

Motions on October 28, 2014 (Clerk's No. 52); Defendants replied on October 30, 2014 (Clerk's No. 54). Defendants collectively filed a Supplemental Motion to Dismiss on October 30, 2014. Clerk's No. 55. Plaintiff responded on November 17, 2014. Clerk's No. 56. Defendants replied on December 5, 2014. Clerk's No. 62. An oral argument on Defendants' Motions to Dismiss and Supplemental Motion to Dismiss was held on December 16, 2014. Clerk's No. 63. The matters are fully submitted.

## I.   FACTS

Continental Western is an Iowa corporation that owns shares of preferred stock in the Federal National Mortgage Association ("Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie"). Compl. ¶ 31. Fannie and Freddie are government-sponsored entities ("GSEs") that were created by Congress in part to "promote access to mortgage credit throughout the Nation . . . by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financings." 12 U.S.C. § 1716(4). Since their creation, the GSEs have been reorganized as for-profit, stockholder-owned corporations. Compl. ¶ 29.

In 2008, a major economic and housing crisis was occurring in the United States; as a result, the GSEs incurred significant losses to their portfolios. *Id*. ¶¶ 3, 33–34. To address the crisis, Congress passed the Home and Economic Recovery Act of 2008 ("HERA"). *Id*. ¶ 34. HERA created FHFA as an independent agency with power to supervise and regulate Fannie and Freddie. 12 U.S.C. § 4511(b)(2). HERA also authorized FHFA to place the GSEs under conservatorship or receivership. 12 U.S.C. § 4617(2). According to HERA, FHFA as conservator or receiver would "immediately succeed to—(i) all rights, titles, powers, and

privileges of the [GSEs], and of any stockholder, officer, or director of such [GSEs] with respect to the [GSEs] and the assets of the [GSEs]."   12 U.S.C. § 4617(b)(2)(A)(i).   Importantly, HERA also states that "[e]xcept as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator or receiver."   12 U.S.C. § 4617(f).

On September 6, 2008, FHFA exercised its power under HERA and placed the GSEs under conservatorship.   Compl. ¶¶ 35–36.   Shortly thereafter, pursuant to authority granted by HERA, Treasury entered into a Preferred Stock Purchase Agreement ("PSPA") with FHFA.   *Id*. ¶ 6; *see* 12 U.S.C. §§ 1455(l), 1719(g).   Under the PSPA, Treasury committed to provide up to $100 billion to both Fannie and Freddie to ensure that the GSEs maintained a positive net worth. Compl. ¶ 44.   On May 6, 2009, FHFA and Treasury agreed to amend the PSPA and increase Treasury's funding cap to $200 billion.   *Id.* ¶ 52.   On December 24, 2009, FHFA and Treasury again amended the PSPA, this time to allow Fannie and Freddie to draw unlimited sums of money to cure any negative net worth until the end of 2012, at which time Treasury's funding cap would be fixed according to an agreed-upon formula.   *Id.* ¶ 53.

In return for its funding commitment, Treasury received shares of a newly created class of securities, known as Senior Preferred Stock, in both GSEs.   *Id.* ¶ 6.   The stock entitled Treasury to several contractual rights:   (1) a senior liquidation preference over other preferred stock of $1 billion which would increase to match the amount of any funds the GSEs drew from Treasury (*id*. ¶ 46); (2) quarterly dividend payments from the GSEs equal to 10% of Treasury's existing liquidation preference (*id.* ¶ 47); (3) warrants to purchase 79.9% of the common stock of both GSEs (*id.* ¶ 45); and (4) a quarterly periodic commitment fee paid by the GSEs to Treasury

to compensate Treasury's ongoing support (*id.* ¶ 48).

In order to pay Treasury the 10% quarterly dividend required by the PSPA, the GSEs occasionally had to engage in the circular practice of drawing funds from Treasury, which would then be paid directly back to Treasury to meet the dividend obligation ("the circular draws"). Compl. ¶ 55.   On August 17, 2012, Treasury and FHFA entered into a third amendment to the PSPA ("the Third Amendment").   *Id.* ¶ 68.   The Third Amendment, among other things, altered the dividend obligation by eliminating the quarterly 10% dividend payments and instead requiring the GSEs to make quarterly payments to Treasury equal to their total net worth ("the Net Worth Sweep").   *Id.* ¶ 70.   The Net Worth Sweep took effect January 1, 2013, and has been in operation since.   *Id.*   The GSEs returned to profitability in 2012.   *Id.* ¶ 58.

On July 10, 2013, Continental Western's parent company, Berkley Regional Insurance Company ("Berkley"), as well as Berkley's parent company, Berkley Insurance Company (collectively "the Berkley plaintiffs") filed a lawsuit in the United States District Court for the District of Columbia ("the D.C. court").   *See* Clerk's Nos. 23-12, 55-1 at 1–2.   That suit was filed against the same Defendants that are involved in this case, and alleged the same seven claims that Continental Western makes here.   *Compare* Compl. ¶¶ 94–166 *with* Clerk's No. 23-12 at 34–46.   On September 30, 2014, the D.C. court issued an order dismissing the Berkley plaintiffs' claims for lack of subject matter jurisdiction, among other things.   *See Perry Capital, Inc. v. Lew*, ___ F. Supp. 3d. ____, 2014 WL 4829559 (D.D.C. Sept. 30, 2014).   The Berkley plaintiffs appealed the *Perry Capital* order to the District of Columbia Circuit; the appeal is still pending.   *See* Clerk's No. 55-5.

Continental Western filed this suit on February 5, 2014, alleging that FHFA and Treasury

acted outside the statutory authority granted to them by HERA, and that FHFA and Treasury violated the Administrative Procedure Act ("APA").  Compl. ¶¶ 94–136.  Continental Western also asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty against FHFA in its role as conservator of the GSEs.  *Id.* ¶¶ 137–66.  Continental Western requests an order from this Court that, among other things: (1) declares that the actions taken by FHFA and Treasury were arbitrary and capricious and outside the authority granted to them by HERA; (2) vacates the Net Worth Sweep, the circular draws, and any post-2009 payments Treasury made to the GSEs; (3) requires Treasury to return all money obtained in the Net Worth Sweep to the GSEs; (4) enjoins FHFA and Treasury from taking any further action pursuant to the Net Worth Sweep; and (5) awards monetary damages to Continental Western including "contractually-due dividends on the Preferred Stock for each quarter when a dividend based on the net worth of the [GSEs] was paid to Treasury."  *Id.* ¶ 167.

## II.  THE MOTIONS

### A.  *Defendants' Motions to Dismiss or Transfer/Stay the Action*

On April 29, 2014, FHFA and Watt filed a Motion to Dismiss the case for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  Clerk's No. 23 at 1–2. Treasury also filed a Motion to Dismiss on April 29, 2014, which was substantively similar to the motion filed by FHFA and Watt.  *See* Clerk's No. 24.  Defendants assert that HERA bars relief when FHFA, as conservator, is carrying out its statutory powers or functions.  Clerk's Nos. 23-13 at 12; 24-1 at 10; *see* 12 U.S.C. § 4617(f).  Defendants also argue that HERA bars Plaintiff's claims for breach of contract, breach of the implied covenant of good faith and fair

dealing, and breach of fiduciary duty. [1]   Clerk's Nos. 23-13 at 24, 24-1 at 20.

### B. *Defendants' Supplemental Motion to Dismiss*

Defendants collectively filed a Supplemental Motion to Dismiss on October 31, 2014.

Clerk's No. 55.   Defendants argue that the doctrine of issue preclusion applies to this case

because *Perry Capital* already conclusively resolved the same claims asserted herein.

Defendants also argue that although Continental Western was not a party to the *Perry Capital*

litigation, two exceptions to the same-party requirement exist that make preclusion appropriate. [2]

*Id.* at 6–13.

### III.   LAW AND ANALYSIS

### A. *Issue Preclusion*

The doctrine of issue preclusion "bars 'successive litigation of an issue of fact or law

actually litigated and resolved in a valid court determination essential to the prior judgment,'

even if the issue recurs in the context of a different claim."   *Taylor v. Sturgell*, 553 U.S. 880,

892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)).   "To preclude

parties from contesting matters that they have had a full and fair opportunity to litigate protects

---

[1]      In the alternative, Defendants argued that the case should be transferred to the United States District Court for the District of Columbia where *Perry Capital* was litigated.   Clerk's Nos. 23-13 at 31–33, 24-1 at 26–28.   After the order dismissing the Berkley plaintiffs' claims was filed in *Perry Capital*, Defendants withdrew their motion to transfer this case, but retain their alternative motion to stay the action until the *Perry Capital* appeal is resolved.   Clerk's No. 55-1 at 5 n.3, 6.

[2]      Although issue preclusion is an affirmative defense that generally would be considered at the summary judgment or trial phase of a case, the Eighth Circuit has permitted an affirmative defense to be considered as part of a motion to dismiss where the defense is "apparent on the face of the complaint."   *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 763–64 (8th Cir. 2012).   In determining whether the defense is apparent, the Court may also consider public records, and materials embraced by or attached to the complaint.   *Id.*   Here, the complaint and accompanying materials provide a sufficient basis for the Court to rule on the question.

their adversaries from the expense and vexation [of] attending multiple lawsuits, conserves

judicial resources, and fosters reliance on judicial action by minimizing the possibility of

inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153–54 (1979).   Issue

preclusion applies even if a previous decision was decided wrongly, or in error.   *Ginters v.*

*Frazier*, 614 F.3d 822, 826 (8th Cir. 2010).   In the Eighth Circuit, issue preclusion has five

elements:

> (1) the party sought to be precluded in the second suit must have
> been a party, or in privity with a party, to the original lawsuit;
>
> (2) the issue sought to be precluded must be the same as the issue
> involved in the prior action;
>
> (3) the issue sought to be precluded must have been actually
> litigated in the prior action;
>
> (4) the issue sought to be precluded must have been determined by
> a valid and final judgment; and
>
> (5) the determination in the prior action must have been essential
> to the prior judgment.

*Robinette v. Jones*, 476 F.3d 585, 589 (8th Cir. 2007) (quoting *Anderson v. Genuine Parts Co.,*

*Inc.*, 128 F.3d 1267, 1273 (8th Cir. 1997)).   The party asserting preclusion bears the burden to

prove all the necessary elements.   *Taylor*, 553 U.S. at 907.

   1.  *Same party or privity.*

   Defendants argue that even though Continental Western was not a party in *Perry Capital*,

it is in privity with its parent corporation, Berkley, who was a plaintiff in that case.   *See* Clerk's

No. 55-1 at 5.   The Supreme Court has identified several exceptions to the requirement that the

party sought to be precluded in the second suit must have been a party in the first.   *See Taylor*,

553 U.S. at 892–96.   Two are applicable here:   (1) where a nonparty to the first suit was

adequately represented by someone with the same interests; and (2) where the nonparty is the

proxy or agent of a party to the prior litigation.   *See id.*

    a.   *Adequate representation.*

    Defendants first argue that Continental Western was adequately represented by the

Berkley plaintiffs in *Perry Capital*.

> A party's representation of a nonparty is 'adequate' for preclusion
> purposes only if, at a minimum:  (1) the interests of the nonparty
> and her representative are aligned . . . ; and (2) either the party
> understood herself to be acting in a representative capacity or the
> original court took care to protect the interests of the nonparty.

*Taylor*, 553 U.S. at 900.   Additionally, adequate representation may require that the nonparty

had notice of the original suit.   *Id.*   These requirements protect the due process rights of the

nonparty, and ensure that nonparty preclusion will not be expanded such that it becomes, "in

effect, a common-law kind of class action."   *Id.* at 901.

    As to the first factor, it is clear that the interests of Continental Western are aligned with

those of the Berkley plaintiffs.   The complaint in *Perry Capital* makes the same seven claims

and seeks essentially the same relief that Continental Western seeks here.   *Compare* Compl.

*with* Clerk's No. 23-12 (*Perry Capital* Compl.).   Specifically, the Berkley plaintiffs and

Continental Western both seek, among other things, a declaration that FHFA and Treasury acted

outside the power granted to them by HERA when they agreed to the Net Worth Sweep, and

both ask the respective district courts to vacate and set aside the Net Worth Sweep.   *See* Compl.

at 54–55; Clerk's No. 23-12 at 46–47.   Both the Berkley plaintiffs and Continental Western

claim that the Net Worth Sweep "essentially eliminated the dividend and liquidation preference

rights associated with [each Plaintiff's] Preferred Stock."   Compl. at 53; Clerk's No. 23-12 at

46.   In addition, the Berkley plaintiffs and Continental Western are co-plaintiffs in another action filed in the Court of Federal Claims where they assert that the same government action challenged here amounted to an illegal taking of their property.   *See* Clerk's No. 84-1 at 6–7.

As to the second factor, Continental Western disputes that the Berkley plaintiffs understood themselves to be acting in a representative capacity or that the court in *Perry Capital* took care to protect Continental Western's interests.   Continental Western cites *Yankton Sioux Tribe v. United States Department of Health and Human Services*, 533 F.3d 634 (8th Cir. 2008), for the proposition that there must be explicit evidence that the original plaintiff was suing in a representative capacity.   Hr'g Tr. at 88.   In *Yankton Sioux*, an individual tribe member sought judicial review of the United States Indian Health Service's decision to close an emergency room.   533 F.3d at 637.   The Eighth Circuit concluded that the case was properly dismissed on preclusion grounds because the complaint of a similar suit filed several years earlier specifically stated that "[p]laintiff Yankton Sioux Tribe brings this complaint on its own behalf *and on behalf of its individual members*."   *Id.* at 641 (emphasis added).   Importantly, although the evidence of adequate representation was explicit in *Yankton*, nowhere in the opinion does the Eighth Circuit state that explicit evidence is required.

The Court likewise finds no "explicit evidence" requirement in *Taylor's* discussion of the adequate representation exception, which focuses on two prior Supreme Court cases.   *See* 553 U.S. at 896–97.   First, in *Richards v. Jefferson County, Alabama*, the Supreme Court concluded that individual taxpayers challenging an occupation tax were not adequately represented in a previous suit challenging the same law brought by the city of Birmingham.   517 U.S. 793, 805 (1996).   There, the Court explained that there was no reason to conclude that the court in the

original action "took care to protect the interests of [the subsequent plaintiffs]," nor was "there

any reason to suppose that the [original plaintiffs] understood their suit to be on behalf of absent

county taxpayers."   *Id*. at 802.   The Court concluded that the original and subsequent plaintiffs

were "best described as mere 'strangers' to one another," because the original plaintiffs had not

"provided representation sufficient to make up for the fact that petitioners neither participated in

. . . nor had the opportunity to participate in, the [original case]."   *Id*.   Additionally, the

*Richards* Court was persuaded by the fact that the original plaintiffs failed to provide the

subsequent plaintiffs "with any notice that a suit was pending which would conclusively resolve

their legal rights."   *Id*. at 799.   The Court went on to explain that "[t]hat failure is troubling

because . . . the right to be heard ensured by the guarantee of due process 'has little reality or

worth unless one is informed that the matter is pending and can choose for himself whether to

appear or default, acquiesce or contest.'"   *Id*. (quoting *Mullane v. Cent. Hanover Bank & Trust

Co.*, 339 U.S. 306, 314 (1950)).

   The second case, *South Central Bell Telephone Company v. Alabama*, similarly held that

a lawsuit filed by a corporation challenging Alabama's franchise tax was not barred on

preclusion grounds where a different corporation had previously challenged the same law.   526

U.S. 160, 168 (1999).   There, the Court noted that the cases "involve different plaintiffs and

different tax years."   *Id*. at 167.   They further explained that neither case was "a class action,

and no one claimed that there was 'privity' or some other special relationship between the two

sets of plaintiffs."   *Id*. at 167–68.   The Court concluded that the fact the subsequent plaintiffs

knew of the earlier suit and utilized one of the same attorneys "created no special

representational relationship."   *Id*. at 168.

This case is distinguishable from both *Richards* and *South Central*.   The Berkley plaintiffs and Continental Western, as parent company and wholly owned subsidiary, are far from "mere strangers."   *See Richards*, 517 U.S. at 802.   Further, although there is no explicit evidence in the pleadings of *Perry Capital* that shows the Berkley plaintiffs were suing in a representative capacity on behalf of Continental Western, the factual circumstances surrounding *Perry Capital* and this case allow such a conclusion.   On the day the Berkley plaintiffs filed suit in *Perry Capital*, they sold a portion of their stock in the GSEs to Continental Western.   Hr'g Tr. at 40.   That stock is the basis for Continental Western's claims in this case.   *See* Compl. ¶ 31.   Continental Western is wholly owned by Berkley, and both parties are represented by the same counsel.   *See* Clerk's No. 14 at 2.   Berkley and Continental Western make the same seven claims and seek nearly identical relief.   *See* Compl. at 54–55; Clerk's No. 23-12 at 46–47. Berkley and Continental Western are also co-plaintiffs in a case filed in the Federal Court of Claims seeking damages for the same government action that was challenged in *Perry Capital* and this case.   *See* Clerk's No. 64-1.

In sum, the Berkley plaintiffs must have understood themselves to be acting in a representative capacity on behalf of Continental Western considering their identical interests, the simultaneous nature of the stock sale, and the shared Court of Claims case.   Those facts indicate that both companies were equally involved in the subject matter of the litigation.   *See Doe v. Urohealth Sys., Inc.*, 216 F.3d 157, 162 (2000) (stating in a products liability case that there was "little doubt" a court would treat a judgment in favor of a parent company as resolving an identical claim against its wholly owned subsidiary where the two corporations had identical interests and both had involvement with the product at issue).   Continental Western also had, at

the very least, constructive notice of the *Perry Capital* litigation because it was represented by the same counsel as the Berkley plaintiffs.  *See Taylor*, 553 U.S. at 900 (identifying notice as a potential factor to consider for the adequate representation exception).  The shared case in the Court of Claims strongly suggests that Continental Western could have joined with the Berkley plaintiffs in *Perry Capital* as well, but did not.  *See Richards*, 517 U.S. at 802 (concluding that preclusion was inappropriate where the plaintiffs did not have the opportunity to participate in the first action).

The Court is also not persuaded by Continental Western's claim that Defendants' arguments in favor of preclusion "mimic the virtual representation theory that *Taylor* rejected." Clerk's No. 56 at 8.  In *Taylor*, the plaintiffs in the two lawsuits "[had] no legal relationship," and there was no evidence that the second plaintiff "controlled, financed, participated in, or even had notice of [the] earlier suit."  553 U.S. at 885.  *Taylor* rejected the Government's argument in that case that nonparty preclusion based on virtual representation should apply when "'the relationship between a party and non-party is 'close enough' to bring the second litigant within the judgment.'"  *Id*. at 898.  *Taylor* expressed concern that adopting the expansive doctrine of virtual representation would remove procedural protections for litigants and instead authorize preclusion based only on similar interests between plaintiffs with "some kind" of relationship. *Id*. at 900.  Here, the parties have identical interests, a legal relationship, and the evidence shows that Berkley understood itself to be acting in a representative capacity on behalf of its wholly owned subsidiary, Continental Western, in the first suit.  The *Taylor* Court rightly rejected the notion that preclusion could apply to two plaintiffs who were legal and actual strangers to one another—this is not such a case.  Defendants have proven that all of the

adequate representation factors have been met.

    b.  *Proxy or agent.*

Defendants also argue that Continental Western was acting as Berkley's proxy or agent when filing this lawsuit.   The Supreme Court has warned that "courts should be cautious about finding preclusion on this basis."   *Taylor*, 553 U.S. at 906.   The showing required to prove that a nonparty is a "litigating agent for a party to the earlier case" has never been established.   *Id.* But "[a] mere whiff of 'tactical maneuvering' will not suffice; instead . . . preclusion is appropriate only if the putative agent's conduct of the suit is subject to the control of the party who is bound by the prior adjudication."   *Id.* (citing Restatement (Second) of Agency § 14, p. 60 (1975)).

*Taylor* cites *United States v. Des Moines Valley Railroad Company*, 84 F. 40 (8th Cir. 1897), as one example of the proxy exception.   553 U.S. at 899–900.   There, the Eighth Circuit held that the United States had no real interest in the case, and had only lent its name to a plaintiff who had already lost two similar cases in state court.   84 F. at 44.   The court concluded that:

> where the government lends its name as a plaintiff in a suit . . .
> merely to enable one private person to maintain a suit against
> another in its name, a court of equity will hold the nominal
> plaintiff . . . subject to the same defenses which exist and might be
> pleaded as against the real party in interest, if he were suing in his
> own name.

*Id.* at 43.   Continental Western argues that this case "bears no resemblance" to *Des Moines Valley*. [3]   *See* Clerk's No. 56 at 16.   But *Taylor* acknowledged that *Des Moines Valley* may not

---

[3]    Continental Western also argues that this case is distinguishable from *Montana*, 440 U.S. at 155, where the Supreme Court precluded the United States from challenging a Montana law in federal court when the United States had already controlled litigation brought by a different

be a perfect example of the proxy exception because it is "debatable" whether the real party in interest and the United States had any sort of agency relationship.   553 U.S. at 900 n.10.   What *Taylor* does make clear is that the hallmark of the proxy exception rests with principles of agency law and, most importantly, whether the second plaintiff is subject to the control of the plaintiff in the first case.   *See* 553 U.S. at 906.

Continental Western argues that the sole fact that it is wholly owned by Berkley is not enough, by itself, to establish that the requisite control exists.   Hr'g Tr. at 88.   The Court acknowledges that "[t]he parent-subsidiary relationship does not of itself establish privity." 18A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure Jurisdiction* § 4460 (2d ed. 2014).   However, the fact that Berkley is the sole owner of Continental Western remains a valid consideration for the Court.   As counsel for Treasury observed at the motion hearing, it is difficult to understand the argument that a corporation with 100% ownership of its subsidiary does not have the right to control that subsidiary.   *See* Hr'g Tr. at 108–09.   The Restatement (Second) of Judgments § 59 comment e (1982) recognizes that it is proper to allow preclusion when the two plaintiffs have such a legal relationship:

> "[f]or the purpose of affording opportunity for a day in court on issues contested in litigation . . . there is no good reason why a closely held corporation and its owners should ordinarily be regarded as legally distinct.   On the contrary, it may be presumed that their interests coincide and that one opportunity to litigate issues that concern them in common should sufficiently protect both."[4]

plaintiff challenging the same law in state court.   The Court finds Continental Western's argument unpersuasive.   The key issue in *Montana*, as here, is control—although the evidence of control in this case is different than the evidence in *Montana*, it is still more than sufficient for the Court to conclude that the proxy exception applies, as explained *infra*.

[4]     Importantly, the Supreme Court cited the Restatement (Second) of Judgments §§ 39–62 with approval, as an example of how "[t]he established grounds for nonparty preclusion could be

As noted above, in addition to their corporate relationship, Berkley and Continental Western share the same counsel, advance nearly identical claims seeking the same relief, and are co-plaintiffs in other litigation challenging the same government action.   Berkley sold Continental Western the shares in the GSEs that formed the basis for Continental Western's lawsuit on the same day Berkley filed suit in *Perry Capital*.   All of these facts support the conclusion that Continental Western's litigation strategy was subject to the control of the Berkley plaintiffs.

Continental Western also claims that the Government is making a "*sub silentio* effort to pierce the corporate veil," and argues that allowing preclusion in this case would "ignor[e] the corporate form" and permit the Court to "see a single entity where the law commands that it see two."   Clerk's No. 56 at 16.   But Continental Western's argument conflates the two distinct legal concepts of piercing the corporate veil and issue preclusion.   *See Aetna Cas. & Sur. Co. of Hartford, Conn. v. Kerr-McGee Chem. Corp.*, 875 F.2d 1252, 1258 (7th Cir. 1989) (concluding that "[t]he preclusive effect of a prior decision for or against the [parent corporation] does not depend on a finding that the [subsidiary] is the [parent corporation's] 'alter ego,' such that 'piercing the corporate veil' for all purposes would be appropriate.").   The nonparty preclusion analysis does not require the Court to decide whether the two plaintiffs are identical, but rather whether the relationship between the two plaintiffs is sufficient for the Court to conclude the due process rights of the second plaintiff will not be harmed.   *See Taylor*, 553 U.S. at 891 ("The federal common law of preclusion is, of course, subject to due process limitations.").   The unique legal relationship of a wholly owned subsidiary and its parent corporation is thus a highly

organized differently."   *Taylor*, 553 U.S. at 893 n.6.

relevant factor when determining whether nonparty preclusion applies. *See Doe*, 216 F.3d at 162 ("A further factor supporting determination of privity here is that the companies are parent and wholly owned subsidiary.").

Continental Western also argues that there is no evidence that it engaged in "tactical maneuvering" with the Berkley plaintiffs because this case was filed while *Perry Capital* was still pending—not after the order granting Defendants' motions to dismiss and for summary judgment in that case. Hr'g Tr. at 91–92. But counsel for Continental Western agrees that the "key issue [for the proxy exception] is control." Hr'g Tr. at 88. As discussed, the facts of the case show that the requisite control exists here, regardless of the motives involved in filing this suit. Thus, Defendants have offered enough evidence to show that the proxy exception applies.[5]

2.     *Same issues.*

A comparison of the Berkley plaintiffs' complaint in *Perry Capital* and Continental Western's complaint in this case reveals that all seven asserted claims are identical: (1) FHFA's conduct exceeded its statutory authority under HERA; (2) FHFA's conduct was arbitrary and capricious in violation of the APA; (3) Treasury's conduct exceeded its statutory authority under HERA; (4) Treasury's conduct was arbitrary and capricious in violation of the APA; (5) breach of contract against FHFA as conservator; (6) breach of the implied covenant of good faith and fair dealing against FHFA as conservator; and (7) breach of fiduciary duty against FHFA as conservator. Clerk's No. 23-12 at 34–46; Compl. ¶¶ 94–166.

---

[5]     The Court notes that it does not conclude that *every* parent-subsidiary relationship gives rise to nonparty preclusion under the adequate representation and proxy exceptions, only that the circumstances of this case warrant such a conclusion. In addition, because the Court concludes that both the adequate representation and proxy exceptions apply in this case, it is not necessary to reach Defendants' argument related to the derivative nature of some of Continental Western's claims.

Nonetheless, Continental Western argues that its complaint presents two unique issues that were not litigated in *Perry Capital*, and thus cannot be dismissed on the basis of issue preclusion.   Hr'g Tr. at 84.   These issues arise under claims (1) and (3)—that FHFA and Treasury acted outside the scope of the authority granted to them by HERA.   *See* Compl. ¶¶ 103, 117.   First, Continental Western argues that Treasury's investments in the GSEs postdating December 31, 2009, violated the sunset provision of HERA that eliminated Treasury's right to purchase new securities in the GSEs after that date.   *Id*.   Second, Continental Western argues that the practice of making circular draws in order to pay Treasury the 10% quarterly dividends required under the original PSPA exceeded FHFA's authority under HERA.   *Id*.

The Court concludes that Continental Western cannot establish that either of the arguments are unique, because they are merely different bases for arguing the same claims that were already made in *Perry Capital*—that FHFA and Treasury exceeded their authority under HERA.   The actions challenged by Continental Western occurred *before* the Third Amendment was adopted, thus it cannot be said that the arguments were unavailable to the Berkley plaintiffs. *See Third Nat'l Bank v. Stone*, 174 U.S. 432 (1899) (concluding that preclusion is inappropriate when circumstances have changed because "[a] question cannot be held to have been adjudged before an issue on the subject could possibly have arisen").

The "mere assertion of a different ground" to reach the same outcome "does not bar application of issue preclusion because it is reasonable to require a party to bring forward all evidence in support of its argument in the initial proceeding."   *Simmons v. Small Bus. Admin.*, 475 F.3d 1372, 1374 (Fed. Cir. 2007) (internal quotation and citation omitted); *see also* 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure Jurisdiction* § 4416 (2d

ed. 2014) (stating that issue preclusion "cannot be avoided by offering in admissible form evidence that was excluded from the first action") (citing *Yamaha Corp. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (explaining that "once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case"); *Jones v. United States*, 466 F.2d 131, 136 (10th Cir. 1972) (stating that evidence that "is not the result of a different factual situation or changed circumstances" cannot work to overcome the application of issue preclusion); *Cory v. Comm'r of Internal Revenue*, 159 F.2d 391, 392 (3d Cir. 1947) ("[T]he parties are not entitled to have a question considered on its merits a second time merely because they failed to produce all the facts the first time.")).   This is consistent with "[t]he underlying goal of issue preclusion" which "is to promote judicial economy and finality in litigation."   *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 758 (8th Cir. 2003).

Here, the ultimate issue—whether FHFA and Treasury exceeded the statutory authority granted to them by HERA—has already been decided by *Perry Capital*; Continental Western merely sets forth two additional arguments related to the same ultimate issue that could have been argued in the first case.   *See* Restatement (Second) of Judgments § 27 cmt. c (1982) (explaining that in determining whether an issue is properly precluded the Court should consider whether there is "substantial overlap" between the argument in the second proceeding and that in the first and whether discovery in the first action reasonably could have been expected to embrace the argument made in the second proceeding). Thus, these allegedly new issues can be properly precluded, in addition to Continental Western's remaining claims which are undisputedly identical to those raised in *Perry Capital*.

3.      *Remaining elements – issues actually litigated, valid and final judgment, essential to judgment.*

There is no dispute that the remaining elements of issue preclusion are satisfied. Although *Perry Capital* has been appealed, it is still "valid and final" for purposes of an issue preclusion analysis.   *See In re Ewing*, 852 F.2d 1057, 1060 (8th Cir. 1988) ("It is well established in the federal courts that the pendency of an appeal does not diminish the *res judicata* effect of a judgment rendered by a federal court.") (internal quotation and citations omitted).   It is also undisputed that, apart from the two allegedly new issues, the issues raised by Continental Western in this case were actually litigated and essential to the *Perry Capital* decision.   *See Ginters*, 614 F.3d at 826 (concluding that the determination of subject matter jurisdiction was essential to a prior judgment because "jurisdiction is a threshold question and must be answered before all other questions").   Accordingly, Continental Western's complaint must be dismissed on the basis of issue preclusion.[6]   *See Taylor*, 553 U.S. at 892 (stating that "successive litigation

---

[6]      The Court notes that even if it were to reach the merits of Continental Western's claims, including the allegedly new claims, it would agree with the well-reasoned opinion of the very able Judge Lamberth in *Perry Capital* that the case must be dismissed.   Specifically the Court agrees that:   (1) FHFA and Treasury did not act outside the power granted to them by HERA (*see Perry Capital*, 2014 WL 4829559 at *8–12); (2) HERA bars Continental Western's claims under the APA (*see id*. at *7); (3) Continental Western's claims for monetary damages based on a breach of contract and breach of the implied covenant of good faith and fair dealing against FHFA must be dismissed because they are not ripe and because Continental Western's shares of the GSEs do not contractually guarantee them a right to dividends (*see id*. at *15–19); and (4) Continental Western's claim for breach of fiduciary duty by FHFA is barred by HERA because it is a derivative claim and HERA grants all shareholder rights, including the right to bring a derivative suit, to FHFA (*see id*. at *13–15).   The Court shares in Judge Lamberth's observation that "[i]t is understandable for the Third Amendment, which sweeps nearly all GSE profits to Treasury, to raise eyebrows, or even engender a feeling of discomfort."   *Perry Capital*, 2014 WL 4829559 at *24.   But it is not the role of this Court to wade into the merits or motives of FHFA and Treasury's actions—rather the Court is limited to reviewing those actions on their face and determining if they were permissible under the authority granted by HERA.

of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment" is "bar[red]").

## IV.  CONCLUSION

Defendants' Supplemental Motion to Dismiss Continental Western's complaint on the basis of issue preclusion (Clerk's No. 55) is GRANTED.   The remaining Motions to Dismiss filed by FHFA (Clerk's No. 23) and Treasury (Clerk's No. 24) are DENIED as moot based on the Court's decision.

IT IS SO ORDERED.

Dated this ___3rd___ day of February, 2015.

ROBERT W. PRATT, Judge
U.S. DISTRICT COURT